**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JAMES BLEDSOE, et al., on be-
half of themselves and all others
similarly situated,

          Plaintiffs,

    v.

FCA US LLC, a Delaware corpo-
ration, and CUMMINS INC., an
Indiana corporation,

          Defendants.

Case No. 4:16-cv-14024
Hon. Terrence G. Berg

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS WITHOUT PREJUDICE (Dkts. 26, 27)

### I.    Introduction

Plaintiffs in this proposed putative class action allege that Defend-
ant FCA's 2007-2012 Dodge Ram 2500 and 3500 diesel trucks (the
"Trucks" or "Affected Vehicles"), equipped with 6.7-liter Turbo Diesel en-
gines manufactured by Defendant Cummins Inc., emit nitrogen oxides
("NOx") at levels in excess of federal and state emissions standards. The
Complaint alleges violations of the Racketeer Influenced and Corrupt Or-
ganizations Act ("RICO Act"), the Magnuson Moss Warranty Act
("MMWA"), as well as claims asserted under the respective laws of 49
states and the District of Columbia. Plaintiffs allege that Defendants

marketed the Trucks as containing "clean diesel engines," while they discharged emissions at levels greater than what a reasonable customer would expect based on the alleged representations. Defendants have moved for dismissal of Plaintiffs' Complaint, which Plaintiffs oppose.

Plaintiffs seek to bring claims on behalf of themselves and a nationwide class of all persons or entities in the United States who, as of November 1, 2016, owned or leased the following Trucks:

1. 2007-2010 Dodge Ram 2500 and 3500 with Cummins diesel (2WD, 4WD)
2. 2011-2012 Dodge Ram 2500 and 3500 with Cummins diesel (non-SCR systems, 2WD, 4WD).

Plaintiffs also seek to establish sub-classes representing owners and/or lessees of the Trucks in every state and the District of Columbia, alleging deceptive advertising, breach of contract, and fraudulent concealment claims under the laws of those respective states.

Pending before the Court are Defendants' motions to dismiss plaintiffs' Consolidated and Amended Class Action Complaint ("Amended Complaint" or "Complaint") pursuant, in part, to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons outlined below, Defendants' motions are **GRANTED WITHOUT PREJUDICE.**

## II.    Background

The United States Environmental Protection Agency ("EPA") promulgates emissions standards and regulations for manufacturers of diesel engines. Plaintiffs' Complaint maintains that diesel engines, unlike their

gasoline counterparts, generate power by compressing a mist of liquid fuel and air to very high temperatures and pressures, causing the mixture to spontaneously combust. *See* Dkt. 22, Pg. ID 1540. One by-product of this diesel combustion process is the creation of oxides of nitrogen ("NOx"), which include a variety of nitrogen and oxygen chemical compounds that only form at high temperatures. *Id.* NOx emissions have been the target of EPA regulation, for the pollutant and harmful nature of nitrogen oxides is well documented.[1]

In January 2001, the EPA issued the "2010 NOx standard," requiring NOx emissions from heavy-duty diesel engines be reduced by 95 percent—to .20 grams of NOx per horsepower-hour—by no later than 2010. *See* 66 Fed.Reg. 5,002 (Jan. 18, 2001). The EPA exercised authority pursuant to Section 202 of the Clean Air Act ("CAA") in enacting this new standard. As one court explained, "[b]y delaying the effective date until 2010, [the] EPA gave [the] industry nine years to innovate the necessary new technologies." *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 89 (D.C. Cir. 2012).

The named Plaintiffs in this case are 15 alleged purchasers or lessees of model year 2007-2012 Dodge Ram 2500 and 3500 heavy-duty trucks equipped with Defendant Cummins' 6.7-liter turbo diesel engines. Defendant Fiat Chrysler Automobiles LLC ("FCA") is a motor vehicle

---

[1] Plaintiffs' Complaint alleges that NOx is a toxic pollutant that contributes to nitrogen dioxide, particulate matter in the air and certain health problems. *See* Dkt. 22, Pg. ID 1541 at ¶ 54.

manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. Dkt. 22, Pg. ID 1537. Plaintiffs allege that FCA sells and leases the vehicles it manufactures, including the Trucks at issue in this case, through FCA franchise dealerships. Dkt. 22, Pg. ID 1538. Defendant Cummins Inc. is a Fortune 500 company that designs, manufactures, and distributes engines, filtration, and power generation products. Dkt. 22, Pg. IDs 1538-39. Cummins Inc. manufactured the diesel engines for the Trucks at issue in this case.

The Complaint alleges that each Plaintiff is similarly situated. Each purchased or leased a 2007-2012 model year Dodge Ram 2500 or 3500. These trucks were allegedly:

> [E]quipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean Diesel," and at many multiples of that allowed by federal law.

