UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JAMES BLEDSOE, PAUL CHOUFFET, MARTIN RIVAS, JEREMY PERDUE, MICHAEL ERBEN, MARTIN WITBERG, MARTY WARD, ALAN STRANGE, JAMES FORSHAW, MATT LANGWORTHY, NATALIE BEIGHT, JORDAN HOUGO, DAWN ROBERTS, AND MARC GANZ, on behalf of themselves and all others similarly situated, | Case No. 4:16-cv-14024<br><br>Hon. Terrence G. Berg<br>Magistrate Judge R. Steven Whalen<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| FCA US LLC, a Delaware corporation, and CUMMINS INC., an Indiana corporation, | |
| Defendants. | |

**SECOND CONSOLIDATED AND AMENDED
CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................1

II.    JURISDICTION AND VENUE.................................................................16

III.   PARTIES ..........................................................................................17

    A.     Plaintiffs ..................................................................................17

        1.     California Plaintiff ................................................................18

            a.     James Bledsoe............................................................18

        2.     Illinois Plaintiffs.................................................................20

            a.     Dawn Roberts ............................................................20

            b.     Marc Ganz .................................................................22

        3.     Michigan Plaintiff ...............................................................24

            a.     Matt Langworthy ........................................................24

        4.     Minnesota Plaintiff ..............................................................26

            a.     Jordan Hougo.............................................................26

        5.     Montana Plaintiff ................................................................28

            a.     Michael Erben............................................................28

        6.     New Mexico Plaintiff ...........................................................30

            a.     Marty Ward................................................................30

        7.     North Carolina Plaintiff .......................................................32

            a.     Jeremy Perdue............................................................32

        8.     South Carolina Plaintiff .......................................................34

            a.     James Forshaw............................................................34

010649-11 1032740 V1

9.     Tennessee Plaintiff ..................................................36

     a.     Martin Witberg ............................................36

10.    Texas Plaintiffs .....................................................38

     a.     Natalie Beight .............................................38

     b.     Martin Rivas ...............................................40

     c.     Paul Chouffet ..............................................42

11.    Washington Plaintiff .............................................44

     a.     Alan Strange ...............................................44

B.     Defendants.............................................................47

     1.     FCA US LLC ........................................................47

     2.     Cummins Inc. .......................................................48

IV.    FACTUAL ALLEGATIONS ...................................................49

A.     The environmental challenges posed by diesel engines and the U.S. regulatory response thereto ........................................49

B.     Both the Ram 2500 and 3500 share a common engine......................55

C.     The Cummins engine and certification approach were unique...........57

     1.     Injection timing and in-cylinder controls...................................59

     2.     Exhaust Gas Recirculation (EGR) ...........................................60

     3.     Diesel Oxidation Catalyst (DOC) ...........................................61

     4.     NOx Adsorber Catalyst (NAC)...............................................62

     5.     Diesel Particulate Filter (DPF)................................................62

     6.     Integrated aftertreatment configuration ....................................64

010649-11 1032740 V1

D.      Sales of 6.7L engines for the Dodge Ram 2500 and 3500 gave
        Cummins a competitive advantage in the heavy-duty engine
        market. .................................................................................. 66

E.      EPA standards for light duty vehicles and Cummins' use of
        energy credits .......................................................................... 69

F.      Dodge and Cummins jointly develop and promote the Polluting
        Vehicles with statements about emissions and cleanliness
        because each knew these issues were material to a reasonable
        consumer. ................................................................................ 72

        1.      Cummins ........................................................................ 73

        2.      FCA promotes reduced emissions and clean diesel ................ 78

                a.      2008 brochure for Ram 2500/3500 trucks ...................... 78

                b.      2009 brochure for Ram 2500/3500 trucks ...................... 80

                c.      2010 brochure for Ram 2500/3500 trucks ...................... 81

                d.      2011 brochure for Ram 2500/3500 trucks ...................... 81

                e.      2012 brochure for Ram 2500/3500 trucks ...................... 82

G.      FCA's other emissions deception ............................................. 83

H.      Testing of the vehicles ............................................................ 86

        1.      Emission test cycles and emission standards ........................... 86

        2.      Vehicle testing methodology ....................................... 92

        3.      PEMS testing is reliable and accurate ....................................... 93

I.      Overview of testing conducted by Plaintiffs ..................................... 101

        1.      Dynamometer testing ............................................................. 101

        2.      FTP-75 results for 2012 Dodge Ram ...................................... 102

        3.      PEMS testing ..................................................................... 102

        4.      Stop-and-go overall results ................................................. 103

- iii -

5.     Effect of active regeneration ....................................................107

6.     On-road FTP-75 results...........................................................111

7.     2012 FTP-75 PEMs results .....................................................111

8.     Cold start results.....................................................................112

9.     Hot start results ......................................................................113

10.    Highway results.......................................................................114

11.    Flat road steady speed testing ................................................119

12.    Effect of hills...........................................................................122

13.    Additional testing of Ram trucks ...........................................130

J.     The environmental damage ..............................................................132

1.     Economic harm specifically alleged here ..............................136

K.     The FCA-Cummins scheme is just the latest in a worldwide diesel emissions cheating scandal that adds plausibility to the allegations here as virtually all diesel manufacturers are falsely advertising their vehicles and were unable to meet U.S. emissions standards. ..........................................................................137

L.     Plaintiffs' testing methodology is supported by their testing of other vehicles and third parties confirming either expressly or implicitly their work or arriving at the similar conclusions..............141

V.    TOLLING OF THE STATUTE OF LIMITATIONS ..................................142

A.     Discovery rule tolling.......................................................................142

B.     Fraudulent concealment tolling........................................................143

C.     Estoppel ............................................................................................144

VI.   CLASS ALLEGATIONS ...........................................................................145

A.     Claims brought on behalf of the Nationwide Class ..........................155

COUNT I  VIOLATION OF 18 U.S.C. § 1962(C)–(D): THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")..................................................................................155

    1.    The Emission Fraud Enterprise................................156

    2.    Mail and Wire Fraud...............................................161

COUNT II  VIOLATIONS OF 15 U.S.C. § 2301 *ET SEQ.* THE MAGNUSON-MOSS WARRANTY ACT ("MMWA")..........................170

B.    Claims Brought on Behalf of the Michigan Subclass.......................173

COUNT I  VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT  (MICH. COMP. LAWS § 445.903 *ET SEQ.*) .........173

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MICHIGAN LAW)..................................................................178

COUNT III  BREACH OF CONTRACT (BASED ON MICHIGAN LAW) ......186

C.    Claims Brought on Behalf of the California Subclass.....................187

COUNT I  VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)..................................................................187

COUNT II  VIOLATIONS OF THE CALIFORNIA CONSUMER  LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750 *ET SEQ.*)...........................192

COUNT III  VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*)..................................................................198

COUNT IV  BREACH OF CONTRACT  (BASED ON CALIFORNIA LAW)..................................................................200

COUNT V  FRAUDULENT CONCEALMENT (BASED ON CALIFORNIA LAW)..................................................................202

D.    Claims Brought on Behalf of the Illinois Subclass..........................210

COUNT I  VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
          DECEPTIVE BUSINESS PRACTICES ACT (815 ILL. COMP.
          STAT. 505/1 *ET SEQ.* AND  720 ILL. COMP. STAT. 295/1A) ..............210

COUNT II  BREACH OF CONTRACT (BASED ON ILLINOIS LAW) ...........215

COUNT III  FRAUDULENT CONCEALMENT (BASED ON ILLINOIS
          LAW) ....................................................................................................216

      E.    Claims Brought on Behalf of the Minnesota Subclass ....................224

COUNT I  VIOLATION OF THE MINNESOTA PREVENTION OF
          CONSUMER FRAUD ACT  (MINN. STAT. § 325F.68 *ET SEQ.*)...........224

COUNT II  BREACH OF CONTRACT (BASED ON MINNESOTA LAW).....229

COUNT III  FRAUDULENT CONCEALMENT (BASED ON
          MINNESOTA LAW) ................................................................................231

      F.    Claims Brought on Behalf of the Montana Subclass ........................238

COUNT I  VIOLATION OF MONTANA UNFAIR TRADE PRACTICES
          AND CONSUMER PROTECTION ACT OF 1973 (MONT. CODE
          ANN. § 30-14-101 *ET SEQ.*)........................................................................238

COUNT II  BREACH OF CONTRACT (BASED ON MONTANA LAW)........244

COUNT III  FRAUDULENT CONCEALMENT (BASED ON MONTANA
          LAW) ....................................................................................................245

      G.    Claims Brought on Behalf of the New Mexico Subclass.................253

COUNT I  VIOLATIONS OF THE NEW MEXICO UNFAIR  TRADE
          PRACTICES ACT (N.M. STAT. ANN. § 57-12-1 *ET SEQ.*) ....................253

COUNT II  FRAUDULENT CONCEALMENT (BASED ON NEW
          MEXICO LAW) ....................................................................................258

COUNT III  BREACH OF CONTRACT (BASED ON NEW MEXICO
          LAW)....................................................................................................265

      H.    Claims Brought on Behalf of the South Carolina Subclass ..............267

COUNT I  VIOLATIONS OF THE SOUTH CAROLINA UNFAIR
   TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10 *ET SEQ.*) .......267

COUNT II  VIOLATIONS OF THE SOUTH CAROLINA REGULATION
   OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT
   (S.C. CODE ANN. § 56-15-10 *ET SEQ.*) ....................................................272

COUNT III  FRAUDULENT CONCEALMENT (BASED ON SOUTH
   CAROLINA LAW) ...................................................................................273

COUNT IV  BREACH OF CONTRACT (BASED ON SOUTH
   CAROLINA LAW) ...................................................................................280

   I.    Claims Brought on Behalf of the Tennessee Subclass.....................282

COUNT I  VIOLATIONS OF THE TENNESSEE CONSUMER
   PROTECTION ACT (TENN. CODE ANN. § 47-18-101 *ET SEQ.*) .........282

COUNT II  BREACH OF CONTRACT  (BASED ON TENNESSEE LAW).....287

COUNT III  FRAUDULENT CONCEALMENT (BASED ON
   TENNESSEE LAW) .................................................................................289

   J.    Claims Brought on Behalf of the Texas Subclass............................296

COUNT I  VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES
   ACT (TEX. BUS. & COM. CODE § 17.41 *ET SEQ.*)................................296

COUNT II  BREACH OF CONTRACT (BASED ON TEXAS LAW) ..............301

COUNT III  FRAUDULENT CONCEALMENT (BASED ON TEXAS
   LAW)........................................................................................................302

   K.    Claims Brought on Behalf of the Washington Subclass ..................310

COUNT I  VIOLATION OF THE WASHINGTON CONSUMER
   PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010 *ET
   SEQ.*)........................................................................................................310

COUNT II  BREACH OF CONTRACT (BASED ON WASHINGTON
   LAW) .......................................................................................................315

COUNT III  FRAUDULENT CONCEALMENT (BASED ON
   WASHINGTON LAW)..............................................................................317

010649-11 1032740 V1

L.     Claims Brought on Behalf of the Alabama Subclass ........................324

COUNT I  VIOLATIONS OF THE ALABAMA DECEPTIVE  TRADE
PRACTICES ACT (ALA. CODE § 8-19-1 *ET SEQ.*) ................................324

COUNT II  BREACH OF CONTRACT  (BASED ON ALABAMA LAW) .......329

COUNT III  FRAUDULENT CONCEALMENT (BASED ON ALABAMA
LAW) ........................................................................................................331

M.     Claims Brought on Behalf of the Alaska Subclass ..........................338

COUNT I  VIOLATION OF THE ALASKA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT (ALASKA
STAT. ANN. § 45.50.471 *ET SEQ.*) ...........................................................338

COUNT II  FRAUDULENT CONCEALMENT (BASED ON ALASKA
LAW) ........................................................................................................343

COUNT III  BREACH OF CONTRACT (BASED ON ALASKA LAW) ...........350

N.     Claims Brought on Behalf of the Arizona Subclass .........................352

COUNT I  VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT
(ARIZ. REV. STAT. § 44-1521 *ET SEQ.*) ..................................................352

COUNT II  BREACH OF CONTRACT  (BASED ON ARIZONA LAW) .........356

COUNT III  FRAUDULENT CONCEALMENT (BASED ON ARIZONA
LAW) ........................................................................................................358

O.     Claims Brought on Behalf of the Arkansas Subclass .......................365

COUNT I  VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE
ACT (ARK. CODE ANN. § 4-88-101 *ET SEQ.*) ........................................365

COUNT II  FRAUDULENT CONCEALMENT (BASED ON ARKANSAS
LAW) ........................................................................................................370

COUNT III  BREACH OF CONTRACT (BASED ON ARKANSAS LAW) .....378

P.     Claims Brought on Behalf of the Colorado Subclass .......................380

COUNT I  VIOLATIONS OF THE COLORADO CONSUMER
PROTECTION ACT (COLO. REV. STAT. § 6-1-101 *ET SEQ.*)..............380

COUNT II  BREACH OF CONTRACT (BASED ON COLORADO LAW)......385

COUNT III  FRAUDULENT CONCEALMENT (BASED ON
COLORADO LAW)...............................................................386

    Q.    Claims Brought on Behalf of the Connecticut Subclass...................394

COUNT I  VIOLATIONS OF THE CONNECTICUT UNFAIR  TRADE
PRACTICES ACT (CONN. GEN. STAT. ANN. § 42-110A *ET SEQ.*) ....394

COUNT II  BREACH OF CONTRACT (BASED ON CONNECTICUT
LAW) ...............................................................................399

COUNT III  FRAUDULENT NON-DISCLOSURE (BASED ON
CONNECTICUT LAW)...........................................................401

    R.    Claims Brought on Behalf of the Delaware Subclass.......................408

COUNT I  VIOLATIONS OF THE DELAWARE CONSUMER FRAUD
ACT (DEL. CODE § 2513 *ET SEQ.*).........................................408

COUNT II  BREACH OF CONTRACT  (BASED ON DELAWARE LAW).....414

COUNT III  FRAUDULENT CONCEALMENT (BASED ON
DELAWARE LAW) ...............................................................415

    S.    Claims Brought on Behalf of the District of Columbia Subclass.....422

COUNT I  VIOLATION OF THE CONSUMER PROTECTION
PROCEDURES ACT (D.C. CODE § 28-3901 *ET SEQ.*).........................422

COUNT II  FRAUDULENT CONCEALMENT (BASED ON DISTRICT
OF COLUMBIA LAW) ...........................................................427

COUNT III  BREACH OF CONTRACT (BASED ON DISTRICT OF
COLUMBIA LAW)................................................................434

    T.    Claims Brought on Behalf of the Florida Subclass...........................436

COUNT I  VIOLATIONS OF THE FLORIDA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201
*ET SEQ.*) ...................................................................................436

COUNT II  BREACH OF CONTRACT (BASED ON FLORIDA LAW)...........441

COUNT III  FRAUDULENT CONCEALMENT (BASED ON FLORIDA
LAW) ..........................................................................................443

U.    Claims Brought on Behalf of the Georgia Subclass .........................450

COUNT I  VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES
ACT (GA. CODE ANN. § 10-1-390 *ET SEQ.*) ...........................450

COUNT II  BREACH OF CONTRACT (BASED ON GEORGIA LAW) ..........455

COUNT III  FRAUDULENT CONCEALMENT (BASED ON GEORGIA
LAW) ..........................................................................................456

V.    Claims Brought on Behalf of the Hawaii Subclass...........................464

COUNT I  UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF
HAWAII LAW (HAW. REV. STAT. § 480 *ET SEQ.*)................464

COUNT II  FRAUDULENT CONCEALMENT (BASED ON HAWAII
LAW) ..........................................................................................468

COUNT III  BREACH OF CONTRACT (BASED ON HAWAII LAW)...........475

W.    Claims Brought on Behalf of the Idaho Subclass .............................477

COUNT I  VIOLATIONS OF THE IDAHO CONSUMER PROTECTION
ACT (IDAHO CODE § 48-601 *ET SEQ.*) ...................................477

COUNT II  BREACH OF CONTRACT  (BASED ON IDAHO LAW) ..............482

COUNT III  FRAUDULENT CONCEALMENT (BASED ON IDAHO
LAW) ..........................................................................................483

X.    Claims Brought on Behalf of the Indiana Subclass ..........................491

COUNT I  VIOLATION OF THE INDIANA DECEPTIVE CONSUMER
SALES ACT (IND. CODE § 24-5-0.5-3) ....................................491

COUNT II  FRAUDULENT CONCEALMENT ..................................................496

COUNT III  BREACH OF CONTRACT  (BASED ON INDIANA LAW).........503

    Y.    Claims Brought on Behalf of the Iowa Subclass .............................505

COUNT I  VIOLATIONS OF THE PRIVATE RIGHT OF ACTION FOR
    CONSUMER FRAUDS ACT (IOWA CODE § 714H.1, *ET SEQ.*)...........505

COUNT II  BREACH OF CONTRACT  (BASED ON IOWA LAW) ...............509

COUNT III  FRAUDULENT CONCEALMENT (BASED ON IOWA
    LAW)........................................................................................................511

    Z.    Claims Brought on Behalf of the Kansas Subclass..........................518

COUNT I  VIOLATIONS OF THE KANSAS CONSUMER PROTECTION
    ACT (KAN. STAT. ANN. § 50-623 *ET SEQ.*)...........................................518

COUNT II  FRAUDULENT CONCEALMENT (BASED ON KANSAS
    LAW)........................................................................................................523

COUNT III  BREACH OF CONTRACT (BASED ON KANSAS LAW)...........531

    AA.    Claims Brought on Behalf of the Kentucky Subclass.......................532

COUNT I  VIOLATIONS OF THE KENTUCKY CONSUMER
    PROTECTION ACT (KY. REV. STAT. ANN. § 367.110 *ET SEQ.*)........532

COUNT II  BREACH OF CONTRACT  (BASED ON KENTUCKY LAW) .....537

COUNT III  FRAUD BY OMISSION (BASED ON KENTUCKY LAW) .........539

    BB.    Claims Brought on Behalf of the Louisiana Subclass.......................546

COUNT I  VIOLATION OF THE LOUISIANA UNFAIR TRADE
    PRACTICES AND CONSUMER PROTECTION LAW (LA. STAT.
    ANN. § 51:1401 *ET SEQ.*) ........................................................................546

COUNT II  FRAUDULENT CONCEALMENT (BASED ON LOUISIANA
    LAW)........................................................................................................551

COUNT III  BREACH OF CONTRACT (BASED ON LOUISIANA LAW).....558

CC.   Claims Brought on Behalf of the Maine Subclass ...........................560

COUNT I  VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT
(ME. REV. STAT. ANN. TIT. 5 § 205-A *ET SEQ.*) ...................560

COUNT II  FRAUDULENT CONCEALMENT (BASED ON MAINE
LAW) ....................................................................................564

COUNT III  BREACH OF CONTRACT (BASED ON MAINE LAW).............571

DD.   Claims Brought on Behalf of the Maryland Subclass......................573

COUNT I  VIOLATIONS OF THE MARYLAND CONSUMER
PROTECTION ACT (MD. CODE ANN. COM. LAW § 13-101 *ET
SEQ.*)....................................................................................573

COUNT II  BREACH OF CONTRACT (BASED ON MARYLAND LAW).....578

COUNT III  FRAUDULENT CONCEALMENT (BASED ON
MARYLAND LAW)................................................................579

EE.   Claims Brought on Behalf of the Massachusetts Subclass ..............587

COUNT I  VIOLATIONS OF THE MASSACHUSETTS CONSUMER
PROTECTION ACT (MASS. GEN. LAWS CH. 93A)............................587

COUNT II  BREACH OF CONTRACT (BASED ON MASSACHUSETTS
LAW) ....................................................................................592

COUNT III  FRAUDULENT CONCEALMENT (BASED ON
MASSACHUSETTS LAW).........................................................593

FF.   Claims Brought on Behalf of the Mississippi Subclass ...................601

COUNT I VIOLATION OF MISSISSIPPI CONSUMER PROTECTION
ACT  (MISS. CODE. ANN. § 75-24-1, *ET SEQ.*)......................................601

COUNT II FRAUD BY CONCEALMENT.........................................................605

COUNT III BREACH OF CONTRACT  (BASED ON MISSISSIPPI LAW).....613

GG.   Claims Brought on Behalf of the Missouri Subclass ........................614

COUNT I  VIOLATIONS OF THE MISSOURI MERCHANDISING
 PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*) ....................614

COUNT II  BREACH OF CONTRACT (BASED ON MISSOURI LAW) .........620

COUNT III  FRAUDULENT CONCEALMENT (BASED ON MISSOURI
 LAW) ....................................................................................................621

  HH.  Claims Brought on Behalf of the Nebraska Subclass ......................629

COUNT I  VIOLATION OF THE NEBRASKA CONSUMER
 PROTECTION ACT (NEB. REV. STAT. § 59-1601 *ET SEQ.*) ...............629

COUNT II  FRAUDULENT CONCEALMENT (BASED ON NEBRASKA
 LAW) ....................................................................................................633

COUNT III  BREACH OF CONTRACT (BASED ON NEBRASKA LAW) .....640

  II.  Claims Brought on Behalf of the Nevada Subclass ..........................642

COUNT I  VIOLATIONS OF THE NEVADA DECEPTIVE TRADE
 PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*) ................642

COUNT II  BREACH OF CONTRACT (BASED ON NEVADA LAW) ...........647

COUNT III  FRAUDULENT CONCEALMENT (BASED ON NEVADA
 LAW) ....................................................................................................648

  JJ.  Claims Brought on Behalf of the New Hampshire Subclass ............656

COUNT I  VIOLATION OF N.H. CONSUMER PROTECTION ACT (N.H.
 REV. STAT. ANN. § 358-A:1 *ET SEQ.*).....................................................656

COUNT II  FRAUDULENT CONCEALMENT (BASED ON NEW
 HAMPSHIRE LAW)..............................................................................660

COUNT III  BREACH OF CONTRACT (BASED ON NEW HAMPSHIRE
 LAW) ....................................................................................................668

  KK.  Claims Brought on Behalf of the New Jersey Subclass....................669

COUNT I  VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD
 ACT (N.J.S.A. § 56:8-1 *ET SEQ.*) ..............................................................669

COUNT II  BREACH OF CONTRACT  (BASED ON NEW JERSEY LAW) ........................................................................................674

COUNT III  FRAUDULENT CONCEALMENT (BASED ON NEW JERSEY LAW)..................................................................................675

    LL.   Claims Brought on Behalf of the New York Subclass......................683

COUNT I  VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y. GEN. BUS. LAW § 349).........................................683

COUNT II  VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 (N.Y. GEN. BUS. LAW § 350).........................................687

COUNT III  BREACH OF CONTRACT (BASED ON NEW YORK LAW) .....691

COUNT IV  FRAUDULENT CONCEALMENT (BASED ON NEW YORK LAW)........................................................................................693

    MM.  Claims Brought on Behalf of the North Carolina Subclass ..............701

COUNT I  VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1 *ET SEQ.*).........................................................................701

COUNT II  BREACH OF CONTRACT (BASED ON NORTH CAROLINA LAW) ........................................................................................706

COUNT III  FRAUDULENT CONCEALMENT (BASED ON NORTH CAROLINA LAW) ......................................................................708

    NN.   Claims Brought on Behalf of the North Dakota Subclass ...............715

COUNT I  VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT (N.D. CENT. CODE § 51-15-02) .........................................715

COUNT II  FRAUDULENT CONCEALMENT (BASED ON NORTH DAKOTA LAW) ........................................................................720

COUNT III  BREACH OF CONTRACT (BASED ON NORTH DAKOTA LAW) ........................................................................................727

    OO.   Claims Brought on Behalf of the Ohio Subclass .............................729

- xiv -

COUNT I  VIOLATIONS OF THE OHIO CONSUMER SALES
PRACTICES ACT (OHIO REV. CODE § 1345.01 *ET SEQ.*)..................729

COUNT II  BREACH OF CONTRACT  (BASED ON OHIO LAW) ................734

COUNT III  FRAUDULENT CONCEALMENT (BASED ON OHIO LAW)....735

PP.    Claims Brought on Behalf of the Oklahoma Subclass......................743

COUNT I  VIOLATION OF OKLAHOMA CONSUMER PROTECTION
ACT (OKLA. STAT. TIT. 15 § 751 *ET SEQ.*)...........................................743

COUNT II  FRAUDULENT CONCEALMENT (BASED ON
OKLAHOMA LAW)...................................................................................749

COUNT III  BREACH OF CONTRACT (BASED ON OKLAHOMA
LAW)..........................................................................................................756

QQ.    Claims Brought on Behalf of the Oregon Subclass ..........................758

COUNT I VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT (OR. REV. STAT. § 646.605, *ET SEQ.*)....................758

COUNT II FRAUD BY CONCEALMENT..........................................................763

COUNT III BREACH OF CONTRACT  (BASED ON OREGON LAW)..........770

RR.    Claims Brought on Behalf of the Pennsylvania Subclass.................772

COUNT I  VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW (73 P.S.
§ 201-1 *ET SEQ.*)......................................................................................772

COUNT II  BREACH OF CONTRACT  (BASED ON PENNSYLVANIA
LAW)..........................................................................................................777

COUNT III  FRAUDULENT CONCEALMENT (BASED ON
PENNSYLVANIA LAW)............................................................................778

SS.    Claims Brought on Behalf of the Rhode Island Subclass.................786

COUNT I  VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT (R.I. GEN.
LAWS § 6-13.1 *ET SEQ.*) ..........................................................................786

- xv -

COUNT II  FRAUDULENT CONCEALMENT (BASED ON RHODE ISLAND LAW) ........................................................................791

COUNT III  BREACH OF CONTRACT (BASED ON RHODE ISLAND LAW)..........................................................................799

 TT. Claims on Behalf of the South Dakota Subclass...............................800

COUNT I VIOLATION OF THE SOUTH DAKOTA  DECEPTIVE TRADE PRACTICES AND CONSUMER  PROTECTION LAW (S.D. CODIFIED LAWS § 37-24-6)............................................800

COUNT II FRAUD BY CONCEALMENT............................................................805

COUNT III BREACH OF CONTRACT  (BASED ON SOUTH DAKOTA LAW)......................................................................813

 UU. Claims Brought on Behalf of the Utah Subclass...............................814

COUNT I  VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET SEQ.*) ................814

COUNT II  BREACH OF CONTRACT (BASED ON UTAH LAW) .................819

COUNT III  FRAUDULENT CONCEALMENT (BASED ON UTAH LAW).........................................................................821

 VV. Claims Brought on Behalf of the Vermont Subclass ........................828

COUNT I  VIOLATION OF VERMONT CONSUMER FRAUD ACT (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)........................................828

COUNT II  FRAUDULENT CONCEALMENT (BASED ON VERMONT LAW).........................................................................834

COUNT III  BREACH OF CONTRACT (BASED ON VERMONT LAW).......841

 WW. Claims Brought on Behalf of the Virginia Subclass ........................843

COUNT I  VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT (VA. CODE ANN. § 59.1-196 *ET SEQ.*)................843

COUNT II  BREACH OF CONTRACT  (BASED ON VIRGINIA LAW).........848

COUNT III  FRAUDULENT CONCEALMENT (BASED ON VIIRGINIA
     LAW) ........................................................................................849

     XX.   Claims Brought on Behalf of the West Virginia Subclass ...............857

COUNT I  VIOLATIONS OF THE WEST VIRGINIA CONSUMER
     CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-101 *ET
     SEQ.*) ......................................................................................857

COUNT II  BREACH OF CONTRACT  (BASED ON WEST VIRGINIA
     LAW) ........................................................................................861

COUNT III  FRAUDULENT CONCEALMENT (BASED ON WEST
     VIRGINIA LAW) .......................................................................863

     YY.   Claims Brought on Behalf of the Wisconsin Subclass ...................870

COUNT I  VIOLATIONS OF THE WISCONSIN  DECEPTIVE TRADE
     PRACTICES ACT (WIS. STAT. § 110.18) ................................870

COUNT II  BREACH OF CONTRACT (BASED ON WISCONSIN LAW) ......875

COUNT III  FRAUDULENT CONCEALMENT (BASED ON
     WISCONSIN LAW) ...................................................................877

     ZZ.   Claims Brought on Behalf of the Wyoming Subclass .....................884

COUNT I VIOLATION OF THE WYOMING CONSUMER
     PROTECTION ACT (WYO. STAT. § 40-12-101, *ET SEQ.*) ...................884

COUNT II FRAUD BY CONCEALMENT ...........................................................892

COUNT IV BREACH OF CONTRACT  (BASED ON WYOMING LAW) ......900

REQUEST FOR RELIEF ....................................................................................901

DEMAND FOR JURY TRIAL ...........................................................................902

Plaintiffs, individually and on behalf of all others similarly situated (the "Class"), allege the following based upon the investigation of counsel, a review of scientific papers, and the investigation of experts, which includes the testing of multiple vehicles with the use of a scientifically accepted PEMs device, devices monitoring the vehicles' ECMs, and a rigorous and scientifically accepted testing protocol, as described below:

## I.    INTRODUCTION

1.     In response to this Court's order of dismissal without prejudice, Plaintiffs have amended the complaint to allege testing of additional representative vehicles, to further allege that these vehicles are representative for all material purposes of all makes and model years of the Polluting Vehicles at issue here, and to further allege the propriety, accuracy, and reliability of Plaintiffs' PEMs testing.

2.     Plaintiffs conducted emissions testing of three vehicles that are within the proposed class (the "exemplar vehicles"). As explained below, the tested vehicles are representative of the emissions system for the 2007-2012 model years at issue. Plaintiffs specifically allege, based on Defendants' own statements, that the 6.7-liter adsorber/Turbo Diesel engine used in the Polluting Vehicles was materially identical in each of the 2007-2012 model years.

3.     Plaintiffs also describe in detail below the scientific basis for using a PEMS device to measure emissions and the reasons why PEMS results are reliable

- 1 -

and used by the Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") to discover Defeat Devices. Plaintiffs further describe the testing process in detail and further validate the results of the testing process with a log of data from the Engine Control Module ("ECM") computers in the representative vehicles while they were in operation.

4.    Plaintiffs also conducted tests on a chassis dynamometer, an apparatus that holds a vehicle in place while allowing its driven wheels to turn with varying resistance meant to simulate the actual load on the engine during on-road driving. The vehicle with a representative emissions system passed the emissions test on the dynamometer. This additional test demonstrates that the vehicle performs differently in a test environment (on the dynamometer) than in the real world (PEMS testing), which should not be the case unless the emissions system has been set up with a device to turn the system off or down during real-world testing.

5.    When the Polluting Vehicles are not in a test environment, they emit nitrogen oxide ("NOx") in massive amounts and at levels well over the legal standard. Plaintiffs' test results and analysis reveal that when Defendants promised that the Polluting Vehicles were "clean" and "environmentally friendly" and "complied with the emissions standards in all 50 states," they were being untruthful.

- 2 -

6.     The comprehensive body of evidence set forth below plausibly demonstrates that the Dodge Ram 2500 and 3500, model years 2007-2012 diesel vehicles (the "Polluting Vehicles") have at least two designed software features that operate to derate or turn down the emissions controls when the vehicle operates outside the test environment. When the Polluting Vehicles are not in a test environment, they emit massive amounts of NOx well in excess of the legal standard and at levels inconsistent with the promises that FCA and Cummins made.

7.     Diesel engines pose a difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and emissions. Compared to gasoline engines, diesel engines generally produce greater torque, low-end power, better drivability, and much higher fuel efficiency. But these benefits come at the cost of much dirtier and more harmful emissions.

8.     One by-product of diesel combustion is oxides of nitrogen ("NOx"), which generally describes several compounds comprised of nitrogen and oxygen atoms. These compounds are formed in the cylinder of the engine during the high-temperature combustion process. NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including serious respiratory illnesses and premature death due to respiratory-

- 3 -

related or cardiovascular-related effects. The United States Government, through the EPA, as well as many states like California have passed and enforced laws designed to protect United States citizens from these pollutants and certain chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these U.S. laws and must adhere to EPA rules and regulations.

9.     Seeing a major opportunity for growth by manufacturing emission-compliant vehicles, and vehicles that ostensibly provide both power and low NOx, almost all of the major automobile manufacturers rushed to develop "clean diesel" and promoted new diesel vehicles as "environmentally friendly" and "clean," and compliant with emissions laws. FCA, along with Volkswagen, Mercedes, General Motors, and other manufacturers, all began touting diesel cars and trucks as more powerful, yet also as an environmentally friendly alternative to gasoline vehicles. And the "clean diesel" marketing worked, as millions of diesel vehicles were purchased in the United States between 2007-2016.

10.     The green bubble with respect to the new clean diesel vehicles popped on September 18, 2015, when the EPA issued a Notice of Violation of the Clean Air Act ("CAA") (the "First NOV") to Volkswagen Group of America, Audi AG, and VW America for installing illegal "defeat devices" in 2009-2015 Volkswagen and Audi diesel cars equipped with 2.0-liter diesel engines. A defeat device is any

- 4 -

apparatus that unduly reduces the effectiveness of emissions control systems under conditions a vehicle may reasonably be expected to experience. The EPA found that the VW/Audi Defeat Device allowed the vehicles to pass emissions testing while in the real world these vehicles polluted far in excess of emissions standards. CARB also announced that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the First NOV.

11.     On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same Defeat Device software that had evaded emissions testing by U.S. regulators. Contemporaneously, Volkswagen announced that it had set aside reserves of 6.5 billion euros ($7.3 billion) in the third quarter to address the matter.[1] Volkswagen has since pleaded guilty to criminal charges, paid a multi-billion dollar fine, and settled civil class action claims for approximately $10 billion.

12.     Volkswagen wasn't alone. Soon, government agencies in the United States and abroad revealed that other manufacturers had produced dozens of models that were exceeding emissions standards.

13.     The "Dieselgate" issue is not limited to passenger vehicles. The EPA recently announced that FCA's Dodge Ram "EcoDiesel" trucks (model years

---

[1] *See* Exhibit 1, Nathan Bomey, *Volkswagen Emission Scandal Widens: 11 Million Cars Affected*, USA Today (Sept. 22, 2015), http://www.usatoday.com/story/money/cars/2015/09/22/volkswagen-emissions-scandal/72605874/.

- 5 -

2014-2016) contain defeat devices. On January 12, 2017, the EPA issued a notice of violation against FCA because FCA "failed to disclose Auxiliary Emission Control Devices (AECDs)" in the EcoDiesel trucks.[2] The EPA identified eight specific devices that cause the vehicle to perform effectively when being tested for compliance, and then reduce the effectiveness of the emissions control system during normal operation and use.

14.     "Once again," said CARB Chair Mary D. Nichols about FCA's cheating, "a major automaker made the business decision to skirt the rules and got caught."[3]

15.     FCA and Cummins' business decision to install defeat devices in the 2500 and 3500 trucks at issue here, was spurred by the EPA's 2001 announcement that stringent emissions standards for heavy-duty highway diesel engines would take effect in 2010.[4] Cummins Inc. and Chrysler (now known as FCA US LLC[5]) saw a golden business opportunity, and worked together to build a truck that, at

---

[2] Exhibit 2, EPA's January 12, 2017 Notice of Violation ("NOV") to Fiat Chrysler Automobiles, https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.

[3] Exhibit 3, EPA News Release, *EPA Notifies Fiat Chrysler of Clean Air Act Violations* (Jan.12, 2017), https://www.epa.gov/newsreleases/epa-notifies-fiat-chrysler-clean-air-act-violations.

[4] *See* Exhibit 4, "Cummins Technology Partnerships," https://cumminsengines.com/technology-partnerships.

[5] FCA stands for Fiat Chrysler Automobiles.

least on paper, met these standards, three years ahead of schedule.[6] Cummins

announced the new truck as the "strongest, cleanest, quietest best-in-class 2007

Cummins Turbo Diesel. Leapfrogging the competition, the Cummins 6.7-liter

Turbo Diesel engine, used exclusively in Dodge Ram 2500 and 3500 Heavy Duty

pickup trucks, has increased displacement[,] providing increased horsepower and

torque[,] while achieving the world's lowest 2010 [EPA] NOx standard a full three

years ahead of the requirements."[7]

16.    To produce a diesel engine that has desirable torque and power

characteristics, good fuel economy, and emissions levels low enough to meet the

stringent European and U.S. emission standards, FCA and Cummins (collectively,

"Defendants") developed the 6.7-liter diesel engine with a sophisticated NOx

adsorber (the "Adsorber Engine") installed in the Polluting Vehicles at issue here.

The primary emission control after-treatment technologies in the Adsorber Engine

include (1) a Diesel Particulate Filter (DPF) and (2) a NOx adsorber catalyst

system. The Diesel Particulate Filter traps and removes particulate (soot)

emissions, while the NOx adsorber system facilitates the capture and reduction of

NOx into less harmful substances, such as nitrogen and oxygen.

---

[6] *See id.*

[7] Exhibit 5, Cummins Inc.'s Jan. 23, 2007 Press Release, *Cummins Reveals Best-In-Class 2007 Turbo Diesel Engine*, http://investor.cummins.com/phoenix.zhtml?c=112916&p=irol-newsArticle_pf&ID=953050.

- 7 -

17.     To appeal to consumers, FCA and Cummins vigorously marketed the Adsorber Engine, and the Dodge Ram 2500 and 3500 with the Adsorber Engine, as the "strongest, cleanest, quietest" diesel engine in its class,[8] and as "squeaky clean" and a "model of cleanliness." In 2011, Cummins stated that the "product has been in commercial use for over four years, delighting customers with its performance and durability, and delivering on Cummins [sic] commitment to a cleaner, healthier environment."[9] FCA claims that "[t]he savings are measured in time, expense, and hassles: both versions of the 6.7-liter Cummins Turbo Diesel in Ram Heavy Duty pickups meet all 50-state emissions standards with no need for a [diesel exhaust fluid] system. Neither Ford nor GM pickups can offer that value."[10]

18.     These representations were deceptive and false. In ordinary, real-world use, the Polluting Vehicles were not designed to simultaneously provide power and low emissions. As set forth in detail below, Plaintiffs' emissions testing using accepted testing equipment and protocols conducted by experts in emissions testing demonstrates that the Polluting Vehicles emit far more pollution on the road than in the emissions-certification testing environment. That means that consumers did not get the supposed benefits Defendants touted of diesel vehicles with both power and low emissions. Rather, the stark difference in emission levels between

---

[8] *See id.*

[9] *See id.*

[10] Exhibit 6, 2012 Dodge Ram brochure.

- 8 -

the test environment and the real-world environment is a classic indicator that the vehicle design includes one or more features to turn down or turn off the emission controls when the vehicle is operated in real-world driving—*i.e.*, outside the certification test cycle ("defeat devices"). In modern vehicles with electronic engine controls, defeat devices are almost always activated by illegal software in the vehicle's engine control module (ECM)—the computer that controls the operation of the engine and emission control devices.

19.     The legal limit of NOx emissions for stop-and-go driving is 200 mg/mile. The 2007 exemplar vehicle tested by plaintiffs' produced average emissions of 871 mg/mile in stop-and-go testing similar in profile to the cycle used for certification testing. This is 4.4 times the legal standard. Maximum non-regeneration (explained below) emissions were found to be 1,475 mg/mile or 7.4 times the standard. The vehicles at issue were designed and configured to require active regeneration (explained below) so that they could pass the emissions "cold start" test. The by-product of the vehicles' configuration was the need for the engine to have frequent active regeneration to clean the Diesel Particulate Filter. The 2007 vehicle performed active regeneration 15.8% of the vehicle miles traveled, or ten times the frequency allowed in the federal emissions test. During active regeneration emissions were found to be as high as 4,543 mg/mile. This

- 9 -

excessive regeneration is a defeat device. Similar results, described below, were found in stop-and-go testing of the 2009 and 2012 exemplar vehicles.

20.     The 2007 exemplar vehicle was tested over 506 miles in stop and go conditions similar to the emissions test profile. A total of 90 tests were conducted. The average emissions were 871 mg/mile, or 4.4 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 1,475 mg/mile, or 7.4 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 15.8% of the vehicle miles traveled. This is nearly 10 times the frequency disclosed in the certification through the statement of the upward adjustment factor. During active regeneration, emissions were found to be as high as 4,543 mg/mile.

21.     The 2009 exemplar vehicle was tested over 453 miles in stop and go conditions similar to the FTP-75 test profile. A total of 92 tests were conducted. The average emissions were 1,064 mg/mile, or 5.3 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 1,690 mg/mile, or 8.5 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 16.5%. This is nearly 10 times the frequency required by certification. During active regeneration, emissions were found to be as high as 8,787 mg/mile.

- 10 -

22.     The 2012 exemplar vehicle was tested over 987 miles in stop and go conditions similar to the FTP-75 test profile. A total of 181 tests were conducted. The average emissions were 751 mg/mile, or 3.8 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 2,985 mg/mile, or 14.9 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 11.5%. This is 6 times the frequency required by certification. During active regeneration, emissions were found to be as high as 8,379 mg/mile.

23.     The exemplar vehicles were also tested in highway conditions. Again, that testing revealed emissions at elevated levels and in amounts that exceeded the emissions standards. For example, the 2007 exemplar vehicle was tested over 1,158 miles in steady speed conditions. The average emissions were 548 mg/mile, or 2.7 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 3,402 mg/mile, or 17 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 15.9%. This is nearly 10 times the frequency allowed by certification. During active regeneration, emissions were found to be as high as 2,815 mg/mile.

24.     The 2009 exemplar vehicle was tested over 1,065 miles in steady speed conditions. The average emissions were 590 mg/mile, or 3.0 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were

- 11 -

found to be 1,942 mg/mile, or 9.7 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 10.7%. This is six times the frequency allowed by certification. During active regeneration, emissions were found to be as high as 4,562 mg/mile.

25.     The high active regeneration frequency during steady driving is particularly troubling because such conditions represent ideal conditions for passive regeneration (*i.e.*, no upstream fuel injection of the DPF). During steady driving catalyst temperatures in the exhaust are sufficient for excellent passive regeneration. In fact, most truck manufacturers suggest a "drive hard" procedure at high speed on the freeway specifically to initiate passive regeneration to clean the DPF when a high backpressure light is activated for the DPF. Plaintiffs' testing of the Polluting Vehicles show that the defeat device for excessive active regeneration is active in these vehicles even under these ideal passive regeneration conditions. This is further evidence of a system designed to routinely allow excessive emissions in real-world driving conditions despite "passing" certification testing.

26.     The 2012 exemplar vehicle was tested over 2,151 miles in steady speed conditions. A total of 178 tests were performed. The average emissions were 722 mg/mile, or 3.6 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 7,153 mg/mile, or 36 times the

standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 13.3%. This is six times the frequency required by certification.

27.     In addition to the PEMs testing on the exemplar vehicles, three additional vehicles owned by plaintiffs were tested using a digital logger capable of measuring vehicle parameters broadcast by the ECM, the vehicle's on-board computer. These tests confirmed the frequency of active regeneration found in the PEMs testing and the existence of an active regeneration defeat device.

28.     The impact of these defeat devices can be demonstrated by measuring the percent of time the vehicles are out of compliance with legal standards. The 2007 exemplar in stop-and-go driving is out of compliance 90% of the time, and driven over 50% of the time at twice the legal standard. The 2009 exemplar is out of compliance 80% of the time.

29.     Not only did Defendants conceal the high NOx emissions put out by these vehicles, they also failed to disclose the effect of their defeat devices on fuel economy. Active regeneration requires additional fuel to be injected to achieve the temperature necessary for regeneration. In stop-and-go driving, fuel economy was reduced by 17% of vehicle miles driven in the 2007 exemplar vehicle and 35% of vehicle miles driven in the 2009 exemplar vehicle during active regeneration. This reduction in fuel economy results in increased fuel costs.

30.     Thus, in contrast to Defendants' promises, real-world testing has revealed material facts that Defendants failed to disclose, namely that the Dodge 2500 and 3500 vehicles equipped with the Cummins 6.7-liter Turbo Diesel engine (the "Polluting Vehicles") emit dangerous levels of NOx at many times higher than (i) what a reasonable consumer would expect from the "cleanest engine in its class," (ii) EPA and state maximum standards, and (iii) the levels set for the vehicles to obtain a certificate of conformity that allows them to be sold in the United States. Defendants also failed to disclose the impact of the active regeneration defeat device on fuel economy. Defendants' self-proclaimed "cleanest engine in its class" is far from clean and has fuel performance issues hidden from consumers.[11]

31.     In addition to trying to capture the market created by new emissions standards, Defendants had another reason to rush the Polluting Vehicles to market. Under the EPA regulations, Cummins was able to "bank" emissions credits from these allegedly compliant vehicles to spend on other, dirtier engines.[12] Cummins, in turn, could share those credits with FCA. As a result, Defendants were able to design and build dirty trucks with the credits from the sale of Polluting Vehicles.

---

[11] *See* Exhibit 7, "EPA 2010 Exhaust Emissions Regulations," https://cummins engines.com/uploads/docs/4971350.pdf.

[12] *See* 40 C.F.R. § 1036.701 *et seq.*

32.     FCA and Cummins helped create the demand for diesel Ram trucks by their promotional efforts. Such demand would not have existed and Plaintiffs would not have purchased their trucks, or would have paid less for them, had FCA and Cummins told the truth about the emission performance, the defeat devices, and the impact on fuel economy. FCA and Cummins thus were a direct and proximate cause of Plaintiffs' injury.

33.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of Polluting Vehicles. Plaintiffs seek damages and equitable relief for Defendants' misconduct related to the design, manufacture, marketing, sale, and lease of Polluting Vehicles with undisclosed, unreasonable, and/or unlawfully high emissions and impaired fuel economy, as alleged in this complaint.

34.     The violations of law alleged herein are in two distinct categories. Plaintiffs' RICO allegations are based in part on a pattern of conduct and scheme that include obtaining certificates of conformity for vehicles that were in fact non-complaint and are illegally on the road. Plaintiffs' state law counts rely on Defendants' deceptive conduct in failing to disclose the polluting nature of the Dodge Ram and the fact that these vehicles do not perform as advertised. Plaintiffs' state law claims are not based on a violation of emission standards.

- 15 -

## II.   **JURISDICTION AND VENUE**

35.     This Court has original jurisdiction over the subject matter of this

action pursuant to 28 U.S.C. §§ 1331 & 1332. There is also complete diversity of

citizenship in this case because each defendant is a citizen of a different state than

any of the plaintiffs, and the amount in controversy exceeds the sum of $75,000. 28

U.S.C. § 1332. This Court also has supplemental jurisdiction over the state law

claims because those claims are integrally related to the federal claims and form

part of the same case and controversy under 28 U.S.C. § 1367.

36.     This Court has personal jurisdiction over FCA by virtue of its

transacting and doing business in this District and because FCA is registered to do

business in Michigan. FCA has transacted and done business in the State of

Michigan and in this District and has engaged in statutory violations and common

law tortious conduct in Michigan and in this District.

37.     This Court has personal jurisdiction over Cummins by virtue of its

transacting and doing business in this District and because Cummins is registered

to do business in Michigan. Cummins has transacted and done business in the State

of Michigan and in this District and has engaged in statutory violations and

common law tortious conduct in Michigan and in this District.

38.     Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a

substantial part of the events or omissions giving rise to the claims occurred in this

- 16 -

District. Venue is proper pursuant to 18 U.S.C. § 1965(a) & (b) because Defendants transact affairs in this District, and the ends of justice require it. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants reside in this judicial district for venue purposes.

## III.   PARTIES

A.   **Plaintiffs**

39.   Each and every Plaintiff and Class member has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with their vehicles, including, but not limited to, out-of-pocket loss, which can be measured at a minimum in part by the approximately $9,000 premium paid for a diesel vehicle over a comparable gas vehicle, and higher fuel costs due to the higher fuel consumption caused by the excessive active regeneration.

40.   Neither Defendant, nor any of their agents, dealers, or other representatives, informed Plaintiffs or Class members of the existence of designs and/or programming to derate or turn down the emissions reduction systems during real-world driving conditions, the use of active regeneration to clean the Diesel Particulate Filter and the impact of active regeneration on emissions and fuel economy, emissions beyond those expected by a reasonable consumer in ordinary

- 17 -

use of the Polluting Vehicles, the vehicles' unlawfully high emissions, or that a defeat device was used to pass emissions testing.

### 1.    California Plaintiff

#### a.    James Bledsoe

41.    Plaintiff James Bledsoe (for the purpose of this paragraph, "Plaintiff") is a resident of California domiciled in Delhi, California. On or about September 7, 2007, Plaintiff purchased a 2007 Dodge Ram 2500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Merced, California. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck of $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his

- 18 -

vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a reasonable consumer would expect, and that Plaintiff would be required to pay out-

- 19 -

of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it, and would not have paid a premium.

### 2.   Illinois Plaintiffs

#### a.   Dawn Roberts

42.    Plaintiff Dawn Roberts (for the purpose of this paragraph, "Plaintiff") is a resident of Illinois, domiciled in Earlville, Illinois. On or about September 23, 2012, Plaintiff purchased a 2012 Dodge Ram 2500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Sycamore, Illinois. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck of $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but

- 20 -

did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased her vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a

- 21 -

reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, would have paid less for it, and would not have paid a premium.

### b.    Marc Ganz

43.    Plaintiff Marc Ganz (for the purpose of this paragraph, "Plaintiff") is a resident of Illinois, domiciled in Lockport, Illinois. On or about July 1, 2013, Plaintiff purchased a 2012 Dodge Ram 3500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Tinley Park, Illinois. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck of $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but

- 22 -

did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a

- 23 -

reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it, and would not have paid a premium.

### 3. Michigan Plaintiff

#### a. Matt Langworthy

44. Plaintiff Matt Langworthy (for the purpose of this paragraph, "Plaintiff") is a resident of Michigan, domiciled in Coldwater, Michigan. On or about June 7, 2016, Plaintiff purchased a 2012 Dodge Ram 3500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Battle Creek, Michigan. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck in the thousands of dollars. FCA and

- 24 -

Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design,

- 25 -

the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it, and would not have paid a premium.

### 4. Minnesota Plaintiff

#### a. Jordan Hougo

45.    Plaintiff Jordan Hougo (for the purpose of this paragraph, "Plaintiff") is a resident of Minnesota, domiciled in Belle Plaine, Minnesota. On or about September 30, 2015, Plaintiff purchased a 2008 Dodge Ram 2500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Rogers, Minnesota. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission

- 26 -

controls has caused Plaintiff out-of-pocket loss in at least the thousands of dollars of the premium he paid for a diesel versus a comparable gas truck. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's

- 27 -

emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it.

### 5.    Montana Plaintiff

#### a.    Michael Erben

46.    Plaintiff Michael Erben (for the purpose of this paragraph, "Plaintiff") is a resident of Montana domiciled in White Sulfer Springs, Montana. On or about May 31, 2008, Plaintiff purchased a 2008 Dodge Ram 2500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Kellogg, Idaho. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful,

- 28 -

and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck of $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with

- 29 -

the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it.

### 6. New Mexico Plaintiff

#### a. Marty Ward

47.    Plaintiff Marty Ward (for the purpose of this paragraph, "Plaintiff") is a resident of New Mexico, domiciled in Aztec, New Mexico. On or about April 10, 2012, Plaintiff purchased a 2012 Dodge Ram 3500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Farmington, New Mexico. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect

- 30 -

from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck of $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a

- 31 -

high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it, and would not have paid a premium.

### 7. North Carolina Plaintiff

#### a. Jeremy Perdue

48.    Plaintiff Jeremy Perdue (for the purpose of this paragraph, "Plaintiff") is a resident of North Carolina domiciled in Asheboro, North Carolina. On or about July 10, 2014, Plaintiff purchased a 2009 Dodge Ram 2500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Madison, North Carolina. Plaintiff purchased, and still owns, this vehicle and paid a diesel premium for it. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of

- 32 -

emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the thousands of dollars of the premium he paid for a diesel versus a comparable gas truck of. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff wanted to purchase a diesel vehicle due to both its power and fuel efficiency as compared to gasoline vehicles, but would not have purchased one that he understood to have excessive emissions or otherwise be harmful to the environment. Plaintiff assumed that the vehicle would pass his county's annual emissions inspection, and thus Plaintiff relied upon his assumption that his vehicle's engine complied with all local, state and federal emissions regulations. No disclosure was made to Plaintiff that the Polluting Vehicle had high emissions

- 33 -

compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it, and would not have paid a premium.

### 8.    South Carolina Plaintiff

#### a.    James Forshaw

49.    Plaintiff James Forshaw (for the purpose of this paragraph, "Plaintiff") is a resident of South Carolina, domiciled in Georgetown, South Carolina. On or about April 22, 2008, Plaintiff purchased a 2007 Dodge Ram 3500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Pawleys Island, South Carolina. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions

- 34 -

system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck of approximately $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or

- 35 -

representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it, and would not have paid a premium.

### 9. Tennessee Plaintiff

#### a. Martin Witberg

50.     Plaintiff Martin Witberg (for the purpose of this paragraph, "Plaintiff") is a resident of Tennessee domiciled in Dandridge, Tennessee. On or about July 9, 2008, Plaintiff purchased a 2008 Dodge Ram 2500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Romeo, Michigan. Plaintiff

- 36 -

purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck of $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and representations touted the cleanliness of the engine

- 37 -

system for the environment and the efficiency and power/performance of the

engine system. None of the advertisements reviewed or representations received by

Plaintiff contained any disclosure that the Polluting Vehicle had high emissions

compared to gasoline vehicles and the fact that Defendants had designed part of the

emissions reduction system to emit very high emissions for extended periods at a

high rate of frequency during normal driving conditions, or that the emissions

system did not comply with the law. At no time did either defendant disclose that

Defendants' had designed the Polluting Vehicle's emissions system to derate or

turn down such that the vehicle would emit high emissions for an extended period

of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle

actually emitted pollutants at a much higher level than gasoline vehicles do and at

a much higher level than a reasonable consumer would expect, and that Plaintiff

would be required to pay out-of-pocket costs to fix it and pay higher fuel costs,

Plaintiff would have reviewed these disclosures and would not have purchased the

vehicle, or would have paid less for it, and would not have paid a premium.

### 10. Texas Plaintiffs

#### a. Natalie Beight

51.     Plaintiff Natalie Beight (for the purpose of this paragraph, "Plaintiff")

is a resident of Texas, domiciled in Pottsboro, Texas. On or about November 14,

2013, Plaintiff purchased a 2012 Dodge Ram 2500 (for the purpose of this

- 38 -

paragraph, the "Polluting Vehicle"), in Columbiana, Ohio. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium she paid for a diesel versus a comparable gas truck of $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased her vehicle on the reasonable, but mistaken, belief that her vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased her vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and

- 39 -

representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it, and would not have paid a premium.

### b. Martin Rivas

52.    Plaintiff Martin Rivas (for the purpose of this paragraph, "Plaintiff") is a resident of Texas domiciled in Kingsville, Texas. On or about November 15, 2011, Plaintiff purchased a 2012 Dodge Ram 2500 (for the purpose of this

- 40 -

paragraph, the "Polluting Vehicle"), in Kingsville, Texas. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck of $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and

- 41 -

representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it, and would not have paid a premium.

### c. Paul Chouffet

53. Plaintiff Paul Chouffet (for the purpose of this paragraph, "Plaintiff") is a resident of Texas domiciled in Irving, Texas. On or about May 12, 2009, Plaintiff purchased a 2009 Dodge Ram 2500 (for the purpose of this paragraph, the

"Polluting Vehicle"), in Turlock, Texas. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck of approximately $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel" system, as represented through advertisements and representations made by Defendants. Plaintiff recalls that the advertisements and

- 43 -

representations touted the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Polluting Vehicle had high emissions compared to gasoline vehicles and the fact that Defendants had designed part of the emissions reduction system to emit very high emissions for extended periods at a high rate of frequency during normal driving conditions, or that the emissions system did not comply with the law. At no time did either defendant disclose that Defendants' had designed the Polluting Vehicle's emissions system to derate or turn down such that the vehicle would emit high emissions for an extended period of time. Had Defendants disclosed this design, the fact that the Polluting Vehicle actually emitted pollutants at a much higher level than gasoline vehicles do and at a much higher level than a reasonable consumer would expect, and that Plaintiff would be required to pay out-of-pocket costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these disclosures and would not have purchased the vehicle, or would have paid less for it, and would not have paid a premium.

11. **Washington Plaintiff**

    a. **Alan Strange**

54.    Plaintiff Alan Strange (for the purpose of this paragraph, "Plaintiff") is a resident of Washington domiciled in Shelton, Washington. On or about March

- 44 -

12, 2009, Plaintiff purchased a 2009 Dodge Ram 2500 (for the purpose of this paragraph, the "Polluting Vehicle"), in Shelton, Washington. Plaintiff purchased, and still owns, this vehicle. Unknown to Plaintiff at the time the vehicle was purchased, it was equipped with an emissions system that turned off or limited its emissions reduction system during normal driving conditions and emitted pollutants such as NOx at many multiples of emissions emitted from gasoline-powered vehicles, at many times the level a reasonable consumer would expect from a "clean diesel," and at many multiples of that allowed by federal law. Defendants' unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Polluting Vehicle without proper emission controls has caused Plaintiff out-of-pocket loss in at least the premium he paid for a diesel versus a comparable gas truck of approximately $9,000. FCA and Cummins knew about, manipulated, or recklessly disregarded the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased his vehicle on the reasonable, but mistaken, belief that his vehicle was a "clean diesel" as compared to gasoline vehicles, complied with United States emissions standards, could be legally operated within the United States, and would retain all of its operating characteristics throughout its useful life, including high fuel economy. Plaintiff selected and ultimately purchased his vehicle, in part, because of the "clean diesel"

- 45 -

system, as represented through advertisements and representations made by
Defendants. Plaintiff recalls that the advertisements and representations touted the
cleanliness of the engine system for the environment and the efficiency and
power/performance of the engine system. None of the advertisements reviewed or
representations received by Plaintiff contained any disclosure that the Polluting
Vehicle had high emissions compared to gasoline vehicles and the fact that
Defendants had designed part of the emissions reduction system to emit very high
emissions for extended periods at a high rate of frequency during normal driving
conditions, or that the emissions system did not comply with the law. At no time
did either defendant disclose that Defendants' had designed the Polluting Vehicle's
emissions system to derate or turn down such that the vehicle would emit high
emissions for an extended period of time. Had Defendants disclosed this design,
the fact that the Polluting Vehicle actually emitted pollutants at a much higher
level than gasoline vehicles do and at a much higher level than a reasonable
consumer would expect, and that Plaintiff would be required to pay out-of-pocket
costs to fix it and pay higher fuel costs, Plaintiff would have reviewed these
disclosures and would not have purchased the vehicle, or would have paid less for
it.

55.    Each of the Plaintiffs purchased their vehicles at an FCA-authorized
dealership. And each received information about the characteristics, benefits, and

quality of the RAM vehicles at the dealership that was created by FCA for the purpose of influencing Plaintiffs.

B.    **Defendants**

1.    **FCA US LLC**

56.    Defendant FCA US LLC ("FCA") is a limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by holding company Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, United Kingdom. FCA's principal place of business and headquarters is in Auburn Hills, Michigan, in the Eastern District of Michigan.

57.    FCA (sometimes referred to as Chrysler) is a motor vehicle "Manufacturer" and a licensed "Distributor" of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division. As of 2015, FCA is the seventh largest automaker in the world by unit production.

58.    FCA's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network

- 47 -

of independent, franchised motor vehicle dealers. FCA is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States.

59.     FCA sells its trucks through FCA franchise dealerships. FCA distributes information about its RAM trucks to its dealers for the purpose of passing that information to consumers. FCA also understands that its dealers pass on information from FCA about the characteristics, benefits, and quality of its RAM products to consumers. The dealers act as FCA's agents in selling the Polluting Vehicles and disseminating information about the Polluting Vehicles to customers and potential customers. FCA also disseminates information about its vehicles on its website. At the point of sale, as well as in written materials and on its website, FCA could have told the truth.

### 2.     Cummins Inc.

60.     Cummins Inc. ("Cummins") is a Fortune 500 company that designs, manufactures, and distributes engines, filtration, and power generation products. It earned approximately $19.1 billion in revenue in 2015. Cummins is doing business in the Eastern District of Michigan and elsewhere. It conducts business in interstate and foreign commerce through its network of 600 company-owned and independent distributor facilities, supplying its customers with its products, and

more than 7,200 dealer locations in over 190 countries and territories. It is headquartered in Columbus, Indiana.

61.     Cummins organizes itself around business groups, one of which is "Emissions Solutions," and describes itself as a "leader in designing, manufacturing and integrating after treatment technology and solutions" for medium and heavy duty engines. It describes after treatment technology as the mechanism to convert pollutants, including NOx, into "harmless emissions." In annual reports, Cummins identifies the supply of engines for Ram as one of its largest contracts.

62.     Also, according to Cummins' Form 10-K, a significant portion of its business is the heavy duty truck market and its heavy duty customers include PACCAR, Ford, MAN Latin America and Daimler Trucks of North America.

## IV.   FACTUAL ALLEGATIONS

### A.   The environmental challenges posed by diesel engines and the U.S. regulatory response thereto

63.     The U.S. government, through the EPA, has passed and enforced laws designed to protect U.S. citizens from pollution and, in particular, certain chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these laws and must adhere to the EPA's rules and regulations.

- 49 -

64.     Vehicle manufacturers must certify to the EPA that the vehicles sold in the United States meet applicable federal emissions standards to control air pollution. Every vehicle sold in the United States must be covered by an EPA-issued certificate of conformity.

65.     There is a very good reason that these laws and regulations exist, particularly in regards to vehicles with diesel engines: for many years, scientists studying the health impacts from diesel engines have raised concerns, and in 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

66.     Diesel engines pose a particularly difficult challenge to the environment because they have an inherent trade-off between power, fuel efficiency, and NOx emissions—the greater the power and fuel efficiency, the dirtier and more harmful the emissions.

67.     The spark ignition engines use a spark plug to combust highly refined, shorter chain hydrocarbon fuel (gasoline), which is designed to resist self-igniting during compression. By comparison, compression ignition engines (also known as diesel engines) use diesel fuel consisting of longer-length hydrocarbons, which is designed to easily ignite when subjected into a high-temperature, high-pressure environment. This fuel is injected under very high pressure into the cylinder after the piston has compressed the intake air to the appropriate temperature and

- 50 -

pressure to facilitate combustion. Almost immediately after the start of injection, the fuel auto-ignites and begins to release energy in the form of heat and pressure, which is then converted to work by moving the piston downward in the cylinder.

68.     The diesel engine has fuel efficiency advantages over gasoline engines for several reason. First, they operate at higher compression ratios than gasoline engines, leading to greater thermodynamic efficiency. Second, unlike gasoline engines, diesel engines do not have an air intake throttle; thus, they do not suffer air intake throttling losses. Finally, diesel fuel contains more energy than gasoline on a per volume basis, so more energy is available on a per gallon basis.

69.     The diesel engine also has performance and durability advantages over gasolines engines. The higher compression ratio and longer piston stroke of the diesel generates greater torque energy, which results in better vehicle acceleration performance. This performance is generally enhanced and tuned with the application of a turbo charger, which increases the power and performance across the map of engine speed and load. By comparison to gasoline engines, diesel engine are sturdier in design with more robust components, so the engines tend to be more durable and longer-lasting.

70.     But this greater performance and fuel efficiency come at an environmental cost: diesel engines produce dirtier and more dangerous emissions. A byproduct of high temperature diesel combustion are two compounds: nitric

- 51 -

oxide and nitrogen dioxide, collectively called NOx. These compounds are formed at high temperature in the cylinder during combustion through the dissociation of oxygen and nitrogen.

71.    NOx emissions lead to several forms of pollution. First, NOx contributes to high levels of ambient nitrogen dioxide, which by itself is a health hazard. Second, in the lower atmosphere, NOx can form tiny nitrate aerosol particulates that can be inhaled. And finally, NOx in the atmosphere reacts with hydrocarbon in the presence of sunlight to form ozone, a strong oxidizer and lung irritant. Ozone is a criteria pollutant and is regulated as part of the National Ambient Air Quality Standards. Exposure to these pollutants has been linked with harmful health issues, including asthma attacks and other respiratory illnesses severe enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illness are at acute risk of health effects from these pollutants. As a ground level pollutant, NO2 is highly toxic in comparison to nitric oxide (NO). If overall NOx levels are not sufficiently controlled, then concentrations of NO2 concentrations at ground level can be quite high, where they can impact the health of the breathers.

- 52 -

72.     Though more efficient, diesel engines come with their own set of challenges. If not controlled, emissions from diesel engines can include higher levels of NOx and particulate matter ("PM") (i.e., soot) compared to emissions from gasoline engines. Therefore, a number of in-cylinder and aftertreatment technologies are employed to reduce these emissions.

73.     Inside the cylinder, NOx emissions can be reduced through exhaust gas recirculation, a process whereby exhaust gases are routed back into the intake of the engine and mixed with fresh incoming air. Exhaust gas recirculation lowers NOx by reducing the available oxygen, and by increasing the specific heat of the exhaust gas mixture which reduces maximum combustion temperatures. However, exhaust gas recirculation can also lead to an increase in PM as well, since less oxygen and lower temperatures prevent complete oxidation of PM formed during the combustion process.

74.     Given fundamental limits and tradeoffs in controlling NOx and PM formed during in-cylinder combustion, exhaust gas aftertreatment devices must be employed. Exhaust aftertreatment is expensive and complex, and is typically comprised of ceramic catalyst support and filter media, catalyst coatings, sheet metal shells and tubing, sensors, and controls. The fundamental aftertreatment components include particulate filters designed to trap solid particles and catalysts

- 53 -

designed to either oxidize or reduce pollutants, transforming them into harmless inert gases, such as nitrogen gas (N2), water (H2O), and carbon dioxide (CO2).

75. Modern diesel engines are designed with the intent to balance trade-offs between emissions, fuel economy, reliability/durability, and cost. Meeting emission standards is at the forefront of the challenges that must be addressed. In order for the EPA to designate a diesel car as a "clean" vehicle, it must demonstrate emission levels of PM, NOx, carbon monoxide, and hydrocarbon below certain standards. In 2000, the EPA announced stricter emissions standards requiring all diesel models starting in 2007 to emit dramatically less NOx and PM than years prior.

76. Before introducing affected vehicles into the U.S. stream of commerce (or causing the same), FCA/Cummins was required to first apply for, and obtain, an EPA-administered certificate of conformity ("COC") certifying that the vehicles comport with the emissions standards for pollutants enumerated in 40 C.F.R. §§ 86.1811-04, 86.1811-09, and 86.1811-10. Moreover, the vehicles must be accurately described in the COC application "in all material respects" to be deemed covered by a valid COC. California's emission standards are even more stringent than those of the EPA. "CARB", the State of California's regulator for mobile emissions, including cars and trucks, requires a similar application from

- 54 -

automakers to obtain an Executive Order confirming compliance with California's emission regulations before allowing the vehicle onto California's roads.

77.    The truck business is vitally important to Dodge as is the engine business to Cummins. It is estimated that during the model years of 2007-2012, sales of Cummins-powered Ram 2500 and 3500 trucks were between 400,000 and 500,000 vehicles.

78.    The Dodge Ram pickup is designed to appeal to consumers who will want to use a "working truck"—*i.e.*, to haul a load or a trailer. The diesel option is attractive to consumers because diesel-powered vehicles allegedly offer better fuel economy and towing capacity relative to their gasoline-powered counterparts.

79.    Dodge and Cummins have had a long-standing and mutually beneficial relationship, as Cummins has been providing diesel engines for the Dodge line of Ram-branded pickup trucks dating back to 1989. Until 2013, Cummins was the exclusive supplier to Dodge of diesel engines and continues to be the only supplier for the larger Ram 2500 and 3500 pickup truck platforms.

B.    **Both the Ram 2500 and 3500 share a common engine.**

80.    To meet the EPA's emissions requirements applicable to model year 2010 vehicles, Dodge/Cummins introduced a new 6.7-liter Cummins diesel engine in both the 2500 and 3500 series trucks. They initially released this new engine three years ahead of the 2010 standard.

- 55 -

81.    The 2007-2012 diesel version of the 2500 and 3500 trucks is powered by the Cummins 6.7-liter diesel engine that incorporates a sophisticated set of emission control components, including a Bosch common rail fuel injection system, exhaust gas recirculation, and an advanced aftertreatment system comprised of a close coupled diesel oxidation catalyst, a NOx adsorber catalyst, and a diesel particulate filter. The critical emission control components in all Cummins 6.7-liter engines are outlined in the following section. The Ram 2500 and 3500 share an identical engine and differ only in the weight class to which they are certified. For example, the drawings below illustrate that the aftertreatment configuration is identical for the Ram 2500 and Ram 3500 for model years 2007 through 2012.



| 2007 Dodge Ram 2500 Aftertreatment | 2007 Dodge Ram 3500 Aftertreatment |



2012 Dodge Ram 2500 Aftertreatment | 2012 Dodge Ram 3500 Aftertreatment

**C.    The Cummins engine and certification approach were unique.**

82.    The certification approach as well as the technological aspects of the Cummins engine used in model years 2007 to 2012 are unique and, as such, deserve further discussion.

83.    First, in 2007, Dodge and Cummins made a breakthrough announcement that they would offer a vehicle meeting the lower 2010 emission standards three years ahead of the deadline. The 2010 standards were exceedingly challenging, requiring a nearly 90% reduction in both NOx and PM from the previous standard. To meet these challenges, separate NOx and PM control technologies would be required.

84.    Most other Original Equipment Manufacturers ("OEMs") chose an easier two-step path, first offering an engine in 2007 that reduced PM by 90% with a diesel particulate filter, and then later, in 2010, adding a 90% NOx reduction solution using additional technology. This more conservative approach allowed the

- 57 -

manufacturers more time to develop technology and to gain field experience. However, Cummins took the bold step to achieve the 2010 standards early, by deploying a sophisticated engine and simultaneously introducing NOx and PM aftertreatment technologies.

85.     The motivation for this early implementation was two-fold. First, with heavy-duty on highway emission standards changing starting in 2007, CARB and the EPA would allow "averaging" of engine sales to occur, permitting Cummins to continue to produce a large number of higher-NOx heavy-duty engines that would be offset by the sales of the lower-emitting pickup trucks. This averaging strategy provided a significant competitive advantage against other heavy-duty engine manufacturers unable to use offsets. The Heavy-Duty market is a significant market for Cummins.

86.     Second, Cummins had spent considerable time and effort working on NOx aftertreatment that did not employ a secondary reduction fluid. Selective Catalyst Reduction technology, which eventually became the preferred NOx aftertreatment reduction technology for diesel engines, particularly in this truck weight class, requires storage and handling of aqueous urea solution (also known as Diesel Exhaust Fluid, or DEF). It required extensive infrastructure to make DEF available to customers as well as additional cost and effort for the customer to buy DEF and refill the DEF tank.

87. Since 2010, SCR technology has become the preferred technology for NOx reduction; but in 2007, it was not clear that this would be the case and Cummins was worried consumers would not accept the maintenance practice of monitoring and refilling the on-board diesel emission fluid reserve. As will be shown, the NOx adsorber approach was found to be deficient in several regards and was ultimately replaced with SCR by Cummins and Dodge in 2013.

88. The following sections discuss some of the components and sub-systems in further detail, describing their function in delivering power and emissions reductions. Then the integrated engine aftertreatment system is discussed in more detail below.

### 1. Injection timing and in-cylinder controls

89. Fuel is metered into the engine during the power stroke using an injector with an electronic controller. Fuel can be delivered either before the piston reaches the top of its stroke (top dead center, or "TDC"), which is called "advanced timing" at the top of the stroke, or after TDC, which is called "retarded timing." Furthermore, fuel delivered to the cylinder is often delivered in distinct pulses rather than a single pulse, with the goal being to reduce emissions and improve efficiency. Generally speaking, advanced timing will increase NOx emissions and reduce particulate matter (PM) emissions (but improve fuel economy), while retarded timing will reduce NOx emissions and increase PM

- 59 -

emissions. In-cylinder controls like injection timing play a critical role in the overall NOx emissions performance of the engine, as the emissions coming out of the cylinder must be low enough that the other emission control systems aren't pushed beyond their technical limits. If engine-out emissions of NOx are too high, the exhaust gas recirculation and aftertreatment catalyst systems may not be able to reduce NOx sufficiently to meet the standard.

90.     The fuel system is also capable of injecting fuel very late in the combustion cycle, up to 140 degrees after engine top dead center. This late cycle fuel injection allows fuel to leave the cylinder unburned so it can react over the oxidation catalyst to provide hot exhaust for the purpose of regenerating the diesel particulate filter.

### 2.     Exhaust Gas Recirculation (EGR)

91.     Exhaust gas recirculation is used to reduce NOx emissions by introducing part of the exhaust exiting the engine back into the engine intake. Since oxides of nitrogen form in oxygen-rich, high-temperature environments, introducing exhaust gases back into the intake air charge reduces the amount of these compounds that form primarily by reducing the oxygen concentration and increasing the overall specific heat of the combustion gas mixture. Exhaust gas recirculation results in lower peak temperatures during combustion and, in turn, lower NOx concentrations. Exhaust gas recirculation is not a new technology and

- 60 -

has been regularly used on diesel engines for many years. Generally, there is a balance that must be struck with the use of exhaust gas recirculation. Increasing the exhaust gas recirculation rates decreases NOx emissions, but also increases PM emissions. High PM emission rates can be problematic as it causes the diesel particulate filter to "fill up" more frequently, thus complicating the overall emission control strategy.

### 3.     Diesel Oxidation Catalyst (DOC)

92.     The diesel oxidation catalyst is generally located near the turbo charger outlet to treat the exhaust gases just as they are leaving the engine. In the Dodge/Cummins 6.7-litre application, the close coupled diesel oxidation catalyst provides a number of functions. First, it serves as an oxidation catalyst to convert nitric oxide to nitrogen dioxide, and hydrocarbons and carbon monoxide to $CO_2$ and water.

93.     Second, the close coupled diesel oxidation catalyst works as a combustion catalyst, burning extra fuel in order to generate heat to raise exhaust temperatures necessary for the active regeneration of the diesel particulate filter.

94.     Finally, under special oxygen depleted "rich" conditions, the diesel oxidation catalyst converts injected diesel fuel into hydrogen, carbon monoxide, and lighter hydrocarbons which are used periodically to regenerate the NOx adsorber.

### 4.      NOx Adsorber Catalyst (NAC)

95.      The NOx adsorber catalyst (also known as lean-NOx trap, or LNT) technology is based on the concept of storing NOx as nitrates over storage components, typically barium species, during a lean-burn operation cycle and then reducing the stored nitrates to N2 during fuel-rich conditions over a precious metal catalyst.

96.      The NO and the $NO_2$ in the exhaust gas are first oxidized and stored on the basic components of the catalyst (mostly barium) as during normal engine operation in "lean" conditions (i.e. more oxygen present than is needed to burn the injected fuel). When the stored NOx reaches the storage capacity of the catalyst, the engine is temporarily operated in a "rich," oxygen-depleted condition. During this process, NOx is converted to nitrogen and water and removed from the NOx adsorber catalyst, thus restoring the NOx adsorber catalyst to a condition where it can adsorb more NOx.

97.      This rich operation to restore the NOx adsorber capacity typically happens on the order of every few minutes for a brief period of time.

### 5.      Diesel Particulate Filter (DPF)

98.      Once the exhaust stream has been treated by the diesel oxidation catalyst and NOx adsorber catalyst, it travels through the diesel particulate filter, where particulate matter (soot) is collected. The captured soot is cleaned through a

- 62 -

process known as regeneration, which is divided into two strategies: 1) passive regeneration and 2) active regeneration.

99.     Passive regeneration occurs any time the vehicle is being operated, provided there is sufficient nitrogen dioxide present and exhaust gas temperatures are high enough. If those two conditions are met, nitrogen dioxide (NO2) will react with captured PM and oxidize it to CO2, thus cleaning out the diesel particulate filter. It is a continuous process, meaning it occurs any time the conditions are met under normal operation. Ideally the diesel particulate filter regeneration operation would rely entirely on the passive strategy, however, low NO2 concentrations or very low exhaust temperatures limit its effectiveness and reliability.

100.    Active regeneration occurs only when the engine's control system senses the diesel particulate filter needs to be cleaned because of insufficient passive regeneration. During this process, the engine's fuel injection timing is retarded, resulting in higher temperature exhaust leaving the cylinder. These higher exhaust temperatures are further augmented with a late cycle injection of fuel over the close coupled diesel oxidation catalyst, where heat generated from catalytic combustion can raise the exhaust temperature to 600°C (1112°F). This high temperature exhaust promotes the oxidation of particulate matter held in the diesel particulate filter, thus "cleaning out" the DPF. This process is called "active

- 63 -

regeneration" because it requires specific changes to the normal engine operation driven by the engine's control system.

101.   During the active regeneration process, NOx emissions are significantly increased—as high as 20 times the NOx standard. Furthermore, active regeneration dramatically reduces fuel economy since fuel is being used for purposes other than producing engine work. For this reason, CARB and EPA require these emissions to be measured and the frequency of occurrence to reported in the certification process. It is generally desirable to report as low a regeneration frequency as possible to keep the adjusted emissions impacts low. This is discussed in more detail later.

### 6.   Integrated aftertreatment configuration

102.   Most OEMs using diesel aftertreatment opt for a configuration of the key components in the following order:

Diesel Oxidation Catalyst → Diesel Particulate Filter → NOx Reduction catalyst

103.   There are a few reasons to do this, but one primary reason is to place the DPF where it will be exposed to high levels of NOx. This configuration is favorable for the successful passive regeneration of DPF. The higher the NOx concentration, the better the DPF can remove the captured carbon without the need for high NOx and fuel-consuming active regenerations.

- 64 -

104.   Dodge/Cummins chose a different configuration for the 6.7L engine in the Ram 2500 and 3500 trucks. In this application, the key components are in the following order:

Diesel Oxidation Catalyst → NOx Adsorber Catalyst →
Diesel particulate filter

This configuration is pictured below:



2007-2012 Dodge/Cummins Aftertreatment Configuration

105.   Cummins/Dodge places the NOx adsorber upstream of the DPF specifically to address the cold start, and to a lesser extent the hot start portions of the FTP-75 certification cycle.

106.   In order to effectively reduce emissions on the cold start test, the NOx adsorber catalyst needs to heated to its operating temperature as quickly as possible. If the DPF were placed upstream of the NOx adsorber, it would soak up heat during the start up of the test and not allow the NOx catalyst to heat up in time to treat the emissions during the first part of the test cycle.

- 65 -

107.   The configuration of the NOx reduction catalyst upstream of the diesel particulate filter creates an inherent conflict of functional intent with the operation of the diesel particulate filter. As mentioned, passive low temperature regeneration of the DPF relies on the presence of NOx, especially nitrogen dioxide. If the NOx is removed by the NOx adsorber catalyst ahead of the diesel particulate filter, the diesel particulate filter is in an unfavorable location. This configuration choice essentially defaults to the need for the active DPF regeneration strategy. As will be shown, the active regeneration strategy results in very high emissions and a large impact on fuel economy. Dodge/Cummins did not fully disclose the impacts of these active regenerations in their certification documents.

D.   **Sales of 6.7L engines for the Dodge Ram 2500 and 3500 gave Cummins a competitive advantage in the heavy-duty engine market.**

108.   Cummins is a leader in the sale of heavy duty engines in the United States. Historically, Cummins has held a large market share against a number of able competitors. Sales data from Polk/IHS indicates that, between 2007 and 2009, Cummins sold approximately 155,000 engines covering six different models.

| Model/Model Year | 2007 | 2008 | 2009 | Total |
|---|---|---|---|---|
| ISB | 4,450 | 13,483 | 18,313 | 36,246 |
| ISC | 4,037 | 5,024 | 6,649 | 15,710 |
| ISL | 3,693 | 3,285 | 2,510 | 9,488 |
| ISM | 14,253 | 7,475 | 8,167 | 29,895 |
| ISX | 27,956 | 12,780 | 13,836 | 54,572 |
| ISX/SIG 600 | | | 9,408 | 9,408 |

- 66 -

| Model/Model Year | 2007 | 2008 | 2009 | Total |
|---|---|---|---|---|
| Total | 54,389 | 42,047 | 58,883 | 155,319 |

109.   During this time, the interim 2010 standards were in place. Under those standards, heavy-duty engine manufacturers were required to have a fleet average NOx emission of 1.2 g/bhp-hr. One option for truck manufacturers is to certify all engines at this standard. But Cummins decided to certify the majority of these engines far below the standard (at .2 g/bhp-hr), which allowed it to certify the sales of high-emissions trucks.

110.   The term "Family Emission Limit" (FEL) is used by OEMs to designate the emissions level used in the averaging methodology. Sales of engines with family emission limts above the standard must be offset by sales of engines below the standard. Cummins offset the sales of high family emission limit heavy-duty engines with the sales of low emission 6.7L Dodge 2500 and 3500 engines.

111.   The table below shows that for essentially all the heavy-duty engines Cummins sold between 2007-2009, there were models certified to emit above the standards. CARB and EPA allows this practice to occur based on the assumption the Cummins 6.7L engine used in the Ram 2500 and 3500 pickup trucks was a low emitting engine. It was not.

- 67 -

| Model Year | Model | Engine Size (L) | Nox Emission Levels (g/bhp-hr) | |
| --- | --- | --- | --- | --- |
| | | | Family Emission Limit (FEL) | Average Emission Standard for Model Year 2007-2009 |
| 2007 | ISB | 6.7 | 2.20 | 1.2 |
| 2007 | ISM | 10.8 | 2.50 | 1.2 |
| 2007 | ISX | 14.9 | 2.50 | 1.2 |
| 2008 | ISB | 6.7 | 2.20 | 1.2 |
| 2008 | ISL | 8.9 | 2.20 | 1.2 |
| 2008 | ISM | 10.8 | 2.50 | 1.2 |
| 2008 | ISX | 14.9 | 2.30 | 1.2 |
| 2009 | ISB | 6.7 | 2.20 | 1.2 |
| 2009 | ISM | 10.8 | 2.50 | 1.2 |
| 2009 | ISM | 10.8 | 2.20 | 1.2 |
| 2009 | ISM | 10.8 | 2.10 | 1.2 |
| 2009 | ISX | 14.9 | 2.20 | 1.2 |

112.   Cummins was allowed to sell engines certified above the standard by averaging in credits obtained by selling the 0.2 g/bhp-hr equivalent 6.7L engines used in the Ram 2500 and 3500 pickups.

Estimated sales of the 6.7L engines are show in the table below:

| Model / Model Year | 2007 | 2008 | 2009 | Total |
| --- | --- | --- | --- | --- |
| Cummins 6.7 | 33,000 | 66,000 | 56,478 | 155,478 |

113.   Dodge and Cummins voluntarily chose to pursue the ambitious task of certifying an engine meeting the 2010 emission levels three years ahead of schedule, as they did not have to be so aggressive with their technology. However,

- 68 -

Cummins benefitted greatly from this strategy by being able to sell more high-emission engines in the 2007-2009 timeframe.

E. **EPA standards for light duty vehicles and Cummins' use of energy credits**

114. The United States has two sets of parallel standards that affect fuel economy: (1) the corporate average fuel economy ("CAFÉ") standards adopted by the National Highway Traffic Safety Administration ("NHTSA"), an agency within the Department of Transportation ("DOT"); and (2) greenhouse gas ("GHG") emissions standards adopted by the EPA. The first CAFE standards were adopted in the 1970s in response to the Arab oil embargo. The first GHG emission standards became effective in model year 2012.

115. The Energy Policy Conservation Act of 1975 established the first CAFE standards for light-duty vehicles. Separate sets of standards were adopted for cars and for light trucks. For cars, the standards aimed to double the average fuel economy from 13.6 miles per gallon (mpg) in 1974 to 27.5 mpg by 1985. Vehicle manufacturers almost met this target, reaching 27.0 mpg by 1985. While the CAFE program remained in force for a number of years, its fuel economy target for cars stagnated at 27.5 mpg through 2010.

116. In 2007, the stage was set for more progressive fuel economy and GHG emission regulations. The Energy Independence and Security Act ("EISA") of 2007 mandated a 40% increase in fuel economy by 2020. Tougher fuel economy

- 69 -

standards were to be set starting with model year 2011, until the standards achieve

a combined average fuel economy of 35 mpg for model year 2020.

117.   In April 2010, NHTSA and EPA finalized new, harmonized CAFE

and GHG emission rules for model year 2012-2016 light-duty vehicles. These rules

have been designed to result in an average CAFE fuel economy of 34.1 mpg (6.9

L/100 km) and $CO_2$ emissions of 250 mg/mile in model year 2016 vehicles.

118.   These new model year 2011 rules presented manufacturing with

obstacles and opportunity. The opportunity was capturing new markets by

promoting technology that complied with new emission regulations. Manufacturers

adopted several strategies, including the introduction of electric and diesel models.

119.   Under EPA regulations, engine manufacturers may earn emissions

credits equal to their emissions limit, less the amount of emissions produced by the

engines.[13] An engine manufacturer may average, bank, and trade these emissions

credits.[14] To "average" credits means the engine manufacturer can use its

emissions credits from one engine model and apply it to another engine model—

effectively allowing the "clean" engine to pay for the dirty engine.[15] Banking

credits allows an engine manufacturer to save their emissions credits for future

---

[13] *See* Exhibit 8 EPA, "What is Emissions Trading?," https://www.epa.gov/emissions-trading-resources/what-emissions-trading.

[14] *See* 40 C.F.R. § 1036.701(a).

[15] *See* 40 C.F.R. § 1036.710.

years.[16] In some cases, engine manufacturers can use their credits retrospectively, to offset previous engines that exceeded their emissions levels.[17] Finally, engine manufacturers can trade and sell these emissions credits, either privately or on the open market.[18]

120.   According to the EPA, this system was designed to offer "flexibility for individual emissions sources to tailor their compliance path to their needs," and "incentive[s] for early pollution reductions as a result of the ability to bank surplus allowances."[19] The EPA concludes that, "[u]nder the right circumstances, emissions trading programs have proven to be extremely effective. They can achieve substantial reductions in pollution while providing accountability and transparency."[20]

121.   Falsely claiming to obtain reduced emission levels undermines this system. By using fraudulently obtained emissions credits for dirty engines, it increases the pollutants in the air and shifts the cost of emissions compliance from the owners of vehicles with dirty engines to the owners of vehicles with clean engines. According to the TruckTrend website, "Dodge made a decisive move to head off 2010 emissions regulations at the pass. By increasing the [use of the

---

[16] *See* 40 C.F.R. § 1036.715.

[17] *See id.*

[18] *See* 40 C.F.R. § 1036.720.

[19] Exhibit 8, *supra* n.13.

[20] *Id.*

010649-11 1032740 V1

Cummins 6.7L engine], the company was able to meet the upcoming 2010 standards early. This allowed Chrysler to build up EPA emissions credits that could be used during future model years. During the later part of the 2007 model year, GM introduced the 6.6L Duramax LMM engine, which made 365 hp and 660 lb-ft, even with the addition of a DPF."[21] Upon information and belief, Cummins either gave or sold FCA the credits to allow FCA to use a more powerful engine that released more emissions.

122.   In April 2010, NHTSA and EPA finalized new, harmonized CAFE and GHG emission rules for model year 2012-2016 light-duty vehicles. These rules have been designed to result in an average CAFE fuel economy of 34.1 mpg (6.9 L/100 km) and $CO_2$ emissions of 250 mg/mile in model year 2016 vehicles.

F.   **Dodge and Cummins jointly develop and promote the Polluting Vehicles with statements about emissions and cleanliness because each knew these issues were material to a reasonable consumer.**

123.   FCA and Cummins moved aggressively to promote its new vehicle, and to emphasize the strength of the relationship between the two companies. Below are a selection of public statements made by each, as part of an orchestrated campaign by each Defendant to sell the Polluting Vehicles as a cleaner and more

---

[21] Exhibit 9, *A Decade of Cummins, Duramax, and Power Stroke Diesel Engines*, Truck Trend (June 15, 2015), http://www.trucktrend.com/features/1507-a-decade-of-cummins-duramax-and-power-stroke-diesel-engines/.

- 72 -

economical alternative to gas trucks for customers looking to purchase heavy-duty trucks.

### 1.   Cummins

124.   "[E]very Dodge Ram pickup will comply with the 2010 NOx and PM emissions standards."[22]

125.   The Dodge 2500 was the "strongest, cleanest, quietest" diesel engine in its class, and delivered on their "commitment to a cleaner, healthier environment."[23]

126.   In Cummins' 2007 Sustainability Report, Cummins noted its Mission included "to demand that everything we do lead to a cleaner, healthier, safer environment."[24]

127.   Cummins' "10 Statements of Ethical Principles" include: "[1] We will follow the law everywhere," … "[5] We will demand that everything we do leads to a cleaner, healthier and safer environment," … and "[10] We will create a culture where all employees take responsibility for ethical behavior."[25]

---

[22] Exhibit 5, *supra* n.7.

[23] Exhibit 7, *supra* n.11.

[24] Exhibit 10, Cummins Inc.'s *2007 Sustainability Report* at 34, https://www. cummins.com/sites/default/files/sustainability/2007_Sustainability _Report_FINAL.pdf.

[25] *Id.*

- 73 -

128.    "Cummins engineers determined that certifying the Dodge Ram pickup truck to the 0.2 g/mi 2010 NOx emission standard early would provide Cummins with significant commercial and technical advantages. Achieving these stringent emission standards required engineers to reduce particulate and NOx emissions by more than 90 percent. This catalyst system was used in more than 450,000 Chrysler ISB engines from 2007 to 2013. The EPA credits generated by this technology allowed Cummins' teams to focus on hitting the next round of emissions standards for other engine platforms, and allowed the company to avoid interim emissions phase-ins. As a result, Cummins increased its heavy duty market share and gained the market share lead in 2007. Today, the company maintains that lead with 41.5 percent of Class 8 vehicles, and 62.5 percent of Class 6 and 7 vehicles.[26]

129.    "The application of the right technology on the Dodge Ram is an extension of the joint clean diesel development work Cummins and DaimlerChrysler have performed together for nearly two decades," said Cummins President and Chief Operating Officer Joe Loughrey. "The new best-in-class Cummins Turbo Diesel and the Dodge Ram will provide the strongest, cleanest, quietest solution for heavy-duty pickup truck customers."[27]

---

[26] *See* Exhibit 11, "Employees Honored for Making Cummins Stronger through Innovation," http://social.cummins.com/making-cummins-stronger-innovation/.

[27] Exhibit 5, *supra* n.7.

130.   "Cummins built its 2-millionth pickup truck engine for the Chrysler Group LLC in December, the latest development in a more than 25-year partnership between the two companies."[28]

131.   "This milestone build is a significant achievement for Cummins and our employees, and is an accomplishment of which we are immensely proud," said Wayne Ripberger, General Manager—Pickup and Light Commercial Vehicle Operations. "At Cummins, we take great pride in each and every engine we build—whether it's the first or the 2-millionth."[29]

132.   In winning a 2008 award from *Automotive News*, Cummins stated "Cummins has been recognized for the 6.7L Dodge Ram Turbo Diesel engine which debuted in January 2007 and is available in the Dodge Ram 2500 and 3500 models. The 6.7L diesel engine is the strongest, cleanest, quietest heavy-duty diesel pickup truck engine available on the market and is the first to meet the 2010 EPA emissions regulations in all 50 states. Cummins achieves this by using a NOx Adsorber Catalyst—a breakthrough technology designed and integrated by Cummins." [30]

---

[28] Exhibit 12, "Two-Millionth Cummins Pickup Engine Rolls off Line for Chrysler," http://social.cummins.com/two-millionth-cummins-pickup-engine-rolls-line-chrysler/.

[29] *Id*.

[30] Exhibit 13, Cummins Inc.'s Apr. 15, 2008 Press Release, http://investor.cummins.com/phoenix.zhtml?c=112916&p=irol-newsArticle_Print&ID=1129865.

133.   As noted by Joe Loughrey, President and Chief Operating Officer of Cummins, in accepting the award, "This is a significant product innovation and a terrific honor for Cummins to be recognized. We share this recognition with our customer, Chrysler, who collaborated with us in developing a common vision for a product that would deliver on our commitment to exceptional customer satisfaction while ensuring our contribution to a cleaner environment."[31]

134.   "Cummins Inc. today announced a multiyear extension of its current agreement with Chrysler Group LLC. Cummins will supply 6.7-liter Turbo Diesel engines for Ram Heavy Duty pickups and Chassis Cab trucks while continuing to grow its partnership with Chrysler, which began 21 years ago. Cummins has produced over 1.7 million Cummins Turbo Diesel engines for Dodge Ram Heavy Duty trucks since 1989. Today, over 80 percent of Ram Heavy Duty truck customers purchase their truck with the legendary Cummins Turbo Diesel."[32]

135.   "Today's 6.7-liter Turbo Diesel delivers 350 hp (261 kW) and 650 lb-ft (881 N-m) of torque. This 118 percent increase in horsepower and 86 percent increase in torque have been achieved while also reducing exhaust emissions by 90 percent. In 2007, Dodge and Cummins produced the cleanest heavy-duty diesel

---

[31] *Id.*

[32] Exhibit 14, Cummins Inc.'s Feb. 3, 2010 Press Release, http://investor.cummins.com/phoenix.zhtml?c=112916&p=irol-newsArticle&ID=1382531.

pickup in the market by meeting [EPA] 2010 emissions levels a full three years in advance."[33]

136.    "Cummins and Chrysler have a long and important history together," said Dave Crompton, Cummins VP and General Manager, Midrange Engine Business. "The Chrysler business continues to be a key part of our MidRange engine business. Cummins is proud to supply engines for the award-winning Ram Heavy Duty and to continue working with Chrysler to develop best-in-class products that customers can trust and depend on now and in the future."[34]

137.    FCA for its part publicly praised its relationship with Cummins. After reaching two million truck sales as partners, FCA stated that "[t]he Ram Truck-Cummins diesel partnership is one of the industry's most enduring and certainly fitting of such a tribute." In the news release FCA noted "Both companies have benefited greatly, but Ram diesel customers are the real beneficiaries. Every day they experience the toughness and capability a Cummins-powered Ram can deliver."[35]

138.    In presenting an environmental award to Cummins, FCA/Chrysler stated: "Working in a close partnership, Chrysler and Cummins achieved remarkable results in meeting and exceeding both regulatory requirements and

---

[33] *Id.*

[34] *Id.*

[35] Exhibit 12, *supra* n.28.

customer needs. The new Dodge Ram 2500 and 3500 are the first vehicles to achieve the stringent NOx 'phase-in' emission standard in all 50 states, and to do so three years early. The 6.7-liter Cummins Turbo Diesel maintains fuel efficiency as compared to the 2006 model. It also maintains the diesel engine's 30 percent fuel economy savings over gasoline engines, and thus lower $CO_2$ emissions."[36]

### 2.   FCA promotes reduced emissions and clean diesel

139.   In brochures, on websites, and in advertisements, FCA promoted the "clean" nature of its Cummins engine diesel vehicles, promising technology "profoundly effective" at reducing emissions, as well as compliance with emission standards.

#### a.   2008 brochure for Ram 2500/3500 trucks

140.   In the 2008 brochure, FCA promised that the Cummins 6.7 was "so clean it warrants a class of its own:"[37]

> **The Cummins® 6.7-liter Turbo Diesel. So good, so powerful, and so clean it warrants a class of its own – and it's only in a Dodge Ram Heavy Duty.**
>
> The most recent example of the world-famous Cummins powerplant continues the Cummins history with Dodge Ram—a legacy of pure, driven truck power taking advantage of an increasingly popular—and today, surprisingly clean—fuel source. By utilizing a high pressure direct-injection fuel system in a Ram Heavy Duty—trucks that now cover weight classes from the

---

[36] Exhibit 10, *supra* n.24, at 13.
[37] Exhibit 15, 2008 Dodge Ram Brochure.

trusted Ram 2500 up to the all-new Ram 5500 Chassis Cab models—Cummins and Ram deliver everything it takes for world-class performance. Torque is the most critical component for many heavy-duty applications. With the Cummins 6.7-liter, it maxes out at an incredible 650 lb-ft[38]—as well as offering the best-in-class low-end torque.[39] Horsepower peaks at 350, providing ample acceleration. (In fact, power from the Cummins Turbo Diesel in the Dodge Ram lineup is under Cummins peak performance: the engine is so extraordinary, it's actually designed to power much larger Class 6 and Class 7 trucks.) Consider all that Cummins has to offer, and you become part of history in the making in real time: today, over 1.5 million Cummins equipped Dodge Rams are powering the roads, farms, and industrial sites of the world. What can you expect from Cummins in your Ram? Count on diesel-specific efficiency. Outstanding performance that defines reliability. Longevity that reaches hundreds of thousands of miles. And durability so impressive, it approaches the inexhaustible. For more, visit doge.com/ram/cummins—or see for yourself, during your test drive.

141.   And the brochure promised the vehicles met emissions standards in all states:[40]

**ADVANCED REQUIREMENTS MET TODAY**. The particulate filter is profoundly effective, and is a major factor in Cummins diesel emissions reduction Ram 2500 and 3500 pickup models. Reduced emissions are so important, the 6.7-liter is already able to meet the stringent truck emissions standards based on future requirements—for the 2010 model year. And it meets them in all 50 states.

---

[38] Requires automatic transmission.

[39] Below 1,500 rpm.

[40] Exhibit 15 *supra* n.37.

- 79 -

142.   Again the brochure promised the "cleanest diesels of any:"[41]

> **LARGE PISTON BOWL HELPS KEEP THINGS CLEAN.** The large piston bowl is another engineering technique used to ensure good power and clean emissions. In fact, based on full-size diesel pickup trucks, the Cummins offers the cleanest diesel emissions of any.

    **b.**    **2009 brochure for Ram 2500/3500 trucks**

143.   The 2009 Brochure continued the promises of technology that would yield "low emissions," "among the cleanest of any full size pickup trucks:"[42]

> **THE INCREDIBLE CUMMINS 6.7-LITER TURBO DIESEL. SO POWERFUL, IT DROPS THE COMPETITION WITH A ONE-TWO-THREE PUNCH OF 650[43] LB-FT OF TORQUE, 350 HORSEPOWER, AND SQUEAKY CLEAN EMISSIONS.**
>
> **THE CUMMINS® 6.7-LITER TURBO DIESEL: A CLEAN BREAK FROM OTHER DIESELS**. Cummins and Dodge Ram form a team that results in outstanding reliability. Used in Ram 2500 up to Ram 5500 Chassis Cabs, the Cummins has total capability with 650 lb-ft[44] of torque and best-in-class low-end torque.[45] But a history that starts with powering more than 1.6 million Dodge Rams also addresses the future. The Cummins 6.7-liter now ranks among the cleanest of any full-size pickup diesel engine. Emissions are so low, they currently meet 2010 emissions regulations. For more, visit dodge.com/ram_hd.

---

[41] *Id.*

[42] Exhibit 16, 2009 Dodge Ram Brochure.

[43] Requires automatic transmission.

[44] *Id.*

[45] Below 1,500 rpm.

- 80 -

**LEAN, MEAN—AND VERY CLEAN**. Fewer moving parts than comparable gas engines reduces complexity—and consequent costs. And this Cummins is super-clean, making it the cleanest full-size pickup diesel out there.

### c.    2010 brochure for Ram 2500/3500 trucks

144.    The 2010 Brochure called the Cummins engine one of the cleanest:[46]

> **THE DRIVING FORCE BEHIND MANY RAM HEAVY DUTY MODELS: THE SINGULAR 6.7-LITER CUMMINS® TURBO DIESEL**. By any measure, it's got game. Torque—the benchmark figure for working power—is almost off the charts, maxing out at 650 lb-ft @ 1,500 rpm. But no matter which model you drive, when measured in terms of quality, it's got legs. Over a million Ram models have been powered by the world-renowned Cummins Turbo Diesel. As one of the cleanest, most powerful, and most respected diesel engines in any commercial pickup, this remarkable power plant can power significantly larger-class vehicles. Measure it in your own terms for strength, quietness and efficiency—when you test-drive a new 2010 Ram Heavy Duty.

### d.    2011 brochure for Ram 2500/3500 trucks

145.    The 2011 Brochure promised "clean performance" including when used for towing and hauling:[47]

> **CUMMINS. THE QUIET AUTHORITY IN CHARGE OF DIESEL POWER.** Boasting quiet and <u>clean performance</u>, the Cummins generates between 610 and 650 lb-ft of torque (at only 1,500 rpm) and 350 horsepower, depending on transmission, meeting

---

[46] Exhibit 17, 2010 Dodge Ram Brochure.

[47] Exhibit 18, 2011 Dodge Ram Brochure.

virtually every need for towing, hauling, and responsive acceleration.

146.   And it promised it met emissions standards:[48]

The Cummins 6.7-liter Turbo Diesel in Ram Heavy Duty is the only one in its class to meet all 50-state emissions standards—with no need for DEF—resulting in impressive savings in time, costs and hassles.[49]

147.   The Brochure called the engine a model of cleanliness:[50]

**FUEL FILTER: A WORKING MODEL OF EFFICIENCY.** There is little doubt that diesel will play an increasingly important role for both truck and car propulsion. Diesel engines today are a model of cleanliness—in part, due to the fuel filter. The Cummins Turbo Diesel features a fuel filter with outstanding efficiency.[51]

**e.      2012 brochure for Ram 2500/3500 trucks**

148.   The 2012 Brochure marketed the Cummins-FCA 6.7-liter engine as the most formidable partnership in the world and proclaimed that this engine was the only one that eliminates the need for a Diesel Exhaust Fluid System (DEF) as required by Ford and General Motors.[52] Again, FCA promised that the 6.7 Cummins engines in the Ram trucks met all emissions requirements.[53]

---

[48] *Id.*

[49] *Id.* at 8.

[50] *Id.*

[51] *Id.*

[52] Exhibit 6, *supra* n.10.

[53] *Id.*

G.   **FCA's other emissions deception**

149.   As referenced above, on January 12, 2017, the EPA issued a Notice of

Violation against Fiat Chrysler Automobiles N.V. and FCA US LLC for failing to

justify or disclose defeat devices in model year 2014-2016 Dodge Ram 1500

EcoDiesel and 2014-2016 Jeep Grand Cherokee EcoDiesel vehicles.[54] The EPA is

currently working in coordination with CARB to investigate FCA, which has also

issued a notice of violation to FCA.[55]

150.   The Notice of Violation is based in part on emissions testing

performed by the EPA at the National Vehicle and Fuel Emissions Laboratory. The

EPA performed this testing "using driving cycles and conditions that may

reasonably be expected to be encountered in normal operation and use for the

purposes of investigating a potential defeat device."[56]

151.   The EPA identified at least eight Auxiliary Emissions Control

Devices (AECDs) in the FCA vehicles:

- AECD 1 (Full Exhaust Gas Recirculation ("EGR") Shut-Off at Highway Speed)

- AECD 2 (Reduced EGR with Increasing Vehicle Speed)

- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)

---

[54] Exhibit 2, *supra* n.2.

[55] Exhibit 3, *supra* n.3.

[56] Exhibit 2, *supra* n.2.

- 83 -

- AECD 4 (Diesel Exhaust Fluid Dosing Disablement during SCR[57] Adaptation)

- AECD 5 (EGR Reduction due to Modeled Engine Temperature)

- AECD 6 (SCR Catalyst Warm-Up Disablement)

- AECD 7 (Alternative SCR Dosing Modes)

- AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

152.    EPA testing found that "some of these AECDs appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards using the Federal emission test procedure (e.g., FTP, US06) than in normal operation and use."[58] For example:

   a.    AECD 3, when combined with either AECD 7 or AECD 8, disables the EGR system without increasing the effectiveness of SCR system. Under some normal driving conditions, this disabling reduces the effectiveness of the overall emission control system. The AECD 3 uses a timer to shut off the EGR,

---

[57] Selective Catalytic Reduction ("SCR") is an emissions control system that injects diesel exhaust fluid through a special catalyst into the exhaust stream of a diesel engine.

[58] *Id.*

which does not appear to the EPA to meet any exceptions to the regulatory definition of "defeat device."

b.      AECD 5 & 6 together reduce the effectiveness of the NOx emissions control system, using a timer to discontinue warming of the SCR after treatment system, which reduces its effectiveness.

c.      AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx during normal vehicle operation and use. The operation of AECD 1, AECD 2 and/or AECD 5 increase the frequency of occurrence of AECD 4.

d.      AECDs 7 & 8 work together to reduce NOx emissions during variable-grade and high-load conditions.

153.    The EPA further found that FCA did not disclose or justify these control devices in their Certificate of Conformity applications, as required by EPA regulations, and that FCA was in violation of the Clean Air Act each time it sold, offered for sale, introduced in commerce, or imported approximately 103,828 of these EcoDiesel vehicles.

H.    **Testing of the vehicles**

1.    **Emission test cycles and emission standards**

154.   An emissions test cycle defines a protocol that enables repeatable and comparable measurements of exhaust emissions to evaluate compliance. The protocol specifies all conditions under which the engine is tested, including lab temperature and vehicle conditions. Most importantly, the test cycle defines the vehicle speed over time that is used to simulate a typical driving scenario. An example of a driving cycle is shown in Figure A. This graph represents the FTP-75 (Federal Test Procedure) cycle that has been created by the EPA and is used for emission certification and fuel economy testing of passenger vehicles in the United States. The cycle simulates an urban route with frequent stops, combined with both a cold- and a hot-start transient phase. The cycle lasts 1,877 seconds (about 31 minutes) and covers a distance of 11.04 miles (17.77 km) at an average speed of 21.2 mph (34.12 km/h).

- 86 -

**Figure A**



Graph of FTP-75 Cycle

155.   To assess conformance, these tests are conducted on a chassis dynamometer, an apparatus that holds a vehicle in place while allowing its driven wheels to turn with varying resistance meant to simulate the actual load on the engine during on-road driving. A chassis dynamometer is essentially a "treadmill" where vehicles can operate as if they are driving on-road, but without physically moving the vehicle.

156.   Emissions are measured during the test and compared to an emissions standard that defines the maximum pollutant levels that can be released during such a test. In the United States, emissions standards are managed on a national level by the EPA. In addition, California has its own emissions standards that are defined and enforced by CARB. These more stringent California standards are also

- 87 -

adopted by a number of other states (the so called "Section 177" states).[59] Together with California, these states cover a significant fraction of the U.S. market, making them a *de facto* second national standard.

157.   The FTP-75 is the primary dynamometer test cycle used to certify light- and medium-duty passenger cars/trucks. This cycle is predominately a dynamic cycle, with rapid changes in speed and acceleration meant to reflect city driving combined with some steadier higher speed sections meant to account for highway driving.

158.   A critically important thing to understand about the FTP-75 is that it is a "cold start" cycle, meaning the vehicle starts the cycle with the engine having been off for at least eight hours, with the intention that all engine components are at ambient temperature. The "cold start" portion of the test is challenging for diesel engines like the Cummins engine employing a NOx adsorber catalyst because the catalyst designed to capture NOx emissions is not yet at temperatures where it works (*i.e.*, above their "light-off" temperature). To a lesser, but important, extent the FTP-75 also includes a "hot start" phase, which has similar issues resulting from cool down of catalysts before this phase begins.

---

[59] Those states are: Connecticut, Maine, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, Delaware, Georgia, and North Carolina.

159.   These cold start and hot start phases of the certification drove Cummins to place the NOx adsorber catalyst ahead of the diesel particulate filter, as explained above, with the result that the vehicle cannot achieve the emission standard and limit the number of active regenerations.

160.   The regulatory agencies know that active regeneration events lead to extreme NOx. For this reason, manufacturers must quantify the impacts of active regenerations as part of the certification procedure. This calculation, which is described in CFR 86.004-028 paragraph (i), amounts to a simple weighted average of emissions when active regenerations events are NOT occurring, multiplied by the fraction of time when active regeneration is not occurring, plus the emissions during active regeneration multiplied by the fraction of time active regeneration occurs.

The following simple example illustrates a typical calculation:

- Normal emissions as measured on the FTP-75 without active regeneration = 150 mg/mile.

- Emissions measured on the FTP-75 with active regeneration = 2000 mg/mile.

- Fraction of driving time during which active regeneration occurs = 2%.

Emissions for certification purposes would therefore be:

(150 mg/mile) x 98% + (2000 mg/mile) x 2% = 187 mg/mile

- 89 -

161.   The difference between the emissions as measured on the FTP-75 and the weighted average emissions that include the impact of active regeneration is called the Upward Adjustment Factor (UAF). The UAF in this example would be (187 mg/mile – 150 mg/mile) = 37 mg/mile. It essentially quantifies the increase in NOx due to the long-term, time-weighted effect of active regenerations.

162.   When certifying a vehicle, the upward adjustment factor must be added to the FTP-75 result. The sum of the two must be less than the emission standard. The following table lists the FTP-75 emission result, UAF, and certification emissions for the relevant vehicle model years. Note that the certification result is rounded to one significant digit so, for example in model year 2007, 170 + 49 = 219 is rounded down to 200 mg/mile.

| Model Year | FTP-75 result | Upward Adjustment Factor (UAF) | Certification Result | Standard |
|---|---|---|---|---|
| 2007 | 170 | 49 | 200 | 200 mg/mile |
| 2008 | 170 | 49 | 200 | 200 mg/mile |
| 2009 | 170 | 49 | 200 | 200 mg/mile |
| 2010 | 170 | 49 | 200 | 200 mg/mile |
| 2011 | 150 | 61 | 200 | 200 mg/mile |
| 2012 | 150 | 61 | 200 | 200 mg/mile |

163.   Plaintiff PEMS testing has shown that the average emission rate during regeneration during conditions substantially similar to the FTP-75 certification test is 3,352 mg/mile. This is the average of three trucks spanning all

- 90 -

model years. The regeneration emissions were found to be quite consistent across the dozens of tests conducted. In order to achieve an upward adjustment factor of 49 mg/mile with an FTP emissions value of 170, as certified for model years 2007 through 2010, the regeneration frequency must be 1.5%. In order to achieve an upward adjustment factor or 61 mg/mile with an FTP emissions value of 150, as certified for model years 2011 and 2012, the regeneration frequency must be 1.9%. This kind of regeneration frequency has been observed by Plaintiffs' experts in a wide variety of other diesel applications as quite common, so this frequency is about what would be expected.

164.   In practice, because the location of the NOx adsorber catalyst is in front of the DPF, passive regeneration does not occur often enough to allow the 2007-2012 Dodge Ram 2500 and 3500 trucks to operate reliably without active regenerations. In order to compensate, Cummins introduced a defeat device to dramatically increase the active regeneration frequency to an average of 14.6% in driving closely approximating the FTP-75 certification cycle and 13.3% in steady speed highway driving—7 to 10 times the values permitted by the reported upward adjustment factors. Specifically the defeat device is the non-disclosed increase in regeneration frequency. Because of the extreme NOx emissions associated with active regeneration events, the real-world NOx emissions of the model year 2007-2012 trucks are much higher than the standard.

- 91 -

## 2.    Vehicle testing methodology

165.   Plaintiffs' experts have performed extensive portable emission measurement system (PEMS) testing on three exemplar Dodge Ram 2500 pickups equipped with 6.7 Liter Cummins diesel engines: a model year 2007 with 41,000 miles, a model year 2009 with 48,000 miles, and a model year 2012 with 73,000 miles. Furthermore, chassis dynamometer testing of the type used to certify these vehicles was performed on the 2012 model year.

166.   It should be noted that all three trucks are certified for a full useful life of 120,000 miles. In the case of the 2007 and 2009 trucks, the actual vehicle mileage is little more than 1/3 of the way through their full useful life, while the 2012 is about 60% of the way through its full useful life. In that regard, the test vehicles were selected to produce *conservative* (*i.e.*, lower) measures of emissions, as aged emission components and engines can lead to higher emissions.

167.   The test vehicles underwent rigorous inspections and check-in processes. The vehicles were put on a hydraulic rack, the underbody cowlings were removed, and the emission control systems were inspected to ensure the parts were intact and free from damage.

168.   The vehicles were also checked for engine faults and maintenance history to ensure the regular scheduled maintenance was performed, that the

- 92 -

vehicles were free from accidents, and that there were no fault codes indicating any problems with the emission control system.

169.   The tire pressure was adjusted to the recommended specification and the vehicle weight was set to the certification test weight of 8,500 lbs using water buckets for ballast. The final weight with driver and test system was confirmed on a scale.

### 3.   PEMS testing is reliable and accurate.

170.   The vehicle was tested over a variety of conditions using a portable emission measurement system (PEMS). As explained below, PEMS is essentially a "portable laboratory" that allows measurement of emissions outside of a laboratory setting used for certification testing.

171.   PEMS is a collection of measurement devices that has been used since the 1990s to measure real-world vehicle emissions performance outside of a laboratory. PEMS measures oxides of nitrogen, total hydrocarbon, methane, carbon monoxide, and carbon dioxide as well as particulate matter (PM) emissions during on-road driving of light and heavy-duty vehicles.

172.   PEMS systems are highly accurate when compared to chassis dynamometer-based tests used for vehicle emissions certification. In fact, their accuracy is such that they are currently integrated into the European vehicle emission certification process to test RDE (real driving emissions). Both EPA and

- 93 -

CARB employ PEMS as part of the heavy duty in-use compliance program to measure emissions against the not to exceed (NTE) standards, where procedures have been codified in the code of federal regulations. Furthermore, both CARB and EPA make wide use of PEMS to evaluate vehicles for the presence of defeat devices. One such study, published by the Center for Alternative Fuels Engines and Emissions (CAFEE) in collaboration with CARB, made heavy use of PEMS to discover the presence of defeat devices in Volkswagen diesels.[60]

173.   PEMS has been used since the 1990s to measure real-world vehicle emissions performance. These systems are manufactured by highly respected and well-established emissions measurement equipment suppliers like AVL, Horiba, and Sensors Incorporated. All three of these companies are leading suppliers of emissions measurement systems used for vehicle and engine certification, and they bring their experience in conventional emissions analyzers to bear in designing PEMS. Conventional gas analysis systems are very large and complex. Since the years when chassis dynamometer testing was originally introduced, advances in analyzer technologies over the past three decades have allowed for the miniaturization of conventional laboratory analyzers, yielding major size and weight reductions. The introduction of powerful laptop computers capable of controlling and capturing data from these systems was also essential their

---

[60] Thompson, Gregory J., *et. al.* "In-Use Emissions Testing of Light-Duty Diesel Vehicles in the United States," CAFEE publication, May 15, 2014.

introduction. These technological advances made it possible for high-accuracy emissions analyzers to be deployed on vehicles while driving on the road outside of the laboratory setting.

174.   Conventional emissions testing used for certification of vehicles is performed on a chassis dynamometer. As mentioned above, the dynamometer is a "treadmill" for the driven wheels of a vehicle. The driven wheels are placed on rollers attached to an electric motor capable of simulating the forces on the vehicle during real-world driving on the road (in certain instances, flywheels may also be used to simulate vehicle inertia). The chassis dynamometer simulates inertial forces (*i.e.*, the resistance to acceleration or deceleration from the vehicle's weight), static friction, rolling resistance, and aerodynamic drag. When properly calibrated, the chassis dynamometer will simulate real-world driving with a high degree of accuracy. A "coastdown" procedure is used to verify that rolling resistance and drag are accurately simulated. However, the inertial load simulation requires very rapid and precise response from the electric motor for high accuracy. Slow responding systems can under-load the vehicle during acceleration. By contrast, real-world inertial forces on the vehicle are inherent in PEMS testing since this testing is conducted on the road in normal driving.

175.   The analyzers used to measure gaseous emissions in the chassis dynamometer setting are accurate to within 1% of the full measurement scale.

- 95 -

These analyzers are calibrated before and after each emissions test to ensure they deliver a high level of accuracy and that the calibration does not appreciably change (or drift) during the emissions test. Furthermore, analyzers undergo monthly 10-point calibrations to ensure their response is accurate throughout the measurement range of each analyzer. These measurements are supplemented with high precision measurement of ambient temperature and relative humidity. NOx is adjusted for those values.

176.   PEMS analyzers are subject to the same requirements. In fact, analyzers used by Plaintiffs' experts have an accuracy of 0.3% of full scale, well within the 1% requirement used for chassis dynamometer analyzers. These analyzers are also subject to the same monthly 10-point calibration to ensure accuracy throughout the measurement range. The analyzers are also calibrated before and after each test to ensure they are both accurate and free of excessive drift. Drift has been shown to be far less than 1% even after several hours of testing. PEMS also employs high accuracy temperature and relative humidity measurements to adjust NOx.

177.   Put simply, the analyzers used in chassis dynamometer testing and PEMS testing have virtually identical levels of accuracy and are subject to the same strict requirements for calibration and drift.

178.   Notably, because PEMS testing is designed for and is conducted on the road in actual driving, it is potentially more accurate than chassis dynamometer testing in certain respects. The chassis dynamometer simulates inertial forces (*i.e.*, the resistance to acceleration or deceleration from the vehicle's weight), static friction, rolling resistance, and aerodynamic drag. When properly calibrated, the chassis dynamometer will simulate real-world driving with a high degree of accuracy. A "coastdown" procedure is used to verify that rolling resistance and drag are accurately simulated. However, the inertial load simulation requires very rapid and precise responses from the electric motor for high accuracy. Slow responding systems can under-load the vehicle during acceleration. By contrast, real-world inertial forces on the vehicle are inherent in PEMS testing since this testing is conducted on the road in normal driving.

179.   One primary difference between PEMS and chassis dynamometer emissions testing is that the latter mixes the raw exhaust with ambient air in a dilution tunnel to simulate the effects of vehicle exhaust mixing with ambient air immediately after emission from the tailpipe. In the case of PEMS, the raw exhaust emissions are measured. The dilution tunnel has the largest effect on particulate matter measurements, where sulfate and hydrocarbon aerosols may be formed during the dilution process, thereby increasing PM emissions. In modern diesels using low-sulfur fuels, these effects are much less important than in the past, where

- 97 -

hydrocarbon and sulfate formation was much higher. The effect on gaseous

pollutants, and in particular NOx, is negligible. Therefore, the raw gas

measurement of NOx taken during PEMS testing will closely match the diluted

exhaust measurement taken in a dilution tunnel.

180.   A wide variety of studies have been performed over the years to

validate the accuracy of PEMS. One such study, conducted by experts at Ricardo

UK, one of the world's leading vehicle research and development companies,

concluded that, "NOx emissions agreed within ∼10% across a wide range of

values."[61] When considering that defeat devices result in emissions that are often

several times, or even orders of magnitude, higher than the relevant emissions

standards, this level of agreement with chassis dynamometer emissions

measurement is more than sufficient to identify the presence of defeat devices and

to quantify the effects.

181.   A well-designed PEMS test program can account for ambient

temperature, traffic variability, relative positive acceleration (RPA—*i.e.*, the

"hardness" or "softness" of the driver's driving style), road quality, and wind

speed. The effect of wind speed, in particular, can be averaged out by conducting a

large number of tests with variable wind conditions. Tests are typically repeated

dozens of times, with careful attention paid to, among other things, the average

---

[61] Anderson, Jon, *et. al.*, "On-Road and Chassis Dynamometer Evaluations of
Emissions from Two Euro 6 Diesel Vehicles," SAE 2014-01-2826, October 2014.

cycle speed, ambient temperature, RPA, and road grade. Plaintiffs' experts, who have extensive experience with chassis dynamometer and PEMS testing, took careful measures to ensure tests were conducted properly and according to best practice, with awareness of the variety of variables to be considered and factored into the interpretation of the results.

182.   Notably, chassis dynamometer-based testing also depends on data collected through real-world driving. To perform chassis dynamometer testing to certify a vehicle, on-road data must be collected for each vehicle that is tested to obtain a proper model of the vehicle's rolling resistance and aerodynamic drag (called the vehicle's "road load model"). This procedure is conducted over the road and must be repeated multiple times to account for the effects of variable wind speeds and directions. This kind of repetition is no different than that required to average out the effects of wind speed during PEMS testing. In order for the chassis dynamometer to simulate real-world driving accurately, the testing conducted over the road to create the road load model must be generated with great care, accounting for effects like tire pressure, drive train resistance, state of maintenance, vehicle inertial load, etc.—the same issues that must be addressed when conducting PEMS tests.

183.   Furthermore, it is possible to re-create virtually any chassis dynamometer certification cycle over the road using a PEMS by simply following

the same vehicle speed cycle in a carefully controlled setting. Special test software has been developed by Plaintiffs' experts to allow these test cycles to be performed on the road. In the case of medium duty passenger vehicles, like the Ram 2500, it is virtually impossible to test the full combined weight rating of 20,000-20,000 lbs on a chassis dynamometer, as most of these dynamometers either lack the ability to simulate those inertial loads or maintain traction of the driven wheels on the dynamometer roller (or rollers) during testing. For the same reason, sharp accelerations and aggressive driving can be problematic for these heavier vehicles.

184.   Importantly, it is often not possible to test conditions on a chassis dynamometer that might be experienced in the real world. As was discovered during the Volkswagen diesel scandal, the vehicle's engine control module can often detect that the vehicle is being tested on a chassis dynamometer. In addition to being able to detect that a certification test cycle is being run, as with Volkswagen, vehicles can use various sensors to determine the vehicle is on a chassis dynamometer. Types of algorithms used to detect a chassis dynamometer include, but are not limited to, the following:

    a)    Driven wheels are moving but the front wheels are not turning, a condition only experienced on a chassis dynamometer. All modern vehicles are equipped with steering wheel angle sensors and can detect when the steering wheel is being turned.

    b)    On a 2-wheel drive vehicle, the driven wheels are moving but the non-driven wheels are not, a condition only experience on a chassis dynamometer.

- 100 -

c)    On a vehicle equipped with GPS, the vehicle's wheels are moving while the GPS position is not changing.

185.    For this reason, while testing on a chassis dynamometer for defeat devices, it can never be ruled out that the vehicle can detect it is being tested on a chassis dynamometer. Therefore, results from chassis dynamometer testing may be dramatically different than those measured in real-world driving. In contrast to chassis dynamometer testing, the vehicle cannot detect the presence of a PEMS. PEMS is not only accurate for detection and quantification of defeat devices, it is essential.

186.    PEMS testing was also used by CAFEE at West Virginia University to test light duty vehicles under a contract from the International Council on Clean Transportation ("ICCT"). CAFEE relied primarily on PEMs testing and in the process uncovered the fact that Volkswagen vehicles were not meeting emissions standards. The ICCT contract with CAFEE mandates that CAFEE use PEMs.

I.    **Overview of testing conducted by Plaintiffs**

1.    **Dynamometer testing**

187.    Of the three trucks for which emissions testing was performed, the one truck with the highest mileage and most component aging—the 2012—was selected for chassis dynamometer testing. The 2012 Ram 2500 was tested according to the federal test procedures on the FTP-75 cycle—the cycle that's used to certify the vehicle to the emission standard. The FTP-75, as previously

- 101 -

explained, is split into three phases, as described above. The results are presented below:

### 2. FTP-75 results for 2012 Dodge Ram

| Phase 1 NOx (mg/mile) | Phase 2 NOx (mg/mile) | Phase 3 NOx (mg/mile) | Composite NOx (mg/mile) | Rounded Result (mg/mile) | Standard (mg/mile) | Pass/Fail |
|---|---|---|---|---|---|---|
| 463 | 106 | 278 | 227 | 200 | 200 | **Pass** |

188. The 2012 exemplar produced a composite result of 227 mg/mile on the FTP-75, which is rounded to 200 mg/mile. The truck therefore meets the emission standard and the emission system is operating as intended. Although the 2012 truck was aged more heavily than both the 2007 and 2009 exemplars, it did not experience significant deterioration. It is therefore expected that the truck should demonstrate the ability to meet the standard during on-road testing with the PEMS system. As will be shown, because of the presence of defeat devices, the on-road NOx emissions with PEMS are dramatically higher.

### 3. PEMS testing

189. In general, PEMS testing was conducted in two types of conditions:

1) Stop-and-go driving with average speeds and relative positive accelerations (*i.e.*, a measure of the aggressiveness of driving) that correlate closely with the FTP-75 certification test cycle.

2) Steady speed testing at 60 mph with cruise control. This speed is typical of a highway driving speed. Steady speed at cruise control is conservative (*i.e.*, tends toward lower emissions) from an emissions standpoint because the steady conditions allow the vehicle's software to more easily control emissions.

- 102 -

### 4.    Stop-and-go overall results

190.    In stop-and-go conditions, the results are as follows for the three model years.

191.    The model year 2007 vehicle was tested over 506 miles in stop-and-go conditions similar to the FTP-75 test profile. A total of 90 tests were conducted. The average emissions were 871 mg/mile, or 4.4 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 1,475 mg/mile, or 7.4 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 15.8% of the vehicle miles traveled. This is nearly 10 times the frequency disclosed in the certification through the statement of the upward adjustment factor. During active regeneration, emissions were found to be as high as 4,543 mg/mile.

192.    The model year 2009 vehicle was tested over 453 miles in stop-and-go conditions similar to the FTP-75 test profile. A total of 92 tests were conducted. The average emissions were 1,064 mg/mile, or 5.3 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 1,690 mg/mile, or 8.5 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 16.5%. This is nearly 10 times the frequency required by certification. During active regeneration, emissions were found to be as high as 8,787 mg/mile.

- 103 -

193.   The model year 2012 vehicle was tested over 987 miles in stop-and-go conditions similar to the FTP-75 test profile. A total of 181 tests were conducted. The average emissions were 751 mg/mile, or 3.8 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 2,985 mg/mile, or 14.9 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 11.5%. This is six times the frequency required by certification. During active regeneration, emissions were found to be as high as 8,379 mg/mile.

194.   The "compliance factor" for these vehicles in FTP-like conditions is shown in the following three plots, once for each model year vehicle. The compliance factor is based on the vehicle emissions relative to standard. It is simply the actual emissions divided by the standard. In the compliance factor charts below, a compliance factor of 1 indicates the fraction of vehicle miles traveled the vehicle was above the standard (a compliance factor less than 1 would mean the emissions are below the standard). A compliance factor of 2 indicates the fraction of vehicle miles driven where the NOx emissions were twice the standard or more. Similarly, a compliance factor of 10 indicates the fraction of vehicle miles driven where the NOx exceeded the standard by a factor of 10 or more. The distribution of compliance factors for all three test vehicles is shown below.

- 104 -







195.   The 2007 Ram spends 89% of the vehicle miles traveled ("VMT")

above the standard (*i.e.*, a compliance factor of 1). The vehicle spends 52% of

VMT at twice the standard or more (compliance factor of 2), and 15% of VMT at

10 times the standard or more.

196.   The 2009 Ram spends 82% of the VMT above the standard (*i.e.*, a

compliance factor of 1). The vehicle spends 54% of VMT at twice the standard or

more (compliance factor of 2), and 17% of VMT at 10 times the standard or more.

197.   The 2012 Ram spends 79% of the VMT above the standard (*i.e.*, a

compliance factor of 1). The vehicle spends 44% of VMT at twice the standard or

more (compliance factor of 2), and 9% of VMT at 10 times the standard or more.

5.    **Effect of active regeneration**

198.    When the stop-and-go results are examined on flat roads only, to ensure comparability to the FTP-75 test (which is run to simulate flat roads), we can assess the effect of excessive active regeneration on the overall NOx emission results. Hills generally result in higher NOx, however, so they are excluded from this analysis.

199.    For the 2007 vehicle, testing was conducted on flat roads for 291 miles and a total of 36 individual tests. Speeds were carefully controlled to simulate the speeds experienced during the FTP-75. The average speed for stop-and-go in flat road testing was 19.1 mph. Average NOx emissions over the 36 tests conducted were 374 mg/mile for conditions where there was ***no active regeneration***. In other words, even without the emissions from active regeneration, the average emissions were well above the standard.

200.    During the course of stop-and-go testing, 13 active regeneration events were observed and NOx emissions were measured during each of these events. Average NOx emissions during active regeneration were found to be 2,855 mg/mile.

201.    Recall that this vehicle performs active regenerations in stop-and-go conditions similar to the FTP-75 for 15.8% of the vehicle miles traveled. When the non-active regeneration emissions are combined with the active regeneration

- 107 -

emissions using the prescribed formula from certification testing, the result is 766 mg/mile. The excessive regeneration defeat device required to maintain proper function of the DPF results in a massive increase in NOx. The effect of active regeneration is to increase NOx by 392 mg/mile. This is 8 times higher than the reported upward adjustment factor of 49 mg/mile in the certification document. As a result, the NOx emission rate on flat roads is some 3.8 times the standard.

202.   For the 2009 vehicle, testing was conducted on flat roads for 250 miles and a total of 30 individual tests. Speeds were carefully controlled to simulate the speeds experienced during the FTP-75. The average speed for stop-and-go in flat road testing was 18.1 mph. Average NOx emissions over the 30 tests conducted were 347 mg/mile for conditions where there was no active regeneration.

203.   During the course of stop-and-go testing, 18 active regeneration events were observed and NOx emissions were measured during these events. Average NOx emissions during active regeneration were found to be 3,937 mg/mile.

204.   Recall that this vehicle performs active regenerations in stop-and-go conditions similar to the FTP-75 for 16.5% of the vehicle miles traveled. When the non-active regeneration emissions are combined with the active regeneration emissions using the prescribed formula from certification testing, the result is 938

- 108 -

mg/mile. The excessive regeneration defeat device required to maintain proper function of the DPF results in a massive increase in NOx. The effect of active regeneration is to increase NOx by 591 mg/mile. This is 12 times higher than the reported upward adjustment factor of 49 mg/mile in the certification document. The resulting NOx emission rate on flat roads is 4.7 times the standard.

205.   For the 2012 vehicle, testing was conducted on flat roads for 460 miles and a total of 54 individual tests. Speeds were carefully controlled to simulate the speeds experienced during the FTP-75. The average speed for stop-and-go in flat road testing was 20.1 mph. Average NOx emissions over the 54 tests conducted were 312 mg/mile for conditions where there was no active regeneration.

206.   During the course of stop-and-go testing, 26 active regeneration events were observed and NOx emissions were measured during these events. Average NOx emissions during active regeneration were found to be 3,339 mg/mile.

207.   Recall that this vehicle performs active regenerations in stop-and-go conditions similar to the FTP-75 for 11.5% of the vehicle miles traveled. When the non-active regeneration emissions are combined with the active regeneration emissions using the prescribed formula from certification testing, the result is 661 mg/mile. The excessive regeneration defeat device required to maintain proper

- 109 -

function of the DPF results in a massive increase in NOx. The effect of active regeneration is to increase NOx by 349 mg/mile. This is six times higher than the reported upward adjustment factor of 61 mg/mile in the certification document. The resulting NOx emission rate on flat roads is 3.3 times the standard.

208.   These active regeneration events, as explained above, require addition fuel to be injected to achieve the exhaust temperatures necessary for active regeneration. These active regeneration events consume significant quantities of fuel, particularly since the events are so common in the 2007-2012 Dodge Ram trucks. Fuel economy was measured during the above testing on flat roads both with and without regeneration.

| Vehicle | Normal Stop-and-go Fuel Economy (mpg) | Active Regeneration Fuel Economy (mpg) | Reduction in Fuel Economy (%) |
|---|---|---|---|
| 2007 | 14.2 | 11.7 | -17.6% |
| 2009 | 13.4 | 8.7 | -35.0% |
| 2012 | 13.9 | 10.8 | -22.0% |
|  |  | Average: | -24.9% |

209.   As can be seen, the fuel economy is reduced between 17 and 35% during regeneration events, with an average reduction of 24.9%. The excessive regeneration events therefore have a significant impact on fuel economy.

- 110 -

### 6. On-road FTP-75 results

210. Furthermore, Plaintiffs' experts developed software that allowed the test vehicles to be driven on the FTP-75 test cycle over the road. Since the test cycle is simply a specific sequence of vehicle speeds, the test cycle can be fully repeated over the road with a PEMS system. The cold start, stabilized, and hot start portions of the cycle were conducted, measured, and weighted in accordance with the standard. The tests were carefully conducted on conditions with a perfectly flat road for direct comparison with the certification test cycle, which only measures flat road emissions. The test procedure is identical to the test procedure used for certification testing except that testing is conducted on the road instead of a dynamometer. The results are therefore expected to be the same.

### 7. 2012 FTP-75 PEMs results

| Test | Phase 1 NOx (mg/mile) | Phase 2 NOx (mg/mile) | Phase 3 NOx (mg/mile) | Composite NOx (mg/mile) |
|---|---|---|---|---|
| 2012 Chassis Dynamometer | 463 | 106 | 278 | 227 |
| 2012 On-Road with PEMS | 1106 | 310 | 742 | 589 |
| 2007 On-Road with PEMS | 912 | 316 | 1151 | 662 |
| 2009 On-Road with PEMS | 1076 | 366 | 1281 | 747 |

211. What is immediately obvious is that the results are significantly different for an identical test sequence on the exact same model year 2012 truck

- 111 -

when conducted on the road compared to the chassis dynamometer. The results for all 3 phases are much higher on the road than on the dynamometer *even though the test sequence is identical.* These results suggest the truck can detect that it is being tested on a chassis dynamometer and uses a lower NOx program while being tested on the dynamometer. This defeat device results in much higher real-world emissions than would be suggested by the chassis dynamometer result.

212.   The results are remarkably consistent and repeatable from vehicle to vehicle and are all well in excess of the 200 mg/mile standard.

213.   The flat road results presented in the previous section have speed and relative positive acceleration profiles very similar to phase 2 of the FTP-75. As previously presented, the non-active regeneration emissions were 392, 347, and 312 for the 2007, 2009, and 2012, respectively. These results closely match the results found during on-road FTP-75 testing and suggest the performance even on randomized cycles with similar characteristics is repeatable regardless of test cycle. In no case do emissions in conditions either identical to or closely resembling Phase 2 of the FTP-75 approach the 106 mg/mile emission rate measured on the chassis dynamometer for the 2012 model year truck.

## 8.   Cold start results

214.   Several tests were conducted on each vehicle to measure emissions during vehicle cold starts. Recall that the FTP-75 Phase 1 test is a "cold start,"

meaning that the vehicle starts from a perfectly cold condition, having sat in ambient conditions for 8 hours after the engine was last operation. Cold start tests were conducted for a distance of approximately 3.5-3.6 miles, the same distance tested during Phase 1 of the FTP-75.

215.   For the 2007 Ram, cold start emissions were measured to be 922 mg/mile on average. This is twice the value measured on the 2012 Ram on the chassis dynamometer for Phase 1. For the 2009 Ram, cold start emissions were measured to be 880 mg/mile, nearly twice the value measured on the 2012 Ram on the chassis dynamometer. For the 2012, cold start emissions were found to be 830 mg/mile, again nearly twice the value found on the chassis dynamometer. These results again indicate a defeat device is active that can detect the presence of the chassis dynamometer. The cold start emissions are significantly higher on the road even though the drive cycles are parametrically similar to Phase 1 (similar average speeds and relative positive accelerations) of the FTP-75.

### 9.    Hot start results

216.   Several tests were conducted on each vehicle to measure emissions during vehicle hot starts. Recall that the FTP-75 Phase 3 test is a "hot start," meaning that the vehicle starts after 10 minutes without the engine running. In most cases with hot starts presented below, the engine has only been off for a few minutes, and the catalysts should still be in their active temperature region with

- 113 -

little reason for high emissions. Tests were performed over a distance of 3.5-3.6 miles, the same distance as Phase 3 of the FTP-75.

217.   For the 2007 Ram, hot start emissions were measured to be 437 mg/mile on average. This is 1.6 times the value measured on the 2012 Ram on the chassis dynamometer for Phase 3. For the 2009 Ram, hot start emissions were measured to be 561 mg/mile, twice the value measured on the 2012 Ram on the chassis dynamometer. For the 2012 Ram, hot start emissions were measured to be 515 mg/mile, nearly twice the value measured for the same truck on the chassis dynamometer. These results again indicate a defeat device is active that can detect the presence of the chassis dynamometer. The hot start emissions are significantly higher on the road even though the drive cycles are parametrically similar to Phase 3 of the FTP-75.

218.   Cold and hot start emissions are important because the performance in these situations dominates when vehicle trips are relatively short (*i.e.*, fewer than 10 miles).

### 10.   Highway results

219.   As previously explained, testing was conducted at steady speeds on the highway for all 3 test trucks. Testing was conducted with the vehicles in cruise control and set to 60 mph. From an emissions standpoint, this is a very

- 114 -

conservative test condition (*i.e.*, produces low emissions). The emission control system can more easily control NOx when operating conditions are not changing.

220.   In steady highway speed conditions, the results are as follows for the three model years.

221.   The 2007 Ram was tested over 1,158 miles in steady speed conditions. A total of 108 tests were performed. The average emissions were 548 mg/mile, or 2.7 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 3,402 mg/mile, or 17 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 15.9%. This is nearly 10 times the frequency required by certification. During active regeneration, emissions were found to be as high as 2,815 mg/mile.

222.   The 2009 Ram was tested over 1,065 miles in steady speed conditions. A total of 109 tests were performed. The average emissions were 590 mg/mile, or 3.0 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 1,942 mg/mile, or 9.7 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 10.7%. This is six times the frequency required by certification. During active regeneration, emissions were found to be as high as 4,562 mg/mile.

223.   The 2012 Ram was tested over 2,151 miles in steady speed conditions. A total of 178 tests were performed. The average emissions were 722

mg/mile, or 3.6 times the standard of 200 mg/mile. Maximum non-regeneration emissions of NOx were found to be 7,153 mg/mile, or 36 times the standard. In such conditions, the vehicle was found to perform active regenerations at a frequency of 13.3%. This is six times the frequency required by certification.

224.   The high active regeneration frequency during steady driving is particularly troubling because such conditions represent ideal conditions for passive regeneration. Catalyst temperatures in the exhaust are sufficient for excellent passive regeneration. In fact, most truck manufacturers suggest a "drive hard" procedure at high speed on the freeway specifically to initiate passive regeneration when a high backpressure light as activated for the DPF. Nevertheless, the defeat device for excessive active regeneration is active even under these ideal passive regeneration conditions.

225.   The "compliance factor" for all three in steady highway conditions is shown below.





010649-11 1032740 V1



226.   For steady speed testing, the 2007 Ram spends 65% of the VMT above the standard (*i.e.*, a compliance factor of 1). The vehicle spends 34% of VMT at twice the standard or more (compliance factor of 2), and 7% of VMT at 10 times the standard or more.

227.   For steady speed testing, the 2009 Ram spends 79% of the VMT above the standard (*i.e.*, a compliance factor of 1). The vehicle spends 45% of VMT at twice the standard or more (compliance factor of 2), and 4% of VMT at 10 times the standard or more.

228.   For steady speed testing, the 2012 Ram spends 83% of the VMT above the standard (*i.e.*, a compliance factor of 1). The vehicle spends 44% of

- 118 -

VMT at twice the standard or more (compliance factor of 2), and 12% of VMT at 10 times the standard or more.

### 11.   Flat road steady speed testing

229.   As with the stop-and-go testing, steady testing was conducted on flat roads for direct comparison with the certification test, which is run on simulated flat roads and does not account for the effects of hills.

230.   The 2007 Ram was run for 388 miles on flat roads at 60 mph over the course of 18 emissions tests. Average NOx emissions were found to be 259 mg/mile on average for conditions where there was no active regeneration.

231.   Over the course of highway testing, 8 active regeneration events were observed, corresponding to a regeneration frequency of 15.9% of the vehicle miles traveled. Average active regeneration emissions were measured to be 1,833 mg/mile.

232.   When the non-active regeneration emissions are combined with the active regeneration emissions using the prescribed formula from certification testing, the result is 509 mg/mile. The excessive regeneration defeat device required to maintain proper function of the diesel particulate filter results in a massive increase in NOx. The effect of active regeneration is to increase NOx by 250 mg/mile. This is 5 times higher than the reported upward adjustment factor of 49 mg/mile in the certification document.

- 119 -

233.   The 2009 Ram was run for 428 miles on flat roads at 60 mph over the course of 21 emissions tests. Average NOx emissions were found to be 262 mg/mile on average for conditions where there was no active regeneration.

234.   Over the course of highway testing, 7 active regeneration events were observed, corresponding to a regeneration frequency of 10.7% of the vehicle miles traveled. Average active regeneration emissions were measured to be 2,119 mg/mile.

235.   When the non-active regeneration emissions are combined with the active regeneration emissions using the prescribed formula from certification testing, the result is 460 mg/mile. The excessive regeneration defeat device required to maintain proper function of the diesel particulate filter results in a massive increase in NOx. The effect of active regeneration is to increase NOx by 198 mg/mile. This is 4 times higher than the reported upward adjustment factor of 49 mg/mile in the certification document.

236.   The 2012 Ram was run for 653 miles on flat roads at 60 mph over the course of 33 emissions tests. Average NOx emissions were found to be 315 mg/mile on average for conditions where there was no active regeneration.

237.   Over the course of highway testing, 17 active regeneration events were observed, corresponding to a regeneration frequency of 13.3% of the vehicle

- 120 -

miles traveled. Average active regeneration emissions were measured to be 2,384 mg/mile.

238.   When the non-active regeneration emissions are combined with the active regeneration emissions using the prescribed formula from certification testing, the result is 590 mg/mile. The excessive regeneration defeat device required to maintain proper function of the DPF results in a massive increase in NOx. The effect of active regeneration is to increase NOx by 275 mg/mile. This is 4.5 times higher than the reported upward adjustment factor of 61 mg/mile in the certification document.

239.   These active regeneration events, as explained above, require additional fuel to be injected to achieve the exhaust temperatures necessary for active regeneration. These active regeneration events consume significant quantities of fuel, particularly since the events are so common in the 2007-2012 Dodge Ram trucks. Fuel economy was measured during the above testing on flat roads both with and without regeneration.

| Model Year Ram | Normal Stop-and-go Fuel Economy (mpg) | Active Regeneration Fuel Economy (mpg) | Reduction in Fuel Economy (%) |
|---|---|---|---|
| 2007 | 23.6 | 15.8 | -33.1% |
| 2009 | 22.1 | 15.6 | -29.4% |
| 2012 | 20.4 | 16.0 | -21.6% |
| | | Average: | -28.0% |

- 121 -

240. The fuel economy penalty during these excessive regeneration events is significant, with an average reduction in fuel economy of 28.0%.

241. Furthermore, a sensitivity analysis was conducted on the 2009 Ram to determine the effect of driving without cruise control and at higher freeway speeds, conditions that are much more representative of real-world driving. With a modest average relative positive acceleration factor of 0.085, indicative of relatively low acceleration driving, and an average speed increase from 60 mph to 67 mph, the flat road emissions increase from 262 mg/mile to 680 mg/mile, or a factor of 2.6. When driving conditions are changed from the highly conservative cruise control at 60 mph to normal driving at 67 mph, emissions increase significantly. The latter conditions are much more likely to represent real-world highway driving than the relatively conservative cruise control at 60 mph condition. The vehicle is shown to be highly sensitive to small changes in driving conditions, with slightly less conservative driving conditions producing disproportionately large increases in NOx emissions.

**12. Effect of hills**

242. Steady speed testing was conducted on hills with a wide variety of grades at 60 mph using cruise control. Again, this condition is conservative (*i.e.*, tends to lower emissions) from a NOx emissions standpoint. All three vehicles were found to be extremely sensitive to road grade. The emissions are plotted

- 122 -

against road grade for all three trucks below. Emissions increase significantly above about 2% grade.







243.    The results are summarized in the table below for the certification test

weight of 8,500 lbs.

| Grade | 2007 Ram NOx (mg/mile) | 2009 Ram NOx (mg/mile) | 2012 Ram NOx (mg/mile) |
|---|---|---|---|
| Flat | 259 | 262 | 315 |
| 0.5% - 1.0% | 666 | 725 | 547 |
| 1.1% - 2.0% | 679 | 669 | 1,055 |
| 2.1% - 3.0% | 1,260 | 1,468 | 1,487 |
| 4.1% - 6.0% | | | 4,118 |

244.    The road grades tested are relatively modest and commonly

experienced on highways. With a very modest increase in road grade from flat

(0%) to between 0.5 and 1.0%, emissions for the 2007 go from 259 to 666 mg/mile, a factor of 2.6 increase. For grades between 2.1% and 3.0%, emissions increase by a factor of 4.9 relative to flat roads. For the 2009, the same increase from flat to between 0.5% and 1.0% causes an increase from 262 to 725 mg/mile, or a factor of 2.8. For grades between 2.1% and 3.0%, emissions increase by a factor of 5.6 relative to flat roads. The 2012 shows similar behavior. This truck was tested at even higher grades between 4.1% and 6.0%, where emissions were found to be, on average, 4,118 mg/mile, some 21 times the standard.

245.   It is important to note that the test weight of 8,500 (used for all testing on all three vehicles) is on the low end of the vehicle weight these trucks are designed to haul. The 2007 and 2009 trucks have a combined weight rating of 20,000 lbs when fully loaded with a trailer. The 2012 has a combined weight rating of 22,000 lbs. At a higher weight, hills with a lower grade will produce the same load on the engine as a truck loaded to 8,500 lbs.

246.   At road grades higher than 2.0%, emissions spike to levels as high as 6 to 7 times the standard and quickly increase as the road grade increases. Again, the plots above are only relevant for a truck loaded to a relatively modest 8,500 lbs. With a full combined weight of 20,000/22,000 lbs hauling a fully loaded trailer, the threshold road grade where emissions start to become extreme would be 0.7%. For

- 126 -

the 2012, a fully loaded truck would produce emissions 20 times the standard at a road grade of 1.6%.

247.   These conditions are commonly experienced on controlled access highways. The following plot shows the road grade distribution for 127,000 miles of controlled access highways in the United States.[62]



---

[62] Wood, Eric, *et. al.* "EPA GHG Certification of Medium- and Heavy-Duty Vehicles: Development of Road Grade Profiles Representative of US Controlled Access Highways," NREL Study under Contract DE-AC36-08GO28308, May 2015.



248.   According to United States Geological Survey (USGS) data, 20% of controlled access highways have a road grade more than 2%; considering the severity of the NOx emissions under those conditions, the weighted average NOx emissions for vehicles loaded to 8,500 lbs at steady conditions on such highways would be approximately 689 mg/mile, 736 mg/mile, and 960 mg/mile for the 2007, 2009, and 2012 trucks, respectively. That's 3.5-4.8 times the standard.

249.   As an example, for a 2012 truck loaded to 22,000 lbs, a road grade of 0.8% would trigger the same power thresholds that result in extreme emissions on the 8,500 lb truck. Approximately 50% of controlled access highways in the U.S. have grades steeper than 0.8%. When the test results are plotted against the road grades that would produce equivalent power output as an 8,500 lb truck for a truck loaded to 22,000 lbs, extreme emissions would become even more commonplace. See the plot below. Using the USGS road grade distribution and NOx emission

- 128 -

results, estimated weighted average emissions considering all road grades would be 2,173 mg/mile, some 11 times the standard. In reality, rolling resistance and drag would also increase on a vehicle loaded to that weight, placing even more load on the vehicle. If anything, these calculated road grade thresholds for the 22,000 lb case are conservative.



250.   It is important to note that high power conditions are not experienced solely under steady speed driving conditions on road grades. They are also experienced during more aggressive accelerations, when the vehicle is operating in non-steady conditions with more weight, or any combination of the two. Put

- 129 -

simply, accelerating more quickly or hauling heavy loads requires the engine to make more and more use of those high-power operating conditions that have been demonstrated to produce extreme NOx emissions. For a vehicle designed to operate at loads as high as 22,000 lbs, the tested configuration of 8,500 lbs in stop-and-go operation requires relatively low levels of power and torque, and yet emissions are still well above the standard.

**13.    Additional testing of Ram trucks**

251.   Three additional Ram trucks owned by plaintiffs were tested using a data logger capable of logging all vehicle parameters broadcast by the vehicle's computer, the engine control module (ECM). The first was a 2007 Ram 2500 with 135,000 miles owned by plaintiff James Bledsoe. The second was a 2007 Ram 3500 with 91,500 miles owned by plaintiff James Forshaw. The third was a 2008 Dodge Ram 2500 with 108,500 miles owned by plaintiff Martin Witberg. In particular, the active regeneration frequency and vehicle speed were monitored for the three vehicles.

252.   The Bledsoe vehicle logged 890 miles during testing. The active regeneration frequency was found to be 17.8% of the vehicle miles traveled, and thus consistent with the three vehicles used for PEMS testing.

- 130 -

253. The Forshaw vehicle logged 867 miles during testing. The active regeneration frequency was found to be 20.7% of the vehicle miles traveled, and thus consistent with the three vehicles used for PEMS testing.

254. The Witberg vehicle logged 1,104 miles during testing. The active regeneration frequency was found to be 19.4% of the vehicle miles traveled, and thus consistent with the three vehicles used for PEMS testing.

255. Moreover, the vehicle speed distribution was analyzed for these 3 vehicles. Active regenerations are expected to be more common in vehicles that drive at low speed or experience excessive idle. Vehicles that drive at higher speeds and maintain hot exhaust should be able to avoid active regeneration in favor of passive regeneration. The vehicle speed distributions during testing are plotted below and compared to the vehicle speed distribution during for the FTP-75 certification test. In all three cases, the vehicles spend much more time at high speeds than the FPT-75 and should therefore experience excellent passive regeneration performance. In other words, these vehicles were not driven in excessively congested traffic conditions that would require more active regeneration. They exhibit active regeneration frequencies that are consistent with all three of the Ram trucks tested with PEMS. In total, all 6 test vehicles show active regeneration frequencies that are well in excess of the frequency required to maintain a low enough upward adjustment factor for NOx to meet the certification

standard. These real-world excessive active regeneration events result in a massive

increase in NOx emissions and are indicative of the presence of a defeat device.



## J.    The environmental damage

256.    Plaintiffs do not seek damage for the harm to the environment they

have unwittingly caused. However, it is important to understand why (1) NOx is

regulated and (2) why a reasonable consumer would not want his or her vehicle to

dump NOx into the air.

257.    NOx contributes to ground-level ozone and fine particulate matter.

According to the EPA, "Exposure to these pollutants has been linked with a range

of serious health effects, including increased asthma attacks and other respiratory illnesses that can be serious enough to send people to the hospital. Exposure to ozone and particulate matter have also been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory disease are particularly at risk for health effects of these pollutants."

258. The EPA describes the danger of NOx as follows:



Acid Rain - $NO_x$ and sulfur dioxide react with other substances in the air to form acids which fall to earth as rain, fog, snow, or dry particles. Some may be carried by the wind for hundreds of miles. Acid rain damages forests; causes deterioration of cars, buildings, and historical monuments; and causes lakes and streams to become acidic and unsuitable for many fish.



Water Quality Deterioration - Increased nitrogen loading in water bodies, particularly coastal estuaries, upsets the chemical balance of nutrients used by aquatic plants and animals. Additional nitrogen accelerates "eutrophication," which leads to oxygen depletion and reduces fish and shellfish populations. $NO_x$ emissions in the air are one of the largest sources of nitrogen pollution to the Chesapeake Bay.

- 133 -



**Toxic Chemicals** - In the air, $NO_x$ reacts readily with common organic chemicals, and even ozone, to form a wide variety of toxic products, some of which may cause biological mutations. Examples of these chemicals include the nitrate radical, nitroarenes, and nitrosamines.

**Ground-level Ozone (Smog)** - is formed when $NO_x$ and volatile organic compounds (VOCs) react in the presence of heat and sunlight. Children, the elderly, people with lung diseases such as asthma, and people who work or exercise outside are susceptible to adverse effects such as damage to lung tissue and reduction in lung function. Ozone can be transported by wind currents and cause health impacts far from the original sources. Millions of Americans live in areas that do not meet the health standards for ozone. Other impacts from ozone include damaged vegetation and reduced crop yields.



- 134 -



**Particles** - NO$_x$ react with ammonia, moisture, and other compounds to form nitric acid vapor and related particles. Human health concerns include effects on breathing and the respiratory system, damage to lung tissue, and premature death. Small particles penetrate deeply into sensitive parts of the lungs and can cause or worsen respiratory disease, such as emphysema and bronchitis, and aggravate existing heart disease.



**Global Warming** - One member of the NO$_x$ family, nitrous oxide, is a greenhouse gas. It accumulates in the atmosphere with other greenhouse gases causing a gradual rise in the earth's temperature. This will lead to increased risks to human health, a rise in the sea level, and other adverse changes to plant and animal habitat.

259.   A recent study published in NATURE estimates that there are 38,000 deaths worldwide due to excess NOx emissions. And recently a study commissioned by the Federal Office for the Environment (Germany) concluded that 6,000 people died prematurely in 2014 from illnesses known to be caused or aggravated by NOx exposure. Plaintiffs here do not seek damages to the injury to the environment, but Plaintiffs did not intend to drive cars whose emissions manipulation would deliberately injure the environment.

### 1.     Economic harm specifically alleged here

260.   As a result of Defendants' unfair, deceptive, and/or fraudulent

business practices, and the failure to disclose that under normal operating

conditions the Polluting Vehicles are not "clean" diesels, emit more pollutants than

a reasonable consumer would expect, emit more pollutants than do gasoline-

powered vehicles, and emit more pollutants than permitted under federal and state

laws, owners and/or lessees of the Polluting Vehicles have suffered losses in

money and/or property. Had Plaintiffs and Class members known of the higher

emissions at the time they purchased or leased their Polluting Vehicles, or had they

known of the effects on fuel economy if the emissions were not manipulated, they

would not have purchased or leased those vehicles, or would have paid

substantially less for the vehicles than they did. Plaintiffs and members of the

Class paid a premium of at least $9,000, as FCA charged more for its diesel engine

than a comparable gas engine based on features that were falsely advertised,

including the cleanliness of the emissions, fuel performance, and durability. In

addition, each plaintiff has paid increased amounts for fuel as more fuel is

consumed due to the fuel needed to fuel an active regeneration. Based on an

average of 5,000 miles per year, in a 2009 vehicle, the increased fuel cost could be

$136 a year or more. In 2012, R. Polk & Co. estimated the length of ownership at

10.5 years, resulting in increased fuel cost of $1,360 over the life of a 2009 Ram.

Further, without improvements in fuel economy and emissions over gasoline vehicles, there is no reason for a consumer to purchase a diesel truck over a gasoline-powered truck. Thus, Plaintiffs would not have purchased their vehicles if Defendants had told the truth, or would not have paid a diesel premium. In addition, Plaintiffs could not have lawfully purchased these vehicles because without the scheme, these vehicles could not have been sold. Hence, alternately for the RICO claim, Plaintiffs' damage is the entire purchase price less some amount for use of the vehicle.

261.   Plaintiffs have also been harmed and injured by the fact that they unwittingly drove vehicles that were not legally on the road and unwittingly drove vehicles that were polluting in volumes and manners a reasonable consumer would not expect. This harm can be measured and precisely monetized through conjoint and economic analysis.

K.   **The FCA-Cummins scheme is just the latest in a worldwide diesel emissions cheating scandal that adds plausibility to the allegations here as virtually all diesel manufacturers are falsely advertising their vehicles and were unable to meet U.S. emissions standards.**

262.   As noted, the world was shocked to learn that Volkswagen had manufactured over 11 million vehicles that were on the road in violation of European emissions standards, and over 480,000 vehicles were operating in the United States in violation of EPA and state standards. But Volkswagen was not the only manufacturer of vehicles that exceeded emissions standards.

- 137 -

263.   In the wake of the major scandal involving Volkswagen and Audi diesel vehicles evading emissions standards with the help of certain software that manipulates emission controls (called "defeat devices"),[63] scientific literature and reports and testing indicate that most of the diesel vehicle manufactures of so-called "clean diesel" vehicles emit far more pollution on the road than in lab tests. The EPA has widened its probe of auto emissions to include, for example, the Mercedes BlueTEC diesels and FCA's Jeep Cherokees and Dodge Rams. The results of the studies enhance the plausibility of the allegations here as it is unlikely that only BMW would have been capable of emissions technology that did not cheat.

264.   In May 2015, a study conducted on behalf of the Dutch Ministry of Infrastructure and the Environment found that all sixteen vehicles made by a variety of manufacturers, when tested, emitted significantly more NOx on real-world trips while they passed laboratory tests. The report concluded that "[i]n most

---

[63] Exhibit 19, EPA's Sept. 18, 2015 Notice of Violation to Volkswagen Group of America, Inc., https://www.epa.gov/sites/production/files/2015-10/documents/vw-nov-caa-09-18-15.pdf. As detailed in the Notice of Violation, software in Volkswagen and Audi diesel vehicles detects when the vehicle is undergoing official emissions testing and turns full emissions controls on only during the test. But otherwise, while the vehicle is running, the emissions controls are suppressed. This results in cars that meet emissions standards in the laboratory or at the state testing station, but during normal operation they emit NOx at up to 40 times the standard allowed under U.S. laws and regulations. Volkswagen has admitted to installing a defeat device in its diesel vehicles.

circumstances arising in normal situations on the road, the system scarcely

succeeded in any effective reduction of NOx emissions."[64]

265.    The report further remarked:[65]

> It is remarkable that the NOx emission under real-world
> conditions exceeds the type approval value by [so much].
> It demonstrates that the settings of the engine, the EGR
> and the SCR during a real-world test trip are such that
> they do not result in low NOx emissions in practice. In
> other words: *In most circumstances arising in normal
> situations on the road, the systems scarcely succeed in
> any effective reduction of NOx emissions*.

266.    Other organizations reached similar conclusions. The Transportation

and Environment (T&E) organization, a European group aimed at promoting

sustainable transportation, compiled data from "respected testing authorities

around Europe." T&E stated in September 2015 that real-world emissions testing

showed drastic differences from laboratory tests such that models tested emitted

more pollutants on the road than in their laboratory tests. "For virtually every new

model that comes onto the market the gap between test and real-world performance

leaps," the report asserts.[66]

---

[64] Exhibit 20, *Detailed investigations and real-world emission performance of Euro 6 diesel passenger cars*, TNO (May 18, 2015), http://publications.tno.nl/publication/34616868/a1Ug1a/TNO-2015-R10702.pdf.

[65] *Id.* at 6 (emphasis added).

[66] Exhibit 21, *VW's cheating is just the tip of the iceberg*, Transport & Environment (Sept. 21, 2015), http://www.transportenvironment.org/publications/vw%E2%80%99s-cheating-just-tip-iceberg.

267.   In a summary report, T&E graphically depicted the widespread failure of most manufacturers:[67]



268.   The T&E report found that the current system for testing vehicles in a laboratory produces "meaningless results."[68]

---

[67] Exhibit 22, *Five facts about diesel the car industry would rather not tell you*, Transport & Environment (Sept. 2015), http://www.transportenvironment.org/sites/te/files/publications/2015_09_Five_facts_about_diesel_FINAL.pdf.

[68] *Id.*

269.    Emissions Analytics is a U.K. company which says that it was formed to "overcome the challenge of finding accurate fuel consumption and emissions figures for road vehicles." With regard to its recent on-road emissions testing, the company explains:[69]

> [I]n the European market, we have found that real-world emissions of the regulated nitrogen oxides are four times above the official level, determined in the laboratory. Real-world emissions of carbon dioxide are almost one-third above that suggested by official figures. For car buyers, this means that fuel economy on average is one quarter worse than advertised. This matters, even if no illegal activity is found.

270.    In June 2016, T&E issued a new report identifying the thirty most polluting vehicles in Europe, comparing road testing to the Euro 6 Standard (lower than the United States). The T&E "Dirty 30" included one FCA model which exceed the lower than the U.S. Euro 6 Standard. The FIAT 500X model employed a software instruction to switch off emissions controls after 22 minutes.

L.    **Plaintiffs' testing methodology is supported by their testing of other vehicles and third parties confirming either expressly or implicitly their work or arriving at the similar conclusions.**

271.    The experts used in this case also used PEMs testing in support of the complaint filed on February 18, 2016 involving Mercedes BlueTec vehicles. Shortly thereafter, the EPA asked Mercedes to respond to the lawsuit and

---

[69] Exhibit 23, Emissions Analytics Press Release (Sept. 28, 2015), http://www.abvwc.com/home/emissions-analytics.

Mercedes is now under investigation by the DOJ. Media reports from February 2018 report that U.S. authorities have discovered a defeat device that shuts down emissions after 16 miles.

272.   Using PEMs testing, Plaintiffs' experts found defeat devices in FCA 1500 pickups and Jeep Grand Cherokees. As noted above, shortly thereafter the EPA issued a notice of violation on the same vehicles.

273.   Plaintiffs' experts also found defeat devices on Ford Super Duty trucks, and a lawsuit was filed in Eastern District of Michigan.

274.   Thereafter, a nearly identical suit was filed in the Northern District of California, *Goodwin v. Ford*. The plaintiffs also alleged that their testing demonstrated that Ford was also using defeat devices in its trucks. The experts in the *Goodwin* case are from the CAFEE at West Virginia University. This is the same entity that used PEMs testing to uncover the Volkswagen scandal.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

A.     **Discovery rule tolling**

275.   Class members had no way of knowing about Defendants' deception with respect to the comparatively and unlawfully high emissions of the adsorber engine in Polluting Vehicles.

276.   Within the time period of any applicable statutes of limitation, Plaintiffs and members of the proposed classes could not have discovered through

- 142 -

the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and misrepresenting the companies' true position with respect to the emission qualities of the Polluting Vehicles.

277.   Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants did not report information within their knowledge to federal and state authorities, the dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Defendants had concealed information about the true emissions of the Polluting Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor, in any event, would such an investigation on the part of Plaintiffs and other Class members have disclosed that Defendants valued profits over truthful marketing and compliance with law.

278.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Polluting Vehicles.

B.   **Fraudulent concealment tolling**

279.   All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

- 143 -

280.   Instead of disclosing their emissions scheme, the fact that the quality and quantity of emissions from the Polluting Vehicles were far worse than represented, and their disregard of the law, Defendants falsely represented that the Polluting Vehicles had emissions cleaner than their gasoline-powered counterparts, complied with federal and state emissions standards, that the diesel engines were "clean," and that they were reputable manufacturers whose representation could be trusted. Defendants further concealed, and prevented consumers from being alerted to, the derated or defeated emissions reduction systems and/or excessive NOx emissions by not providing the emissions alert signals specified in their EPS certificate.

C.   **Estoppel**

281.   Defendants were under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of emissions from the Polluting Vehicles, and of those vehicles' emissions systems.

282.   Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the emissions systems, and the emissions, of the Polluting Vehicles.

283.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

- 144 -

## VI.    CLASS ALLEGATIONS

284.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses (collectively, the "Classes"):

**The Nationwide Class**

All persons or entities in the United States who own, owned, and/or leased a "Polluting Vehicle" as of November 1, 2016. Polluting Vehicles include 2007 to 2012 Dodge Ram 2500 and Dodge Ram 3500 pickups equipped with a Cummins 6.7-Liter diesel engine.

**The Alabama Subclass**

All persons or entities in the state of Alabama who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Alaska Subclass**

All persons or entities in the state of Alaska who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Arizona Subclass**

All persons or entities in the state of Arizona who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Arkansas Subclass**

All persons or entities in the state of Arkansas who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The California Subclass**

All persons or entities in the state of California who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Colorado Subclass**

All persons or entities in the state of Colorado who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Connecticut Subclass

All persons or entities in the state of Connecticut who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The District of Columbia Subclass

All persons or entities in the District of Columbia who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Delaware Subclass

All persons or entities in the state of Delaware who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Florida Subclass

All persons or entities in the state of Florida who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Georgia Subclass

All persons or entities in the state of Georgia who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Hawaii Subclass

All persons or entities in the state of Hawaii who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Idaho Subclass

All persons or entities in the state of Idaho who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Illinois Subclass

All persons or entities in the state of Illinois who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Indiana Subclass

- 146 -

All persons or entities in the state of Indiana who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Iowa Subclass

All persons or entities in the state of Iowa who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Kansas Subclass

All persons or entities in the state of Kansas who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Kentucky Subclass

All persons or entities in the state of Kentucky who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Louisiana Subclass

All persons or entities in the state of Louisiana who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Maine Subclass

All persons or entities in the state of Maine who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Maryland Subclass

All persons or entities in the state of Maryland who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Massachusetts Subclass

All persons or entities in the state of Massachusetts who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Michigan Subclass

All persons or entities in the state of Michigan who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Minnesota Subclass

- 147 -

All persons or entities in the state of Minnesota who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Mississippi Subclass

All persons or entities in the state of Mississippi who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Missouri Subclass

All persons or entities in the state of Missouri who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Montana Subclass

All persons or entities in the state of Montana who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Nebraska Subclass

All persons or entities in the state of Nebraska who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Nevada Subclass

All persons or entities in the state of Nevada who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The New Hampshire Subclass

All persons or entities in the state of New Hampshire who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The New Jersey Subclass

All persons or entities in the state of New Jersey who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The New Mexico Subclass

All persons or entities in the state of New Mexico who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The New York Subclass

- 148 -

All persons or entities in the state of New York who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The North Carolina Subclass

All persons or entities in the state of North Carolina who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The North Dakota Subclass

All persons or entities in the state of North Dakota who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Ohio Subclass

All persons or entities in the state of Ohio who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Oklahoma Subclass

All persons or entities in the state of Oklahoma who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Oregon Subclass

All persons or entities in the state of Oregon who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Pennsylvania Subclass

All persons or entities in the state of Pennsylvania who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The Rhode Island Subclass

All persons or entities in the state of Rhode Island who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The South Carolina Subclass

All persons or entities in the state of South Carolina who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

### The South Dakota Subclass

All persons or entities in the state of South Dakota who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Tennessee Subclass**

All persons or entities in the state of Tennessee who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Texas Subclass**

All persons or entities in the state of Texas who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Utah Subclass**

All persons or entities in the state of Utah who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Vermont Subclass**

All persons or entities in the state of Vermont who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Virginia Subclass**

All persons or entities in the state of Virginia who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Washington Subclass**

All persons or entities in the state of Washington who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The West Virginia Subclass**

All persons or entities in the state of West Virginia who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Wisconsin Subclass**

All persons or entities in the state of Wisconsin who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

**The Wyoming Subclass**

- 150 -

All persons or entities in the state of Wyoming who own, owned and/or lease or leased a Polluting Vehicle as of November 1, 2016.

285. Excluded from the Class are individuals who have personal injury claims resulting from the high emissions in the Polluting Vehicles. Also excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

286. Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

287. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

288. **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are hundreds of thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from

- 151 -

Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

289. **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether Defendants engaged in the conduct alleged herein;

b. Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Polluting Vehicles into the stream of commerce in the United States;

c. Whether the Adsorber Engine in the Polluting Vehicles emit pollutants at levels that do not make them "clean" diesels and that do not comply with U.S. EPA requirements;

d. Whether Defendants knew about the comparatively and unlawfully high emissions and, if so, how long Defendants have known;

e. Whether Defendants designed, manufactured, marketed, and distributed Polluting Vehicles with defective or otherwise inadequate emission controls;

- 152 -

f.      Whether Defendants' conduct violates consumer protection statutes and constitutes breach of contract and fraudulent concealment as asserted herein;

g.      Whether Plaintiffs and the other Class members overpaid for their Polluting Vehicles; and

h.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

290. **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above.

291. **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

292. **Declaratory Relief**: Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to

Plaintiffs and the other members of the Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

293. **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the members of the Classes to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

- 154 -

A.    **Claims brought on behalf of the Nationwide Class**

## COUNT I

### VIOLATION OF 18 U.S.C. § 1962(C)–(D):
### THE RACKETEER INFLUENCED AND CORRUPT
### ORGANIZATIONS ACT ("RICO")

294.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

295.   Plaintiffs bring this Count on behalf of the Nationwide Class against FCA US LLC ("FCA") and Cummins Inc. (inclusively, for purpose of this Count, the "RICO Defendants").

296.   At all relevant times, the RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

297.   By their own admission, the RICO Defendants moved aggressively to capture a large portion of the "clean" diesel truck market. In so doing, they created a product that fell far short of the promises the RICO Defendants made about the product. In particular, the RICO Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (the "Emission Fraud Enterprise"), whose purpose was to deceive regulators and the driving public into believing that the Class Vehicles were complaint with emissions standards, "clean," and

"environmentally friendly" so as to increase revenues and minimize losses from the design, manufacture, distribution, and sale of the Class Vehicles and the defective catalyst devices installed therein. As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to extract revenues of billions of dollars from Plaintiffs and the Class. As explained in detail below, the RICO Defendants' years-long misconduct violated 18 U.S.C. § 1962(c) & (d).

### 1.    The Emission Fraud Enterprise

298.    At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown third parties involved in the design, manufacture, testing, and sale of the Polluting Vehicles, operated an association-in-fact enterprise engaged in interstate and foreign commerce, which was formed for the purpose of obtaining EPA Certificates of Conformity ("COCs"), as well as California Air Resources Board ("CARB") Executive Orders ("EOs"), in order to sell the Polluting Vehicles containing the defective device throughout the United States, and through which they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

299.    Alternatively, each of the RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in the U.S. In

particular, FCA and Cummins jointly designed, manufactured, and sold the

Polluting Vehicles, and FCA obtained the COCs and the EOs through material

misrepresentations and omissions in order to introduce the Polluting Vehicles into

the U.S. Stream of Commerce. Cummins participated directly or indirectly in the

enterprise by developing, supplying, and promoting the 6.7-liter Engine.

300.   At all relevant times, the Emissions Fraud Enterprise: (a) had an

existence separate and distinct from each Defendant; (b) was separate and distinct

from the pattern of racketeering in which the RICO Defendants engaged; and (c)

was an ongoing organization consisting of legal entities, including FCA and

Cummins, and other entities and individuals associated for the common purpose of

designing, manufacturing, distributing, testing, and selling the Polluting Vehicles

through fraudulent COCs and EOs, false emissions tests, deceptive and misleading

marketing and materials, and deriving profits and revenues from those activities.

Each member of the Emissions Fraud Enterprise shared in the bounty generated by

the enterprise—*i.e.*, by sharing the benefit derived from increased sales revenue

generated by the scheme to defraud consumers and franchise dealers alike

nationwide, and sharing the benefit of earning emissions "credits" as described

herein.

301.   The Emissions Fraud Enterprise functioned by selling vehicles and

component parts to the consuming public. Many of these products are legitimate,

- 157 -

including vehicles that do not contain defeat devices. However, the RICO Defendants and their co-conspirators, through their illegal Emissions Fraud Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Polluting Vehicles.

302. The Emissions Fraud Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, and sale or lease of the Polluting Vehicles throughout the country, and the receipt of monies from the sale of the same.

303. Within the Emissions Fraud Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Emissions Fraud Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Polluting Vehicles to the general public nationwide.

304. Each participant in the Emissions Fraud Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Emissions Fraud Enterprise, the RICO Defendants functioned as a continuing unit with the purpose

- 158 -

of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

305.   The RICO Defendants participated in the operation and management of the Emissions Fraud Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

306.   As detailed above, each RICO Defendant also relentlessly promoted the Polluting Vehicles as clean, powerful, and cost-efficient and helped create a market for these vehicles. The Defendants routinely proclaimed the Polluting Vehicles, and the Adsorber Engine, as the "cleanest" in its class, "meeting and exceeding both regulatory requirements and customer needs." The Polluting Vehicles were "squeaky clean"; "super clean"; "a model of cleanliness"—"so clean it warrants a class of its own," and "durability so impressive, it approaches the inexhaustible." All of this success is due to the tight collaboration among the RICO Defendants—what Cummins called the "most formidable partnership in the working world." Each defendant was aware of the other's promotion of the Polluting Vehicles to the public.

- 159 -

307.    The Enterprise functioned by selling Polluting Vehicles to the public. The RICO Defendants engaged in a pattern of racketing activity through their scheme to increase revenue and profits for the RICO Defendants to sell the Polluting Vehicles in interstate and foreign commerce, and to increase the emissions credits they earned, thereby allowing them to sell dirty vehicles as well, all for an additional profit. The enterprise involved commercial activities across state boundaries, such as the marketing, promotion, advertisement, and sale or lease of the Polluting Vehicles throughout the country, and the receipt of monies from the sale of the same.

308.    The RICO Defendants worked closely together to further the enterprise, by and among the following manner and means:

a.    Jointly planning to manufacture a diesel engine and truck that would purportedly meet EPA and state emissions standards three years early;

b.    Designing the Polluting Vehicles and Manufacturing, distributing, and selling the Class Vehicles that emitted greater pollution than permitted under the applicable regulations;

c.    Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

d.     Introducing the Polluting Vehicles into the stream of U.S. commerce without a valid COC and/or EO;

e.     Concealing the unlawfully high emissions from regulators and the public;

f.     Misleading the public about the fuel performance in the Polluting Vehicles;

g.     Otherwise misrepresenting or concealing the true nature of the Polluting Vehicles from the public and regulators;

h.     Illegally selling and/or distributing the Class Vehicles;

i.     Designing, testing, and installing the Adsorber Engine into the Polluting Vehicles; and

j.     Collecting revenues and profits from the sale of such products, including the Polluting Vehicles and the Adsorber Engines.

## 2.     Mail and Wire Fraud

309.   To carry out, and attempt to carry out, the scheme to defraud, the RICO Defendants, each of whom is a person associated in fact with the enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), and which employed the use

- 161 -

of the mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) &

1343 (wire fraud).

310.   Specifically, the RICO Defendants have committed, conspired to

commit, and/or aided and abetted in the commission of, at least two predicate acts

of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 & 1343), within the

past ten years. The multiple acts of racketeering activity which the RICO

Defendants committed, or aided or abetted in the commission of, were related to

each other, posed a threat of continued racketeering activity, and therefore

constitute a "pattern of racketeering activity." The racketeering activity was made

possible by the RICO Defendants' regular use of the facilities, services,

distribution channels, and employees of the enterprise. The RICO Defendants

participated in the scheme to defraud by using mail, telephone, and the Internet to

transmit mailings and wires in interstate or foreign commerce.

311.   In devising and executing the illegal scheme, the RICO Defendants

devised and knowingly carried out a material scheme and/or artifice to defraud

Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the

Nationwide Class by means of materially false or fraudulent pretenses,

representations, promises, or omissions of material facts. For the purpose of

executing the illegal scheme, the RICO Defendants committed these racketeering

- 162 -

acts intentionally and knowingly with the specific intent to advance the illegal scheme.

312. The RICO Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1), include but are not limited to:

a. **Mail Fraud**: The RICO Defendants violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

b. **Wire Fraud**: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

313. The RICO Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery and shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

a. Application for certificates submitted to the EPA and CARB and Approved Applications received in the mail on April 9, 2008, June 23, 2008, June 6, 2008, and July 2, 2008.

b. Applications submitted to the EPA and CARB for each model year as follows:

- 163 -

- 2007-2010 Dodge Ram 2500 with Cummins diesel (2WD, 4WD);

- 2011-2012 Dodge Ram 2500 with Cummins diesel (non-SCR systems, 2WD, 4WD);

- 2007-2010 Dodge Ram 3500 with Cummins diesel (2WD, 4WD); and

- 2011-2012 Dodge Ram 3500 with Cummins diesel (non-SCR systems, 2WD, 4WD).

c.   The Polluting Vehicles.

d.   The Adsorber Engines.

e.   The essential hardware for the Polluting Vehicles.

f.   False and misleading emissions tests.

g.   Additional fraudulent applications for COCs and EOs.

h.   Fraudulently obtained COCs and EOs.

i.   Vehicle registrations and plates as a result of the fraudulently obtained EPA COCs and EOs.

j.   False or misleading communications to the public and to regulators.

k.   Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, falsely promoted, and concealed the true nature of the Polluting Vehicles.

l.   Documents intended to facilitate the manufacture and sale of the Polluting Vehicles, including bills of lading, invoices, shipping records, reports and correspondence.

m.   Documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts.

n.   Payments to Cummins.

o.   Deposits of proceeds.

- 164 -

p.     Other documents and things, including electronic communications.

314.   Although Cummins my not have applied for the OCC's it was aware that such applications were made by FCA.

315.   The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, the RICO Defendants made misrepresentations about the Class Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

316.   The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

317.   The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Class Vehicles were "clean" diesel cars.

318.   Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities are hidden to the Plaintiffs, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of predicate acts of mail and/or wire fraud that occurred.

319.   The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

320.   The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 & 1343 offenses.

321.   To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and emissions of the Polluting Vehicles and obfuscated the true nature of the defect even after regulators raised concerns. The

- 166 -

RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the defeat devices present in the Polluting Vehicles.

322.   The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the defeat devices contained therein).

323.   Indeed, for the conspiracy to succeed each of the RICO Defendants and their coconspirators had to agree to implement and use the similar devices and fraudulent tactics—specifically complete secrecy about the defeat devices in the Polluting Vehicles.

324.   The RICO Defendants knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them about the Polluting Vehicles. The RICO Defendants knew and intended that consumers would incur costs as a result.

325.   As fully alleged herein, Plaintiffs, along with hundreds of thousands of other consumers, relied upon Defendants' representations and omissions that were made or caused by them. Plaintiffs' reliance on omitted fact is made obvious

- 167 -

by the fact that they purchased illegal vehicles that never should have been introduced into the U.S. stream of commerce.

326.   As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members based on their misrepresentations and omissions, while providing Class Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

327.   The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the enterprise and in furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Polluting Vehicles.

328.   By reason of and as a result of the conduct of the RICO Defendants, and in particular its pattern of racketeering activity, Plaintiffs and the Class have been injured in multiple ways, including but not limited to:

a.     Overpayment for Polluting BMW Vehicles, in that Plaintiffs and the Class at the time of purchase overpaid for their vehicles. Plaintiffs would not have purchased their vehicles because they would not have done so if FCA truthfully disclosed the vehicles were unlawfully on the road and/or did not deliver improved emissions and fuel performance over gasoline-powered vehicles. Alternately, Plaintiffs would not have paid a diesel premium of up to $9,000 or more if proper disclosures had been made. Plaintiffs also overpaid thousands of dollars in extra fuel costs due to lower fuel economy when the active regeneration defeat device is activated. Plaintiffs have also been injured because they have been unwittingly driving cars whose emissions systems from the outset are not what a reasonable consumer would expect. This form of injury can be monetized by expert testimony using a conjoint analysis.

b.     Plaintiffs have been wrongfully deprived of their property in that the price for their vehicles was artificially inflated by deliberate acts of false statements, omissions, and concealment and by the RICO Defendants' acts of racketeering.

- 169 -

329.   The RICO Defendants' violations of 18 U.S.C. § 1962(c) & (d) have directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II

### VIOLATIONS OF 15 U.S.C. § 2301 *ET SEQ.*
### THE MAGNUSON-MOSS WARRANTY ACT ("MMWA")

330.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

331.   This claim is brought on behalf of the Nationwide Class.

332.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

333.   FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

334.   The Polluting Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

335.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

336.   FCA's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Polluting Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

337.   FCA breached these warranties, as described in more detail above. Without limitation, the Polluting Vehicles are equipped with a defective Adsorber Engine that breaks down and releases emissions far in excess of U.S. and California regulations. The Polluting Vehicles share a common design defect in that the Adsorber Engine fails to operate as represented by FCA.

338.   Plaintiffs and the other Class members have had sufficient direct dealings with either FCA or its agents (*e.g.*, dealerships and technical support) to establish privity of contract between FCA on one hand, and Plaintiffs and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Polluting Vehicles and have no rights under the warranty agreements provided with the Polluting Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

339.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

- 171 -

340.   At the time of sale or lease of each Polluting Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Polluting Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

341.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Polluting Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Polluting Vehicles by retaining them.

342.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

010649-11 1032740 V1

343.   Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of the Polluting Vehicles, in an amount to be proven at trial.

B.   **Claims Brought on Behalf of the Michigan Subclass**

## COUNT I

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903 *ET SEQ.*)

344.   Plaintiffs Martin Witberg and Matt Langworthy ("Plaintiffs" for purposes of all Michigan Subclass claims) incorporate by reference all paragraphs as though fully set forth herein.

345.   This claim is brought on behalf of the Michigan Subclass.

346.   Plaintiffs and the Michigan Class Members were "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

347.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," … including: "(c) Representing that goods or services have … characteristics … that they do not have;" … "(e) Representing that goods or services are of a particular standard … if they are of another;" … "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" … "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not

- 173 -

reasonably be known by the consumer;" … "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" … and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).

348.   In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above, one that the fuel economy achieved was the result of this emissions manipulation. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and

- 174 -

which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

349.   In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

350.   Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel Defendants' deception on their own.

351.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

- 175 -

352.    The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

353.    The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

354.    The Defendants knew or should have known that their conduct violated the Michigan CPA.

355.    The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

- 176 -

356.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

357.   The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

358.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

359.   The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

360.   Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Michigan Class member; reasonable attorneys' fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911. Plaintiffs also seek punitive damages against the Defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others. The Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON MICHIGAN LAW)

361.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

362.   This claim is brought on behalf of the Michigan Subclass.

363.   The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants

- 178 -

higher than a reasonable consumer would expect in light of the Defendants'
advertising campaign, emitted unlawfully high levels of pollutants such as NOx,
and were non-compliant with EPA emission requirements, or the Defendants acted
with reckless disregard for the truth, and denied Plaintiffs and the other Subclass
members information that is highly relevant to their purchasing decision.

364.   The Defendants further affirmatively misrepresented to Plaintiffs and
Subclass members in advertising and other forms of communication, including
standard and uniform material provided with each car, that the Polluting Vehicles
they were selling had no significant defects, were Earth-friendly and low-emission
vehicles, complied with EPA regulations, and would perform and operate properly
when driven in normal usage.

365.   The Defendants knew these representations were false when made.

366.   The Polluting Vehicles purchased or leased by Plaintiffs and the other
Subclass members were, in fact, defective, emitting pollutants at a much higher
rate than gasoline-powered vehicles and at a much higher rate than a reasonable
consumer would expect in light of the Defendants' advertising campaign, non-
EPA-compliant, and unreliable because the NOx reduction system in the Polluting
Vehicles turns off or is limited during normal driving conditions.

367.   The Defendants had a duty to disclose that the NOx reduction system
in the Polluting Vehicles turns off or is limited during normal driving conditions

- 179 -

and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

368.   As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

369.   The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the

- 180 -

Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

370.   Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

371.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

372.   The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they

concerned compliance with applicable federal and state law and regulations

regarding clean air and emissions, and also because the representations played a

significant role in the value of the vehicles. As the Defendants well knew, their

customers, including Plaintiffs and Subclass members, highly valued that the

vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with

reduced emissions, and they paid accordingly.

373.   The Defendants had a duty to disclose the emissions defect, defective

design of emissions controls, and violations with respect to the Polluting Vehicles

because details of the true facts were known and/or accessible only to the

Defendants, because the Defendants had exclusive knowledge as to such facts, and

because the Defendants knew these facts were not known to or reasonably

discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to

disclose because they made general affirmative representations about the qualities

of the vehicles with respect to emissions, starting with references to them as

*reduced-emissions* diesel cars and as compliant with all laws in each country,

which were misleading, deceptive, and incomplete without the disclosure of the

additional facts set forth above regarding the actual emissions of their vehicles,

their actual philosophy with respect to compliance with federal and state clean air

law and emissions regulations, and their actual practices with respect to the

vehicles at issue. Having volunteered to provide information to Plaintiffs and

Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

374.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

375.   The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

- 183 -

376.    Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

377.    Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles

- 184 -

would have paid less for their vehicles or would not have purchased or leased them at all.

378.    The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

379.    Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

380.    The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF CONTRACT
### (BASED ON MICHIGAN LAW)

381.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

382.   Plaintiffs bring this Count on behalf of the Michigan Subclass.

383.   The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

384.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass

members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Adsorber Engine.

385.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

C.   **Claims Brought on Behalf of the California Subclass**

### COUNT I

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

386.   Plaintiff James Bledsoe ("Plaintiff" for purposes of all California Subclass Counts) incorporates by reference all paragraphs as though fully set forth herein.

387.   Plaintiff brings this Count on behalf of the California Subclass.

388.   California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

- 187 -

389.   The Defendants' conduct, as described herein, was and is in violation of the UCL. The Defendants' conduct violates the UCL in at least the following ways:

i.   By failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions;

ii.   By selling and leasing Polluting Vehicles that suffer from a defective emissions control system and that emit unlawfully high levels of pollutants under normal driving conditions;

iii.   By knowingly and intentionally concealing from Plaintiff and the other Subclass members that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that the Polluting Vehicles suffer from a defective emissions control system and emit unlawfully high levels of pollutants under normal driving conditions;

iv.   By marketing Polluting Vehicles as reduced emissions vehicles possessing functional and defect-free, EPA-compliant diesel engine systems;

v.   By advertising and posting a miles per gallon ("MPG") rate that the Polluting Vehicles do not meet and maintain without manipulation of the emissions controls; and

- 188 -

vi.     By violating other California laws, including California consumer

protection laws and California laws governing vehicle emissions and

emission testing requirements.

390.   The Defendants intentionally and knowingly misrepresented material

facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the

Subclass.

391.   In purchasing or leasing the Polluting Vehicles, Plaintiff and the other

Subclass members were deceived by the Defendants' failure to disclose the NOx

reduction system in the Polluting Vehicles turns off or is limited during normal

driving conditions, that the emissions controls were defective, that the Polluting

Vehicles would not meet and maintain the advertised MPG rate; and that the

Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as

described above.

392.   Plaintiff and Subclass members reasonably relied upon the

Defendants' false misrepresentations. They had no way of knowing that the

Defendants' representations were false and gravely misleading. As alleged herein,

the Defendants engaged in extremely sophisticated methods of deception. Plaintiff

and Subclass members did not, and could not, unravel the Defendants' deception

on their own.

393.   The Defendants knew or should have known that their conduct violated the UCL.

394.   The Defendants owed Plaintiff and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

395.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, were non-EPA-compliant and unreliable, and that the Polluting Vehicles would not meet and maintain their advertised MPG rate,

- 190 -

because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

396.    The Defendants' conduct proximately caused injuries to Plaintiff and the other Subclass members.

397.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. They also were required to pay more for fuel than they reasonably anticipated based on the Defendants' material representations. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

398.    The Defendants' violations present a continuing risk to Plaintiff as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

399.    The Defendants' misrepresentations and omissions alleged herein caused Plaintiff and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these

vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain defective Adsorber Engines that failed to comply with EPA and California emissions standards.

400.   Accordingly, Plaintiff and the other Subclass members have suffered injury in fact, including lost money or property, as a result of the Defendants' misrepresentations and omissions.

401.   Plaintiff requests that this Court enter such orders or judgments as may be necessary to restore to Plaintiff and members of the Subclass any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345, and for such other relief as may be appropriate.

## COUNT II

### VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750 *ET SEQ.*)

402.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

403.   This claim is brought on behalf of the California Subclass.

404.   California's Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750 *et seq.*, proscribes "unfair methods of competition and unfair or

- 192 -

deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

405.   The Polluting Vehicles are "goods" as defined in CAL. CIV. CODE § 1761(a).

406.   Plaintiff and the other Subclass members are "consumers" as defined in CAL. CIV. CODE § 1761(d), and Plaintiff, the other Subclass members, and the Defendants are "persons" as defined in CAL. CIV. CODE § 1761(c).

407.   As alleged above, the Defendants made representations concerning the benefits, efficiency, performance, and safety features of the Polluting Vehicles and Adsorber Engines that were misleading.

408.   In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles were equipped with defective Adsorber Engines that failed EPA and California emissions standards, and that the Polluting Vehicles would not meet and maintain the advertised MPG rate.

409.   The Defendants' conduct, as described hereinabove, was and is in violation of the CLRA. The Defendants' conduct violates at least the following enumerated CLRA provisions:

- 193 -

i.    CAL. CIV. CODE § 1770(a)(2): Misrepresenting the approval or

certification of goods.

ii.    CAL. CIV. CODE § 1770(a)(3): Misrepresenting the certification by

another.

iii.    CAL. CIV. CODE § 1770(a)(5): Representing that goods have

sponsorship, approval, characteristics, uses, benefits, or quantities

which they do not have.

iv.    CAL. CIV. CODE § 1770(a)(7): Representing that goods are of a

particular standard, quality, or grade, if they are of another.

v.    CAL. CIV. CODE § 1770(a)(9): Advertising goods with intent not to

sell them as advertised.

vi.    CAL. CIV. CODE § 1770(a)(16): Representing that goods have been

supplied in accordance with a previous representation when they have

not.

410.    The Defendants intentionally and knowingly misrepresented material

facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the

Subclass.

411.    In purchasing or leasing the Polluting Vehicles, Plaintiff and the other

Subclass members were deceived by the Defendants' failure to disclose the NOx

reduction system in the Polluting Vehicles turns off or is limited during normal

- 194 -

driving conditions, that the emissions controls were defective, and that the

Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as

described above. They were also deceived by the Defendants' failure to disclose

that the Polluting Vehicles would not meet and maintain their advertised MPG rate.

412. Plaintiff and Subclass members reasonably relied upon the

Defendants' false misrepresentations. They had no way of knowing that the

Defendants' representations were false and gravely misleading. As alleged herein,

the Defendants engaged in extremely sophisticated methods of deception. Plaintiff

and Subclass members did not, and could not, unravel the Defendants' deception

on their own.

413. The Defendants knew or should have known that their conduct

violated the CLRA.

414. The Defendants owed Plaintiff and the Subclass a duty to disclose the

truth about their emissions systems manipulation because the Defendants:

    a. Possessed exclusive knowledge that they manipulated the emissions

       system in the Polluting Vehicles to turn off or limit effectiveness in

       normal driving conditions;

    b. Intentionally concealed the foregoing from Plaintiff and the Subclass;

       and/or

c.     Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

415.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, were non-EPA-compliant and unreliable, and would not meet and maintain the Polluting Vehicles' posted MPG rate, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

416.   The Defendants' conduct proximately caused injuries to Plaintiff and the other Subclass members.

417.   Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their

- 196 -

Polluting Vehicles have suffered a diminution in value. They also were required to pay more for fuel than they reasonably anticipated based on the Defendants' material representations. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

418.    The Defendants' violations present a continuing risk to Plaintiff as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

419.    The Defendants knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the Adsorber Engines, and that the Polluting Vehicles were not suitable for their intended use.

420.    The facts concealed and omitted by the Defendants from Plaintiff and the other Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Polluting Vehicles or pay a lower price. Had Plaintiff and the other Subclass members known about the defective nature of the Polluting Vehicles, and their non-compliance with EPA requirements, and the failure of the Polluting Vehicles to meet and maintain their posted MPG rate, they would not have purchased or leased the Polluting Vehicles or would not have paid the prices they paid.

421.    Plaintiff and the Subclass have provided the Defendants with notice of their violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a), and seek damages in this court.

422.    Plaintiff's and the other Subclass members' injuries were proximately caused by the Defendants' unlawful and deceptive business practices.

## COUNT III

### VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*)

423.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

424.    This claim is brought on behalf of the California Subclass.

425.    CAL. BUS. & PROF. CODE § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

426.    The Defendants caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications,

- 198 -

statements that were untrue or misleading, and which were known, or which by the

exercise of reasonable care should have been known to the Defendants, to be

untrue and misleading to consumers, including Plaintiff and the other Subclass

members.

427.   The Defendants have violated § 17500 because the misrepresentations

and omissions regarding the functionality, reliability, environmental-friendliness,

lawfulness, fuel efficiency, and safety of Polluting Vehicles as set forth in this

complaint were material and likely to deceive a reasonable consumer.

428.   Plaintiff and the other Subclass members have suffered an injury in

fact, including the loss of money or property, as a result of the Defendants' unfair,

unlawful, and/or deceptive practices. In purchasing or leasing their Polluting

Vehicles, Plaintiff and the other Subclass members relied on the misrepresentations

and/or omissions of the Defendants with respect to the functionality, reliability,

environmental-friendliness, fuel efficiency, and lawfulness of the Polluting

Vehicles. The Defendants' representations turned out not to be true because the

NOx reduction system in the Polluting Vehicles turns off or is limited during

normal driving conditions and the Polluting Vehicles are distributed with Adsorber

Engines that include defective emissions controls and a "Defeat Device." The

Polluting Vehicles also do not meet and maintain the posted MPG rate. Had

Plaintiff and the other Subclass members known this, they would not have

- 199 -

purchased or leased their Polluting Vehicles and/or paid as much for them. Accordingly, Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

429.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Defendants' business. The Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

430.   Plaintiff, individually and on behalf of the other Subclass members, requests that this Court enter such orders or judgments as may be necessary to restore to Plaintiff and the other Subclass members any money the Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief as may be appropriate.

## COUNT IV

## BREACH OF CONTRACT
## (BASED ON CALIFORNIA LAW)

431.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

432.   Plaintiff brings this Count on behalf of the California Subclass members.

433.   The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber

Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiff and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

434.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiff and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the Adsorber Engine's defect and/or defective design of emissions controls, including information known to FCA rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

435.   As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT V

## FRAUDULENT CONCEALMENT
## (BASED ON CALIFORNIA LAW)

436.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

437.   This claim is brought on behalf of the California Subclass.

438.   The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, did not meet and maintain the advertised MPG rate, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

- 202 -

439.   The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

440.   The Defendants knew these representations were false when made.

441.   The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, costly in that Plaintiff and other Subclass members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

442.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those

- 203 -

expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

443.   As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the Adsorber Engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

444.   The truth about the defective emissions controls and the Defendants' manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts and the Defendants actively concealed these facts from Plaintiff and Subclass members.

- 204 -

445.   Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

446.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of each Defendant—one characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

447.   The Defendants' false representations were material to consumers, because they concerned the quality and cost-effectiveness of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the

- 205 -

Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

448.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, failure to meet and maintain the advertised MPG rate, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles

purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

449.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

450.   The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

451.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had

- 207 -

known of the concealed and/or suppressed facts, in that they would not have

purchased purportedly reduced-emissions diesel cars manufactured by the

Defendants, and/or would not have continued to drive their heavily polluting

vehicles, or would have taken other affirmative steps in light of the information

concealed from them. Plaintiff's and Subclass members' actions were justified.

The Defendants were in exclusive control of the material facts, and such facts were

not generally known to the public, Plaintiff, or Subclass members.

452.   Because of the concealment and/or suppression of the facts, Plaintiff

and Subclass members have sustained damage because they own vehicles that are

diminished in value as a result of the Defendants' concealment of the true quality

and quantity of those vehicles' emissions and fuel efficiency and the Defendants'

failure to timely disclose the defect or defective design of the Adsorber Engine, the

actual emissions qualities and quantities of the Defendants' vehicles, and the

serious issues engendered by the Defendants' corporate policies. Had Plaintiff and

Subclass members been aware of the true emissions facts with regard to the

Polluting Vehicles, and the Defendants' disregard for the truth and compliance

with applicable federal and state law and regulations, and their failure to meet and

maintain the advertised MPG rate, Plaintiff and Subclass members who purchased

or leased new or certified previously owned vehicles would have paid less for their

vehicles or would not have purchased or leased them at all.

- 208 -

453. The value of Plaintiff's and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand names, attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

454. Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

455. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

D.     **Claims Brought on Behalf of the Illinois Subclass**

## COUNT I

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT
(815 ILL. COMP. STAT. 505/1 *ET SEQ.* AND
720 ILL. COMP. STAT. 295/1A)**

456.   Plaintiffs Dawn Roberts and Marc Ganz incorporate by reference all paragraphs as though fully set forth herein.

457.   This claim is brought on behalf of the Illinois Subclass.

458.   Each Defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. 505/1(c).

459.   Plaintiffs and the Subclass members are "consumers" as that term is defined in 815 Ill. Comp. Stat. 505/1(e).

460.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. 505/2.

461.   In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

462.   In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that

- 211 -

the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

463.   Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

464.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

465.   The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

466.   The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

467.   The Defendants knew or should have known that their conduct violated the Illinois CFA.

468.   The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

469.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting

- 213 -

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

470.   The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

471.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

472.   The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

473.   Pursuant to 815 Ill. Comp. Stat. 505/10a(a), Plaintiffs and the Subclass members seek monetary relief against the Defendants in the amount of actual damages, as well as punitive damages because the Defendants acted with fraud and/or malice and/or was grossly negligent.

474.   Plaintiffs also seek punitive damages, attorneys' fees, and any other just and proper relief available under 815 ILL. COMP. STAT. § 505/1 *et seq.*

- 214 -

## COUNT II

## BREACH OF CONTRACT
## (BASED ON ILLINOIS LAW)

475.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

476.   Plaintiffs bring this Count on behalf of the Illinois Subclass.

477.   The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

478.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts

by selling or leasing to Plaintiffs and the other Subclass members defective

Polluting Vehicles and by misrepresenting or failing to disclose that the NOx

reduction system in the Polluting Vehicles turns off or is limited during normal

driving conditions and the existence of the Adsorber Engine's defect and/or

defective design of emissions controls, including information known to FCA

rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than

vehicles not equipped with the Adsorber Engine.

479.   As a direct and proximate result of FCA's breach of contract,

Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and

consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON ILLINOIS LAW)

480.   Plaintiffs incorporate by reference all preceding allegations as though

fully set forth herein.

481.   This claim is brought on behalf of the Illinois Subclass.

482.   The Defendants intentionally concealed that the NOx reduction

system in the Polluting Vehicles turns off or is limited during normal driving

conditions, that the Polluting Vehicles had defective emissions controls, emitted

pollutants at a higher level than gasoline-powered vehicles, emitted pollutants

- 216 -

higher than a reasonable consumer would expect in light of the Defendants'
advertising campaign, emitted unlawfully high levels of pollutants such as NOx,
and were non-compliant with EPA emission requirements, or the Defendants acted
with reckless disregard for the truth, and denied Plaintiffs and the other Subclass
members information that is highly relevant to their purchasing decision.

483.   The Defendants further affirmatively misrepresented to Plaintiffs and
Subclass members in advertising and other forms of communication, including
standard and uniform material provided with each car, that the Polluting Vehicles
they were selling had no significant defects, were Earth-friendly and low-emission
vehicles, complied with EPA regulations, and would perform and operate properly
when driven in normal usage.

484.   The Defendants knew these representations were false when made.

485.   The Polluting Vehicles purchased or leased by Plaintiffs and the other
Subclass members were, in fact, defective, emitting pollutants at a much higher
rate than gasoline-powered vehicles and at a much higher rate than a reasonable
consumer would expect in light of the Defendants' advertising campaign, non-
EPA-compliant, and unreliable because the NOx reduction system in the Polluting
Vehicles turns off or is limited during normal driving conditions.

486.   The Defendants had a duty to disclose that the NOx reduction system
in the Polluting Vehicles turns off or is limited during normal driving conditions

- 217 -

and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

487.   As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

488.   The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the

Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

489.   Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

490.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

491.   The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they

- 219 -

concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

492.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and

- 220 -

Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

493.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

494.   The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

- 221 -

495.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

496.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles

would have paid less for their vehicles or would not have purchased or leased them at all.

497.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

498.   Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

499.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

E.     **Claims Brought on Behalf of the Minnesota Subclass**

## COUNT I

## VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (MINN. STAT. § 325F.68 *ET SEQ.*)

500.   Plaintiff Jordan Hougo ("Plaintiff" for purposes of all Minnesota

Subclass claims) incorporates by reference all paragraphs as though fully set forth

herein.

501.   This claim is brought on behalf of the Minnesota Subclass.

502.   The Polluting Vehicles constitute "merchandise" within the meaning

of MINN. STAT. § 325F.68(2).

503.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota

CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false

pretense, false promise, misrepresentation, misleading statement or deceptive

practice, with the intent that others rely thereon in connection with the sale of any

merchandise, whether or not any person has in fact been misled, deceived, or

damaged thereby." MINN. STAT. § 325F.69(1). The Minnesota CFA also prohibits

the dissemination, directly or indirectly, of an advertisement "of any sort regarding

merchandise," where that advertisement contains "any material assertion,

representation, or statement of fact which is untrue, deceptive, or misleading."

MINN. STAT. § 325F.67. In the course of Defendants' business, they willfully failed

to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, Defendants used or employed a fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby and disseminated advertisements containing material assertions, representations, or statements of fact which were untrue, deceptive, or misleading, all in violation of the Minnesota CFA.

504. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

505.   In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

506.   Plaintiff and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein,

- 226 -

the Defendants engaged in extremely sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own.

507.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

508.   The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

509.   The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

510.   The Defendants knew or should have known that their conduct violated the Minnesota CFA.

511.   The Defendants owed Plaintiff and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

- 227 -

    c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

512.    The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

513.    The Defendants' conduct proximately caused injuries to Plaintiff and the other Subclass members.

514.    Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their

Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

515. Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

516. Pursuant to MINN. STAT. § 8.31(3a), Plaintiff and the Minnesota Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

517. Plaintiff also seeks punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights of others.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON MINNESOTA LAW)

518. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

519. Plaintiff brings this Count on behalf of the Minnesota Subclass.

520. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiff and the other Subclass members to make their

- 229 -

purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

521.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiff and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that they were thus less valuable than vehicles not equipped with the Adsorber Engine.

522.   As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

# COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON MINNESOTA LAW)

523.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

524.    This claim is brought on behalf of the Minnesota Subclass.

525.    The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

526.    The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

- 231 -

527.   The Defendants knew these representations were false when made.

528.   The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

529.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

530.   As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx

reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

531.   The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiff and Subclass members.

532.   Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

533.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture

characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

534.   The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

535.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably

discoverable by Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

- 235 -

536.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

537.   The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

538.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

539.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they own vehicles that are

- 236 -

diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

540.    The value of Plaintiff's and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

541.    Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

542.    The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

F.    **Claims Brought on Behalf of the Montana Subclass**

### COUNT I

### VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973
### (MONT. CODE ANN. § 30-14-101 *ET SEQ.*)

543.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

544.    This claim is brought only on behalf of the Montana Subclass.

545.    Each of the Defendants, Plaintiffs, and the Montana Subclass are "persons" within the meaning of MONT. CODE ANN. § 30-14-102(6).

546.    Montana Subclass members are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

547.    The sale or lease of the Polluting Vehicles to Montana Subclass members occurred within "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and Defendants committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

548.    The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MONT. CODE ANN. § 30-14-103. In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of the Montana CPA.

549.    In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting

- 239 -

Vehicles emitted far more pollutants than gasoline-powered vehicles, that the

Polluting Vehicles emit far more pollution than a reasonable consumer would

expect in light of the Defendants' advertising campaign, and that the Polluting

Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

above. Accordingly, the Defendants engaged in unfair methods of competition,

unconscionable acts or practices, and unfair or deceptive acts or practices,

including representing that Polluting Vehicles have characteristics, uses, benefits,

and qualities which they do not have; representing that Polluting Vehicles are of a

particular standard and quality when they are not; failing to reveal a material fact,

the omission of which tends to mislead or deceive the consumer, and which fact

could not reasonably be known by the consumer; making a representation of fact or

statement of fact material to the transaction such that a person reasonably believes

the represented or suggested state of affairs to be other than it actually is; and

failing to reveal facts that are material to the transaction in light of representations

of fact made in a positive manner.

550. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the

other Subclass members were deceived by the Defendants' failure to disclose that

the NOx reduction system in the Polluting Vehicles turns off or is limited during

normal driving conditions, that the emissions controls were defective, and that the

- 240 -

Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

551.    Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

552.    The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

553.    The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

554.    The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

555.    The Defendants knew or should have known that their conduct violated the Montana CPA.

556.    The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

- 241 -

a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

557.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

558.   The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

559.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

560.   The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

561.   Because the Defendants' unlawful methods, acts, and practices have caused Plaintiffs and Montana Subclass members to suffer an ascertainable loss of money and property, Plaintiffs and the Subclass seek from the Defendants actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, and any other relief the Court considers necessary or proper, under MONT. CODE ANN. § 30-14-133.

010649-11 1032740 V1

# COUNT II

## BREACH OF CONTRACT
## (BASED ON MONTANA LAW)

562.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

563.   Plaintiffs bring this Count on behalf of the Montana Subclass members.

564.   The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

565.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts

- 244 -

by, among other things, selling or leasing to Plaintiffs and the other Subclass

members defective Polluting Vehicles and by misrepresenting or failing to disclose

that the NOx reduction system in the Polluting Vehicles turns off or is limited

during normal driving conditions, and that they were thus less valuable than

vehicles not equipped with the Adsorber Engine.

566.   As a direct and proximate result of FCA's breach of contract,

Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and

consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON MONTANA LAW)

567.   Plaintiffs incorporate by reference all preceding allegations as though

fully set forth herein.

568.   This claim is brought on behalf of the Montana Subclass.

569.   The Defendants intentionally concealed that the NOx reduction

system in the Polluting Vehicles turns off or is limited during normal driving

conditions, that the Polluting Vehicles had defective emissions controls, emitted

pollutants at a higher level than gasoline-powered vehicles, emitted pollutants

higher than a reasonable consumer would expect in light of the Defendants'

advertising campaign, emitted unlawfully high levels of pollutants such as NOx,

and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

570.    The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

571.    The Defendants knew these representations were false when made.

572.    The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

573.    The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had

- 246 -

emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

574. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

575. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and

the Defendants actively concealed these facts from Plaintiffs and Subclass members.

576.   Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

577.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

578.   The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations

- 248 -

regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

579.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial

- 249 -

truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

580.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

581.   The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

010649-11 1032740 V1

582.    Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

583.    Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles

- 251 -

would have paid less for their vehicles or would not have purchased or leased them at all.

584.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

585.   Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

586.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

G.    **Claims Brought on Behalf of the New Mexico Subclass**

## COUNT I

### VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT (N.M. STAT. ANN. § 57-12-1 *ET SEQ.*)

587.   Plaintiff Marty Ward ("Plaintiff" for purposes of all New Mexico Subclass claims) incorporates by reference all preceding allegations as though fully set forth herein.

588.   This claim is brought on behalf of the New Mexico Subclass.

589.   The Defendants, Plaintiff, and New Mexico Subclass members are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. STAT. ANN. § 57-12-2.

590.   The Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

591. The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12- 2(D). The Defendants' acts and omissions described herein constitute

- 253 -

unfair or deceptive acts or practices under N.M. STAT. ANN. § 57-12-2(D). In

addition, the Defendants' actions constitute unconscionable actions under N.M.

STAT. ANN. § 57-12-2(E), since they took advantage of the lack of knowledge,

ability, experience, and capacity of the New Mexico Subclass members to a

grossly unfair degree.

592.    In the course of the Defendants' business, they willfully failed to

disclose and actively concealed that the NOx reduction system in the Polluting

Vehicles turns off or is limited during normal driving conditions, that the Polluting

Vehicles emitted far more pollutants than gasoline-powered vehicles, that the

Polluting Vehicles emit far more pollution than a reasonable consumer would

expect in light of the Defendants' advertising campaign, and that the Polluting

Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

above. Accordingly, the Defendants engaged in unfair methods of competition,

unconscionable acts or practices, and unfair or deceptive acts or practices,

including representing that Polluting Vehicles have characteristics, uses, benefits,

and qualities which they do not have; representing that Polluting Vehicles are of a

particular standard and quality when they are not; failing to reveal a material fact,

the omission of which tends to mislead or deceive the consumer, and which fact

could not reasonably be known by the consumer; making a representation of fact or

statement of fact material to the transaction such that a person reasonably believes

- 254 -

the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

593. In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

594. Plaintiff and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own.

595. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

596. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

- 255 -

597.   The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

598.   The Defendants knew or should have known that their conduct violated the New Mexico UTPA.

599.   The Defendants owed Plaintiff and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

600.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

- 256 -

emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

601. The Defendants' conduct proximately caused injuries to Plaintiff and the other Subclass members.

602. The Defendants' violations present a continuing risk to Plaintiff as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

603. As a direct and proximate result of the Defendants' violations of the New Mexico UTPA, Plaintiff and the New Mexico Subclass have suffered injury-in-fact and/or actual damage.

604. New Mexico Subclass members seek punitive damages against the Defendants because the Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith. Because the Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith, it warrants punitive damages.

605.   Because the Defendants' unconscionable, willful conduct caused actual harm to New Mexico Class Members, Plaintiff and the New Mexico Subclass seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

**COUNT II**

**FRAUDULENT CONCEALMENT**
**(BASED ON NEW MEXICO LAW)**

606.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

607.   Plaintiff brings this Count on behalf of the New Mexico Subclass.

608.   The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

609.   The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

610.   The Defendants knew these representations were false when made.

611.   The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

612.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting

- 259 -

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

613.   As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

614.   The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiff and Subclass members.

615.   Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants'

representations were false and/or misleading. As consumers, Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

616.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

617.   The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the

vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

618. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute,

- 262 -

comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

619.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

620.   The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

621.   Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the

- 263 -

Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

622.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

623.   The value of Plaintiff's and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective

- 264 -

emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

624.   Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

625.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF CONTRACT
### (BASED ON NEW MEXICO LAW)

626.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

627.   This claim is brought on behalf of the New Mexico Subclass.

- 265 -

628. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiff and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

629. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiff and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA,

- 266 -

rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

630. As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## H. Claims Brought on Behalf of the South Carolina Subclass

### COUNT I

### VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10 *ET SEQ.*)

631. Plaintiff James Forshaw ("Plaintiff" for purposes of all South Carolina Subclass claims) incorporates by reference all preceding allegations as though fully set forth herein.

632. This claim is brought on behalf of the South Carolina Subclass.

633. Each Defendant is a "person" under S.C. CODE ANN. § 39-5-10.

634. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. CODE ANN. § 39-5-20(a).

635. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting

- 267 -

Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

636. In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the

- 268 -

Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

637.   Plaintiff and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own.

638.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

639.   The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

640.   The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

641.   The Defendants knew or should have known that their conduct violated the South Carolina UTPA.

642.   The Defendants owed Plaintiff and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a. Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b. Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

c. Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

643. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

644.   The Defendants' conduct proximately caused injuries to Plaintiff and the other Subclass members.

645.   Plaintiff and the South Carolina Class suffered ascertainable loss caused by the Defendants' misrepresentations and concealment of and failure to disclose material information. Plaintiff and the other Subclass members who purchased the Polluting Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all. 1694. The Defendants' unlawful acts and practices complained of herein affect the public interest.

646.   As a direct and proximate result of the Defendants' violations of the South Carolina UTPA, Plaintiff and the South Carolina Class have suffered injury-in-fact and/or actual damage.

647.   Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiff seeks monetary relief against the Defendants to recover for their economic losses. Because the Defendants' actions were willful and knowing, Plaintiff's damages should be trebled. *Id.*

648.   Plaintiff further alleges that the Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because the Defendants carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the Class to cruel and unjust hardship as a result.

- 271 -

## COUNT II

## VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT (S.C. CODE ANN. § 56-15-10 *ET SEQ.*)

649.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

650.   This claim is brought only on behalf of the South Carolina Subclass.

651.   Each of the Defendants was a "manufacturer" as set forth in S.C. CODE ANN. § 56-15-10, as each was engaged in the business of manufacturing or assembling new and unused motor vehicles.

652.   Defendants committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. CODE ANN. § 56-15-30.

653.   Defendants engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiff, the South Carolina Subclass, and to the public.

654.   Defendants' bad faith and unconscionable actions include, but are not limited to: (1) representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Polluting Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Polluting Vehicles with the intent not to sell them as advertised, (4)

- 272 -

representing that a transaction involving Polluting Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Polluting Vehicles has been supplied in accordance with a previous representation when it has not.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON SOUTH CAROLINA LAW)

655. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

656. Plaintiff brings this Count on behalf of the South Carolina Subclass.

657. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

658. The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including

- 273 -

standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

659. The Defendants knew these representations were false when made.

660. The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

661. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

662. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

663. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiff and Subclass members.

664. Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own.

Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

665.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

666.   The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

667.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-

compliance, are material concerns to a consumer, including with respect to the

emissions certifications testing their vehicles must pass. The Defendants

represented to Plaintiff and Subclass members that they were purchasing or leasing

reduced-emission diesel vehicles when, in fact, they were purchasing or leasing

defective, high-emission vehicles with unlawfully high emissions.

668.   The Defendants actively concealed and/or suppressed these material

facts, in whole or in part, to pad and protect their profits and to avoid the

perception that their vehicles were not clean diesel vehicles and did not or could

not comply with federal and state laws governing clean air and emissions, which

perception would hurt the brand's image and cost the Defendants money, and they

did so at the expense of Plaintiff and Subclass members.

669.   The Defendants still have not made full and adequate disclosures, and

continue to defraud Plaintiff and Subclass members by concealing material

information regarding the emissions qualities of the Polluting Vehicles.

670.   Plaintiff and Subclass members were unaware of the omitted material

facts referenced herein, and they would not have acted as they did if they had

known of the concealed and/or suppressed facts, in that they would not have

purchased purportedly reduced-emissions diesel cars manufactured by the

Defendants, and/or would not have continued to drive their heavily polluting

vehicles, or would have taken other affirmative steps in light of the information

- 278 -

concealed from them. Plaintiff's and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

671.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

672.   The value of Plaintiff's and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all

of which has greatly tarnished the Defendants' brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

673.   Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

674.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## BREACH OF CONTRACT
## (BASED ON SOUTH CAROLINA LAW)

675.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

676.   This claim is brought on behalf of the South Carolina Subclass.

677.   The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein,

- 280 -

caused Plaintiff and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

678. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiff and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

679. As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which

shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

I.      **Claims Brought on Behalf of the Tennessee Subclass**

**COUNT I**

**VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT
(TENN. CODE ANN. § 47-18-101 *ET SEQ.*)**

680.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

681.    Plaintiffs bring this Count on behalf of the Tennessee Subclass.

682.    Plaintiffs and the Tennessee Subclass are "natural persons" and "consumers" within the meaning of TENN. CODE ANN. § 47-18-103(2).

683.    Each Defendant is a "person" within the meaning of TENN. CODE ANN. § 47-18-103(2).

684.    The Defendants' conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE ANN. § 47-18-103(19).

685.    The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade … if they are of

- 282 -

another;" "Advertising goods or services with intent not to sell them as advertised;" and "Engaging in any other act or practice which is deceptive to the consumer or any other person." Tenn. Code Ann. § 47-18-104. In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, Defendants violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Polluting Vehicles have characteristics or benefits that they did not have; representing that Polluting Vehicles are of a particular standard, quality, or grade when they are of another; advertising Polluting Vehicles with intent not to sell them as advertised; and engaging in acts or practices that are deceptive to consumers.

686.    In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the

- 283 -

Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

687. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

- 284 -

688. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

689. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

690. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

691. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

692. The Defendants knew or should have known that their conduct violated the Tennessee CPA.

693. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a. Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

- 285 -

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

694.    The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

695.    The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

696.    Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the

- 286 -

Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

697.   The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

698.   Pursuant to TENN. CODE § 47-18-109(a), Plaintiffs and the Tennessee Subclass seek monetary relief against the Defendants measured as actual damages in an amount to be determined at trial, treble damages as a result of the Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON TENNESSEE LAW)

699.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

700.   Plaintiffs bring this Count on behalf of the Tennessee Subclass.

701.   The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal

- 287 -

driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

702.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, thus rendering each Polluting Vehicle less valuable, than vehicles not equipped with the Adsorber Engine.

703.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

- 288 -

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON TENNESSEE LAW)

704. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

705. This claim is brought on behalf of the Tennessee Subclass.

706. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

707. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

708. The Defendants knew these representations were false when made.

709. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

710. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

711. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx

reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

712.   The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

713.   Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

714.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture

characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

715.   The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

716.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably

- 292 -

discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

- 293 -

717. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

718. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

719. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

720. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are

diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

721.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

722.    Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

723.    The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

J.    **Claims Brought on Behalf of the Texas Subclass**

**COUNT I**

**VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT
(TEX. BUS. & COM. CODE § 17.41 *ET SEQ.*)**

724.    Plaintiffs Paul Chouffet and Martin Rivas ("Plaintiffs," for purposes of this claim) incorporate by reference all paragraphs as though fully set forth herein.

725.    Plaintiffs and the Subclass members are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4). Defendants are "person[s]" within the meaning of Tex. Bus. & Com.

Code § 17.45(3). 2978. FCA is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

726.   This claim is brought on behalf of the Texas Subclass against FCA.

727.   The Texas Deceptive Trade Practices Act ("Texas DTPA") declares "[f]alse, misleading, or deceptive acts" to be unlawful TEX. BUS. & COM. CODE § 17.46. Through the Consolidated Amended Complaint filed on February 21, 2017, Defendants are on notice regarding the allegations under the Texas DTPA. Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Texas class are entitled.

728.   In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others

- 297 -

rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

729.   In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

730.   Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

731.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

732.   The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

- 298 -

733.   The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

734.   The Defendants knew or should have known that their conduct violated the Texas DTPA.

735.   The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

      a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

      b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

      c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

736.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

- 299 -

emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

737. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

738. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

739. Pursuant to Tex. Bus. & Com. Code § 17.50, Plaintiffs and the Texas Class seek an order enjoining the Defendants' unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON TEXAS LAW)

740.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

741.   Plaintiffs bring this Count on behalf of the Texas Subclass members.

742.   The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and failure to disclose that the Polluting Vehicles did not meet and maintain the advertised MPG rate, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

743.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts

- 301 -

by selling or leasing to Plaintiffs and the other Subclass members defective

Polluting Vehicles and by misrepresenting or failing to disclose that the Polluting

Vehicles would not meet and maintain their advertised MPG rate, and by

misrepresenting or failing to disclose that the NOx reduction system in the

Polluting Vehicles turns off or is limited during normal driving conditions and the

existence of the Adsorber Engine's defect and/or defective design of emissions

controls, including information known to FCA, rendering each Polluting Vehicle

non-EPA-compliant, and thus less valuable than vehicles not equipped with the

defective Adsorber Engine.

744.    As a direct and proximate result of FCA's breach of contract,

Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and

consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON TEXAS LAW)

745.    Plaintiffs incorporate by reference all preceding allegations as though

fully set forth herein.

746.    This claim is brought on behalf of the Texas Subclass.

747.    The Defendants intentionally concealed that the NOx reduction

system in the Polluting Vehicles turns off or is limited during normal driving

- 302 -

conditions, that the Polluting Vehicles had defective emissions controls, failed to meet and maintain the advertised MPG rate, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

748.   The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, met and maintained the advertised MPG rate, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

749.   The Defendants knew these representations were false when made.

750.   The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, not meeting and maintaining the advertised MPG rate, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and

- 303 -

unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

751.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, were non-EPA-compliant and unreliable, and failed to meet and maintain the advertised MPG rate, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

752.   As alleged in this complaint, at all relevant times, the has held out the Polluting Vehicles to be reduced emission, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deployed a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants,

- 304 -

and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

753.   The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," failure to meet and maintain the advertised MPG rate, and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

754.   Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

755.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of each Defendant—one characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. They also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy

- 305 -

diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

756.   The Defendants' false representations were material to consumers because they concerned the quality and cost-effectiveness of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

757.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the Polluting Vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each

- 306 -

country, which were misleading, deceptive, and incomplete without the disclosure

of the additional facts set forth above regarding the actual emissions of their

vehicles, their actual philosophy with respect to compliance with federal and state

clean air law and emissions regulations, and their actual practices with respect to

the vehicles at issue. Having volunteered to provide information to Plaintiffs and

Subclass members, the Defendants had the duty to disclose not just the partial

truth, but the entire truth. These omitted and concealed facts were material because

they directly impact the value of the Polluting Vehicles purchased or leased by

Plaintiffs and Subclass members. Whether a manufacturer's products pollute,

comply with federal and state clean air law and emissions regulations, meets and

maintains the advertised MPG rate, and whether that manufacturer tells the truth

with respect to such compliance or non-compliance, are material concerns to a

consumer, including with respect to the emissions certifications testing their

vehicles must pass. The Defendants represented to Plaintiffs and Subclass

members that they were purchasing or leasing fuel-efficient, reduced-emissions

diesel vehicles when, in fact, they were purchasing or leasing defective, high-

emission vehicles with unlawfully high emissions.

758. The Defendants actively concealed and/or suppressed these material

facts, in whole or in part, to pad and protect their profits and to avoid the

perception that their vehicles were not clean diesel vehicles and did not or could

- 307 -

not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

759. The Defendants had still not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

760. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

761. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and the Defendants' failure to timely disclose the defect or defective design of the Adsorber Engine, the

actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, and their failure to meet and maintain the advertised MPG rate, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

762.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand names, attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

763.   Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

764.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and

Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

K.   **Claims Brought on Behalf of the Washington Subclass**

## COUNT I

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010 *ET SEQ.*)

765.   Plaintiff Alan Strange ("Plaintiff" for purposes of all Washington State claims) incorporates by reference all preceding allegations as though fully set forth herein.

766.   Plaintiff brings this Count on behalf of the Washington Subclass.

767.   Each Defendant, Plaintiff, and each member of the Washington Subclass is a "person" under WASH. REV. CODE ANN. § 19.86.010(1) ("Washington CPA").

768.   Defendants engaged in "trade" or "commerce" under WASH. REV. CODE ANN. § 19.86.010(2).

769.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE. WASH. ANN. § 19.96.010.

- 310 -

770.   In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair and deceptive business practices prohibited by the Washington CPA. The Defendants' conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The Defendants' conduct is deceptive because it has the capacity or tendency to deceive.

771.   In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

- 311 -

above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

772.   In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

773.   Plaintiff and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein,

the Defendants engaged in extremely sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own.

774.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

775.   The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

776.   The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

777.   The Defendants knew or should have known that their conduct violated the Washington CPA.

778.   The Defendants owed Plaintiff and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

- 313 -

     c.     Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

779.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

780.   The Defendants' conduct proximately caused injuries to Plaintiff and the other Subclass members.

781.   Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their

- 314 -

Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

782.   The Defendants' violations present a continuing risk to Plaintiff as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

783.   The Defendants are liable to Plaintiff and the Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE. ANN. § 19.86.090.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON WASHINGTON LAW)

784.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

785.   Plaintiff brings this Count on behalf of the Washington Subclass members.

786.   The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiff and the other Subclass members to make their purchases or leases

- 315 -

of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

787.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiff and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

788.   As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which

- 316 -

shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON WASHINGTON LAW)

789.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

790.   Plaintiff brings this Count on behalf of the Washington Subclass.

791.   The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

792.   The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission

- 317 -

vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

793.   The Defendants knew these representations were false when made.

794.   The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

795.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

796.   As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles.

- 318 -

The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

797.   The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiff and Subclass members.

798.   Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

799.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

800.   The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

801.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the

- 320 -

Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing

- 321 -

reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

802. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

803. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

804. Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

805.   Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

806.   The value of Plaintiff's and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to

- 323 -

purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

807. Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

808. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

L.   **Claims Brought on Behalf of the Alabama Subclass**

### COUNT I

### VIOLATIONS OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT (ALA. CODE § 8-19-1 *ET SEQ.*)

809. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

810. Plaintiffs bring this Count on behalf of the Alabama Subclass.

811. Plaintiffs and the Subclass members are "consumers" within the meaning of ALA. CODE § 8-19-3(2).

812.   Plaintiffs, the Subclass members, and the Defendants are "persons" within the meaning of ALA. CODE § 8-19-3(5).

813.   The Polluting Vehicles are "goods" within the meaning of ALA. CODE § 8-19-3(3).

814.   The Defendants were and are engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

815.   The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5. Through the Consolidated Amended Complaint filed on February 21, 2017, and through a demand in satisfaction letter mailed on June 30, 2017, Defendants are on notice regarding the allegations under the Alabama DTPA. Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Alabama class are entitled.

816.    In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

817.    In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

818.    Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the

- 326 -

Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

819.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

820.   The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

821.   The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

822.   The Defendants knew or should have known that their conduct violated the Alabama DTPA.

823.   The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

- 327 -

b.     Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.     Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

824.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

825.   The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

826.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the

- 328 -

Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

827.   Pursuant to Ala. Code § 8-19-10, Plaintiffs and the Subclass members seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff and each Alabama Class member. Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ala. Code § 8-19-1, et seq.

**COUNT II**

**BREACH OF CONTRACT**
**(BASED ON ALABAMA LAW)**

828.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

829.   Plaintiffs bring this Count on behalf of the Alabama Subclass.

830.   The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal

- 329 -

driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

831.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Adsorber Engine.

832.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

# COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON ALABAMA LAW)

833.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

834.   This claim is brought on behalf of the Alabama Subclass.

835.   The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

836.   The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

- 331 -

837.   The Defendants knew these representations were false when made.

838.   The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

839.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

840.   As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx

- 332 -

reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

841.   The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

842.   Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

843.   The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture

characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

844.   The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

845.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably

- 334 -

discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

- 335 -

846.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

847.   The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

848.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

849.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are

diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

850. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

851.   Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

852.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

M.   **Claims Brought on Behalf of the Alaska Subclass**

### COUNT I

### VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (ALASKA STAT. ANN. § 45.50.471 *ET SEQ.*)

853.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

854.   Plaintiffs bring this Count on behalf of the Alaska Subclass.

855.   The Alaska CPA proscribes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including: "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the

- 338 -

person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." ALASKA STAT. ANN. § 45.50.471. Through the Consolidated Amended Complaint filed on February 21, 2017, Defendants are on notice regarding the allegations under the Alaska CPA. Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Alaska class are entitled.

856.    In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

- 339 -

above. Accordingly, the Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

857.   In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

858.   Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

859.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

860.   The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

861.   The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

862.   The Defendants knew or should have known that their conduct violated the Alaska CPA.

863.   The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    d.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    e.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

    f.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

- 341 -

864.    The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

865.    The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

866.    Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

867.    Pursuant to Alaska Stat. Ann. § 45.50. 531, Plaintiffs and the Subclass seek monetary relief against Defendants measured as the greater of (a) three times

the actual damages in an amount to be determined at trial or (b) $500 for each

Plaintiff and each Alaska Class member. 569. Plaintiffs also seek an order

enjoining Defendants' unfair, unlawful, and/or deceptive practices pursuant to

Alaska Stat. § 45.50. 535, attorneys' fees, and any other just and proper relief

available under the Alaska CPA.

**COUNT II**

**FRAUDULENT CONCEALMENT**
**(BASED ON ALASKA LAW)**

868.   Plaintiffs reallege and incorporate by reference all paragraphs as

though fully set forth herein.

869.   This claim is brought on behalf of the Alaska Subclass.

870.   The Defendants intentionally concealed that the NOx reduction

system in the Polluting Vehicles turns off or is limited during normal driving

conditions, that the Polluting Vehicles had defective emissions controls, emitted

pollutants at a higher level than gasoline-powered vehicles, emitted pollutants

higher than a reasonable consumer would expect in light of the Defendants'

advertising campaign, emitted unlawfully high levels of pollutants such as NOx,

and were non-compliant with EPA emission requirements, or the Defendants acted

with reckless disregard for the truth, and denied Plaintiffs and the other Subclass

members information that is highly relevant to their purchasing decision.

- 343 -

871.   The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

872.   The Defendants knew these representations were false when made.

873.   The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

874.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

875. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

876. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

877. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants'

- 345 -

representations were false and/or misleading. As consumers, the Plaintiffs and
Subclass members did not, and could not, unravel the Defendants' deception on
their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass
members by concealing the true facts about the Polluting Vehicle emissions.

878. The Defendants also concealed and suppressed material facts
concerning what is evidently the true culture of the Defendants—a culture
characterized by an emphasis on profits and sales above compliance with federal
and state clean air law and emissions regulations that are meant to protect the
public and consumers. Defendants also emphasized profits and sales above the
trust that Plaintiffs and Subclass members placed in their representations.
Consumers buy diesel cars from the Defendants because they feel they are clean
diesel cars. They do not want to be spewing noxious gases into the environment.
And yet, that is precisely what the Polluting Vehicles are doing.

879. The Defendants' false representations were material to consumers,
because they concerned the quality of the Polluting Vehicles, because they
concerned compliance with applicable federal and state law and regulations
regarding clean air and emissions, and also because the representations played a
significant role in the value of the vehicles. As the Defendants well knew, their
customers, including Plaintiffs and Subclass members, highly valued that the

vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

880.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute,

- 347 -

comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

881.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

882.   The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

883.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the

Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

884.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

885.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective

emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

886.   Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

887.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF CONTRACT
### (BASED ON ALASKA LAW)

888.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

889.   Plaintiffs bring this Count on behalf of the Alaska Subclass.

- 350 -

890.   The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Polluting Vehicles' defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

891.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the Adsorber Engine's defect and/or defective design of emissions controls, including information known to FCA

- 351 -

rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

892. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

N. **Claims Brought on Behalf of the Arizona Subclass**

## COUNT I

## VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT (ARIZ. REV. STAT. § 44-1521 *ET SEQ.*)

893. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

894. Plaintiffs bring this Count on behalf of the Arizona Subclass.

895. The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

- 352 -

896. In the course of the Defendants' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

897. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

898. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the

- 353 -

Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

899.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

900.   The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

901.   The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

902.   The Defendants knew or should have known that their conduct violated the Arizona CFA.

903.   The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

g.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

- 354 -

h.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

i.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

904.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

905.   The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

906.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the

- 355 -

Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

907.   The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

908.   Plaintiffs and the Subclass seek monetary relief against the Defendants in an amount to be determined at trial. Plaintiffs and the Subclass also seek punitive damages because the Defendants engaged in aggravated and outrageous conduct with an evil mind.

909.   Plaintiffs also seek attorneys' fees and any other just and proper relief available.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON ARIZONA LAW)

910.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

911.   Plaintiffs bring this Count on behalf of the Arizona Subclass.

- 356 -

912.   The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

913.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the Adsorber Engine's defect and/or defective design of emissions controls, including information known to FCA

- 357 -

rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

914.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON ARIZONA LAW)

915.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

916.   This claim is brought on behalf of the Arizona Subclass.

917.   The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

- 358 -

918.   The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

919.   The Defendants knew these representations were false when made.

920.   The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

921.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting

- 359 -

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

922.   As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the Adsorber Engine, but nonetheless, the intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

923.   The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

924.   Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants'

- 360 -

representations were false and/or misleading. As consumers, Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

925. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

926. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the

- 361 -

vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

927.   The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute,

- 362 -

comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

928.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

929.   The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

930.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the

- 363 -

Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

931.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the Adsorber Engine, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

932.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the

Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

933. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

934. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

O.     **Claims Brought on Behalf of the Arkansas Subclass**

### COUNT I

### VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT (ARK. CODE ANN. § 4-88-101 *ET SEQ.*)

935. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

936. This claim is brought on behalf of the Arkansas Subclass.

- 365 -

937.   The Defendants, Plaintiffs, and the Arkansas subclass are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE ANN. § 4-88-102(5).

938.   The "Polluting Vehicles" are "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

939.   The Arkansas DTPA prohibits ""[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" ARK. CODE ANN. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." ARK. CODE ANN. § 4-88-108.

940.   In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting

- 366 -

Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

941.   In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

942.   Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the

- 367 -

Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

943. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

944. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

945. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

946. The Defendants knew or should have known that their conduct violated the Arkansas DTPA.

947. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    j.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    k.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

- 368 -

l.      Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

948.    The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

949.    The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

950.    Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their

Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

951.   The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

952.   Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Arkansas Class member; (c) reasonable attorneys' fees; and (d) any other just and proper relief available under Arkansas law. Plaintiffs also seek punitive damages against the Defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others. The Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON ARKANSAS LAW)

953.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

954.   This claim is brought on behalf of the Arkansas Subclass.

955.   The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, did not meet and maintain the advertised MPG rate, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

956.   The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

957.   The Defendants knew these representations were false when made.

958.   The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable

- 371 -

consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, costly in that the Plaintiffs and other Subclass members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

959.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

960.   As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the Adsorber Engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions

controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

961. The truth about the defective emissions controls and the Defendants' manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

962. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

963. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of each Defendant—one characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the

- 373 -

public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

964.  The Defendants' false representations were material to consumers, because they concerned the quality and cost-effectiveness of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

965.  The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, failure to meet and maintain the advertised MPG rate, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made

- 374 -

general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

- 375 -

966.   The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

967.   The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

968.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

969.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are

- 376 -

diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and the Defendants' failure to timely disclose the defect or defective design of the Adsorber Engine, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, and their failure to meet and maintain the advertised MPG rate, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

970.   The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand names, attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

971.   Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

972.   The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
## (BASED ON ARKANSAS LAW)

973.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

974.   Plaintiffs bring this Count on behalf of the Arkansas Subclass members.

975.   The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent

- 378 -

those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

976.   Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the Adsorber Engine's defect and/or defective design of emissions controls, including information known to FCA rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

977.   As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

P.     **Claims Brought on Behalf of the Colorado Subclass**

## COUNT I

## VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### (COLO. REV. STAT. § 6-1-101 *ET SEQ.*)

978.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

979.   Plaintiffs bring this Count on behalf of the Colorado Subclass.

980.   Colorado's Consumer Protection Act (the "Colorado CPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation as to the source, sponsorship, approval, or certification of goods," or "a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods." COLO. REV. STAT. § 6-1-105(1)(b), (e). The Colorado CPA further prohibits "represent[ing] that goods … are of a particular standard, quality, or grade … if he knows or should know that they are of another," and "advertis[ing] goods … with intent not to sell them as advertised." COLO. REV. STAT. § 6-1-105(1)(g), (i).

981.   Each Defendant is a "person" under § 6-1-102(6) of the Colorado CPA, COLO. REV. STAT. § 6-1-101 *et seq*.

982.   Plaintiffs and Colorado Subclass members are "consumers" for the purpose of COLO. REV. STAT. § 6-1-113(1)(a) who purchased or leased one or more Polluting Vehicles.

- 380 -

983.   In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

984.   In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that

- 381 -

the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

985.   Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

986.   The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

987.   The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

988.   The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

989.   The Defendants knew or should have known that their conduct violated the Colorado CPA.

- 382 -

990.   The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

991.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting

- 383 -

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

992.   The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

993.   Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

994.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

995.   Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs and the Subclass seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and the discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff and Subclass member.

996.   Plaintiffs and the Subclass also seek declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

- 384 -

## COUNT II

## BREACH OF CONTRACT
## (BASED ON COLORADO LAW)

997.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

998.   Plaintiffs bring this Count on behalf of the Colorado Subclass.

999.   The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1000. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective

- 385 -

Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

1001. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON COLORADO LAW)

1002. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1003. Plaintiffs bring this Count on behalf of the Colorado Subclass.

1004. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants'

- 386 -

advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1005. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1006. The Defendants knew these representations were false when made.

1007. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1008. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

- 387 -

emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1009. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1010. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and

the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1011. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1012. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1013. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations

- 389 -

regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1014. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial

- 390 -

truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1015. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1016. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1017. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1018. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles

- 392 -

would have paid less for their vehicles or would not have purchased or leased them at all.

1019. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1020. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1021. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

010649-11 1032740 V1

Q.    **Claims Brought on Behalf of the Connecticut Subclass**

## COUNT I

### VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. ANN. § 42-110A *ET SEQ.*)

1022. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1023. Plaintiffs bring this Count on behalf of the Connecticut Subclass.

1024. Defendants and Plaintiffs are each "persons" as defined by CONN. GEN. STAT. ANN. § 42-110a(3).

1025. The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. ANN. § 42-110b(a). The Connecticut UTPA further provides a private right of action under CONN. GEN. STAT. ANN. § 42-110g(a). In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of

- 394 -

pollutants, including NOx, as described above. Accordingly, Defendants engaged in unfair and deceptive trade practices because their conduct (1) offends public policy as it has been established by statutes, the common law or other established concept of unfairness; (2) is immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury to consumers, competitors or other business persons. The harm caused to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and Defendants fraudulently concealed the defective nature of the Polluting Vehicles from consumers.

1026. Defendants have also engaged in deceptive conduct because (1) they made representations, omissions, or engaged in other conduct likely to mislead consumers; (2) consumers interpret the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice is material—that is, likely to affect consumer decisions or conduct.

1027. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

- 395 -

above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1028. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1029. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein,

- 396 -

the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1030. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1031. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1032. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1033. The Defendants knew or should have known that their conduct violated the Connecticut UTPA.

1034. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

  a.  Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

  b.  Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

- 397 -

c.     Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1035. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1036. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1037. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their

- 398 -

Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

1038. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1039. Plaintiffs and the other Class members sustained damages as a result of Defendants' unlawful acts, and are therefore entitled to damages and other relief as provided under the Connecticut UTPA.

1040. Plaintiffs also seek court costs and attorneys' fees as a result of Defendants' violation of the Connecticut UTPA as provided in CONN. GEN. STAT. ANN. § 42-110g(d). A copy of this complaint has been mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut in accordance with CONN. GEN. STAT. ANN. § 42-110g(c).

## COUNT II

## BREACH OF CONTRACT
## (BASED ON CONNECTICUT LAW)

1041. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1042. Plaintiffs bring this Count on behalf of the Connecticut Subclass members.

- 399 -

1043. FCA's misrepresentations and omissions alleged herein, including, but not limited to, FCA's failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1044. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, rendering the Polluting Vehicles less valuable than vehicles not equipped with the Adsorber Engine.

- 400 -

1045. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

### FRAUDULENT NON-DISCLOSURE
### (BASED ON CONNECTICUT LAW)

1046. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1047. Plaintiffs bring this Count on behalf of the Connecticut Subclass.

1048. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1049. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including

- 401 -

standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1050. The Defendants knew these representations were false when made.

1051. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1052. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1053. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1054. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1055. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on

- 403 -

their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1056. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1057. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1058. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-

- 405 -

compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1059. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1060. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1061. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information

- 406 -

concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1062. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1063. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all

- 407 -

of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1064. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1065. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

R.   **Claims Brought on Behalf of the Delaware Subclass**

### COUNT I

### VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT
### (DEL. CODE § 2513 *ET SEQ.*)

1066. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1067. Plaintiffs bring this Count on behalf of the Delaware Subclass.

1068. Each Defendant is a "person" within the meaning of 6 DEL. CODE § 2511(7).

1069. The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 DEL. CODE § 2513(a). In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of Defendants' advertising campaigns, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, Defendants have engaged in deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of the Polluting Vehicles.

1070. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting

- 409 -

Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1071. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the

- 410 -

Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1072. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1073. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1074. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1075. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1076. The Defendants knew or should have known that their conduct violated the Delaware CFA.

1077. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

- 411 -

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1078. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

- 412 -

1079. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1080. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

1081. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1082. Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Plaintiffs also seek declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

1083. Defendants' engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON DELAWARE LAW)

1084. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1085. Plaintiffs bring this Count on behalf of the Delaware Subclass.

1086. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1087. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass

- 414 -

members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that they are thus less valuable than vehicles not equipped with the Adsorber Engine.

1088. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON DELAWARE LAW)

1089. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1090. Plaintiffs bring this Count on behalf of the Delaware Subclass.

1091. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or Defendants acted

- 415 -

with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1092. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1093. Defendants knew these representations were false when made.

1094. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1095. Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-

- 416 -

compliant and unreliable, because Plaintiffs and the other Subclass members relied on Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1096. As alleged in this complaint, at all relevant times, Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. Defendants disclosed certain details about the diesel engine, but nonetheless, Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1097. The truth about the defective emissions controls and Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to Defendants; Plaintiffs and the Subclass members did not know of these facts and Defendants actively concealed these facts from Plaintiffs and Subclass members.

1098. Plaintiffs and Subclass members reasonably relied upon Defendants' deception. They had no way of knowing that Defendants' representations were

false and/or misleading. As consumers, Plaintiffs and Subclass members did not, and could not, unravel Defendants' deception on their own. Rather, Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1099. Defendants also concealed and suppressed material facts concerning what is evidently the true culture of Defendants—one characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1100. Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were

purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1101. Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to Defendants, because Defendants had exclusive knowledge as to such facts, and because Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. Defendants also had a duty to disclose because they made general affirmative representations about the qualities of their vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air

- 419 -

law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1102. Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that the Polluting Vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1103. Defendants have still not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1104. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by Defendants,

- 420 -

and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1105. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of Defendants' concealment of the true quality and quantity of those vehicles' emissions and Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the vehicles, and the serious issues engendered by Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1106. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, of the unlawfully high emissions of

- 421 -

the Polluting Vehicles, and of the non-compliance with EPA emissions requirements, all of which has greatly tarnished the brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1107. Accordingly, Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1108. Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Defendants made to them, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

S.   **Claims Brought on Behalf of the District of Columbia Subclass**

### COUNT I

### VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT (D.C. CODE § 28-3901 *ET SEQ.*)

1109. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1110. Plaintiffs bring this Count on behalf of the D.C. Subclass.

- 422 -

1111. Each Defendant is a "person" under the Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. CODE § 28-3901(a)(1).

1112. Class Members are "consumers," as defined by D.C. CODE § 28-3901(1)(2), who purchased or leased one or more Polluting Vehicles.

1113. The Defendants' actions as set forth herein constitute "trade practices" under D.C. CODE § 28-3901.

1114. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or

- 423 -

statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1115. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1116. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1117. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1118. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

- 424 -

1119. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1120. The Defendants knew or should have known that their conduct violated the District of Columbia CPPA.

1121. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

    c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1122. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

- 425 -

emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1123. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1124. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1125. As a direct and proximate result of the Defendants' violations of the District of Columbia CPPA, Plaintiffs and the D.C. Subclass have suffered injury-in-fact and/or actual damage.

1126. Plaintiffs and the D.C. Subclass are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. CODE § 28-3901.

1127. Plaintiffs seek punitive damages against the Defendants because the Defendants' conduct evidences malice and/or egregious conduct. The Defendants maliciously and egregiously misrepresented the safety, cleanliness, efficiency and

- 426 -

reliability of the Polluting Vehicles, deceived Class Members, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting their defective and environmentally dirty Adsorber Engine.

1128. The Defendants' unlawful conduct constitutes malice warranting punitive damages.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON DISTRICT OF COLUMBIA LAW)

1129. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1130. This claim is brought on behalf of the District of Columbia Subclass.

1131. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, did not meet and maintain the advertised MPG rate, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

- 427 -

1132. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1133. The Defendants knew these representations were false when made.

1134. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, costly in that the Plaintiffs and other Subclass members had to pay more for fuel than they reasonably expected, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1135. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, did not meet and maintain the advertised MPG rate, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those

- 428 -

expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1136. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the Adsorber Engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1137. The truth about the defective emissions controls and the Defendants' manipulations of those controls, failure to meet and maintain the advertised MPG rate, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

- 429 -

1138. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1139. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of each Defendant—one characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1140. The Defendants' false representations were material to consumers, because they concerned the quality and cost-effectiveness of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the

- 430 -

Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1141. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, failure to meet and maintain the advertised MPG rate, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles

- 431 -

purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1142. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1143. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1144. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had

- 432 -

known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1145. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and fuel efficiency and the Defendants' failure to timely disclose the defect or defective design of the Adsorber Engine, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, and their failure to meet and maintain the advertised MPG rate, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

- 433 -

1146. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand names, attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1147. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1148. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
## (BASED ON DISTRICT OF COLUMBIA LAW)

1149. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

- 434 -

1150. Plaintiffs bring this Count on behalf of the District of Columbia Subclass members.

1151. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1152. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal

- 435 -

driving conditions and the existence of the Adsorber Engine's defect and/or defective design of emissions controls, including information known to FCA rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

1153. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

T.     **Claims Brought on Behalf of the Florida Subclass**

### COUNT I

### VIOLATIONS OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201 *ET SEQ.*)

1154. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1155. Plaintiffs bring this Count on behalf of the Florida Subclass.

1156. Plaintiffs and the Subclass are "consumers" within the meaning of Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA"), FLA. STAT. § 501.203(7).

1157. Defendants engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

- 436 -

1158. Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the Florida UDTPA as described herein. In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in FLA. STAT. § 501.204(1). Defendants' conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and is likely to mislead consumers.

1159. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the

- 437 -

Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1160. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

- 438 -

1161. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1162. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1163. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1164. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1165. The Defendants knew or should have known that their conduct violated the Florida UDTPA.

1166. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

- 439 -

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1167. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1168. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1169. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the

- 440 -

Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1170. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1171. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON FLORIDA LAW)

1172. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1173. Plaintiffs bring this Count on behalf of the Florida Subclass members.

1174. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiffs and the other Subclass

- 441 -

members to make their purchases or leases of their Polluting Vehicles. Absent

those misrepresentations and omissions, Plaintiffs and the other Subclass members

would not have purchased or leased these Polluting Vehicles, would not have

purchased or leased these Polluting Vehicles at the prices they paid, and/or would

have purchased or leased less expensive alternative vehicles that did not contain

the defective Adsorber Engine and which were not marketed as including such a

system. Accordingly, Plaintiffs and the other Subclass members overpaid for their

Polluting Vehicles and did not receive the benefit of their bargain.

1175. Each and every sale or lease of a Polluting Vehicle constitutes a

contract between FCA and the purchaser or lessee. FCA breached these contracts

by selling or leasing to Plaintiffs and the other Subclass members defective

Polluting Vehicles and by misrepresenting or failing to disclose that the NOx

reduction system in the Polluting Vehicles turns off or is limited during normal

driving conditions and the existence of the Adsorber Engine's defect and/or

defective design of emissions controls, including information known to FCA

rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than

vehicles not equipped with the Adsorber Engine.

1176. As a direct and proximate result of FCA's breach of contract,

Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

- 442 -

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

### FRAUDULENT CONCEALMENT (BASED ON FLORIDA LAW)

1177. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1178. Plaintiffs bring this Count on behalf of the Florida Subclass.

1179. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1180. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission

- 443 -

vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1181. The Defendants knew these representations were false when made.

1182. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1183. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1184. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles.

- 444 -

The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1185. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1186. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

- 445 -

1187. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1188. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1189. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the

- 446 -

Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or

- 447 -

leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1190. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1191. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1192. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1193. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1194. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to

- 449 -

purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1195. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1196. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

U.    **Claims Brought on Behalf of the Georgia Subclass**

### COUNT I

### VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT (GA. CODE ANN. § 10-1-390 *ET SEQ.*)

1197. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1198. This claim is made on behalf of the Georgia Subclass.

1199. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 10-1-393(a), including, but not limited to, "representing that goods or services

- 450 -

have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised." GA. CODE. ANN. § 10-1-393(b). Through the Consolidated Amended Complaint filed on February 21, 2017, and through a demand in satisfaction letter mailed on June 30, 2017, Defendants are on notice regarding the allegations under the Georgia FBPA. Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Georgia class are entitled.

1200. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others

- 451 -

rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

1201. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1202. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1203. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1204. The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

010649-11 1032740 V1

1205. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1206. The Defendants knew or should have known that their conduct violated the Georgia FBPA.

8.      The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.      Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.      Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.      Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1207. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had

- 453 -

emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1208. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1209. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1210. Plaintiff and the Subclass members are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a). Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann. § 10-1-399.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON GEORGIA LAW)

1211. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1212. This claim is brought on behalf of the Georgia Subclass.

1213. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1214. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts

- 455 -

by selling or leasing to Plaintiffs and the other Subclass members defective

Polluting Vehicles and by misrepresenting or failing to disclose that the NOx

reduction system in the Polluting Vehicles turns off or is limited during normal

driving conditions and the existence of the Adsorber Engine's defect and/or

defective design of emissions controls, including information known to FCA

rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than

vehicles not equipped with the Adsorber Engine.

1215. As a direct and proximate result of FCA's breach of contract,

Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and

consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON GEORGIA LAW)

1216. Plaintiffs incorporate by reference all preceding allegations as though

fully set forth herein.

1217. This claim is brought on behalf of the Georgia Subclass.

1218. The Defendants intentionally concealed that the NOx reduction

system in the Polluting Vehicles turns off or is limited during normal driving

conditions, that the Polluting Vehicles had defective emissions controls, emitted

pollutants at a higher level than gasoline-powered vehicles, emitted pollutants

- 456 -

higher than a reasonable consumer would expect in light of the Defendants'
advertising campaign, emitted unlawfully high levels of pollutants such as NOx,
and were non-compliant with EPA emission requirements, or the Defendants acted
with reckless disregard for the truth, and denied Plaintiffs and the other Subclass
members information that is highly relevant to their purchasing decision.

1219. The Defendants further affirmatively misrepresented to Plaintiffs and
Subclass members in advertising and other forms of communication, including
standard and uniform material provided with each car, that the Polluting Vehicles
they were selling had no significant defects, were Earth-friendly and low-emission
vehicles, complied with EPA regulations, and would perform and operate properly
when driven in normal usage.

1220. The Defendants knew these representations were false when made.

1221. The Polluting Vehicles purchased or leased by Plaintiffs and the other
Subclass members were, in fact, defective, emitting pollutants at a much higher
rate than gasoline-powered vehicles and at a much higher rate than a reasonable
consumer would expect in light of the Defendants' advertising campaign, non-
EPA-compliant, and unreliable because the NOx reduction system in the Polluting
Vehicles turns off or is limited during normal driving conditions.

1222. The Defendants had a duty to disclose that the NOx reduction system
in the Polluting Vehicles turns off or is limited during normal driving conditions

- 457 -

and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1223. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1224. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the

- 458 -

Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1225. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1226. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1227. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they

- 459 -

concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1228. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and

- 460 -

Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1229. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1230. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1231. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1232. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles

- 462 -

would have paid less for their vehicles or would not have purchased or leased them at all.

1233. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1234. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1235. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

V.     **Claims Brought on Behalf of the Hawaii Subclass**

**COUNT I**

**UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW
(HAW. REV. STAT. § 480 *ET SEQ.*)**

1236. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1237. This claim is brought on behalf of the Hawaii Subclass.

1238. Each Defendant is a "person" under HAW. REV. STAT. § 480-1.

1239. Class Members are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who purchased or leased one or more Polluting Vehicles.

1240. The Defendants' acts or practices as set forth above occurred in the conduct of trade or commerce.

1241. HAW. REV. STAT. § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

1242. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

- 464 -

above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1243. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1244. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein,

- 465 -

the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1245. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1246. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1247. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1248. The Defendants knew or should have known that their conduct violated HAW. REV. STAT. § 480 *et seq.*

1249. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

- 466 -

      c.      Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1250. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1251. Pursuant to HAW. REV. STAT. § 480-13, Plaintiffs and the Hawaii Subclass seek monetary relief against the Defendants measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

1252. Under HAW. REV. STAT. § 480-13.5, Plaintiffs seek an additional award against the Defendants of up to $10,000 for each violation directed at a Hawaiian elder. The Defendants knew or should have known that their conduct

was directed to one or more Class Members who are elders. The Defendants' conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. One or more Hawaii Subclass members who are elders are substantially more vulnerable to the Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from the Defendants' conduct.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON HAWAII LAW)

1253. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1254. This claim is brought on behalf of the Hawaii Subclass.

1255. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted

- 468 -

with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1256. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1257. The Defendants knew these representations were false when made.

1258. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1259. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were

- 469 -

non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1260. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1261. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1262. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1263. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1264. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their

- 471 -

customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1265. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by

- 472 -

Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1266. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1267. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1268. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have

- 473 -

purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1269. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

- 474 -

1270. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1271. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1272. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF CONTRACT
### (BASED ON HAWAII LAW)

1273. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 475 -

1274. This claim is brought on behalf of the Hawaii Subclass.

1275. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1276. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the Adsorber Engine's defect and/or

- 476 -

defective design of emissions controls, including information known to FCA rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

1277. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

W.   **Claims Brought on Behalf of the Idaho Subclass**

## COUNT I

## VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT (IDAHO CODE § 48-601 *ET SEQ.*)

1278. Plaintiff Michael Erben ("Plaintiff" for purposes of all Idaho Subclass claims) incorporates by reference all paragraphs as though fully set forth herein.

1279. Plaintiff brings this Count on behalf of the Idaho Subclass.

1280. Each Defendant is a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), IDAHO CODE § 48-602(1).

1281. The Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CODE § 48-602(2).

1282. IDAHO CODE § 48-603 prohibits the following conduct in trade or commerce: engaging in any act or practice which is otherwise misleading, false, or

- 477 -

deceptive to the consumer; and engaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48-603C.

1283. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

- 478 -

1284. In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1285. Plaintiff and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1286. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1287. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1288. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

- 479 -

1289. The Defendants knew or should have known that their conduct violated the Idaho CPA.

1290. The Defendants owed Plaintiff and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

1291. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass

- 480 -

members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1292. The Defendants' conduct proximately caused injuries to Plaintiff and the other Subclass members.

1293. Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1294. The Defendants' violations present a continuing risk to Plaintiff as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1295. Plaintiff also seeks attorneys' fees and any other just and proper relief available under the Idaho CPA.

1296. Plaintiff also seeks punitive damages against the Defendants because the Defendants' conduct evidences an extreme deviation from reasonable

- 481 -

standards. The Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON IDAHO LAW)

1297. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1298. Plaintiff brings this Count on behalf of the Idaho Subclass.

1299. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiff and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

- 482 -

1300. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiff and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the Adsorber Engine's defect and/or defective design of emissions controls, including information known to FCA rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

1301. As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON IDAHO LAW)

1302. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

1303. This claim is brought on behalf of the Idaho Subclass.

1304. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving

- 483 -

conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

1305. The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1306. The Defendants knew these representations were false when made.

1307. The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

- 484 -

1308. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1309. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

- 485 -

1310. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiff and Subclass members.

1311. Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1312. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean

- 486 -

diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1313. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1314. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions diesel cars* and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the

- 487 -

additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1315. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

- 488 -

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

1316. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1317. Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

1318. Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

- 489 -

issues engendered by the Defendants' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1319. The value of Plaintiff's and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1320. Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

1321. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

X. **Claims Brought on Behalf of the Indiana Subclass**

### COUNT I

### VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3)

1322. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1323. The Indiana Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a

- 491 -

deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." Through the Consolidated Amended Complaint filed on February 21, 2017, Defendants are on notice regarding the allegations under the Indiana DCSA. Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Indiana class are entitled.

1324. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others

rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

1325. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1326. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1327. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1328. The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

- 493 -

1329. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1330. The Defendants knew or should have known that their conduct violated the Indiana DCSA.

1331. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

      a.  Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

      b.  Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

      c.  Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1332. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

- 494 -

emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1333. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1334. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1335. Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs and the Subclass members seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Indiana Class member, including treble damages up to $1,000 for Defendants' willfully deceptive acts. Plaintiff also

seeks punitive damages based on the outrageousness and recklessness of the Defendants' conduct and Defendants' high net worth.

## COUNT II

## FRAUDULENT CONCEALMENT

1336. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

1337. This claim is brought on behalf of the Indiana Subclass.

1338. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1339. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission

- 496 -

vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1340. The Defendants knew these representations were false when made.

1341. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1342. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1343. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles.

- 497 -

The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1344. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1345. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

- 498 -

1346. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1347. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1348. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the

- 499 -

Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions* diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or

- 500 -

leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1349. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1350. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1351. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1352. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1353. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to

- 502 -

purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1354. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1355. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
### (BASED ON INDIANA LAW)

1356. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1357. Plaintiffs bring this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Indiana Subclass.

1358. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their

- 503 -

purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1359. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Adsorber Engine.

1360. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

Y.    **Claims Brought on Behalf of the Iowa Subclass**

### COUNT I

### VIOLATIONS OF THE PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT (IOWA CODE § 714H.1, *ET SEQ.*)

1361.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1362.  Plaintiffs bring this Count on behalf of the Iowa Subclass.

1363.  Defendants are each a "person" under IOWA CODE § 714H.2(7).

1364.  Plaintiffs and the Iowa Subclass are "consumers," as defined by IOWA CODE § 714H.2(3), who purchased or leased one or more Polluting Vehicles.

1365.  The Defendants participated in unfair or deceptive acts or practices that violated Iowa's Private Right of Action for Consumer Fraud Act ("Iowa CFA"), IOWA CODE § 714H.1, *et seq.*, as described herein.

1366.  In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

- 505 -

above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1367. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1368. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein,

- 506 -

the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1369. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1370. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1371. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1372. The Defendants knew or should have known that their conduct violated the Iowa CPA.

1373. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

   a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

   b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

- 507 -

    c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1374. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1375. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1376. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their

Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1377. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1378. The Plaintiffs were injured by Defendants' unlawful acts and are, therefore, entitled to damages and other relief as provided under Chapter 714H of the Iowa Code. Because the Defendants' conduct was committed willfully, Plaintiff seeks treble damages as provided in IOWA CODE § 714H.5(4).

1379. Plaintiff also seeks court costs and attorneys' fees as a result of the Defendants' violation of Chapter 714H as provided in IOWA CODE § 714H.5(2).

## COUNT II

## BREACH OF CONTRACT
## (BASED ON IOWA LAW)

1380. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1381. Plaintiff brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Iowa Subclass.

1382. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx

- 509 -

reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1383. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Adsorber Engine.

1384. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON IOWA LAW)

1385. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1386. Plaintiff brings this Count on behalf of the Iowa Subclass.

1387. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1388. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission

- 511 -

vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1389. The Defendants knew these representations were false when made.

1390. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1391. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1392. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles.

The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1393. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1394. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1395. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1396. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1397. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the

- 514 -

Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions* diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or

- 515 -

leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1398. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1399. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1400. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

- 516 -

1401. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1402. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to

- 517 -

purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1403. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1404. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

Z. **Claims Brought on Behalf of the Kansas Subclass**

## COUNT I

### VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT (KAN. STAT. ANN. § 50-623 *ET SEQ.*)

1405. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1406. Plaintiffs bring this Count on behalf of the Kansas Subclass.

1407. Each Defendant is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

1408. Kansas Class Members are "consumers," within the meaning of KAN. STAT. ANN. § 50-624(b), who purchased or leased one or more Polluting Vehicles.

- 518 -

1409. The sale of the Polluting Vehicles to the Kansas Class Members was a "consumer transaction" within the meaning of KAN. STAT. ANN. § 50-624(c).

1410. The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," KAN. STAT. ANN. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." KAN. STAT. ANN. § 50-627(a).

1411. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would

- 519 -

expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1412. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1413. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1414. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1415. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1416. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1417. The Defendants knew or should have known that their conduct violated the Kansas CPA.

1418. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

- 521 -

b.      Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.      Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1419. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1420. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1421. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the

- 522 -

Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1422. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1423. Pursuant to KAN. STAT. ANN. § 50-634, Plaintiffs and the Kansas Class seek monetary relief against the Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff and Kansas Class member.

1424. Plaintiffs also seek an order enjoining the Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN. § 50-623 *et seq.*

## COUNT II

## FRAUDULENT CONCEALMENT
### (BASED ON KANSAS LAW)

1425. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1426. This claim is brought on behalf of the Kansas Subclass.

- 523 -

1427. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1428. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1429. The Defendants knew these representations were false when made.

1430. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-

- 524 -

EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1431. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1432. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants,

- 525 -

and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1433. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1434. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1435. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations.

- 526 -

Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1436. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1437. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country,

- 527 -

which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1438. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

- 528 -

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1439. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1440. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1441. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

- 529 -

issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1442. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1443. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1444. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
## (BASED ON KANSAS LAW)

1445. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1446. Plaintiffs bring this Count on behalf of the Kansas Subclass.

1447. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a

- 531 -

system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1448. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the Adsorber Engine's defect and/or defective design of emissions controls, including information known to FCA rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

1449. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

AA.   **Claims Brought on Behalf of the Kentucky Subclass**

## COUNT I

## VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT (KY. REV. STAT. ANN. § 367.110 *ET SEQ.*)

1450. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

- 532 -

1451. Plaintiffs bring this Count on behalf of the Kentucky Subclass.

1452. Each Defendant, each Plaintiff, and each member of the Kentucky Subclass is a "person" within the meaning of the KY. REV. STAT. ANN. § 367.110(1).

1453. The Defendants engaged in "trade" or "commerce" within the meaning of KY. REV. STAT. ANN. § 367.110(2).

1454. The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." KY. REV. STAT. ANN. § 367.170(1). In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, Defendants engaged in deceptive business practices prohibited by the Kentucky CPA.

1455. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting

- 533 -

Vehicles emitted far more pollutants than gasoline-powered vehicles, that the

Polluting Vehicles emit far more pollution than a reasonable consumer would

expect in light of the Defendants' advertising campaign, and that the Polluting

Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

above. Accordingly, the Defendants engaged in unfair methods of competition,

unconscionable acts or practices, and unfair or deceptive acts or practices,

including representing that Polluting Vehicles have characteristics, uses, benefits,

and qualities which they do not have; representing that Polluting Vehicles are of a

particular standard and quality when they are not; failing to reveal a material fact,

the omission of which tends to mislead or deceive the consumer, and which fact

could not reasonably be known by the consumer; making a representation of fact or

statement of fact material to the transaction such that a person reasonably believes

the represented or suggested state of affairs to be other than it actually is; and

failing to reveal facts that are material to the transaction in light of representations

of fact made in a positive manner.

1456. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the

other Subclass members were deceived by the Defendants' failure to disclose that

the NOx reduction system in the Polluting Vehicles turns off or is limited during

normal driving conditions, that the emissions controls were defective, and that the

- 534 -

Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1457. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1458. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1459. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1460. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1461. The Defendants knew or should have known that their conduct violated the Kentucky CPA.

1462. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a. Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b. Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c. Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1463. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1464. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1465. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1466. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1467. Pursuant to KY. REV. STAT. ANN. § 367.220, Plaintiffs and the Subclass seek to recover actual damages in an amount to be determined at trial; declaratory relief; attorneys' fees; and any other just and proper relief available under KY. REV. STAT. ANN. § 367.220.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON KENTUCKY LAW)

1468. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

- 537 -

1469. Plaintiffs bring this Count on behalf of the Kentucky Subclass.

1470. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1471. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that they were thus less valuable than vehicles not equipped with the Adsorber Engine.

- 538 -

1472. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

### FRAUD BY OMISSION
### (BASED ON KENTUCKY LAW)

1473. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1474. This claim is brought on behalf of the Kentucky Subclass.

1475. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1476. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including

- 539 -

standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1477. The Defendants knew these representations were false when made.

1478. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1479. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

- 540 -

1480. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1481. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1482. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on

- 541 -

their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1483. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1484. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1485. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-

- 543 -

compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1486. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1487. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1488. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information

- 544 -

concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1489. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1490. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all

- 545 -

of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1491. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1492. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

BB.  **Claims Brought on Behalf of the Louisiana Subclass**

## COUNT I

## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (LA. STAT. ANN. § 51:1401 *ET SEQ.*)

1493. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1494. This claim is brought only on behalf of members of the Louisiana Subclass.

- 546 -

1495. The Defendants, Plaintiffs, and the Louisiana Subclass are "persons" within the meaning of the LA. STAT. ANN. § 51:1402(8).

1496. Plaintiffs and the Louisiana Subclass are "consumers" within the meaning of LA. STAT. ANN. § 51:1402(1).

1497. The Defendants engaged in "trade" or "commerce" within the meaning of LA. STAT. ANN. § 51:1402(9).

1498. The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. STAT. ANN. § 51:1405(A).

1499. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a

- 547 -

particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1500. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1501. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

- 548 -

1502. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1503. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1504. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1505. The Defendants knew or should have known that their conduct violated the Louisiana CPL.

1506. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material

facts from Plaintiffs and the Subclass that contradicted these representations.

1507. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1508. As a direct and proximate result of the Defendants' violations of the Louisiana CPL, Plaintiffs and the Louisiana Subclass have suffered injury-in-fact and/or actual damage.

1509. Pursuant to LA. STAT. ANN. § 51:1409, Plaintiffs and the Louisiana Subclass seek to recover actual damages in an amount to be determined at trial; treble damages for the Defendants' knowing violations of the Louisiana CPL; an order enjoining the Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under LA. STAT. ANN. § 51:1409.

- 550 -

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON LOUISIANA LAW)

1510. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1511. This claim is brought on behalf of the Louisiana Subclass.

1512. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1513. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

- 551 -

1514. The Defendants knew these representations were false when made.

1515. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1516. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1517. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx

- 552 -

reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1518. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1519. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1520. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture

characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1521. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1522. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably

- 554 -

discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

- 555 -

1523. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1524. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1525. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1526. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are

- 556 -

diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1527. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1528. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1529. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
## (BASED ON LOUISIANA LAW)

1530. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1531. This claim is brought on behalf of the Louisiana Subclass.

1532. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members

- 558 -

would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1533. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the Adsorber Engine's defect and/or defective design of emissions controls, including information known to FCA rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

1534. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

- 559 -

CC.  **Claims Brought on Behalf of the Maine Subclass**

## COUNT I

### VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT
### (ME. REV. STAT. ANN. TIT. 5 § 205-A *ET SEQ.*)

1535.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1536.  Defendants, Plaintiffs, and the Maine Class are "persons" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(2). Defendants are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(3).

1537.  The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." ME. REV. STAT. ANN. TIT. 5 § 207. Through the Consolidated Amended Complaint filed on February 21, 2017, Defendants are on notice regarding the allegations under the Maine UTPA. Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Maine class are entitled.

1538.  In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the

Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

1539. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1540. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

- 561 -

1541. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1542. The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1543. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1544. The Defendants knew or should have known that their conduct violated the Maine DTPA.

1545. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    a. Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b. Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

    c. Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material

- 562 -

facts from Plaintiffs and the Subclass that contradicted these representations.

1546. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1547. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1548. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions

- 563 -

1549. Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, Plaintiffs and the Subclass members seek an order enjoining the Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Maine UTPA.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON MAINE LAW)

1550. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1551. This claim is brought on behalf of the Maine Subclass.

1552. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1553. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including

- 564 -

standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1554. The Defendants knew these representations were false when made.

1555. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1556. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1557. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1558. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1559. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on

- 566 -

their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1560. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1561. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1562. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-

- 568 -

compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1563. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1564. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1565. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information

- 569 -

concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1566. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1567. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all

of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1568. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1569. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF CONTRACT
### (BASED ON MAINE LAW)

1570. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1571. This claim is brought on behalf of the Maine Subclass.

1572. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein,

- 571 -

and their failure to disclose that the Polluting Vehicles would not meet and maintain their advertised MPG rate, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1573. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the Adsorber Engine's defect and/or defective design of emissions controls, including information known to FCA rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

- 572 -

1574. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

DD.   **Claims Brought on Behalf of the Maryland Subclass**

### COUNT I

### VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT (MD. CODE ANN. COM. LAW § 13-101 *ET SEQ.*)

1575. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1576. This claim is brought only on behalf of members of the Maryland Subclass.

1577. Each of the Defendants, Plaintiffs, and the Maryland Subclass are "persons" within the meaning of MD. CODE ANN. COM. LAW § 13-101(h).

1578. The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. MD. COM. LAW CODE § 13-303. In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, that the vehicles have a "Defeat Device," and that the Polluting Vehicles emitted unlawfully high

- 573 -

levels of pollutants, including NOx, as described above. Accordingly, Defendants engaged in unfair and deceptive trade practices. Defendants' acts and practices offend public policy; were immoral, unethical, oppressive, or unscrupulous; caused substantial injury to consumers; had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

1579. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a

- 574 -

particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1580. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1581. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1582. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1583. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1584. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1585. The Defendants knew or should have known that their conduct violated the Maryland CPA.

1586. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

    c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material

- 576 -

facts from Plaintiffs and the Subclass that contradicted these representations.

1587. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1588. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1589. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

- 577 -

1590. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1591. Pursuant to MD. CODE ANN. COM. LAW § 13-408, Plaintiffs and the Maryland Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON MARYLAND LAW)

1592. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1593. Plaintiffs bring this Count on behalf of the Maryland Subclass members.

1594. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or

- 578 -

leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1595. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that they were thus less valuable than vehicles not equipped with the Adsorber Engine.

1596. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON MARYLAND LAW)

1597. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1598. This claim is brought on behalf of the Maryland Subclass.

- 579 -

1599. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1600. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1601. The Defendants knew these representations were false when made.

1602. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-

- 580 -

EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1603. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1604. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants,

- 581 -

and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1605. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1606. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1607. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations.

- 582 -

Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1608. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1609. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country,

- 583 -

which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1610. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

- 584 -

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1611. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1612. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1613. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

- 585 -

issues engendered by the Defendants' corporate policies. Had Plaintiffs and

Subclass members been aware of the true emissions facts with regard to the

Polluting Vehicles, and the Defendants' disregard for the truth and compliance

with applicable federal and state law and regulations, Plaintiffs and Subclass

members who purchased or leased new or certified previously owned vehicles

would have paid less for their vehicles or would not have purchased or leased them

at all.

1614. The value of Plaintiffs' and Subclass members' vehicles has

diminished as a result of the Defendants' fraudulent concealment of the defective

emissions controls of the Polluting Vehicles, the unlawfully high emissions of the

Polluting Vehicles, and the non-compliance with EPA emissions requirements, all

of which has greatly tarnished the Defendants' brand name attached to Plaintiffs'

and Subclass members' vehicles and made any reasonable consumer reluctant to

purchase any of the Polluting Vehicles, let alone pay what otherwise would have

been fair market value for the vehicles.

1615. Accordingly, the Defendants are liable to Plaintiffs and Subclass

members for damages in an amount to be proven at trial.

1616. The Defendants' acts were done wantonly, maliciously, oppressively,

deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and

Subclass members' rights and the representations that the Defendants made to

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

EE.    **Claims Brought on Behalf of the Massachusetts Subclass**

## COUNT I

## VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
## (MASS. GEN. LAWS CH. 93A)

1617. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1618. The Massachusetts Consumer Protection Act ("MCPA") makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS CH. 93A, § 2(1). Through the Consolidated Amended Complaint filed on February 21, 2017, Defendants are on notice regarding the allegations under the Massachusetts Act. Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Massachusetts class are entitled.

1619. Defendants, Plaintiffs, and the Massachusetts Class are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

1620. The Defendants engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

1621. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

1622. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

- 588 -

1623. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1624. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1625. The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

1626. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1627. The Defendants knew or should have known that their conduct violated the MCPA.

1628. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

- 589 -

    a.  Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1629. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1630. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1631. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1632. Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs and the Subclass members seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and each Subclass member. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Subclass member, up to three times actual damages, but no less than two times actual damages. Plaintiffs also seek an order enjoining the Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the MCPA.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON MASSACHUSETTS LAW)

1633. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1634. Plaintiffs bring this Count on behalf of the Massachusetts Subclass members.

1635. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1636. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts

- 592 -

by selling or leasing to Plaintiffs and the other Subclass members defective

Polluting Vehicles and by misrepresenting or failing to disclose that the NOx

reduction system in the Polluting Vehicles turns off or is limited during normal

driving conditions and the existence of the diesel engine system's defect and/or

defective design of emissions controls, including information known to FCA

rendering each Polluting Vehicle non-EPA-compliant, and that they were thus less

valuable than vehicles not equipped with the Adsorber Engine.

1637. As a direct and proximate result of FCA's breach of contract,

Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and

consequential damages, and other damages allowed by law.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON MASSACHUSETTS LAW)

1638. Plaintiffs incorporate by reference all preceding allegations as though

fully set forth herein.

1639. This claim is brought on behalf of the Massachusetts Subclass.

1640. The Defendants intentionally concealed that the NOx reduction

system in the Polluting Vehicles turns off or is limited during normal driving

conditions, that the Polluting Vehicles had defective emissions controls, emitted

pollutants at a higher level than gasoline-powered vehicles, emitted pollutants

- 593 -

higher than a reasonable consumer would expect in light of the Defendants'
advertising campaign, emitted unlawfully high levels of pollutants such as NOx,
and were non-compliant with EPA emission requirements, or the Defendants acted
with reckless disregard for the truth, and denied Plaintiffs and the other Subclass
members information that is highly relevant to their purchasing decision.

1641. The Defendants further affirmatively misrepresented to Plaintiffs and
Subclass members in advertising and other forms of communication, including
standard and uniform material provided with each car, that the Polluting Vehicles
they were selling had no significant defects, were Earth-friendly and low-emission
vehicles, complied with EPA regulations, and would perform and operate properly
when driven in normal usage.

1642. The Defendants knew these representations were false when made.

1643. The Polluting Vehicles purchased or leased by Plaintiffs and the other
Subclass members were, in fact, defective, emitting pollutants at a much higher
rate than gasoline-powered vehicles and at a much higher rate than a reasonable
consumer would expect in light of the Defendants' advertising campaign, non-
EPA-compliant, and unreliable because the NOx reduction system in the Polluting
Vehicles turns off or is limited during normal driving conditions.

1644. The Defendants had a duty to disclose that the NOx reduction system
in the Polluting Vehicles turns off or is limited during normal driving conditions

- 594 -

and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1645. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1646. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the

Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1647. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1648. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1649. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they

- 596 -

concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1650. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and

- 597 -

Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1651. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1652. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

- 598 -

1653. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1654. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles

- 599 -

would have paid less for their vehicles or would not have purchased or leased them at all.

1655. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1656. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1657. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

FF.    **Claims Brought on Behalf of the Mississippi Subclass**

## COUNT I
## VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT
### (MISS. CODE. ANN. § 75-24-1, *ET SEQ.*)

1658. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1659. This claim is brought only on behalf of members of the Mississippi Subclass.

1660. The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." MISS. CODE. ANN. § 75-24-5(1). Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods or services with intent not to sell them as advertised."

1661. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting

Vehicles emitted far more pollutants than gasoline-powered vehicles, that the
Polluting Vehicles emit far more pollution than a reasonable consumer would
expect in light of the Defendants' advertising campaign, and that the Polluting
Vehicles emitted unlawfully high levels of pollutants, including NOx, as described
above. Accordingly, the Defendants engaged in unfair methods of competition,
unconscionable acts or practices, and unfair or deceptive acts or practices,
including representing that Polluting Vehicles have characteristics, uses, benefits,
and qualities which they do not have; representing that Polluting Vehicles are of a
particular standard and quality when they are not; failing to reveal a material fact,
the omission of which tends to mislead or deceive the consumer, and which fact
could not reasonably be known by the consumer; making a representation of fact or
statement of fact material to the transaction such that a person reasonably believes
the represented or suggested state of affairs to be other than it actually is; and
failing to reveal facts that are material to the transaction in light of representations
of fact made in a positive manner.

1662. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the
other Subclass members were deceived by the Defendants' failure to disclose that
the NOx reduction system in the Polluting Vehicles turns off or is limited during
normal driving conditions, that the emissions controls were defective, and that the

Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1663. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel Defendants' deception on their own.

1664. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1665. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1666. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1667. The Defendants knew or should have known that their conduct violated the Mississippi CPA.

1668. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1669. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

- 604 -

1670. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1671. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1672. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1673. As a direct and proximate result of the Defendants' violations of the Mississippi CPA, Plaintiffs and the Mississippi Subclass have suffered injury-in-fact and/or actual damage.

1674. Plaintiffs' actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

## COUNT II
## FRAUD BY CONCEALMENT

1675. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 605 -

1676. This claim is brought on behalf of the Mississippi Subclass.

1677. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1678. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1679. The Defendants knew these representations were false when made.

1680. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable

- 606 -

consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1681. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1682. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants,

- 607 -

and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1683. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1684. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1685. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations.

- 608 -

Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1686. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1687. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions* diesel cars and as compliant with all laws in each country,

- 609 -

which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1688. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

- 610 -

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1689. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1690. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1691. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1692. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1693. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1694. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to

- 612 -

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## BREACH OF CONTRACT
## (BASED ON MISSISSIPPI LAW)

1695. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1696. Plaintiffs bring this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Mississippi Subclass.

1697. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system.

- 613 -

Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1698. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Adsorber Engine.

1699. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

GG.   **Claims Brought on Behalf of the Missouri Subclass**

## COUNT I

## VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*)

1700. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1701. Plaintiffs bring this Count on behalf of the Missouri Subclass.

1702. Each of the Defendants, Plaintiffs, and the Missouri Subclass are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

1703. Each of the Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

1704. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020. In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, Defendants used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in violation of the Missouri MPA. Defendants' conduct offends public policy; is unethical,

- 615 -

oppressive, or unscrupulous; and presents a risk of, or causes, substantial injury to consumers.

1705. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

- 616 -

1706. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1707. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1708. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1709. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1710. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

- 617 -

1711. The Defendants knew or should have known that their conduct violated the Missouri MPA.

1712. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1713. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass

- 618 -

members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1714. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1715. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1716. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1717. The Defendants are liable to Plaintiffs and the Missouri Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, and any other just and proper relief under MO. REV. STAT. § 407.025.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON MISSOURI LAW)

1718. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1719. Plaintiffs bring this Count on behalf of the Missouri Subclass members.

1720. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1721. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts

- 620 -

by, among other things, selling or leasing to Plaintiffs and the other Subclass

members defective Polluting Vehicles and by misrepresenting or failing to disclose

that the NOx reduction system in the Polluting Vehicles turns off or is limited

during normal driving conditions, and is thus less valuable than vehicles not

equipped with the Adsorber Engine.

1722. As a direct and proximate result of FCA's breach of contract,

Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and

consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON MISSOURI LAW)

1723. Plaintiffs incorporate by reference all preceding allegations as though

fully set forth herein.

1724. This claim is brought on behalf of the Missouri Subclass.

1725. The Defendants intentionally concealed that the NOx reduction

system in the Polluting Vehicles turns off or is limited during normal driving

conditions, that the Polluting Vehicles had defective emissions controls, emitted

pollutants at a higher level than gasoline-powered vehicles, emitted pollutants

higher than a reasonable consumer would expect in light of the Defendants'

advertising campaign, emitted unlawfully high levels of pollutants such as NOx,

- 621 -

and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1726. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1727. The Defendants knew these representations were false when made.

1728. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1729. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had

- 622 -

emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1730. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1731. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and

- 623 -

the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1732. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1733. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1734. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations

- 624 -

regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1735. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial

- 625 -

truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1736. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1737. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

- 626 -

1738. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1739. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles

would have paid less for their vehicles or would not have purchased or leased them at all.

1740. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1741. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1742. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

HH.   **Claims Brought on Behalf of the Nebraska Subclass**

## COUNT I

## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
(NEB. REV. STAT. § 59-1601 *ET SEQ.*)

1743. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1744. This claim is brought on behalf of the Nebraska Subclass.

1745. The Defendants, Plaintiffs and Nebraska Class Members are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), NEB. REV. STAT. § 59-1601(1).

1746. The Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

1747. The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." NEB. REV. STAT. § 59-1602. The Defendants' conduct as set forth herein constitutes unfair or deceptive acts or practices.

1748. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would

- 629 -

expect in light of the Defendants' advertising campaign, and that the Polluting

Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

above. Accordingly, the Defendants engaged in unfair methods of competition,

unconscionable acts or practices, and unfair or deceptive acts or practices,

including representing that Polluting Vehicles have characteristics, uses, benefits,

and qualities which they do not have; representing that Polluting Vehicles are of a

particular standard and quality when they are not; failing to reveal a material fact,

the omission of which tends to mislead or deceive the consumer, and which fact

could not reasonably be known by the consumer; making a representation of fact or

statement of fact material to the transaction such that a person reasonably believes

the represented or suggested state of affairs to be other than it actually is; and

failing to reveal facts that are material to the transaction in light of representations

of fact made in a positive manner.

1749. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the

other Subclass members were deceived by the Defendants' failure to disclose that

the NOx reduction system in the Polluting Vehicles turns off or is limited during

normal driving conditions, that the emissions controls were defective, and that the

Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as

described above.

1750. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1751. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1752. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1753. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1754. The Defendants knew or should have known that their conduct violated the Nebraska CPA.

1755. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.     Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

- 631 -

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1756. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1757. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1758. Because the Defendants' conduct caused injury to Nebraska Subclass members' property through violations of the Nebraska CPA, Plaintiffs and the

- 632 -

Nebraska Subclass seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining the Defendants' unfair or deceptive acts and practices, court costs, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON NEBRASKA LAW)

1759. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1760. Plaintiffs bring this Count on behalf of the Nebraska Subclass.

1761. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1762. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including

- 633 -

standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1763. The Defendants knew these representations were false when made.

1764. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1765. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1766. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1767. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1768. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on

- 635 -

their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1769. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1770. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1771. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-

- 637 -

compliance, are material concerns to a consumer, including with respect to the

emissions certifications testing their vehicles must pass. The Defendants

represented to Plaintiffs and Subclass members that they were purchasing or

leasing reduced-emission diesel vehicles when, in fact, they were purchasing or

leasing defective, high-emission vehicles with unlawfully high emissions.

1772. The Defendants actively concealed and/or suppressed these material

facts, in whole or in part, to pad and protect their profits and to avoid the

perception that their vehicles were not clean diesel vehicles and did not or could

not comply with federal and state laws governing clean air and emissions, which

perception would hurt the brand's image and cost the Defendants money, and they

did so at the expense of Plaintiffs and Subclass members.

1773. The Defendants still have not made full and adequate disclosures, and

continue to defraud Plaintiffs and Subclass members by concealing material

information regarding the emissions qualities of the Polluting Vehicles.

1774. Plaintiffs and Subclass members were unaware of the omitted material

facts referenced herein, and they would not have acted as they did if they had

known of the concealed and/or suppressed facts, in that they would not have

purchased purportedly reduced-emissions diesel cars manufactured by the

Defendants, and/or would not have continued to drive their heavily polluting

vehicles, or would have taken other affirmative steps in light of the information

- 638 -

concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1775. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1776. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all

of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1777. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1778. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF CONTRACT
### (BASED ON NEBRASKA LAW)

1779. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1780. Plaintiffs bring this Count on behalf of the Nebraska Subclass.

1781. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal

- 640 -

driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1782. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that they were thus less valuable than vehicles not equipped with the Adsorber Engine.

1783. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

- 641 -

II.    **Claims Brought on Behalf of the Nevada Subclass**

## COUNT I

## VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
(NEV. REV. STAT. § 598.0903 *ET SEQ.*)

1784. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

1785. Plaintiffs bring this Count on behalf of the Nevada Subclass.

1786. The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903 *et seq.*, prohibits deceptive trade practices. NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction." Accordingly, Defendants have violated the Nevada DTPA by knowingly representing that Polluting Vehicles have uses and benefits which they

- 642 -

do not have; representing that Polluting Vehicles are of a particular standard, quality, and grade when they are not; advertising Polluting Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Polluting Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

1787. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or

- 643 -

statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1788. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1789. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1790. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1791. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

- 644 -

1792. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1793. The Defendants knew or should have known that their conduct violated the Nevada DTPA.

1794. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

    c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1795. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1796. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1797. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1798. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1799. Accordingly, Plaintiffs and the Nevada Subclass seek their actual damages, punitive damages, court costs, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. NEV. REV. STAT. § 41.600.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON NEVADA LAW)

1800. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1801. Plaintiffs bring this Count on behalf of the Nevada Subclass members.

1802. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

- 647 -

1803. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

1804. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON NEVADA LAW)

1805. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1806. This claim is brought on behalf of the Nevada Subclass.

1807. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving

- 648 -

conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1808. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1809. The Defendants knew these representations were false when made.

1810. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

- 649 -

1811. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1812. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1813. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1814. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1815. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean

diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1816. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1817. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the

- 652 -

additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1818. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

- 653 -

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1819. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1820. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1821. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

- 654 -

issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1822. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1823. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1824. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

JJ.    **Claims Brought on Behalf of the New Hampshire Subclass**

## COUNT I

### VIOLATION OF N.H. CONSUMER PROTECTION ACT (N.H. REV. STAT. ANN. § 358-A:1 *ET SEQ.*)

1825. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1826. Plaintiffs bring this claim on behalf of the New Hampshire Subclass.

1827. Plaintiffs, the New Hampshire Subclass, and each of the Defendants are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. § 358-A:1.

1828. The Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. § 358-A:1.

1829. The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or

- 656 -

grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rᴇᴠ. Sᴛᴀᴛ. § 358-A:2.

1830. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

- 657 -

1831. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1832. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1833. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1834. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1835. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1836. The Defendants knew or should have known that their conduct violated the New Hampshire CPA.

1837. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a. Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b. Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c. Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1838. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass

- 659 -

members relied on the Defendants' material representations that the Polluting

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

from defects.

1839. The Defendants' conduct proximately caused injuries to Plaintiffs and

the other Subclass members.

1840. Because the Defendants' willful conduct caused injury to New

Hampshire Subclass members' property through violations of the New Hampshire

CPA, Plaintiffs and the New Hampshire Subclass seek recovery of actual damages

or $1,000, whichever is greater, treble damages, costs and reasonable attorneys'

fees, an order enjoining the Defendants' unfair and/or deceptive acts and practices,

and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON NEW HAMPSHIRE LAW)

1841. Plaintiffs incorporate by reference all preceding allegations as though

fully set forth herein.

1842. Plaintiffs bring this claim on behalf of the New Hampshire Subclass.

1843. The Defendants intentionally concealed that the NOx reduction

system in the Polluting Vehicles turns off or is limited during normal driving

conditions, that the Polluting Vehicles had defective emissions controls, emitted

pollutants at a higher level than gasoline-powered vehicles, emitted pollutants

higher than a reasonable consumer would expect in light of the Defendants'
advertising campaign, emitted unlawfully high levels of pollutants such as NOx,
and were non-compliant with EPA emission requirements, or the Defendants acted
with reckless disregard for the truth, and denied Plaintiffs and the other Subclass
members information that is highly relevant to their purchasing decision.

1844. The Defendants further affirmatively misrepresented to Plaintiffs and
Subclass members in advertising and other forms of communication, including
standard and uniform material provided with each car, that the Polluting Vehicles
they were selling had no significant defects, were Earth-friendly and low-emission
vehicles, complied with EPA regulations, and would perform and operate properly
when driven in normal usage.

1845. The Defendants knew these representations were false when made.

1846. The Polluting Vehicles purchased or leased by Plaintiffs and the other
Subclass members were, in fact, defective, emitting pollutants at a much higher
rate than gasoline-powered vehicles and at a much higher rate than a reasonable
consumer would expect in light of the Defendants' advertising campaign, non-
EPA-compliant, and unreliable because the NOx reduction system in the Polluting
Vehicles turns off or is limited during normal driving conditions.

1847. The Defendants had a duty to disclose that the NOx reduction system
in the Polluting Vehicles turns off or is limited during normal driving conditions

and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1848. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1849. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the

- 662 -

Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1850. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1851. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1852. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they

- 663 -

concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1853. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and

- 664 -

Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1854. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1855. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

- 665 -

1856. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1857. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles

- 666 -

would have paid less for their vehicles or would not have purchased or leased them at all.

1858. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1859. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1860. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
## (BASED ON NEW HAMPSHIRE LAW)

1861. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1862. Plaintiffs bring this Count on behalf of the New Hampshire Subclass.

1863. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1864. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective

- 668 -

Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

1865. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

KK.   **Claims Brought on Behalf of the New Jersey Subclass**

## COUNT I

### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J.S.A. § 56:8-1 *ET SEQ.*)

1866. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1867. Plaintiffs bring this Count on behalf of the New Jersey Subclass.

1868. The New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq.* ("NJ CFA"), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

- 669 -

1869. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1870. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that

- 670 -

the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1871. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1872. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1873. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1874. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1875. The Defendants knew or should have known that their conduct violated the NJ CFA.

1876. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.      Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.      Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.      Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1877. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting

- 672 -

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1878. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1879. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Class and Subclass members.

1880. Plaintiffs and the other Class and Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Class and Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1881. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1882. Pursuant to N.J.S.A. § 56:8-20, Plaintiffs will serve the New Jersey Attorney General with a copy of this complaint within 10 days of filing.

- 673 -

## COUNT II

## BREACH OF CONTRACT
## (BASED ON NEW JERSEY LAW)

1883. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1884. Plaintiffs bring this Count on behalf of the New Jersey Subclass.

1885. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Class members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Class members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1886. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other New Jersey

- 674 -

Class members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Adsorber Engine.

1887. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON NEW JERSEY LAW)

1888. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1889. Plaintiffs bring this Count on behalf of the New Jersey Subclass.

1890. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted

- 675 -

with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

1891. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1892. The Defendants knew these representations were false when made.

1893. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1894. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were

- 676 -

non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1895. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1896. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1897. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1898. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1899. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their

- 678 -

customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1900. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by

- 679 -

Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1901. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1902. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1903. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have

purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1904. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

- 681 -

1905. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1906. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1907. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

LL.   **Claims Brought on Behalf of the New York Subclass**

## COUNT I

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y. GEN. BUS. LAW § 349)

1908. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1909. This claim is brought on behalf of the New York Subclass.

1910. N.Y. GEN. BUS. LAW § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. The challenged act or practice was "consumer-oriented;" (2) that the act or practice was misleading in a material way; and (3) Plaintiffs suffered injury as a result of the deceptive act or practice. Accordingly, Defendants have violated N.Y. GEN. BUS. LAW § 349.

1911. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting

Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1912. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the

- 684 -

Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1913. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1914. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1915. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1916. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1917. The Defendants knew or should have known that their conduct violated N.Y. GEN. BUS. LAW § 349.

1918. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

- 685 -

a.      Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.      Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.      Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1919.   The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

- 686 -

1920. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

1921. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1922. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1923. Pursuant to N.Y. GEN. BUS. LAW § 349(h), Plaintiffs and each Subclass member may recover actual damages, in addition to three times actual damages up to $1,000 for the Defendants' willful and knowing violation of N.Y. GEN. BUS. LAW § 349.

## COUNT II

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. GEN. BUS. LAW § 350)

1924. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

- 687 -

1925. This claim is brought on behalf of the New York Subclass.

1926. New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity." N.Y. GEN. BUS. LAW § 350-a.

1927. Defendants caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the other Subclass members.

1928. Defendants have violated N.Y. GEN. BUS. LAW § 350 because the misrepresentations and omissions alleged herein, including but not limited to Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1929. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the

- 688 -

Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1930. Plaintiffs and Subclass members reasonably relied upon Defendants' false misrepresentations. They had no way of knowing that Defendants' representations were false and gravely misleading. As alleged herein, Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel Defendants' deception on their own.

1931. Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1932. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1933. Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

1934. Defendants knew or should have known that their conduct violated N.Y. GEN. BUS. LAW § 350.

1935. Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because Defendants:

- 689 -

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

1936. Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1937. Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

- 690 -

1938. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

1939. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1940. Plaintiffs and the other Subclass members are entitled to recover their actual damages or $500, whichever is greater. Because Defendants acted willfully or knowingly, Plaintiffs and the other Subclass members are entitled to recover three times actual damages, up to $10,000.

## COUNT III

## BREACH OF CONTRACT
## (BASED ON NEW YORK LAW)

1941. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1942. Plaintiffs bring this Count on behalf of the New York Subclass members.

1943. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1944. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA,

- 692 -

rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

1945. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IV

## FRAUDULENT CONCEALMENT
## (BASED ON NEW YORK LAW)

1946. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1947. This claim is brought on behalf of the New York Subclass.

1948. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

- 693 -

1949. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

1950. The Defendants knew these representations were false when made.

1951. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1952. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting

- 694 -

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1953. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1954. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

1955. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants'

representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1956. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

1957. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the

- 696 -

vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

1958. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute,

- 697 -

comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

1959. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

1960. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

1961. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the

- 698 -

Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

1962. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

1963. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective

- 699 -

emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

1964. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

1965. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

010649-11 1032740 V1

MM.  **Claims Brought on Behalf of the North Carolina Subclass**

## COUNT I

### VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1 *ET SEQ.*)

1966. Plaintiff Jeremy Perdue ("Plaintiff" for purposes of all the North Carolina Subclass counts) incorporates by reference all paragraphs as though fully set forth herein.

1967. Plaintiff brings this Count on behalf of the North Carolina Subclass.

1968. Defendants engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

1969. The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a). In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, Defendants engaged in unfair and deceptive trade practices because

they (1) had the capacity or tendency to deceive, (2) offend public policy, (3) are immoral, unethical, oppressive or unscrupulous, or (4) cause substantial injury to consumers.

1970. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and

- 702 -

failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1971. In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

1972. Plaintiff and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own.

1973. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1974. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

1975. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

1976. The Defendants knew or should have known that their conduct violated the North Carolina UDTPA.

1977. The Defendants owed Plaintiff and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

1978. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

- 704 -

emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1979. The Defendants' conduct proximately caused injuries to Plaintiff and the other Subclass members.

1980. Plaintiff and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

1981. The Defendants' violations present a continuing risk to Plaintiff as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1982. Plaintiff seeks an order for treble their actual damages, court costs, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

1983. Plaintiff also seek punitive damages against the Defendants because the Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON NORTH CAROLINA LAW)

1984. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1985. Plaintiff brings this Count on behalf of the North Carolina Subclass members.

1986. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiff and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive

- 706 -

alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

1987. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiff and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

1988. As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON NORTH CAROLINA LAW)

1989. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1990. This claim is brought on behalf of the North Carolina Subclass.

1991. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiff and the other Subclass members information that is highly relevant to their purchasing decision.

1992. The Defendants further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

- 708 -

1993. The Defendants knew these representations were false when made.

1994. The Polluting Vehicles purchased or leased by Plaintiff and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

1995. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

1996. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx

reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

1997. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiff and Subclass members.

1998. Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

1999. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture

characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2000. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2001. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably

discoverable by Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

- 712 -

2002. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

2003. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2004. Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

2005. Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they own vehicles that are

- 713 -

diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2006. The value of Plaintiff's and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2007. Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

2008. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

NN. **Claims Brought on Behalf of the North Dakota Subclass**

## COUNT I

## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT (N.D. CENT. CODE § 51-15-02)

2009. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2010. This claim is brought on behalf of the North Dakota Subclass.

2011. Plaintiffs, the North Dakota Subclass members, and each of the Defendants are "persons" within the meaning of N.D. CENT. CODE § 51-15-02(4).

2012. The Defendants engaged in the "sale" of "merchandise" within the meaning of N.D. CENT. CODE § 51-15-02(3), (5).

2013. The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or

practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." N.D. Cent. Code § 51-15-02. As set forth above and below, the Defendants committed deceptive acts or practices, with the intent that North Dakota Subclass members rely thereon in connection with their purchase or lease of the Polluting Vehicles.

2014. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or

- 716 -

statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2015. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2016. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2017. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2018. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2019. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2020. The Defendants knew or should have known that their conduct violated the North Dakota CFA.

2021. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2022. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

- 718 -

emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2023. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2024. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

2025. As a direct and proximate result of the Defendants' violations of the North Dakota CFA, Plaintiffs and the North Dakota Subclass have suffered injury-in-fact and/or actual damage.

2026. North Dakota Subclass members seek punitive damages against the Defendants because the Defendants' conduct was egregious. The Defendants' egregious conduct warrants punitive damages.

2027. Further, the Defendants knowingly committed the conduct described above, and thus, under N.D. CENT. CODE § 51-15-09, the Defendants are liable to Plaintiffs and the North Dakota Subclass for treble damages in amounts to be

proven at trial, as well as attorneys' fees, costs, and disbursements. Plaintiffs further seek an order enjoining the Defendants' unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

**COUNT II**

**FRAUDULENT CONCEALMENT**
**(BASED ON NORTH DAKOTA LAW)**

2028. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2029. Plaintiffs bring this Count on behalf of the North Dakota Subclass.

2030. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2031. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles

- 720 -

they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2032. The Defendants knew these representations were false when made.

2033. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2034. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

- 721 -

2035. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2036. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2037. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on

- 722 -

their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2038. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2039. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2040. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-

compliance, are material concerns to a consumer, including with respect to the

emissions certifications testing their vehicles must pass. The Defendants

represented to Plaintiffs and Subclass members that they were purchasing or

leasing reduced-emission diesel vehicles when, in fact, they were purchasing or

leasing defective, high-emission vehicles with unlawfully high emissions.

2041. The Defendants actively concealed and/or suppressed these material

facts, in whole or in part, to pad and protect their profits and to avoid the

perception that their vehicles were not clean diesel vehicles and did not or could

not comply with federal and state laws governing clean air and emissions, which

perception would hurt the brand's image and cost the Defendants money, and they

did so at the expense of Plaintiffs and Subclass members.

2042. The Defendants still have not made full and adequate disclosures, and

continue to defraud Plaintiffs and Subclass members by concealing material

information regarding the emissions qualities of the Polluting Vehicles.

2043. Plaintiffs and Subclass members were unaware of the omitted material

facts referenced herein, and they would not have acted as they did if they had

known of the concealed and/or suppressed facts, in that they would not have

purchased purportedly reduced-emissions diesel cars manufactured by the

Defendants, and/or would not have continued to drive their heavily polluting

vehicles, or would have taken other affirmative steps in light of the information

- 725 -

concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

2044. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2045. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all

- 726 -

of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2046. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2047. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

### BREACH OF CONTRACT
### (BASED ON NORTH DAKOTA LAW)

2048. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2049. This claim is brought on behalf of the North Dakota Subclass.

2050. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein,

- 727 -

caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2051. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

2052. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

- 728 -

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

OO. **Claims Brought on Behalf of the Ohio Subclass**

## COUNT I

### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE § 1345.01 *ET SEQ.*)

2053. Plaintiff Natalie Beight ("Plaintiff" for purposes of all Ohio Subclass claims) incorporates by reference all preceding allegations as though fully set forth herein.

2054. This claim is brought on behalf of the Ohio Subclass.

2055. Plaintiff and the other Ohio Subclass members are "consumers" as defined by the Ohio Consumer Sales Practices Act, OHIO REV. CODE § 1345.01 ("Ohio CSPA"). Each of the Defendants is a "supplier" as defined by the Ohio CSPA. Plaintiff's and the other Ohio Subclass members' purchases or leases of Polluting Vehicles were "consumer transactions" as defined by the Ohio CSPA.

2056. The Ohio CSPA, OHIO REV. CODE § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in

- 729 -

accordance with a previous representation, if it has not. *Id.* The Defendants'
conduct as alleged above and below constitutes unfair and/or deceptive consumer
sales practices in violation of OHIO REV. CODE § 1345.02.

2057. In the course of the Defendants' business, they willfully failed to
disclose and actively concealed that the NOx reduction system in the Polluting
Vehicles turns off or is limited during normal driving conditions, that the Polluting
Vehicles emitted far more pollutants than gasoline-powered vehicles, that the
Polluting Vehicles emit far more pollution than a reasonable consumer would
expect in light of the Defendants' advertising campaign, and that the Polluting
Vehicles emitted unlawfully high levels of pollutants, including NOx, as described
above. Accordingly, the Defendants engaged in unfair methods of competition,
unconscionable acts or practices, and unfair or deceptive acts or practices,
including representing that Polluting Vehicles have characteristics, uses, benefits,
and qualities which they do not have; representing that Polluting Vehicles are of a
particular standard and quality when they are not; failing to reveal a material fact,
the omission of which tends to mislead or deceive the consumer, and which fact
could not reasonably be known by the consumer; making a representation of fact or
statement of fact material to the transaction such that a person reasonably believes
the represented or suggested state of affairs to be other than it actually is; and

- 730 -

failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2058. In purchasing or leasing the Polluting Vehicles, Plaintiff and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2059. Plaintiff and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2060. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2061. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2062. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiff and the Subclass.

2063. The Defendants knew or should have known that their conduct violated the Ohio CSPA.

2064. The Defendants owed Plaintiff and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

2065. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

emitted pollutants at a much higher rate than gasoline-powered vehicles, had

emissions that far exceeded those expected by a reasonable consumer, and were

non-EPA-compliant and unreliable, because Plaintiff and the other Subclass

members relied on the Defendants' material representations that the Polluting

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

from defects.

2066. The Defendants' conduct proximately caused injuries to Plaintiff and

the other Subclass members.

2067. Plaintiff and the other Subclass members were injured and suffered

ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the

Defendants' conduct in that Plaintiff and the other Subclass members overpaid for

their Polluting Vehicles and did not receive the benefit of their bargain, and their

Polluting Vehicles have suffered a diminution in value. These injuries are the

direct and natural consequence of the Defendants' misrepresentations and

omissions.

2068. The Defendants' violations present a continuing risk to Plaintiff as

well as to the general public. The Defendants' unlawful acts and practices

complained of herein affect the public interest.

2069. Plaintiff and the Subclass sustained damages as a result of the

Defendants' unlawful acts and are, therefore, entitled to damages and other relief

as provided under the Ohio CSPA.

2070. Plaintiff also seeks court costs and attorneys' fees as a result of

Defendants' violations of the OCSPA as provided in OHIO REV. CODE § 1345.09.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON OHIO LAW)

2071. Plaintiff incorporates by reference all preceding allegations as though

fully set forth herein.

2072. Plaintiff brings this Count on behalf of Ohio Subclass members.

2073. The Defendants' misrepresentations and omissions alleged herein,

including, but not limited to, the Defendants' failure to disclose that the NOx

reduction system in the Polluting Vehicles turns off or is limited during normal

driving conditions caused Plaintiff and the other Subclass members to make their

purchases or leases of their Polluting Vehicles. Absent those misrepresentations

and omissions, Plaintiff and the other Subclass members would not have purchased

or leased these Polluting Vehicles, would not have purchased or leased these

Polluting Vehicles at the prices they paid, and/or would have purchased or leased

less expensive alternative vehicles that did not contain the Adsorber Engine and

which were not marketed as including such a system. Accordingly, Plaintiff and

- 734 -

the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2074. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiff and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, thus rendering each Polluting Vehicle less valuable, than vehicles not equipped with the Adsorber Engine.

2075. As a direct and proximate result of FCA's breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON OHIO LAW)

2076. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

2077. This claim is brought on behalf of the Ohio Subclass.

2078. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving

- 735 -

conditions, that the Polluting Vehicles had defective emissions controls, emitted

pollutants at a higher level than gasoline-powered vehicles, emitted pollutants

higher than a reasonable consumer would expect in light of the Defendants'

advertising campaign, emitted unlawfully high levels of pollutants such as NOx,

and were non-compliant with EPA emission requirements, or the Defendants acted

with reckless disregard for the truth, and denied Plaintiff and the other Subclass

members information that is highly relevant to their purchasing decision.

2079. The Defendants further affirmatively misrepresented to Plaintiff and

Subclass members in advertising and other forms of communication, including

standard and uniform material provided with each car, that the Polluting Vehicles

they were selling had no significant defects, were Earth-friendly and low-emission

vehicles, complied with EPA regulations, and would perform and operate properly

when driven in normal usage.

2080. The Defendants knew these representations were false when made.

2081. The Polluting Vehicles purchased or leased by Plaintiff and the other

Subclass members were, in fact, defective, emitting pollutants at a much higher

rate than gasoline-powered vehicles and at a much higher rate than a reasonable

consumer would expect in light of the Defendants' advertising campaign, non-

EPA-compliant, and unreliable because the NOx reduction system in the Polluting

Vehicles turns off or is limited during normal driving conditions.

2082. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2083. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2084. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiff and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiff and Subclass members.

2085. Plaintiff and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiff and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiff and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2086. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean

- 738 -

diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2087. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiff and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2088. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the

- 739 -

additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiff and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiff and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiff and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2089. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

2090. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiff and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2091. Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Subclass members.

2092. Because of the concealment and/or suppression of the facts, Plaintiff and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

- 741 -

issues engendered by the Defendants' corporate policies. Had Plaintiff and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiff and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2093. The value of Plaintiff's and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiff's and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2094. Accordingly, the Defendants are liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

2095. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that the Defendants made to

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

PP. **Claims Brought on Behalf of the Oklahoma Subclass**

### COUNT I

### VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT (OKLA. STAT. TIT. 15 § 751 *ET SEQ.*)

2096. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2097. Plaintiffs bring this Count on behalf of the Oklahoma Subclass.

2098. Plaintiffs and the Oklahoma Subclass members are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), OKLA. STAT. TIT. 15 § 752.

2099. Each of the Defendants is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15 § 15-751(1).

2100. The sale or lease of the Polluting Vehicles to the Oklahoma Subclass members was a "consumer transaction" within the meaning of OKLA. STAT. TIT. 15 § 752, and the Defendants' actions as set forth herein occurred in the conduct of trade or commerce.

2101. The Oklahoma CPA declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: "mak[ing] a false or

misleading representation, knowingly or with reason to know, as to the characteristics, … uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." *See* OKLA. STAT. TIT. 15, § 753.

2102. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact

- 744 -

could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2103. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2104. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2105. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2106. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2107. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2108. The Defendants knew or should have known that their conduct violated the Oklahoma CPA.

2109. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2110. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2111. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2112. Plaintiffs and the Oklahoma Class suffered ascertainable loss caused by the Defendants' misrepresentations and concealment of and failure to disclose material information.

2113. The Defendants' unlawful acts and practices complained of herein affect the public interest.

2114. As a direct and proximate result of the Defendants' violations of the Oklahoma CPA, Plaintiffs and the Oklahoma Class have suffered injury-in-fact and/or actual damage.

2115. The Defendants' conduct as alleged herein was unconscionable because (1) the Defendants, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, the Defendants knew or had reason to know that price grossly exceeded the price at which similar vehicles were readily obtainable in similar transactions by like consumers; and (3) the Defendants knew or had reason to know that the transaction the Defendants induced the consumer to enter into was excessively one-sided in favor of the Defendants.

2116. Because the Defendants' unconscionable conduct caused injury to Oklahoma Subclass members, Plaintiffs and the Oklahoma Subclass seek recovery of actual damages, discretionary penalties up to $2,000 per violation, punitive damages, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15 § 761.1. Plaintiffs and the Oklahoma Subclass further seek an order enjoining the Defendants' unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

010649-11 1032740 V1

## COUNT II

## FRAUDULENT CONCEALMENT
## (BASED ON OKLAHOMA LAW)

2117. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2118. Plaintiffs bring this Count on behalf of the Oklahoma Subclass.

2119. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2120. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

- 749 -

2121. The Defendants knew these representations were false when made.

2122. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2123. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2124. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx

- 750 -

reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2125. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2126. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2127. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture

characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2128. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2129. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably

- 752 -

discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

- 753 -

2130. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

2131. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2132. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

2133. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are

diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2134. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

010649-11 1032740 V1

2135. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2136. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
## (BASED ON OKLAHOMA LAW)

2137. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2138. This claim is brought on behalf of the Oklahoma Subclass.

2139. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting

- 756 -

Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2140. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

2141. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

QQ.   **Claims Brought on Behalf of the Oregon Subclass**

## COUNT I
## VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### (OR. REV. STAT. § 646.605, *et seq.*)

2142. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2143. This claim is brought only on behalf of the Oregon Subclass.

2144. FCA, Cummins, and Plaintiffs are each a person within the meaning of OR. REV. STAT. § 646.605(4).

2145. The Polluting Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

2146. The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce." OR. REV. STAT. § 646.608(1).

- 758 -

2147. The Defendants engaged in unlawful trade practices, including: (1) representing that the Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Polluting Vehicles are of a particular standard and quality when they are not; (3) advertising the Polluting Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

2148. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2149. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact,

- 759 -

the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2150. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2151. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2152. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2153. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2154. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2155. The Defendants knew or should have known that their conduct violated the Oregon UTPA.

2156. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.    Intentionally concealed the foregoing from Plaintiff and the Subclass; and/or

    c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations.

- 761 -

2157. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2158. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2159. Plaintiffs and the Oregon Subclass suffered ascertainable loss caused by the Defendants' misrepresentations and concealment of and failure to disclose material information. Plaintiffs and Subclass members who purchased the Polluting Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

1654. The Defendants' unlawful acts and practices complained of herein affect the public interest.

1655. As a direct and proximate result of the Defendants' violations of the Oregon UTPA, Plaintiffs and the Oregon Subclass have suffered injury-in-fact and/or actual damage.

1656. Plaintiffs and the Oregon Subclass are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a). Plaintiffs also seeks punitive damages in the discretion of the Court because of the Defendants' egregious disregard of consumer and public safety and their long-running concealment of the serious safety defects and their tragic consequences.

## COUNT II
## FRAUD BY CONCEALMENT

2160. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2161. This claim is brought on behalf of the Oregon Subclass.

2162. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted

with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2163. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2164. The Defendants knew these representations were false when made.

2165. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2166. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were

- 764 -

non-EPA-compliant and unreliable, because Plaintiff and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2167. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2168. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

- 765 -

2169. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2170. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2171. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their

- 766 -

customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2172. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions* diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by

- 767 -

Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2173. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiff and Subclass members.

2174. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2175. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have

purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

2176. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2177. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2178. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2179. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## BREACH OF CONTRACT
## (BASED ON OREGON LAW)

2180. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2181. Plaintiffs brings this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Oregon Subclass.

2182. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiff and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2183. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited

- 771 -

during normal driving conditions, and is thus less valuable than vehicles not equipped with the Adsorber Engine.

2184. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

RR.   **Claims Brought on Behalf of the Pennsylvania Subclass**

## COUNT I

### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1 *ET SEQ.*)

2185. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2186. Plaintiffs bring this Count on behalf of the Pennsylvania Subclass.

2187. Plaintiffs purchased or leased their Polluting Vehicle primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

2188. All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

2189. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …

[b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

2190. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes

- 773 -

the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2191. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2192. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2193. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2194. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2195. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2196. The Defendants knew or should have known that their conduct violated the Pennsylvania CPL.

2197. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.   Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.   Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2198. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2199. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2200. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

2201. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

2202. The Defendants are liable to Plaintiffs and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees

and costs. 73 P.S. § 201-9.2(a). Plaintiffs and the Pennsylvania Class are also entitled to an award of punitive damages given that the Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT II

## BREACH OF CONTRACT
## (BASED ON PENNSYLVANIA LAW)

2203. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2204. Plaintiffs bring this Count on behalf of the Pennsylvania Subclass.

2205. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs

- 777 -

and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2206. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, thus rendering each Polluting Vehicle less valuable, than vehicles not equipped with the Adsorber Engine.

2207. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON PENNSYLVANIA LAW)

2208. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2209. This claim is brought on behalf of the Pennsylvania Subclass.

2210. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving

- 778 -

conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2211. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2212. The Defendants knew these representations were false when made.

2213. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2214. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2215. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2216. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2217. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2218. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean

diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2219. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2220. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the

- 782 -

additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2221. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

- 783 -

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

2222. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2223. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

2224. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

- 784 -

issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2225. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2226. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2227. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to

- 785 -

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

SS.  **Claims Brought on Behalf of the Rhode Island Subclass**

## COUNT I

## VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (R.I. GEN. LAWS § 6-13.1 *ET SEQ.*)

2228. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2229. Plaintiffs bring this Count on behalf of the Rhode Island Subclass.

2230. Plaintiffs are persons who purchased or leased one or more Polluting Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

2231. Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any

- 786 -

other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. GEN. LAWS § 6-13.1-1(6).

2232. The Defendants engaged in unlawful trade practices, including: (1) representing that the Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Polluting Vehicles are of a particular standard and quality when they are not; (3) advertising the Polluting Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

2233. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2234. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described

above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2235. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2236. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein,

- 788 -

the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2237. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2238. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2239. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2240. The Defendants knew or should have known that their conduct violated the Rhode Island CPA.

2241. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.      Made incomplete representations that they manipulated the emissions

system in the Polluting Vehicles to turn off or limit effectiveness in

normal driving conditions, while purposefully withholding material

facts from Plaintiffs and the Subclass that contradicted these

representations.

2242. The Defendants had a duty to disclose that the NOx reduction system

in the Polluting Vehicles turns off or is limited during normal driving conditions

and that these Polluting Vehicles were defective, employed a "Defeat Device,"

emitted pollutants at a much higher rate than gasoline-powered vehicles, had

emissions that far exceeded those expected by a reasonable consumer, and were

non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass

members relied on the Defendants' material representations that the Polluting

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

from defects.

2243. The Defendants' conduct proximately caused injuries to Plaintiffs and

the other Subclass members.

2244. Plaintiffs and the Rhode Island Class suffered ascertainable loss

caused by the Defendants' misrepresentations and concealment of and failure to

disclose material information. Plaintiffs who purchased the Polluting Vehicles

either would have paid less for their vehicles or would not have purchased or leased them at all.

2245.  The Defendants' unlawful acts and practices complained of herein affect the public interest.

2246.  As a direct and proximate result of the Defendants' violations of the Rhode Island CPA, Plaintiffs and the Rhode Island Class have suffered injury-in-fact and/or actual damage.

2247.  Plaintiffs and the Rhode Island Class are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a). Plaintiffs also seek punitive damages in the discretion of the Court because of the Defendants' egregious disregard of consumer and public safety and their long-running concealment of the serious safety defects and their tragic consequences.

### COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON RHODE ISLAND LAW)

2248. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2249. Plaintiffs bring this Count on behalf of the Rhode Island Subclass.

2250. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted

- 791 -

pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2251. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2252. The Defendants knew these representations were false when made.

2253. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2254. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2255. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2256. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2257. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2258. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean

diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2259. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2260. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the

- 795 -

additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2261. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

2262. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2263. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

2264. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2265. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2266. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2267. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
## (BASED ON RHODE ISLAND LAW)

2268. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2269. This claim is brought on behalf of the Rhode Island Subclass.

2270. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

- 799 -

2271. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

2272. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

TT.   **Claims on Behalf of the South Dakota Subclass**

**COUNT I
VIOLATION OF THE SOUTH DAKOTA
DECEPTIVE TRADE PRACTICES AND CONSUMER
PROTECTION LAW
(S.D. CODIFIED LAWS § 37-24-6)**

2273. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2274. This claim is brought on behalf of the South Dakota Subclass.

- 800 -

2275. The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which are defined for relevant purposes to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby [.]" S.D. CODIFIED LAWS § 37-24-6(1). The conduct of the Defendants as set forth herein constitutes deceptive acts or practices, fraud, false promises, misrepresentation, concealment, suppression and omission of material facts in violation of S.D. CODIFIED LAWS §§ 37-24-6 and 37-24-31, including, but not limited to, the Defendants' misrepresentations and omissions regarding the safety, cleanliness, efficiency and reliability of the Polluting Vehicles, and the Defendants' misrepresentations concerning a host of other defects and safety issues.

2276. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2277. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the

Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2278. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

- 802 -

2279. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel Defendants' deception on their own.

2280. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2281. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2282. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2283. The Defendants knew or should have known that their conduct violated the South Dakota CPL.

2284. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.   Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

- 803 -

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2285. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2286. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2287. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the

- 804 -

Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

2288. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

2289. The Defendants' unlawful acts and practices complained of herein affect the public interest.

2290. As a direct and proximate result of the Defendants' violations of the South Dakota CPL, Plaintiffs and the South Dakota Class have suffered injury-in-fact and/or actual damage.

2291. Under S.D. CODIFIED LAWS § 37-24-31, Plaintiffs and the South Dakota Class are entitled to a recovery of their actual damages suffered as a result of the Defendants' acts and practices.

## COUNT II
## FRAUD BY CONCEALMENT

2292. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2293. This claim is brought on behalf of the South Dakota Subclass.

- 805 -

2294. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2295. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2296. The Defendants knew these representations were false when made.

2297. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-

- 806 -

EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2298. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2299. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants,

- 807 -

and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2300. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2301. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2302. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations.

Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2303. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2304. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions* diesel cars and as compliant with all laws in each country,

- 809 -

which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2305. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

- 810 -

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

2306. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2307. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

2308. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

issues engendered by the Defendants' corporate policies. Had Plaintiffs and
Subclass members been aware of the true emissions facts with regard to the
Polluting Vehicles, and the Defendants' disregard for the truth and compliance
with applicable federal and state law and regulations, Plaintiffs and Subclass
members who purchased or leased new or certified previously owned vehicles
would have paid less for their vehicles or would not have purchased or leased them
at all.

2309. The value of Plaintiffs' and Subclass members' vehicles has
diminished as a result of the Defendants' fraudulent concealment of the defective
emissions controls of the Polluting Vehicles, the unlawfully high emissions of the
Polluting Vehicles, and the non-compliance with EPA emissions requirements, all
of which has greatly tarnished the Defendants' brand name attached to Plaintiffs'
and Subclass members' vehicles and made any reasonable consumer reluctant to
purchase any of the Polluting Vehicles, let alone pay what otherwise would have
been fair market value for the vehicles.

2310. Accordingly, the Defendants are liable to Plaintiffs and Subclass
members for damages in an amount to be proven at trial.

2311. The Defendants' acts were done wantonly, maliciously, oppressively,
deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and
Subclass members' rights and the representations that the Defendants made to

- 812 -

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## BREACH OF CONTRACT
## (BASED ON SOUTH DAKOTA LAW)

2312. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2313. Plaintiffs bring this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the South Dakota Subclass.

2314. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system.

Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2315. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Adsorber Engine.

2316. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

UU.   **Claims Brought on Behalf of the Utah Subclass**

### COUNT I

### VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES ACT
### (UTAH CODE ANN. § 13-11-1 *ET SEQ.*)

2317. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2318. Plaintiffs bring this Count on behalf of the Utah Subclass.

- 814 -

2319. Each of the Defendants qualifies as a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), UTAH CODE ANN. § 13-11-3.

2320. Plaintiffs and the Subclass members are "persons" under UTAH CODE ANN. § 13-11-3.

2321. Sales of the Polluting Vehicles to Plaintiffs and the Subclass were "consumer transactions" within the meaning of UTAH CODE ANN. § 13-11-3.

2322. The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE ANN. § 13-11-4. Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." UTAH CODE ANN. § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. UTAH CODE ANN. § 13-11-5.

2323. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the

Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2324. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2325. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2326. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2327. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2328. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2329. The Defendants knew or should have known that their conduct violated the Utah CSPA.

2330. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a. Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

- 817 -

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2331. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2332. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2333. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the

- 818 -

Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

2334. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

2335. Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs and the Subclass seek monetary relief against the Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff and Utah Class member, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON UTAH LAW)

2336. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2337. Plaintiffs bring this Count on behalf of the Utah Subclass members.

2338. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine

- 819 -

system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2339. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

- 820 -

2340. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON UTAH LAW)

2341. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2342. Plaintiffs bring this Count on behalf of the Utah Subclass.

2343. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2344. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including

standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2345. The Defendants knew these representations were false when made.

2346. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2347. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2348. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2349. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2350. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on

- 823 -

their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2351. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2352. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2353. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-

- 825 -

compliance, are material concerns to a consumer, including with respect to the

emissions certifications testing their vehicles must pass. The Defendants

represented to Plaintiffs and Subclass members that they were purchasing or

leasing reduced-emission diesel vehicles when, in fact, they were purchasing or

leasing defective, high-emission vehicles with unlawfully high emissions.

2354. The Defendants actively concealed and/or suppressed these material

facts, in whole or in part, to pad and protect their profits and to avoid the

perception that their vehicles were not clean diesel vehicles and did not or could

not comply with federal and state laws governing clean air and emissions, which

perception would hurt the brand's image and cost the Defendants money, and they

did so at the expense of Plaintiffs and Subclass members.

2355. The Defendants still have not made full and adequate disclosures, and

continue to defraud Plaintiffs and Subclass members by concealing material

information regarding the emissions qualities of the Polluting Vehicles.

2356. Plaintiffs and Subclass members were unaware of the omitted material

facts referenced herein, and they would not have acted as they did if they had

known of the concealed and/or suppressed facts, in that they would not have

purchased purportedly reduced-emissions diesel cars manufactured by the

Defendants, and/or would not have continued to drive their heavily polluting

vehicles, or would have taken other affirmative steps in light of the information

concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

2357. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2358. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all

of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2359. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2360. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

VV.    **Claims Brought on Behalf of the Vermont Subclass**

## COUNT I

### VIOLATION OF VERMONT CONSUMER FRAUD ACT
### (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)

2361. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2362. This claim is brought on behalf of the Vermont Subclass.

2363. Each of the Defendants is a seller within the meaning of VT. STAT. ANN. TIT. 9, § 2451(a)(c).

- 828 -

2364. The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." VT. STAT. ANN. TIT. 9, § 2453(a).

2365. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and

- 829 -

failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2366. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2367. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2368. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2369. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2370. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2371. The Defendants knew or should have known that their conduct violated the Vermont CFA.

2372. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2373. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device,"

- 831 -

emitted pollutants at a much higher rate than gasoline-powered vehicles, had

emissions that far exceeded those expected by a reasonable consumer, and were

non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass

members relied on the Defendants' material representations that the Polluting

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

from defects.

2374. The Defendants' conduct proximately caused injuries to Plaintiffs and

the other Subclass members.

2375. The Defendants' unfair or deceptive acts or practices were likely to

and did in fact deceive reasonable consumers, including Plaintiffs, about the true

cleanliness and efficiency of the Adsorber Engine, the quality of the Defendants'

brands, the devaluing of environmental cleanliness and integrity at the Defendants'

companies, and the true value of the Polluting Vehicles.

2376. The Defendants intentionally and knowingly misrepresented material

facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the

Vermont Subclass. The Defendants' fraudulent use of the "defeat device" and

concealment of the true characteristics of the clean diesel engine system were

material to Plaintiffs and the Vermont Class. A vehicle made by a reputable

manufacturer of environmentally friendly vehicles is worth more than an otherwise

comparable vehicle made by a disreputable and dishonest manufacturer of

- 832 -

polluting vehicles that conceals the amount its vehicles pollute rather than make environmentally friendly vehicles.

2377. Plaintiffs and the Vermont Subclass suffered ascertainable loss caused by the Defendants' misrepresentations and concealment of and failure to disclose material information. Plaintiffs who purchased the Polluting Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

2378. The Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive acts or practices under the Vermont CFA. All owners of Polluting Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of the Defendants' deceptive and unfair acts and practices that occurred in the course of the Defendants' business.

2379. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

2380. As a direct and proximate result of the Defendants' violations of the Vermont CFA, Plaintiffs and the Vermont Subclass have suffered injury-in-fact and/or actual damage.

2381. Plaintiffs and the Vermont Subclass are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable

attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to VT. STAT. ANN. TIT. 9, § 2461(b).

## COUNT II

### FRAUDULENT CONCEALMENT
### (BASED ON VERMONT LAW)

2382. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2383. Plaintiffs bring this Count on behalf of the Vermont Subclass.

2384. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2385. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission

- 834 -

vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2386. The Defendants knew these representations were false when made.

2387. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2388. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2389. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles.

- 835 -

The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2390. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2391. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2392. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2393. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2394. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the

- 837 -

Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or

leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2395. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

2396. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2397. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

- 839 -

2398. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2399. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to

purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2400. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2401. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
## (BASED ON VERMONT LAW)

2402. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2403. This claim is brought on behalf of the Vermont Subclass.

2404. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions,

- 841 -

Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2405. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

2406. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

- 842 -

WW. **Claims Brought on Behalf of the Virginia Subclass**

## COUNT I

## VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT
### (VA. CODE ANN. § 59.1-196 *ET SEQ.*)

2407. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2408. This claim is brought on behalf of the Virginia Subclass.

2409. Each Defendant is a "person" as defined by VA. CODE ANN. § 59.1-198. The transactions between Plaintiffs and the other Subclass members on the one hand and Defendants on the other, leading to the purchase or lease of the Polluting Vehicles by Plaintiffs and the other Subclass members, are "consumer transactions" as defined by VA. CODE ANN. § 59.1-198, because the Polluting Vehicles were purchased or leased primarily for personal, family or household purposes.

2410. The Virginia Consumer Protection Act ("Virginia CPA") prohibits "(5) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (6) misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; … (8) advertising goods or services with intent not to sell them as advertised; … [and] (14) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]" VA. CODE ANN. § 59.1-200(A).

- 843 -

2411. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2412. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that

- 844 -

the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2413. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2414. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2415. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2416. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2417. The Defendants knew or should have known that their conduct violated the Virginia CPA.

2418. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2419. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting

- 846 -

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2420. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2421. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

2422. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

2423. Pursuant to VA. CODE ANN. § 59.1-204, Plaintiffs and the Subclass seek monetary relief against the Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and Subclass member. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and Subclass member, the greater of (a) three times actual damages or (b) $1,000.

2424. Plaintiffs also seek punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204 *et seq.*

## COUNT II

## BREACH OF CONTRACT
## (BASED ON VIRGINIA LAW)

2425. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2426. Plaintiffs bring this Count on behalf of Virginia Subclass members.

2427. The Defendants' misrepresentations and omissions alleged herein, including the Defendants' failure to disclose the existence of the diesel engine system's defect and/or defective design of emissions controls as alleged herein, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

- 848 -

2428. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and the existence of the diesel engine system's defect and/or defective design of emissions controls, including information known to FCA, rendering each Polluting Vehicle non-EPA-compliant, and thus less valuable than vehicles not equipped with the Adsorber Engine.

2429. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

## FRAUDULENT CONCEALMENT
## (BASED ON VIIRGINIA LAW)

2430. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2431. Plaintiffs bring this Count on behalf of the Virginia Subclass.

2432. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving

- 849 -

conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2433. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2434. The Defendants knew these representations were false when made.

2435. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

- 850 -

2436. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2437. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

- 851 -

2438. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2439. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2440. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean

diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2441. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2442. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the

- 853 -

additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2443. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

- 854 -

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

2444. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2445. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

2446. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2447. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2448. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2449. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to

- 856 -

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## XX.   Claims Brought on Behalf of the West Virginia Subclass

### COUNT I

### VIOLATIONS OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT
### (W. VA. CODE § 46A-1-101 *ET SEQ.*)

2450. Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

2451. The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." W. VA. CODE § 46A-6-104. Through the Consolidated Amended Complaint filed on February 21, 2017, Defendants are on notice regarding the allegations under the West Virginia CCPA. Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Maine class are entitled.

3257. Defendants, Plaintiffs, and the West Virginia Class are "persons" within the meaning of W. Va. Code § 46A-1-102(31). Plaintiffs and the West Virginia Class members are "consumers" within the meaning of W. Va. Code §§

46A-1-102(2) and 46A-1-102(12). Defendants are engaged in "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

2452. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

2453. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

- 858 -

2454. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2455. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2456. The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

2457. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2458. The Defendants knew or should have known that their conduct violated the West Virginia CCPA.

2459. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

- 859 -

   a.   Possessed exclusive knowledge that they manipulated the

        emissions system in the Polluting Vehicles to turn off or limit

        effectiveness in normal driving conditions;

b.     Intentionally concealed the foregoing from Plaintiffs and the Subclass;

       and/or

c.     Made incomplete representations that they manipulated the emissions

       system in the Polluting Vehicles to turn off or limit effectiveness in

       normal driving conditions, while purposefully withholding material

       facts from Plaintiffs and the Subclass that contradicted these

       representations.

2460. The Defendants had a duty to disclose that the NOx reduction system

in the Polluting Vehicles turns off or is limited during normal driving conditions

and that these Polluting Vehicles were defective, employed a "Defeat Device,"

emitted pollutants at a much higher rate than gasoline-powered vehicles, had

emissions that far exceeded those expected by a reasonable consumer, and were

non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass

members relied on the Defendants' material representations that the Polluting

Vehicles they were purchasing were reduced-emission vehicles, efficient, and free

from defects.

- 860 -

2461. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2462. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

2463. Pursuant to W. Va. Code § 46A-6-106(a), Plaintiffs and the West Virginia Class seek an order enjoining the Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the West Virginia CCPA.

## COUNT II

### BREACH OF CONTRACT
### (BASED ON WEST VIRGINIA LAW)

2464. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2465. Plaintiffs bring this Count on behalf of the West Virginia Subclass.

2466. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx

- 861 -

reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2467. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, thus rendering each Polluting Vehicle less valuable, than vehicles not equipped with the Adsorber Engine.

2468. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

- 862 -

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON WEST VIRGINIA LAW)

2469. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2470. Plaintiffs bring this Count on behalf of the West Virginia Subclass.

2471. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2472. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission

- 863 -

vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2473. The Defendants knew these representations were false when made.

2474. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2475. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2476. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles.

The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2477. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2478. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

- 865 -

2479. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2480. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2481. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the

- 866 -

Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or

- 867 -

leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2482. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

2483. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2484. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

2485. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2486. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to

- 869 -

purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2487. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2488. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

YY.  **Claims Brought on Behalf of the Wisconsin Subclass**

## COUNT I

### VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (WIS. STAT. § 110.18)

2489. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2490. Plaintiffs bring this claim on behalf of the Wisconsin Subclass.

2491. Each of the Defendants is a "person, firm, corporation or association" within the meaning of WIS. STAT. § 100.18(1).

- 870 -

2492. Plaintiffs and Wisconsin Subclass members are members of "the public" within the meaning of WIS. STAT. § 100.18(1). Plaintiffs and Wisconsin Subclass members purchased or leased one or more Polluting Vehicles.

2493. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading." WIS. STAT. § 100.18(1). In the course of Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, Defendants engaged in deceptive business practices prohibited by the Wisconsin DTPA.

2494. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting

Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Polluting Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

2495. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2496. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the

- 872 -

Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2497. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2498. The Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

2499. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2500. The Defendants knew or should have known that their conduct violated the Wisconsin DTPA.

2501. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

a.    Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

- 873 -

c.       Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2502. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2503. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2504. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their

- 874 -

Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

2505. The Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. The Defendants' unlawful acts and practices complained of herein affect the public interest.

2506. Plaintiffs and the Wisconsin Subclass are entitled to damages and other relief provided for under WIS. STAT. § 100.18(11)(b)(2). Because the Defendants' conduct was committed knowingly and/or intentionally, Plaintiff and the Wisconsin Subclass are entitled to treble damages.

2507. Plaintiffs and the Wisconsin Subclass also seek court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

## COUNT II

### BREACH OF CONTRACT
### (BASED ON WISCONSIN LAW)

2508. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2509. Plaintiffs bring this Count on behalf of the Wisconsin Subclass members.

2510. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx

- 875 -

reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Adsorber Engine and which were not marketed as including such a system. Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2511. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, thus rendering each Polluting Vehicle less valuable, than vehicles not equipped with the Adsorber Engine.

2512. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial,

which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON WISCONSIN LAW)

2513. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2514. Plaintiffs bring this Count on behalf of the Wisconsin Subclass.

2515. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2516. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission

- 877 -

vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2517. The Defendants knew these representations were false when made.

2518. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2519. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2520. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles.

- 878 -

The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2521. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2522. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

- 879 -

2523. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations. Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2524. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2525. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the

- 880 -

Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each country, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or

leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2526. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

2527. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2528. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

010649-11 1032740 V1

2529. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2530. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to

- 883 -

purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2531. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2532. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

ZZ.   **Claims Brought on Behalf of the Wyoming Subclass**

## COUNT I
## VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
### (WYO. STAT. § 40-12-101, *ET SEQ.*)

2533. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2534. The Wyoming Consumer Protection Act ("Wyoming CPA") makes it unlawful for a person, in the course of its business and in connection with a consumer transaction, to knowingly: "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not"; "(v) Represents that merchandise has been supplied in accordance with a previous representation, if it

- 884 -

has not…"; "(viii) Represents that a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies or obligations if the representation is false"; "(x) Advertises merchandise with intent not to sell it as advertised"; or "(xv) Engages in unfair or deceptive acts or practices." WYO. STAT. § 45-12-105. Through the Consolidated Amended Complaint filed on February 21, 2017, Defendants are on notice regarding the allegations under the Wyoming CPA. Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Wyoming class are entitled.

3380. Plaintiffs, the Wyoming Class and Defendants are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i). The Class Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi). Each sale or lease of an Class Vehicle to a Plaintiff or Wyoming Class member was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii). These consumer transactions occurred "in the course of [Volkswagen's] business" under Wyo. Stat. § 40-12- 105(a). Plaintiffs and Wyoming Class members purchased or leased one or more Class Vehicles.

2535. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting

Vehicles emitted far more pollutants than gasoline-powered vehicles, that the
Polluting Vehicles emit far more pollution than a reasonable consumer would
expect in light of the Defendants' advertising campaign, and that the Polluting
Vehicles emitted unlawfully high levels of pollutants, including NOx, as described
above. Accordingly, the Defendants engaged in unlawful trade practices by
employing deception, deceptive acts or practices, fraud, misrepresentations, or
concealment, suppression or omission of any material fact with intent that others
rely upon such concealment, suppression or omission, in connection with the sale
of Polluting Vehicles.

2536. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the
other Subclass members were deceived by the Defendants' failure to disclose the
NOx reduction system in the Polluting Vehicles turns off or is limited during
normal driving conditions, that the emissions controls were defective, and that the
Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as
described above.

2537. Plaintiffs and Subclass members reasonably relied upon the
Defendants' false misrepresentations. They had no way of knowing that the
Defendants' representations were false and gravely misleading. As alleged herein,
the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs

- 886 -

and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2538. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2539. The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

2540. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2541. The Defendants knew or should have known that their conduct violated the Wyoming CPA.

2542. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

    a. Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

    b. Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

- 887 -

      c. Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2543. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2544. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2545. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their

- 888 -

Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

2546. Pursuant to Wyo. Stat. § 40-12-108(a), Plaintiffs and Subclass members seek damages as determined at trial, and any other just and proper relief available under the Wyoming CPA, including but not limited to court costs and reasonable attorneys' fees as provided in Wyo. Stat. § 40-12-108(b).

2547. In the course of the Defendants' business, they willfully failed to disclose and actively concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles emitted far more pollutants than gasoline-powered vehicles, that the Polluting Vehicles emit far more pollution than a reasonable consumer would expect in light of the Defendants' advertising campaign, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above. Accordingly, the Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Polluting Vehicles.

2548. In purchasing or leasing the Polluting Vehicles, Plaintiffs and the other Subclass members were deceived by the Defendants' failure to disclose the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the emissions controls were defective, and that the Polluting Vehicles emitted unlawfully high levels of pollutants, including NOx, as described above.

2549. Plaintiffs and Subclass members reasonably relied upon the Defendants' false misrepresentations. They had no way of knowing that the Defendants' representations were false and gravely misleading. As alleged herein, the Defendants engaged in extremely sophisticated methods of deception. Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own.

2550. The Defendants' actions as set forth above occurred in the conduct of trade or commerce.

2551. The Defendants' deception, fraud, misrepresentation, concealment, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

2552. The Defendants intentionally and knowingly misrepresented material facts regarding the Polluting Vehicles with an intent to mislead Plaintiffs and the Subclass.

2553. The Defendants knew or should have known that their conduct violated the Wyoming CPA.

2554. The Defendants owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendants:

        d.  Possessed exclusive knowledge that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions;

e.     Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

f.     Made incomplete representations that they manipulated the emissions system in the Polluting Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

2555. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass

- 891 -

members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2556. The Defendants' conduct proximately caused injuries to Plaintiffs and the other Subclass members.

2557. Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct in that Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain, and their Polluting Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

2558. Pursuant to Wyo. Stat. § 40-12-108(a), Plaintiffs and Subclass members seek damages as determined at trial, and any other just and proper relief available under the Wyoming CPA, including but not limited to court costs and reasonable attorneys' fees as provided in Wyo. Stat. § 40-12-108(b).

## COUNT II
## FRAUD BY CONCEALMENT

2559. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

2560. This claim is brought on behalf of the Wyoming Subclass.

- 892 -

2561. The Defendants intentionally concealed that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, that the Polluting Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of the Defendants' advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or the Defendants acted with reckless disregard for the truth, and denied Plaintiffs and the other Subclass members information that is highly relevant to their purchasing decision.

2562. The Defendants further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Polluting Vehicles they were selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

2563. The Defendants knew these representations were false when made.

2564. The Polluting Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of the Defendants' advertising campaign, non-

- 893 -

EPA-compliant, and unreliable because the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions.

2565. The Defendants had a duty to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions and that these Polluting Vehicles were defective, employed a "Defeat Device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiffs and the other Subclass members relied on the Defendants' material representations that the Polluting Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

2566. As alleged in this complaint, at all relevant times, the Defendants have held out the Polluting Vehicles to be reduced-emissions, EPA-compliant vehicles. The Defendants disclosed certain details about the diesel engine, but nonetheless, the Defendants intentionally failed to disclose the important facts that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and that the Polluting Vehicles had defective emissions controls, deploy a "Defeat Device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants,

and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

2567. The truth about the defective emissions controls and the Defendants' manipulations of those controls, unlawfully high emissions, the "Defeat Device," and non-compliance with EPA emissions requirements was known only to the Defendants; Plaintiffs and the Subclass members did not know of these facts, and the Defendants actively concealed these facts from Plaintiffs and Subclass members.

2568. Plaintiffs and Subclass members reasonably relied upon the Defendants' deception. They had no way of knowing that the Defendants' representations were false and/or misleading. As consumers, the Plaintiffs and Subclass members did not, and could not, unravel the Defendants' deception on their own. Rather, the Defendants intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Polluting Vehicle emissions.

2569. The Defendants also concealed and suppressed material facts concerning what is evidently the true culture of the Defendants—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in their representations.

- 895 -

Consumers buy diesel cars from the Defendants because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Polluting Vehicles are doing.

2570. The Defendants' false representations were material to consumers, because they concerned the quality of the Polluting Vehicles, because they concerned compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Defendants well knew, their customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

2571. The Defendants had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the Polluting Vehicles because details of the true facts were known and/or accessible only to the Defendants, because the Defendants had exclusive knowledge as to such facts, and because the Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. The Defendants also had a duty to disclose because they made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as *reduced-emissions* diesel cars and as compliant with all laws in each country,

which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, the Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Polluting Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. The Defendants represented to Plaintiffs and Subclass members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

2572. The Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits and to avoid the perception that their vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which

- 897 -

perception would hurt the brand's image and cost the Defendants money, and they did so at the expense of Plaintiffs and Subclass members.

2573. The Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the Polluting Vehicles.

2574. Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by the Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. The Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

2575. Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of the Defendants' concealment of the true quality and quantity of those vehicles' emissions and the Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of the Defendants' vehicles, and the serious

issues engendered by the Defendants' corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Polluting Vehicles, and the Defendants' disregard for the truth and compliance with applicable federal and state law and regulations, Plaintiffs and Subclass members who purchased or leased new or certified previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

2576. The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of the Defendants' fraudulent concealment of the defective emissions controls of the Polluting Vehicles, the unlawfully high emissions of the Polluting Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished the Defendants' brand name attached to Plaintiffs' and Subclass members' vehicles and made any reasonable consumer reluctant to purchase any of the Polluting Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

2577. Accordingly, the Defendants are liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

2578. The Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that the Defendants made to

them, in order to enrich the Defendants. The Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV
## BREACH OF CONTRACT
## (BASED ON WYOMING LAW)

2579. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

2580. Plaintiffs bring this Count on behalf of new vehicle or certified pre-owned vehicle purchasers in the Wyoming Subclass.

2581. The Defendants' misrepresentations and omissions alleged herein, including, but not limited to, the Defendants' failure to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions caused Plaintiffs and the other Subclass members to make their purchases or leases of their Polluting Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Subclass members would not have purchased or leased these Polluting Vehicles, would not have purchased or leased these Polluting Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defective Adsorber Engine and which were not marketed as including such a system.

- 900 -

Accordingly, Plaintiffs and the other Subclass members overpaid for their Polluting Vehicles and did not receive the benefit of their bargain.

2582. Each and every sale or lease of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee. FCA breached these contracts by, among other things, selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Adsorber Engine.

2583. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Subclasses, respectfully request that the Court enter judgment in their favor and against the Defendants, as follows:

A.      Certification of the proposed Nationwide Class and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

- 901 -

B.      Restitution, including at the election of Class members, recovery of the purchase price of their Polluting Vehicles, or the overpayment or diminution in value of their Polluting Vehicles;

C.      Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under certain consumer protection statutes, as stated above, shall be limited prior to completion of the applicable notice requirements;

D.      An order requiring the Defendants to pay both pre- and post-judgment interest on any amounts awarded;

E.      An award of costs and attorneys' fees; and

F.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.


Dated: May 14, 2018                      Respectfully submitted,

                                         HAGENS BERMAN SOBOL SHAPIRO LLP

                                         By: */s/ Steve W. Berman*
                                              Steve W. Berman
                                         Jerrod C. Patterson
                                         1918 Eighth Avenue, Suite 3300
                                         Seattle, WA 98101
                                         Telephone: (206) 623-7292
                                         Facsimile: (206) 623-0594
                                         Email: steve@hbsslaw.com
                                         Email: jerrodp@hbsslaw.com

- 902 -

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM PC
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
Email: epm@millerlawpc.com
Email: ssa@millerlawpc.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
Email: cseeger@seegerweiss.com

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: JCecchi@carellabyrne.com

Paul J. Geller
Mark J. Dearman
Stuart A. Davidson
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364
Email: pgeller@rgrdlaw.com
Email: mdearman@rgrdlaw.com
Email: sdavidson@rgrdlaw.com

Jerry E. Martin
David W. Garrison
Seth M. Hyatt
BARRETT JOHNSTON MARTIN
& GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37214
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
Email: jmartin@barrettjohnston.com
Email: dgarrison@barrettjohnston.com
Email: shyatt@barrettjohnston.com

*Attorneys for Plaintiffs and the
Proposed Class*

010649-11 1032740 V1

# CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

HAGENS BERMAN SOBOL SHAPIRO LLP

*/s/ Steve W. Berman*
Steve W. Berman