*See, e.g.*, Dkt. 22, Pg. ID 1510 at ¶ 27. Throughout their Complaint, Plaintiffs allege that Defendants installed "defeat devices" in the Trucks, which resulted in significantly increased emissions when tested during normal driving as compared to when tested in laboratory settings.[2]

---

[2] *See, e.g.,* Dkt. 22, Pg. ID 1598 at ¶¶ 181-183; 1607 at ¶ 216; 1610 at ¶ 227; and 1611 at ¶ 228-29. The Complaint does not explicitly define "defeat device." However, Plaintiffs do reference defeat devices in the Complaint that were identified by the EPA in a similar case. *See* Dkt. 22, Pg. ID 1503 at ¶ 8. The Court therefore interprets the Complaint's use of the term "defeat device" to refer to a device "that cause[s] the vehicle to perform effectively when being tested for compliance, and

According to the Complaint, Plaintiffs tested one 2012 Dodge Ram 2500, the results of which allegedly show that the vehicle emitted emissions at amounts greater than those permitted by federal and state regulations, higher than its "gasoline engine counterpart," higher than what a reasonable consumer would expect, and higher than levels set for vehicles to obtain certificates of compliance. Dkt. 22, Pg. ID 1505. In addition to the emissions test, Plaintiffs support their allegations by pointing to the existence of a purported "worldwide emissions scandal," unrelated regulatory enforcement actions directed at other vehicles manufactured by FCA, and prior regulatory enforcement taken against Cummins for problems with other engines. Plaintiffs contend that these facts give rise to a plausible inference that FCA and Cummins engaged in the alleged "Emissions Fraud Enterprise," where they created, marketed, and sold to consumers Trucks with defective emissions systems or with defeat devices installed in them. According to Plaintiffs, this defeat device allow the vehicles to perform in such a way to "pass" emissions testing when tested, but allow the Trucks to operate differently (emitting emissions as a much higher level) during actual on-road performance.

The consolidated amended Complaint includes two claims brought on behalf of a proposed nationwide class of claimants. The first alleges that the Defendants violated the RICO Act. Dkt 22, Pg. IDs 1586-1601.

---

then reduce[s] the effectiveness of the emissions control system during normal operation and use." *See id.*

The second alleges that the Defendants violated the Magnuson Moss Warranty Act. Dkt. 22, Pg. IDs 1601-04. The Complaint contains additional state law claims arising under the fraudulent concealment and consumer protection laws of 49 states and the District of Columbia. *See generally* Dkt. 22.

Defendants have separately moved for dismissal pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(1) and 12(b)(6). Dkts. 26, 27.

## III.  Standard of Review

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim is plausible on its face if the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atlantic Corp. v. Twombly* 550 U.S. 544, 556 (2007). Plausibility is not the same as probability, but rather "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* While plaintiffs are not required to provide "detailed factual allegations," Rule 8 of the Federal Rules of Civil Procedure demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

The first step in assessing the validity of a 12(b)(6) motion to dismiss is to identify any conclusory allegations contained in the complaint.

*Iqbal*, 556 U.S. at 679. Although the Court must accept well-pleaded factual allegations of the complaint as true at the motion to dismiss stage, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a plausible claim for relief]." *Id.* "A plaintiff's obligation to provide the grounds of [his] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

After assuming the truth of all well-pleaded factual allegations, the second step is for the Court to determine whether the complaint pleads "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678-79 (citing *Twombly*, 550 U.S. at 556). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. In other words, "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. A "plausibility" determination is a context-specific task that requires the reviewing court to draw on its judicial expertise and common sense. *See Iqbal,* 556 U.S. at 679.

## IV.  Analysis

Defendants' motions to dismiss call upon this Court to answer the critical question of "how much is enough"—how much factual matter

must be pleaded to move the allegations advanced in Plaintiffs' Complaint across the line from "conceivable" to "plausible." As noted above, although the Court must accept all well-pleaded facts as true, conclusory allegations are not entitled to the same assumption of truth. *See Iqbal*, 556 U.S. at 678; *see also Eidson v. Tennessee Dept. of Children's Services*, 510 F.3d 631 (6th Cir. 2007) ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice [to state a plausible claim for relief].") (internal citations omitted). The Sixth Circuit has explained:

> [A] plaintiff cannot overcome a Rule 12(b)(6) motion to dismiss simply by referring to conclusory allegations in the complaint that the defendant violated the law. Instead, the sufficiency of a complaint turns on its "factual content," requiring the plaintiff to plead enough "factual matter" to raise a "plausible" inference of wrongdoing. The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct.

*16630 Southfield Ltd. P'Ship v. Flagstar Bank, F.S.B.,* 727 F.3d 502, 504 (citing *Iqbal,* 556 U.S. at 678, 682-83 and *Twombly,* 550 U.S. at 567).

Thus, to determine whether the Complaint states a plausible claim for relief, the Court must identify and weigh the *well-pleaded* factual matter contained in Plaintiffs' Complaint, while not accept-

ing as true any *conclusory* allegations or inferences that are not sufficiently supported by well-pleaded facts. The Court thus first turns to the factual matters alleged in Plaintiffs' Complaint.

## A. Plaintiffs' Purported Factual Allegations

At the heart of Plaintiffs' case is the allegation that while 2007-2012 model year Dodge Ram 2500 and 3500 heavy duty trucks were marketed as "clean diesel" vehicles that complied with federal and state emissions standards and offered customers the "strongest, cleanest quietest best-in-class engine on the market," the Trucks in reality were anything but clean diesel vehicles. Plaintiffs argue that the Trucks produce emissions in quantities substantially higher than what Defendants allegedly advertised and at amounts greater than those permitted by federal and state regulations. Plaintiffs also allege Defendants manufactured the Vehicles to include "defeat devices" that alter the Trucks' performance so that, when tested under regulatory testing conditions they perform within the range of compliance, but during normal on-road use they do not.

Plaintiffs rely on a set of four purported factual allegations to support their claims: 1) the results of portable emission measurement system ("PEMS") testing conducted on a 2012 Dodge Ram 2500; 2) the existence of a worldwide emissions scandal; 3) the EPA's on-going regulatory enforcement action concerning model year 2014-2016 Dodge Ram 1500 and Jeep Grand Cherokee EcoDiesel vehicles; and 4) the history of regulatory enforcement involving other Cummins engines.

### i.  The Test

Plaintiffs aver to have conducted testing on one 2012 Dodge Ram 2500 using a PEMS. *See* Dkt. 22, Pg. IDs 1567-69. According to the Complaint, the results show that the vehicle produced a very high level of NOx emissions. Specifically, the Complaint states:

> Testing was performed on a 2012 Dodge Ram 2500 powered by a Cummins 6.7 diesel engine using a portable emission measurement system (PEMS). The vehicle had accumulated approximately 70,000 miles at the time of testing. The results showed the vehicle does not meet the relevant emissions standards as follows: During on-road testing designed to simulate the driving profile of the Federal Test Procedure (FTP) certification cycle, emissions were found to be 702 mg/mile on average, 2.5 times the federal and California standard of 200 mg/mile. Over significant distances, emissions were found to be as high as 1,100 to 2,800 mg/mile for periods lasting as long as 21% of the total drive time. That is 5.5 to 14 times the relevant standard. During on-road PEMS testing designed to simulate the driving profile of the Highway certification cycle, average emissions were found to be 756 mg/mile, or 1.9 times the California (and Section 177 state) standard. Over significant distances, emissions were found to be as high as 1,200 to 2,250 mg/mile for periods lasting as long as 16% of the total drive time. That equates to 3.0 to 5.6 times the relevant standard.

Dkt. 22, Pg. ID 1567-68 at ¶ 124.

Marshalling the PEMS results, the Complaint states, "The excess emissions are believed to result from excessive DPF [diesel particulate filter] active regeneration in combination with deactivated NOx adsorber catalyst. The need for excessive DPF regeneration

events and lower overall activity of the NOx adsorber catalyst also lead to increased fuel consumption and shortened engine component life." Dkt. 22, Pg. ID 1568 at ¶ 126.

Plaintiffs contend that the PEMS results support a reasonable inference that Defendants' engaged in fraudulent concealment and deceptive conduct regarding the true nature of the Trucks' emissions systems. *See, e.g.,* Dkt. 34, Pg. ID 4854. According to Plaintiffs, these results show that the vehicle produced emissions significantly higher than the amounts: 1) allowed by applicable EPA standards, 2) emitted by the diesel engine's "gas counterparts" 3) expected by a reasonable consumer from a 'clean diesel engine,' and 4) set for vehicles to obtain federal Certificates of Compliance (COCs). *See id*.

### ii. The alleged "worldwide emissions scandal"

In addition to its testing of one vehicle, Plaintiffs cite to a purported "worldwide emissions scandal" as factual support for their claims against Defendants. Dkt. 22, Pg. IDs 1560-64. Plaintiffs' Complaint begins by postulating, "[t]he world is besieged by a scandal involving tens of millions of diesel cars that violate relevant emissions standards and were sold under false pretenses that they were 'clean' or 'cleaner than gas vehicles,' or environmentally friendly." Dkt. 22, Pg. ID 1500 at ¶ 1. According to Plaintiffs, vehicles made by a variety of manufacturers emit significantly more pollutants on real world trips than they do when undergoing

laboratory tests. *See* Dkt. 22, Pg. ID 1560. The inclusion of "defeat devices" by manufacturers in these other cases hide the true nature of the vehicles' emissions performance from laboratory testers during the regulatory compliance process, and ultimately from customers as well. *See* Dkt. 22, Pg. IDs 1560-63.

To support the existence of this alleged worldwide scandal, Plaintiffs cite to the Volkswagen Emissions Scandal, where the EPA issued a Notice of Violation of the Clean Air Act to Volkswagen Group of America (in addition to related Volkswagen entities) for installing defeat devices in 2009-2015 model year Volkswagen and Audi diesel cars equipped with 2.0 liter diesel engines. Dkt. 22, Pg. IDs 1501-02. Volkswagen AG was eventually charged with participating in a criminal conspiracy to: 1) defraud the United States and VW's U.S. customers, 2) violate the Clean Air Act by lying and misleading the EPA and U.S. customers about whether certain diesel vehicles complied with U.S. emissions standards, and 3) circumvent the U.S. testing process by employing cheating software and concealing material facts about its cheating from U.S. Regulators.[3] Volkswagen AG plead guilty to these charges. *See id.* After providing commentary on the Volkswagen Emissions Scandal and the purported worldwide emissions scandal, Plaintiffs state "scientific literature and reports and testing indicate that *most* of the [diesel vehicles that

---

[3] *See* U.S. Dep't of Justice Press Release (January 11, 2017), *available at* *https://www.justice.gov/opa/pr/volkswagen-ag-agrees-plead-guilty-and-pay-43-billion-criminal-and-civil-penalties-six*.

manufacturers call 'clean diesel'] emit far more pollution on the road than in lab tests." Dkt. 22, Pg. IDs 1560-61 at ¶ 109 (emphasis added).

Plaintiffs argue that the Volkswagen Scandal provides evidence to support a reasonable inference that the Affected Vehicles in this action contain emissions systems that turn off or limit their emissions reduction system during normal driving conditions and emit pollutants at many times the level a reasonable consumer would expect from a "clean diesel" engine *See, e.g.,* Dkt. 22, Pg. ID 1523 at ¶ 34. Stating that "VW was not the only manufacturer of vehicles that exceed emissions standards," Plaintiffs cite to investigations and studies from the U.K. and Europe that have tested vehicles manufactured by a variety of manufacturers finding that the tested vehicles emitted significantly more NOx on real world trips than during laboratory testing. Dkt. 22, Pg. ID 1560-63. However, Plaintiffs specifically note that these referenced studies did not evaluate vehicles manufactured by FCA, much less the Trucks at issue in this case. *See* Dkt. 22, Pg. IDs 1560-63; Dkt. 34, Pg. ID 4787 ("Although FCA vehicles were not tested in the study, it nevertheless reveals a persistent problem with diesel engines generally.").

### iii. Facts alleged regarding FCA's Dodge Ram 1500 and Jeep Grand Cherokee EcoDiesel vehicles

Plaintiffs also allege that an enforcement action related to other vehicles manufactured by FCA provides evidence that the claims asserted against the Defendants in this case are sufficient to withstand a motion

to dismiss. The Complaint points to a January 12, 2017 Notice of Violation issued by the EPA against Fiat Chrysler Automobiles N.V. and FCA US LLC. *See* Dkt. 22, Pg. ID 1563. There, the EPA indicated FCA N.V. and FCA US "fail[ed] to justify or disclose defeat devices in model year 2014-2016 Dodge Ram 1500 EcoDiesel and 2014-2016 Jeep Grand Cherokee EcoDiesel vehicles." *Id.* (citing Dkt. 22, Exhibit 30). Plaintiffs maintain that the EPA tested these vehicles and identified that they contained several Auxiliary Emissions Control Devices (AECDs) that "appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emissions standards during the Federal emission test procedure . . . than in normal operation and use." *Id.*

The Department of Justice, on behalf of the EPA, filed a civil complaint against FCA US LLC, Fiat Chrysler Automobiles and others, alleging that FCA equipped over 100,000 Ram 1500 and Jeep Grand Cherokee Vehicles (Model Years 2014-2016) with software-based features that were not disclosed in FCA's applications for certificates of compliance. *See United States v. FCA et al.,* 17-cv-11633, ECF 1, Pg. ID 23 (E.D. Mich. 2017). These undisclosed software features, according to the DOJ, lessen the effectiveness of the vehicles' emissions control systems during certain normal driving situations, resulting in vehicles that meet emission standards in the laboratory and during standard EPA testing, but emit pollutants at rates much higher than the EPA-compliant level during certain

normal on-road driving. *See id.* Notably, these vehicles were manufactured with engines from VM Italy and VM North America, not Cummins engines. *Id.* at 5, ¶ 11.

### iv. Facts alleged regarding history of regulatory enforcement directed at Cummins

Plaintiffs also argue that the claims advanced against the Defendants are plausible because Cummins has allegedly engaged in the sort of behavior alleged against it in the Complaint in the past. *See* Dkt. 22, Pg. ID 1546. Plaintiffs allege that in 1998 the Department of Justice sued every diesel manufacturer in the United States, including Cummins, for installing defeat devices on their engines. Dkt. 22, Pg. ID 1546 at ¶ 63. Plaintiffs state that "Cummins continued to manufacture engines without adequate pollution control equipment through 2006, for which it would pay an additional $2.1 million settlement with the DOJ in 2010." *Id.* at ¶ 64 (citing Dkt. 22, Exhibit 29). Citing the 1998 and 2010 regulatory enforcement activity, Plaintiffs argue the Complaint alleges a plausible claim that Cummins and FCA defrauded consumers as alleged in this case "because they have done it before." Dkt. 34, Pg. ID 4788.

### B. Allegations in the Complaint that are Conclusions and Allegations that are Well-Pleaded Factual Allegations

In *Iqbal,* the Supreme Court explained:

A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint,

they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and determine whether they plausible give rise to an entitlement to relief.

*Iqbal*, 556 U.S. at 679. When "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (citing Fed. R. Civ. Pro. 8(a)(2)).

Guided by the principles set forth in *Twombly* and *Iqbal* regarding Rule 8's construction and requirements, this Court concludes that Plaintiffs' Complaint has not "nudged [their] claims . . . across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570. As explained in more detail below, the Complaint lacks sufficient well-pleaded facts that allow this Court to draw a reasonable inference that the results from Plaintiffs' PEMS testing of one vehicle plausibly shows the presence of a defeat device, a defect in the tested truck, or a defect that exists in the "Affected Vehicles." Because the Complaint lacks such well-pleaded factual matter regarding an alleged defect in the Trucks, an alleged defeat device in the Trucks, or any plausible inferences of the misconduct alleged, Plaintiffs have not shown that there exists an injury in fact to confer standing for this action.

### i. Allegations in the Complaint that are conclusions and therefore not entitled to an assumption of truth

As in *Iqbal*, we begin our analysis by identifying the allegations in the Complaint that are not entitled to an assumption of truth. At a very

basic level, the Complaint alleges that Plaintiffs purchased or leased a product that operates differently from that which they believed (or were led to believe) they were purchasing or leasing. The Complaint advances a number of common allegations related to each named plaintiff, including:

- At the time the vehicle was purchased [or leased], it was *equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions* and emitted pollutants at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law;

- The Defendants *engaged in unfair, unlawful, and deceptive conduct* in designing, manufacturing, marketing, selling, and leasing the Affected Vehicles without proper emission controls;

- The Defendants *knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions*, but did not disclose such facts or their effects to the plaintiff;

- Plaintiff purchased or leased the vehicle by *being misled or defrauded by defendants that the vehicle was a "clean diesel,"* that it complied with United States emissions standards and that it would retain all of its operating characteristics throughout its useful life, including high fuel economy;

*See* Dkt. 22, Pg. IDs 1510-36 (emphasis added).

Furthermore, throughout the Complaint, Plaintiffs classify or refer to the Trucks as "defective,"[4] "illegal,"[5] having defective emissions control devices and a defective NOx absorber,[6] and include over a hundred references to a "defeat device" allegedly present in the affected vehicles.[7]

While Rule 8 does not require detailed factual allegations, it demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678. A complaint offering mere "labels and conclusions" and tendering "naked assertions" devoid of "further factual enhancement" will not do. *See id. Twombly* and its progeny show that a Plaintiff cannot overcome a 12(b)(6) motion to dismiss by simply referring to conclusory allegations in the complaint that the defendant violated the law. *See 16630 Southfield Ltd. P'Ship.*, 727 F.3d at 504. Judged by these requirements, Plaintiffs' Complaint falls short in providing "further factual enhancement" to the above-cited conclusory allegations that the "Affected Vehicles" suffer from a defect or contain a defeat device.

First, Plaintiffs' Complaint lacks well-pleaded factual allegations that the PEMS results plausibly show that the tested truck contains a defeat device or a defective emissions control system. At most, the Complaint states a conclusory allegation regarding the results: that they are "believed to result from excessive [diesel particulate filter ("DPF")] active

---

[4] *See, e.g.,* Dkt. 22, Pg. IDs 1507 at ¶ 18; 1607 at ¶ 216.

[5] *See, e.g.,* Dkt. 22, Pg. ID 1600 at ¶ 188(a).

[6] *See* Dkt. 22, Pg. IDs 1507 at ¶ 18; 1606 at ¶ 209.

[7] *See, e.g.,* Dkt. 22, Pg. IDs 1598 at ¶¶ 181-183; 1607 at ¶ 216; 1610 at ¶ 227; and 1611 at ¶ 228-29.

regeneration in combination with deactivated NOx adsorber catalyst."
Dkt. 22, Pg. ID 1568 at ¶ 126 (emphasis added). While Plaintiffs' Complaint alleges that the DPF system used to trap particulate matter must be "monitored and controlled" by the engine control unit ("ECU"), *see id.* at 1567, ¶ 123, Plaintiffs plead no facts to support a reasonable inference that their conclusory allegation is correct—i.e. that the PEMS results are attributable to a defect in the DPF system or a defeat device that monitors and controls the DPF active regeneration cycle. Nor does the Complaint include any further facts to support Plaintiffs' belief that the NOx adsorber catalyst is defective or is ever deactivated, as Plaintiffs' conclusory allegation also hypothesizes.

The lack of well-pleaded allegations of fact in the Complaint showing the existence of a defect or the presence of a defeat device in the tested vehicle (and by extension the "Affected Vehicles"), based on the alleged results of Plaintiffs' PEMS testing, may be demonstrated by comparing the conclusory allegations of the instant Complaint with factual allegations found to be satisfactory in other cases similar to the one currently before the Court.

*In re Duramax Litigation*, No. 17-CV-11661, 2018 WL 949856 (E.D. Mich. Feb. 20, 2018) concerned a complaint filed against General Motors LLC, Robert Bosch GmBH, and Robert Bosch LLC ("Bosch") involving 2011-2016 model year Silverado and Sierra 2500 and 3500 diesel trucks. In *Duramax*, plaintiffs advanced claims similar to those in this case.

Namely, that emissions testing revealed the diesel trucks "emit levels of NOx many times higher than (i) their gasoline counterparts, (ii) what a reasonable consumer would expect, (iii) what GM had advertised, (iv) the Environmental Protection Agency's maximum standards, and (v) the levels set for the vehicles to obtain a certification of compliance that allows them to be sold in the United States." *See id.* at *2 (internal citations omitted). Also like the Plaintiffs here, the *Duramax* plaintiffs conducted a PEMS test on a vehicle that was within the model and year range of the purportedly defective vehicles. *See id.*

A close look at the *Duramax* complaint—which survived the defendants' motions to dismiss—shows that the complaint included more facts than merely alleging the results of plaintiffs' PEMS testing followed by a conclusory allegation about those results. Rather, the complaint identified that the trucks at issue were manufactured with a particular electronic control module called the "Bosch EDC17." *See Duramax,* No. 17-CV11661, ECF 18, Pg. ID 1020 (Plaintiffs' First Amended and Consolidated Complaint). It alleged that this EDC17 unit "is a good enabler for manufacturers to employ defeat devices" for particular reasons, and that this same unit had been used in other vehicles found or alleged to have been manipulating emissions in the United States. *Id.* at Pg. ID 901. The complaint explicitly alleged that "further testing demonstrates that GM—enabled by Bosch's EDC17—employs three defeat devices" in the

trucks. *Id.* at Pg. ID 968. Adding further factual content about the identified defeat devices' operation, the complaint alleged:

> Defeat Device No. 1 reduces or derates the emissions system when temperatures are above the emissions certification test range (86°F)

> Defeat Device No. 2 operates to reduce emissions control when temperatures are below the emissions certification low temperature range (68°F).

> Defeat Device No. 3 reduces the level of emissions controls after 200-500 seconds of steady speed operation in all temperature windows, causing emissions to increase on average of a factor of 4.5.

*See Duramax*, 2018 WL 949856 at *2 (citing ECF 18 at Pg. ID. 894.). Plaintiffs' complaint also included several pages detailing facts about how the PEMS test results reflected the various operations of the identified defeat devices and the Defendants' alleged manipulation of the identified EDC17 system. In the court's order addressing the alleged injury suffered by the plaintiffs, the court was able to conclude, "EDC17 is the means by which Plaintiffs were injured." *Duramax,* at *27.

Plaintiffs here refer to *United States v. FCA US LLC*, No. 2:17-cv-11633, *complaint filed*, 2017 WL 2242762 (E.D. Mich. May 23, 2017), a case filed by the Department of Justice on behalf of the EPA against FCA in relation to the 2013-2016 Dodge Ram 1500 and Jeep Grand Cherokee EcoDiesel vehicles. As in *Duramax*, in the DOJ's case the "EPA identified eight specific devices that cause the vehicle to perform effectively when being tested for compliance, and then reduce the effectiveness of the

21

emissions control system during normal operation and use." Dkt. 22, Pg. ID 1503 (internal citations omitted). Indeed, in that case the government alleged:

> When the Subject Vehicles are operating outside the parameters of the Federal Emission Tests, [Auxiliary Emission Control Devices ("AECDs")] installed on or in the Subject Vehicles cause the emission control system to underperform or shut off.
>
> During Normal Vehicle Operation outside of the parameters of the Federal Emission Tests, the Subject Vehicles' [electronic control modules ("ECM")] functions and calibrations cause a reduction in the effectiveness of the emission control system, including the engine control system and the aftertreatment control system, resulting in increased NOx emissions.

*See United States v. FCA US LLC*, 17-cv-11633, ECF. 1, Pg. ID 23, ¶ 105 (E.D. Mich. 2017).

The government's complaint went on to identify the eight AECDs that had been found through testing and alleged that those devices "individually, or in combination . . . have a principal effect of bypassing, defeating, or rendering inoperative engine control systems and/or aftertreatment control systems installed in the Subject Vehicles." *Id*. at ¶¶ 106-22.

Unlike in *Duramax* and *United States v. FCA,* Plaintiffs here allege no facts about the Truck in question, or the Affected Vehicles writ large—apart from their PEMS testing results—to plausibly show the presence of a defeat device or that the trucks are defectively manufactured. While the allegations in Plaintiffs' Complaint may be accepted

for the factual proposition that the *tested* vehicle—during the testing in question—produced emissions at levels shown by the test results, plaintiffs offer no well-pleaded factual content for the court to accept as true that:

1. the truck in question had a defective emissions control system or contains a defeat device, which allows the truck to produce low emissions and perform a certain way when tested in a laboratory setting, but differently under normal driving conditions;

2. the "Affected Vehicles" are subject to the same performance characteristics as those observed in the tested vehicle; and

3. the "Affected Vehicles" contain a defeat device or defective emissions control system.

Thus, Plaintiffs' allegations of the presence of a defect or a defeat device in the identified vehicles, based on results of their PEMS testing on a single Truck, are conclusory; they are not founded on specific allegations of fact. The court may not accept as true Plaintiffs' conclusory allegations regarding the performance of vehicles generally (other than the one tested) and the presence of defeat devices or a defective emissions system in any of the vehicles.

## ii. Allegations of well-pleaded factual matter in the Complaint

We next consider the well-pleaded factual allegations in the Complaint to determine if they plausibly make a case for relief.

The Complaint contains three subject areas of alleged facts outside of the PEMS results: 1) a purported "worldwide emissions scandal," 2) enforcement actions involving the Dodge Ram 1500 and Jeep Grand

Cherokee EcoDiesel vehicles, and 3) past enforcement actions involving different Cummins engines. Examining these allegations, it becomes clear that they do not allow a plausible inference that the Defendants are liable for the misconduct alleged in the Complaint. Again, in conducting this examination, it is helpful to consider and compare factual allegations from similar cases raising almost identical claims where courts have found that such inferences may be plausibly drawn.

In *Counts v. General Motors*, 237 F.Supp.3d 572 (E.D. Mich. 2017), buyers of Chevy Cruze cars equipped with a diesel engine brought suit against General Motors alleging deceptive advertising, breach of contract, and fraudulent concealment claims under the laws of thirty states. As in our case, the plaintiffs in *Counts* alleged that GM installed a "defeat device" in the 2014 model year Chevrolet Cruze Diesel, which allegedly caused higher emissions when the vehicle was in actual use compared to when it was being tested in laboratory conditions. *Id.* at 577. Like our Plaintiffs, the complainants in *Counts* alleged to have tested a Chevy Cruze Diesel using a PEMS, and found that emissions were significantly higher than GM represented. *Id.* at 595-96.

Unlike our case, however, in *Counts* the plaintiffs did not rely solely upon their own PEMS testing results. The plaintiffs alleged that six European agencies from four countries tested and found that other GM similar vehicles were noncompliant with European regulations, despite meeting those regulations when tested in laboratory settings. *See id.* at

577-78. Although the vehicles tested by the European authorities were different GM models, the plaintiffs asserted that the tested vehicles shared common engine designs with the subject vehicles. *See id.* at 584. The Court found that the factual allegations in plaintiffs' complaint were sufficient to show a plausible injury-in-fact, stating:

> Here, Plaintiffs have referenced and described multiple studies which found that GM vehicles that share engine technology with the Cruze produce significantly higher emissions than represented. That is enough to raise a plausible allegation that GM's promises of "Clean Diesel" and "90% less nitrogen oxide and particulate emissions" were deceptive.

*Id.* at 583-84. Thus, *Counts* presents a case where plaintiffs alleged—and the court relied upon—factual allegations regarding test results and findings made by other entities in support of the conclusions drawn from plaintiffs' own testing. *See id.* at 596 ("The uniformity of the European testing and its consistency with Plaintiffs' own testing suffices to allege, with particularity, that the Cruze produces emissions at a level significantly higher than a reasonable consumer would expect.").

Also instructive is *In re Mercedes-Benz Emissions Litigation*, 2016 WL 7106020 (D.N.J. Dec. 6, 2016). There, a class of consumers alleged that Defendants misled them into purchasing certain "BlueTec Clean Diesel" vehicles by misrepresenting the environmental impact of the vehicles during on-road driving. *Id.* Plaintiffs alleged Defendants promoted the vehicles as having high fuel economy, low emissions, 90% reduced

NOx, lower emissions than comparable diesel vehicles, and lower emissions than other comparable vehicles. *Id.* at \*1. In support of its allegations that Defendants programmed its vehicles to turn off or otherwise limit the effectiveness of the emissions reduction systems during real-world driving, the court explained that "[p]laintiffs cite to (1) on-road testing of the vehicles, which appear to have been conducted by Plaintiffs' experts; (2) tests conducted by foreign entities; and (3) Defendants' alleged admissions [that the vehicles had an engine management unit containing a shut-off device that stop NOx cleaning under certain conditions] (which Defendants deny)." *See id.* at \*5 (internal citations omitted). The court found that the plaintiffs had adequately alleged an injury in fact because the totality of the allegations amounted to plaintiffs having "plausibly pled that the products received did not live up to the claims made by Defendants." *Id.* at \*4, \*5.

Thus, in both *Counts* and *In re Mercedes-Benz*, courts evaluating whether the pleaded facts supported a plausible inference of the claims relied not only the plaintiffs' own testing, but also on tests and studies by other entities. In holding that the plaintiffs sufficiently alleged GM engaged in deceptive behavior in *Counts,* the court explained the importance of plaintiffs' own testing *in conjunction with* the detailed factual allegations describing numerous studies and reports from European authorities, finding that GM vehicles are noncompliant with European emission regulations, despite meeting those regulations when tested in

laboratory settings. *Counts,* 237 F.Supp.3d at 583, 596. Similarly, the *In re Mercedes-Benz* court found plaintiffs' allegations sufficient to support their claims that the vehicles did not live up to defendants' representations, citing in part the tests alleged by plaintiffs to have been conducted by foreign entities. *In re Mercedes-Benz,* 2016 WL 7106020 at *5 (but dismissing plaintiffs' complaint without prejudice on other grounds).

The facts alleged in the instant action are much different than those deemed sufficient in *Counts* and *In re Mercedes-Benz.* Plaintiffs here rely solely on the results of their own testing. Unlike in *Counts* and *Mercedes-Benz,* here Plaintiffs allege no other studies or tests indicating that the Affected Vehicles perform consistent with the results of Plaintiffs testing. Nor do Plaintiffs cite any tests of vehicles substantially similar in engine design to the "Affected Vehicles" that support their claims. Standing alone, Plaintiffs' PEMS results from one tested vehicle do not raise a plausible inference of wrongdoing because they do not "permit the court to infer more than the mere possibility" that the Affected Vehicles perform as alleged by Plaintiffs. *See Iqbal,* 556 U.S. at 679.

Nor do Plaintiffs' factual allegations surrounding the currently-pending enforcement action involving the Dodge Ram 1500 and Jeep Grand Cherokee EcoDiesel vehicles provide much, if any, support to nudge Plaintiffs' claims from "conceivable" to "plausible." The Court recognizes that the additional factual allegations in *Counts* alleging European testing and results pertained to GM vehicles other than the ones at

issue in the lawsuit. But in *Counts,* plaintiffs explained that the GM vehicles about which corroborative European test results were alleged, "share[d] common designs, including engines," which made it plausible that those test results also applied to the plaintiffs' vehicles. *See Counts,* 237 F.Supp.3d at 583. Plaintiffs allege no such links between the Dodge Ram 1500 and Jeep Grand Cherokee EcoDiesel vehicles and the Trucks at issue in the current action. Indeed, those vehicles had engines manufactured, imported and sold by VM Italy and VM North America.

From the standpoint of plausibility, Plaintiffs' reliance on allegations of past enforcement actions directed at Defendant Cummins is equally unavailing. While Plaintiffs allege Cummins has previously been fined for regulatory noncompliance issues, Plaintiffs do not allege that those past regulatory issues concerned engines, exhaust control systems, or other relevant shared technology with the Cummins engine at issue in this action. If anything, Plaintiffs' Complaint contains facts showing the uniqueness of the 6.2L Cummins diesel engine used in the Affected Vehicles. Moreover, the fine against Cummins in 2010 was for shipping "more than 570,000 heavy duty diesel engines to vehicle equipment manufacturers nationwide *without pollution control equipment*" from between 1998 and 2006. *See* Dkt. 22, Exhibit 12. The allegations in the Complaint are quite different.

Consequently, for the reasons described above, the Court finds that the well-pleaded facts in Plaintiffs' Amended Consolidated Complaint fail

to raise a plausible inference of wrongdoing—namely, that the alleged "Affected Vehicles":

1. perform in a manner consistent with the Plaintiffs' PEMS results; or

2. were manufactured by Defendants with a defective emissions system or with a defeat device installed in them.

The Court makes the above findings with a full appreciation of Rule 8(a)(2), which provides that a pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief. The Court must follow the Supreme Court's guidance in *Twombly* to levy its "judicial experience and common sense" in construing Rule 8's requirements. *See Twombly,* 550 F.3d at 570. Particularly in light of decisions from cases with claims similar to the ones alleged here, it is clear that Plaintiffs' Complaint lacks sufficient well-pleaded factual content necessary to "nudge [its] claims across the line from conceivable to plausible." *Twombly*, 550 at 570.

### C. Plaintiffs' Complaint Fails to Plausibly Allege an Injury-in-Fact to Confer Standing for this Action

Federal courts have limited jurisdiction and are permitted to adjudicate "cases" and "controversies" only as allowed under Article III of the Constitution. *See* U.S. Const., Art. III, § 2. Courts must resolve questions of subject matter jurisdiction before ruling on the merits of a particular claim. *Gross v. Houghland*, 712 F.2d 1034, 1036 (6th Cir. 1983). Accord-

ingly, where a plaintiff has no Article III standing to bring a case, jurisdiction is lacking and the court must dismiss it. *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 622 (6th Cir. 2000). To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Lujan v. Defs. Of Wildlife,* 504 U.S. 555, 560-61 (1992). An "injury in fact" occurs when a plaintiff has suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560 (internal citations omitted).

Plaintiffs' Complaint sets forth a myriad of alleged injuries that are claimed to have resulted from Defendants' conduct. These injuries include, but are not limited to, the purchase or lease of an allegedly illegal and defective class vehicle, overpayment for an Affected Vehicle, owning a class vehicle whose resale value has or will diminish, and a number of out of pocket losses. *See, e.g.,* Dkt. 22, Pg. ID 1600. However, all of Plaintiffs' purported injuries hinge on the Complaint's conclusory allegations that the Defendants defrauded or misled consumers because the "Affected Vehicles" perform in a manner consistent with Plaintiffs' PEMS testing results, contain a defective emission control system, contain a "defective device," and/or contain defeat devices. That is to say, Plaintiffs' alleged injuries are all based upon allegations that the Court must disre-

gard as conclusory, or upon inferences from the well-pleaded facts contained in the Complaint the Court has found implausible. Because the Complaint does not allege sufficient well-pleaded facts to raise a plausible inference of wrongdoing, Plaintiffs have not sufficiently identified an injury in fact to confer standing for this action. *See Lujan*, 504 U.S. at 560-61. Accordingly, the Court must dismiss Plaintiffs' claims.

## V.    Conclusion

For the foregoing reasons, Defendants' motions to dismiss Plaintiffs' Amended Consolidated Complaint (Dkts. 26, 27) are **GRANTED**. Plaintiffs' Amended Consolidated Complaint is hereby **DISMISSED WITHOUT PREJUDICE.** The Court grants Plaintiffs forty-five [45] days to amend their Complaint, and Defendants may file any responsive pleading within twenty-eight [28] days thereafter.

**SO ORDERED.**

Dated:  March 29, 2018    s/Terrence G. Berg
                          TERRENCE G. BERG
                          UNITED STATES DISTRICT JUDGE

### Certificate of Service

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on March 29, 2018.

s/A. Chubb
Case Manager