UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JAMES BLEDSOE**, et al., individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br><br>     vs.<br><br><br>**FCA US LLC**, a Delaware corporation, and **CUMMINS INC.**, an Indiana corporation,<br><br>          Defendants. | **4:16-CV-14024-TGB-RSW**<br><br><br><br>**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>**(ECF NOS. 218, 221, 263)** |

This case is filed as a putative class action by Plaintiffs James Bledsoe, Paul Chouffet, Michael Erben, James Forshaw, Marc Ganz, Donavan Kerber, Jeremy Perdue, Dawn Roberts, Marty Ward, and Martin Witberg ("Plaintiffs") on behalf of a nationwide class of consumers who purchased Dodge Ram 2500 and 3500 diesel trucks ("the Trucks") manufactured and sold by Defendants FCA US LLC ("FCA") and Cummins Inc. ("Cummins") between 2007 and 2012. Plaintiffs allege that the Trucks they purchased emit nitrogen oxide ("NOx") at levels that exceed federal and state emissions standards as well as the expectations of reasonable consumers. Plaintiffs allege that they purchased their Trucks based on Defendants' advertising that touted the Trucks as more

1

fuel efficient and environmentally friendly than other diesel trucks. Plaintiffs allege that despite marketing the Trucks as having "clean diesel engines," Defendants knew the Trucks discharged emissions at levels greater than what a reasonable consumer would expect based on the alleged representations.

Defendants have moved for summary judgment on all claims. Defendants argue that Plaintiffs lack Article III standing, the Clean Air Act ("CAA") preempts Plaintiffs' claims, Plaintiffs lack standing to bring Racketeer Influenced and Corrupt Organizations Act ("RICO Act") claims, and Plaintiffs' state law claims fail for various reasons. Defendant Cummins's Motion for Summary Judgment, ECF No. 218; Defendant FCA's Motion for Summary Judgment, ECF No. 221. Defendant FCA has also moved for summary judgment on the claims of Plaintiff Donovan Kerber, a potential class representative who was added to the case in July 2022. Defendant FCA's Motion for Summary Judgment on Claims of Plaintiff Donovan Kerber, ECF No. 263. Per the Court's Case Management Order, the Court addresses summary judgment before class certification. ECF No. 249, PageID.34864. For the reasons explained below, Defendants' motions for summary judgment are **DENIED in part** and **GRANTED in part**.

# TABLE OF CONTENTS

I.    BACKGROUND ....................................................................5

II.   LEGAL STANDARD ............................................................9

III.  DISCUSSION ....................................................................10

  A. Defendants Cummins and FCA ..........................................11

  B. Plaintiffs and the Putative Class ......................................16

    1.  James Bledsoe .............................................................17

    2.  Paul Chouffet ..............................................................18

    3.  Marc Ganz ...................................................................18

    4.  Jeremy Perdue .............................................................19

    5.  Dawn Roberts ..............................................................20

    6.  Michael Erben ..............................................................21

    7.  James Forshaw .............................................................21

    8.  Marty Ward ..................................................................22

    9.  Martin Witberg .............................................................23

    10. Donovan Kerber ............................................................23

  C. Plaintiffs' Experts Juston Smithers and Edward Stockton ...........26

    1.  Smithers' Technical Opinions ...........................................26

      a.  Excessive Active Regeneration as an Excessive Emissions
          Device ("EED") ..........................................................26

      b.  Smithers' Inadmissible Opinions on Defeat Devices and
          Cummins' Alleged Fraud on the Regulators ...............................29

    2.  Stockton's Damages Opinions ...........................................31

  D. General Principles of Article III Standing ..................................32

  E. Plaintiffs Have Sufficiently Demonstrated Injury-in-Fact and
     Causation ...................................................................34

    1.  Plaintiffs' Alleged Overpayments Confer Standing Because They
        Are Injuries-in-Fact ...................................................35

2.   Plaintiffs Demonstrate Causation Because Their Alleged Injuries Are Fairly Traceable to Defendants' Conduct....................................37

F.  Plaintiffs Lack RICO Standing as Indirect Purchasers.................41

G. Plaintiffs' Claims Are Not Preempted by the Clean Air Act..........44

H. State Law Consumer Protection, Fraudulent Concealment, and Breach of Contract Claims................................................................46

1.   Fraud-Related Claims Generally....................................................47

2.   Breach of Contract Claims.............................................................50

I.   State-by-State Discussion of Plaintiffs' Individual State Law Claims 51

1.   Michigan State Law Claims...........................................................51

a. Michigan Fraudulent Concealment Claim................................53

2.   Illinois State Law Claims ..............................................................54

a. Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") Claim......................................................................54

b. Illinois Fraudulent Concealment Claim ...................................57

c. Illinois Breach of Contract Claim ............................................60

3.   Idaho State Law Claims .................................................................63

d. Idaho Consumer Protection Act ("ICPA") Claim.......................63

e. Idaho Fraudulent Concealment Claims.....................................64

4.   California State Law Claims ..........................................................65

a. California Unfair Competition Law ("UCL"), Consumer Legal Remedies Act ("CLRA"), False Advertising Law ("FAL"), and Fraudulent Concealment Claims ..................................................66

i.  Bledsoe's UCL, CLRA, FAL, and Fraudulent Concealment Claims Against Cummins ........................................................69

ii. Kerber's UCL, CLRA, FAL, and Fraudulent Concealment Claims Against FCA................................................................71

b. Kerber's MMWA Claim.............................................................76

c.  Kerber's California Breach of Contract Claim Against FCA ..... 77

5.  South Carolina Law Claims ........................................ 77

6.  New Mexico Law Claims .......................................... 78

a.  Whether Plaintiff Ward's New Mexico Unfair Trade Practices Act ("NMUTPA") Claim is Time-Barred ...................................... 79

b.  Duty to Disclose Under the NMUTPA ...................................... 81

c.  New Mexico Economic Loss Rule ............................................... 82

d.  New Mexico Breach of Contract Claim ...................................... 83

7.  North Carolina State Law Claims ................................................. 84

a.  North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") and Fraudulent Concealment Claims .................. 85

b.  North Carolina Breach of Contract Claim .................................. 88

8.  Texas State Law Claims ................................................................ 89

a.  Texas Deceptive Trade Practices Act ("DTPA") and Fraudulent Concealment Claims ...................................................................... 89

J.  Standing Issues Related to State Law Claims Lacking a Corresponding Potential Class Representative ............................. 93

IV.  CONCLUSION .................................................................................. 95

# I.   BACKGROUND

Plaintiffs seek to bring a nationwide class action, with sub-classes in all 50 states and the District of Columbia. They allege that Defendant FCA's 2007–2012 Dodge Ram 2500 and 3500 Trucks, equipped with 6.7-liter Turbo Diesel engines manufactured by Defendant Cummins, emit nitrogen oxide ("NOx") in real-world driving at levels that exceed federal and state emissions standards as well as the expectations of reasonable consumers.

Plaintiffs allege that they purchased their Trucks based on Defendants advertising the Trucks as more fuel efficient and environmentally friendly than other diesel trucks. Plaintiffs specifically claim that Defendants knew the Trucks discharged emissions in real-world driving at levels greater than what a reasonable consumer would expect, but continued to market them as using "clean diesel" technology. In Plaintiffs' operative Third Consolidated and Amended Class Action Complaint ("TCAC"), they allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Magnuson Moss Warranty Act ("MMWA"), and consumer protection, breach of contract, and fraudulent concealment laws of 50 states as well as the District of Columbia. ECF No. 255.

Defendants previously moved to dismiss Plaintiffs' Second Consolidated and Amended Class Action Complaint ("SCAC"). ECF Nos. 67, 68. This Court granted Defendants' motions on Plaintiffs' MMWA claim, but denied them for all other claims. ECF No. 97. Later, Defendant FCA moved for judgment on the pleadings on the SCAC as to Plaintiffs Bledsoe, Erben, Forshaw, Witberg, and Chouffet. ECF No. 171. The Court granted FCA's motion as to those five Plaintiffs, and with respect to FCA only. ECF No. 215. Because the five Plaintiffs had been proposed as potential class representatives for state law claims in California, Idaho, South Carolina, Michigan, and Texas respectively, Plaintiffs sought leave to amend their complaint to retain viable claims against

6

FCA. ECF No. 238. The Court granted leave for Plaintiffs to amend the complaint against FCA only, limited to adding new Plaintiffs advancing the same state law claims and theories of liability against FCA as those who were dismissed. ECF No. 249.

Plaintiffs then filed a Third Consolidated and Amended Complaint ("TCAC") for that purpose. As it stands now, Plaintiffs, with the potential to serve as class representatives advancing state law claims against Defendants, are residents of the following states: California, Illinois, Montana, New Mexico, North Carolina, South Carolina, Tennessee, and Texas. ECF No. 255. In addition, Plaintiff Erben, a Montana resident, bought his Truck in Idaho. Plaintiff Witberg, a Tennessee resident, bought his Truck in Michigan.

To prove their claims, Plaintiffs offer expert opinions and reports from Juston Smithers and Edward Stockton. Smithers' opinions address two primary issues: (1) whether the Trucks contain "defeat devices" or "excessive emissions devices" that cause NOx emissions beyond regulatory standards in common real-world driving conditions; and (2) whether the Trucks' designs cause excessive fuel consumption.

Stockton's opinions address two damages models: (1) an "Overpayment" model, calculating the amount at the point of sale that putative class members overpaid for the Trucks that emit excessive NOx; (2) and an "Excess Fuel Consumption" model, calculating the increased costs passed along to the consumer through the Trucks' excessive fuel

consumption. These two damage models are premised on Plaintiffs' ability to prove the existence of excessive emissions devices or defeat devices as described by Smithers.

Defendants previously filed five *Daubert* motions seeking to exclude Smithers' and Stockton's opinions. The Court mostly denied these motions, except with respect to Smithers' and Stockton's opinions as to defeat devices only. *Daubert* Order, ECF No. 262. Specifically, the Court excluded Smithers' opinions on the presence of a defeat device in the Trucks because his fraud-on-the-regulators theory lacked a sufficient factual basis. *Id.* at PageID.36971–72. Consequently, the Court also excluded Stockton's opinions to the extent that they rely upon Smithers' defeat device opinions. *Id.* at PageID.36982–83.

As such, for summary judgment purposes, Plaintiffs are permitted to rely on Smithers' and Stockton's opinions in accordance with the Court's *Daubert* Order. And for the same reasons that Smithers' opinions are admissible in the *Daubert* Order, those opinions establish genuine disputes of material fact as to pertinent issues that preclude a grant of summary judgment. But because the Court has excluded Smithers' opinions on defeat devices, Plaintiffs cannot rely on Smithers' opinions on the existence of a defeat device to create a genuine dispute of material fact. Therefore, summary judgment is warranted for any claims premised on Smithers' inadmissible defeat device theories.

8

Pending before the Court are the following motions filed by Defendants. These motions have been fully and extensively briefed by all parties:

1. Defendant Cummins Inc.'s motion for summary judgment (ECF No. 218), with related briefing at ECF Nos. 241, 247, 248, 250, 257; and

2. Defendant FCA US LLC's motions for summary judgment (ECF Nos. 221, 263), with related briefing at ECF Nos. 241, 247, 251, 252, 257, 264, 266.

The Court held a hearing on these motions on February 17, 2023. As described below, the Court **GRANTS in part** and **DENIES in part** Defendant Cummins' motion for summary judgment (ECF No. 218), and **GRANTS in part** and **DENIES in part** Defendant FCA's motions for summary judgment (ECF Nos. 221, 263).

## II.   LEGAL STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## III.   DISCUSSION

Defendants have moved for summary judgment on all of Plaintiffs' claims. Defendants argue that Plaintiffs lack Article III standing,

Plaintiffs' claims are preempted by the Clean Air Act ("CAA"), Plaintiffs lack standing to bring federal RICO claims, and Plaintiffs' claims fail as a matter of law under the laws of several states. As necessary context before substantively addressing the merits of Defendants' arguments, the Court summarizes key factual issues and Plaintiffs' expert opinions.

## A. Defendants Cummins and FCA

It is undisputed that Plaintiffs did not purchase their Trucks directly from either Cummins or FCA. ECF No. 218, PageID.27366; ECF No. 221, PageID.28588; ECF No. 241, PageID.34147. Instead, Plaintiffs purchased their Trucks from dealerships or prior owners. ECF No. 218, PageID.27365–66; ECF No. 241, PageID.34132. Cummins is the component part supplier to FCA that designed and manufactured the 6.7-liter diesel engine installed in the Trucks at issue. ECF No. 218, PageID.27365; ECF No. 241, PageID.34132. FCA ultimately purchased the completed diesel engines from Cummins, and sold the Trucks to individual dealerships. ECF No. 221, PageID.28590.

In designing the Trucks' engine, Cummins calibrated the engines to control when and how often the process called active regeneration would occur. ECF No. 218, PageID.27367–69. Active regeneration refers to a periodic change in engine conditions where an emissions control device called the diesel particulate filter ("DPF") removes accumulated particulate matter. In general, active regeneration requires additional fuel consumption and causes higher NOx emissions. Therefore, the more

frequently that the Trucks undergo active regeneration, the more fuel they will consume and the more NOx they will emit. Cummins did not share its actual calibrations on active regeneration with FCA because they were Cummins' intellectual property. ECF No. 221, PageID.28589; ECF No. 241, PageID.34147.

Moreover, before Defendants could offer the Trucks for commercial sale, Cummins[1] was tasked with obtaining certification from federal and state environmental regulators ("the Regulators"). ECF No. 218, PageID.27366–67; ECF No. 241, PageID.34133. These Regulators, including the U.S. Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB"), had to ensure that the Trucks met the pertinent emissions standards by conducting emissions testing and reviewing Cummins' methodology for calculating emissions rates. *Id.*

Cummins contends that it did not make any representations to FCA, the Regulators, or Plaintiffs that directly addressed the Trucks' expected fuel economy performance. ECF No. 218, PageID.27378 (citing Fathauer Decl., ECF No. 218-23, PageID.27572, ¶¶ 10–11). Neither the EPA nor CARB required the Trucks to meet any fuel economy standard. ECF No. 241, PageID.34140; *see also* 49 U.S.C. § 32908(a)(1) (fuel

---

[1] Although Cummins was the sole "certificate holder" responsible for obtaining the Trucks' emissions certifications, Plaintiffs dispute the extent to which Defendant FCA was involved in the emissions certification process. ECF No. 218, PageID.27366; ECF No. 221, PageID.28589–90; ECF No. 241, PageID.34148.

economy regulations apply only to automobiles with gross vehicle weight less than 8,500 pounds). The Trucks' "Monroney label" (the window sticker on the vehicle containing mandatory pricing information, engine and transmission specifications, and fuel economy ratings) did not include any specific representation as to fuel economy, such as miles per gallon or estimated annual fuel cost. ECF No. 218-70, PageID.28180–81.

Although Cummins was tasked with designing and producing the engines, FCA consistently provided input on engine design and production issues. FCA engineer Steve Anderson testified that he was responsible for the release of an engine into a vehicle, and that he "oversaw the Cummins [diesel] program" and made sure that the engine met FCA's requirements. Anderson Dep. (July 22, 2021), ECF No. 241-2, PageID.34219. FCA assembled its own teams of engineers to collaborate with Cummins on the engine, specifically an "engine systems organization that was responsible for the release of the aftertreatment components." *Id.* at PageID.34228–30.

FCA also participated in regular liaison meetings with Cummins to discuss ongoing engine development issues. *See, e.g.*, ECF No. 241-4, PageID.3274–76 (email to Cummins and FCA employees, including Anderson, regarding "Task Force" meeting to discuss engine issues); ECF No. 241-2, PageID.34241, PageID.34243 (explaining that Anderson regularly attended "product assurance team" meetings between FCA and Cummins to resolve engine issues). In its collaboration with Cummins,

13

FCA assisted Cummins to correct quality concerns during the engine design process, including O2 sensors, exhaust gas recirculation temperature sensors, valves, and soot generation. *See* ECF No. 241-2, PageID.34245–46.

In addition to regular meetings, FCA and Cummins used a "Change Notice" process. The Change Notice process required Cummins to seek FCA's approval before making any changes to the Trucks' software calibration. Altermatt Dep. (July 21, 2022), ECF No. 241-10, PageID.34617–19. But before FCA approved any proposed changes, FCA and Cummins generally discussed "root cause, the actual change, [and] when [the change] would be implemented." *Id.* at PageID.34620.

To market the Trucks, a 2012 brochure published by FCA[2] touts the Dodge Ram 3500 Chassis Cabs equipped with "6.7L Cummins Diesel" engines as "smarter" with "best-in-class rear fuel tank size and excellent fuel efficiency for exceptional range," and the ability to "decrease fuel consumption." ECF No. 241-17, PageID.34694. FCA also described the

---

[2] At oral argument, FCA's counsel emphasized that FCA cannot be held liable for any alleged misrepresentations made before FCA became a legal entity in April 2009. Feb. 17, 2023 Hearing Transcript, pp.31–32. While FCA did not raise this point in its summary judgment briefing, the Court noted in its Order on FCA's motion for judgment on the pleadings that Trucks purchased before FCA's existence "could not have been purchased upon the reliance of alleged false statements proffered by FCA." ECF No. 215, PageID.25575. Accordingly, for summary judgment purposes, the Court refers only to statements made by FCA or its putative agents after April 28, 2009. *Id.* at PageID.25552.

Cummins engines as "[c]lean by design," specifically because the Trucks did not require diesel exhaust fluid ("DEF"), "while meeting all 50-state emissions standards—a major difference between [Defendants'] pickups and those offered by Ford and Chevy." *Id.* at PageID.34700.

And before making claims regarding fuel efficiency and fuel economy related to the 2011 Trucks, FCA and Cummins conducted internal research and developed messaging to highlight the Trucks' "best-in-class fuel economy." ECF No. 241-19, PageID.34731–32, PageID.34743–44; *see also* ECF No. 241-18 (Cummins presentation on providing a "Fuel Economy Task Force Update," including data on the Trucks' fuel economy compared to Ford and Chevy trucks). Similarly, FCA explained that the 2011 Trucks were "the industry's only Class 2 and 3 trucks to meet 2011 EPA compliance rules without the need for a Selective Catalytic Reduction (SCR) system and Diesel Exhaust Fluid (DEF)." ECF No. 241-19, PageID.34743. And while acknowledging some "issues" that customers experienced with the Trucks' active regeneration, FCA emphasized that "[t]he Cummins Turbo Diesel engine has an advanced diesel exhaust emissions aftertreatment system which we pulled forward several years ahead of federal requirements," giving "customers a less complicated, lower maintenance," and "less costly" aftertreatment process. *Id.* at PageID.34744.

### B. Plaintiffs and the Putative Class

Plaintiffs Witberg, Bledsoe, Ward, Forshaw, Ganz, and Erben purchased their vehicles from FCA-authorized dealerships, not from FCA or Cummins directly. ECF No. 241, PageID.34162. Plaintiffs concede that they did not rely on any statements or representations by Cummins in purchasing their vehicles. ECF No. 241, PageID.34141. But in general, Plaintiffs considered fuel economy as a factor in their purchasing decisions and had varying expectations for the Trucks' fuel economy performance. *Id.* at PageID.34141–42; ECF No. 218, PageID.27381. While Plaintiff Erben testified that his Truck had "great" fuel economy, other Plaintiffs stated that they received lower fuel economy than they expected. ECF No. 218, PageID.27381; ECF No. 241, PageID.34142. Plaintiffs also had other reasons for purchasing their Trucks that were entirely unrelated to emissions or fuel economy, including aesthetic appeal and towing capacity. ECF No. 241, PageID.34140–41; ECF No. 218, PageID.27379.

On the other hand, Plaintiffs did not testify that they considered emissions performance to be a material factor in their purchasing decisions. ECF No. 241, PageID.34141. Even so, Plaintiffs contend that "they have been economically harmed due to their overpayment for vehicles that emit excess emissions and have decreased fuel economy" because they expected "their vehicles' emissions performance to comply with regulatory standards." *Id.* at PageID.34141–42. As Plaintiffs admit,

however, they did not know what type of emissions their Trucks produced or what NOx was. ECF No. 241, PageID.34142. And even Plaintiffs who expected to have a "clean diesel" engine did not have a specific understanding of what "clean diesel" meant. *Id.*; ECF No. 218, PageID.27380–81. Moreover, some Plaintiffs testified that they were satisfied overall with their Trucks, which met their expectations for towing capacity and drivability. ECF No. 241, PageID.34142; ECF No. 218, PageID.27382.

### 1. James Bledsoe

Plaintiff James Bledsoe purchased a new 2007 Ram 2500 Truck from an FCA-authorized dealership in California on September 7, 2007. Bledsoe Fact Sheet (July 2, 2021), ECF No. 183-44, PageID.21297; ECF No. 241, PageID.34162. Bledsoe testified that he is generally satisfied with the Truck, but also noted that the Truck did not meet his expectations for fuel mileage. ECF No. 218, PageID.27382; ECF No. 241, PageID.34142.

Bledsoe's claims against FCA were previously dismissed, but his claims against Cummins remain. ECF No. 215. Bledsoe admits that he did not rely on any representations by Cummins in purchasing the Truck and cannot identify any statements by Cummins on the Truck's fuel economy. ECF No. 218, PageID.27381; ECF No. 241, PageID.34142. Instead, Bledsoe's expectations for fuel economy were formed by discussions "with friends who owned similar vehicles." *Id.*

### 2. Paul Chouffet

Plaintiff Paul Chouffet purchased a new 2009 Ram 2500 Truck from an FCA-authorized dealership in Texas in 2009. Chouffet Fact Sheet (July 2, 2021), ECF No. 175-44, PageID.19662; Chouffet Dep. (June 30, 2021), ECF No. 239-13, PageID.33403; ECF No. 241, PageID.34162. Chouffet testified that he considered hauling ability and fuel economy in purchasing his Truck. ECF No. 239-13, PageID.33405. Chouffet admits that he did not research the Truck's "emissions controls" before purchasing, but claims that the Truck was not working properly as he noticed he was not "getting the right [gas mileage]." *Id.* at PageID.33406.

Chouffet's claims against FCA were previously dismissed, but his claims against Cummins remain. ECF No. 215. Chouffet admits that he did not rely on any representations by Cummins in purchasing the Truck and cannot identify any statements by Cummins on the Truck's fuel economy. ECF No. 218, PageID.27381; ECF No. 241, PageID.34142.

### 3. Marc Ganz

Plaintiff Marc Ganz purchased a new 2012 Ram 3500 Truck from an FCA-authorized dealership in Illinois in July 2013 for his business and personal use. ECF No. 241, PageID.34145. Since purchasing his Truck in 2013, Ganz has driven it for over 140,000 miles and believes it to be in good condition. *Id.*; ECF No. 221, PageID.28586.

Ganz admits that he did not recall seeing any advertisement about "clean diesel" specific to the Trucks prior to purchase. ECF No. 241,

PageID.34144. Similarly, the Monroney label on Ganz's Truck did not reference emissions or "clean diesel." *Id.* But Ganz claims that in researching the Trucks, he found advertisements highlighting the Trucks' "clean emissions" as "better than the competition," even though he did not know what type of emissions his Truck produces. *Id.* at PageID.34144–45. Ganz also recalls that a salesperson at the FCA-authorized dealership made representations about the Truck's estimated fuel economy. *Id.* at PageID.34145.

### 4. Jeremy Perdue

Plaintiff Jeremy Perdue purchased a used 2009 Dodge Ram 2500 Truck from a Chevrolet dealership in North Carolina in July 2014 for business and personal use. *Id.* Perdue concedes that he did not rely on advertisements about the Truck, nor did he research the Truck's emissions prior to purchase. *Id.* But Perdue claims that he investigated the Truck and its fuel economy before buying. *Id.* Perdue did not know what type of emissions his Truck produces and did not know whether vehicles emit NOx. *Id.*; ECF No. 221, PageID.28586.

Perdue does not track his Truck's fuel mileage and does not have an opinion on whether the fuel economy is better or worse than he expected. ECF No. 241, PageID.34145–46. Perdue has driven his Truck for over 323,000 miles and believes that it "drives well." *Id.* at PageID.34146; ECF No. 221, PageID.28587. In 2018, Perdue removed his Truck's diesel particulate filter ("DPF") and replaced it with a DPF

exhaust pipe kit and DPF delete kit. *Id.* Perdue does not dispute Cummins' contention that installing a DPF exhaust pipe kit and DPF delete kit "illegal[ly]" disables the Truck's emissions aftertreatment system and "result[s] in dramatically higher emissions." ECF No. 218, PageID.27380; ECF No. 241, PageID.34141.

### 5. Dawn Roberts

Plaintiff Dawn Roberts purchased a new 2012 Ram 2500 Truck from a dealership in Illinois. ECF No. 221, PageID.28587; ECF No. 241, PageID.34146. Roberts claims that she "anticipated the truck was 'clean burning' as was advertised to her when she purchased the truck." ECF No. 241, PageID.34183. Even so, Roberts admits that emissions was not "one of the key factors" in Roberts' purchase decision. ECF No. 221, PageID.28587; PageID.31346. Relatedly, Roberts did not have any expectations about the Truck's emissions, and she did not purchase her Truck based on it having a "clean diesel system." *Id.* Instead, Roberts was motivated to purchase the Truck because of its towing capabilities, the size of the backseat, and its "pretty" appearance. *Id.*

When she bought the Truck, Roberts did not know what type of emissions the Truck produces and was not familiar with NOx emissions. *Id.* Until early 2019 when the Truck's circuit board shorted out, Roberts had no problems with the Truck's engine. *Id.* Although Roberts traded in her inoperable Truck for a newer Dodge Ram truck, Roberts stated that she felt "financially stuck" in making the trade-in decision. *Id.*

20

### 6. Michael Erben

Plaintiff Michael Erben purchased a new 2008 Ram 2500 Truck from an FCA-authorized dealership in Idaho in 2008. Erben Fact Sheet (July 2, 2021), ECF No. 175-44, PageID.19664; ECF No. 241, PageID.34162. Erben testified that he considered the price of the vehicle, his affinity for the Dodge brand, and "fuel mileage" to be "important factors" in purchasing his Truck. Erben Dep. (July 2, 2021), ECF No. 239-14, PageID.33413–14. Erben also recalled that his expectations of fuel mileage came from a sticker on the window of the Truck and from talking to a dealership salesperson about the Truck. *Id.* at PageID.33414. Erben admits that he did not have any specific expectations about the Truck's emissions. ECF No. 218, PageID.27380.

Erben's claims against FCA were previously dismissed, but his claims against Cummins remain. ECF No. 215. Erben admits that he did not rely on any representations by Cummins in purchasing the Truck and cannot identify any statements by Cummins on the Truck's fuel economy. ECF No. 218, PageID.27381; ECF No. 241, PageID.34142.

### 7. James Forshaw

Plaintiff James Forshaw is a resident of South Carolina. Forshaw Fact Sheet (July 2, 2021), ECF No. 175-44, PageID.19668. Forshaw purchased a new 2007 Ram 3500 Truck from an FCA-authorized dealership based in North Carolina on September 24, 2007. *Id.* at PageID.19670; ECF No. 241, PageID.34162. Forshaw testified that he

21

officially purchased the Truck from a dealership salesperson in South Carolina after test driving the Truck. Forshaw Dep. (June 25, 2021), ECF No. 239-15, PageID.33424–25. The salesperson told Forshaw that the Truck would be "perfect" for towing his boat, and Forshaw noted that he was "impressed" by the fact that the Truck did not have a "diesel exhaust smell" when he test drove it. *Id.* at PageID.33423, PageID.33425.

Forshaw's claims against FCA were previously dismissed, but his claims against Cummins remain. ECF No. 215. Forshaw admits that he did not rely on any representations by Cummins in purchasing the Truck and cannot identify any statements by Cummins on the Truck's fuel economy. ECF No. 218, PageID.27381; ECF No. 241, PageID.34142.

### 8. Marty Ward

Plaintiff Marty Ward purchased a new 2012 Ram 3500 Truck from an FCA-authorized dealership in New Mexico on March 31, 2012. ECF No. 221, PageID.28588; ECF No. 241, PageID.34146. Before buying the Truck, Ward reviewed the Dodge website and brochures, but did not recall seeing any representations about the Truck's emissions or fuel mileage. ECF No. 221, PageID.28588; ECF No. 241, PageID.34147. However, Ward spoke with a dealership salesperson about the Truck's fuel economy and emissions. *Id.* Specifically, the salesperson informed Ward that the Truck was a "clean emissions truck," which Ward interpreted to mean that the Truck "met the EPA guidelines that was required without using DEF [diesel exhaust fluid]." *Id.*

### 9. Martin Witberg

Plaintiff Martin Witberg is a resident of Tennessee. Witberg Fact Sheet (July 2, 2021), ECF No. 175-44, PageID.19688. Witberg purchased a new Ram 2500 Truck from an FCA-authorized dealership in Michigan in 2008. *Id.* at PageID.19689; Witberg Dep. (June 8, 2021), ECF No. 239-9, PageID.33363.

Witberg testified that he recalled hearing or reading representations that the Trucks used "more advanced" technology to reduce their environmental impact, and believed that the Truck he purchased was the most environmentally friendly truck available at the time he bought it. ECF No. 239-9, PageID.33365–67. Witberg also explained that he purchased a diesel truck specifically because he was concerned about "fuel economy[,] number one, torque[,] and towing." *Id.* at PageID.33367.

Witberg's claims against FCA were previously dismissed, but his claims against Cummins remain. ECF No. 215. Witberg admits that he did not rely on any representations by Cummins in purchasing the Truck and cannot identify any statements by Cummins on the Truck's fuel economy. ECF No. 218, PageID.27381; ECF No. 241, PageID.34142.

### 10. Donovan Kerber

Plaintiff Donovan Kerber was added to this case on July 20, 2022, when Plaintiffs filed their Third Amended Class Action Complaint ("TCAC"). The Court granted Plaintiffs' request for leave to file their

TCAC to add new named plaintiffs with claims against FCA only under the laws of California, Idaho, South Carolina, Michigan, and Texas. Case Management Order, ECF No. 249, PageID.34862–63. While the Court permitted Plaintiffs to add multiple new plaintiffs through the TCAC, Plaintiffs added only Kerber as a potential class representative for putative class members in California. ECF No. 255.

Over three years after this lawsuit was initially filed, on June 12, 2020, Kerber purchased a then eight-year-old used 2012 Ram 2500 Truck from a dealership in California. ECF No. 263, PageID.37017; ECF No. 264, PageID.37614. Kerber's Truck had approximately 111,000 miles on it when purchased, and it was not covered by any FCA warranty. ECF No. 263, PageID.37017–18; ECF No. 264, PageID.37614. Kerber never communicated with FCA regarding the Truck prior to or after purchasing it. ECF No. 263, PageID.37018; ECF No. 264, PageID.37614. Kerber admits that he has not seen any contract between FCA and the dealership where he purchased his Truck, and he is not aware of whether any such contract exists. ECF No. 263, PageID.37020; ECF No. 264, PageID.37616.

Although Kerber conducted "some research" on the Truck and reviewed "three or four Internet forums with discussions of Ram diesel trucks," he claims that "his searches did not reveal the existence of this lawsuit or the defects identified in the lawsuit." ECF No. 264, PageID.37614. Kerber does not know what type of emissions his Truck

produces and was unaware of the state and federal regulatory emissions requirements. ECF No. 263, PageID.37019; ECF No. 264, PageID.37616.

Kerber concedes that he did not see or rely upon any advertisement, brochure, or Monroney label from FCA in purchasing his Truck. ECF No. 263, PageID.37018; ECF No. 264, PageID.37614. In addition, Kerber does not recall encountering or relying on any statements about the Trucks' "clean diesel" or emissions in purchasing his Truck. *Id.* Before purchasing, Kerber contends that he read about the Truck's fuel economy on third-party websites and briefly discussed the Truck's emissions with a dealership salesperson. ECF No. 264, PageID.37615–16. Specifically, Kerber recalled that the salesperson told him the Truck would run at 16 or 17 miles per gallon on the freeway. ECF No. 263, PageID.37109.

FCA did not make any representations directly to Kerber about the Truck's fuel economy. ECF No. 264, PageID.37616. Kerber also did not receive any published fuel economy estimates from the dealership. *Id.*; ECF No. 263, PageID.37019. And Kerber could not recall whether there were EPA-promulgated fuel estimates for his Truck at the time he purchased it. *Id.*

Since purchasing his Truck, Kerber has not kept written records of his fuel mileage, but uses his Truck's trip meter and fuel mileage readouts to assess fuel economy. ECF No. 264, PageID.37616. After driving his Truck for over 23,000 miles, Kerber believes that his Truck is in overall good condition. *Id.*; ECF No. 263, PageID.37020. Kerber has

complained that the Truck requires additional fuel to complete "regeneration cycles to clean the diesel particulate filter," but admits that the Truck's owner's manual described this regeneration process. ECF No. 263, PageID.37020–21; ECF No. 264, PageID.37617.

## C. Plaintiffs' Experts Juston Smithers and Edward Stockton

Plaintiffs' claims are supported by expert opinions and reports from two experts, Juston Smithers and Edward Stockton. As discussed in detail in this Court's *Daubert* Order (ECF No. 262), Smithers provides technical opinions on how the Trucks' components and operations purportedly increased NOx emissions in real-world settings. Stockton is Plaintiffs' damages expert. Stockton provides two primary damages models—an Overpayment model and an Excess Fuel Consumption model—to quantify the alleged harm to putative class members in purchasing and driving Trucks that emitted higher levels of NOx than advertised and, as a result, consumed more fuel than buyers anticipated.

### 1. Smithers' Technical Opinions
#### a. Excessive Active Regeneration as an Excessive Emissions Device ("EED")

Smithers opines that the Trucks are equipped with what he calls "excessive emissions devices" ("EEDs"). Smithers' Ram 2500 Class Certification Report (Aug. 16, 2021), ECF No. 184-2, PageID.21577. Smithers uses EED as shorthand for software controls that cause NOx emissions to exceed regulatory test limits. *Id.*

26

Of particular relevance here, Smithers identifies the active regeneration that takes place in the Trucks as an EED. Smithers explains that all modern diesel vehicles, including the Trucks, are equipped with an emission control device called a diesel particulate filter ("DPF") to control emissions of particulate matter (soot). *Id.* at PageID.21577. These DPFs must undergo a periodic change in engine conditions, called active regeneration, to clean and remove the accumulated particulate matter. *Id.*

In addition to consuming significant quantities of fuel, active regeneration causes higher NOx emissions. *Id.* Because these active regeneration events are not accurately captured on a single emissions test cycle, Regulators have developed a concept called Upward Adjustment Factors ("UAFs"), to account for the increases in NOx emissions caused by active regeneration. *Id.* In other words, because active regeneration impacts emissions, its effect must be quantified and factored into the regulatory certification of a vehicle's emissions. *Id.* at PageID.21615. Active regeneration is factored into emissions values as an Infrequent Regeneration Adjustment Factor ("IRAF"). *Id.* IRAFs that increase emissions are referred to as UAFs. *Id.* Therefore, Regulators require calculating the impact of active regeneration on overall NOx emissions by adding UAFs onto a base NOx measurement for vehicle emissions certification. *Id.*

The more often a vehicle must actively regenerate, the higher the UAF value will become, increasing the overall NOx emissions to an extent that may exceed emissions standards. *Id.* Consequently, a vehicle that undergoes excessive active regeneration could fail to achieve certification by the Regulators. *Id.*

Moreover, excessive active regeneration consumes additional fuel. Through his testing, Smithers found that the Trucks' active regeneration caused an average net decrease in fuel economy of 4.1% and 3.7% for city and highway driving, respectively. *Id.* at PageID.21577, PageID.21622–23. Smithers' testing also revealed that for both city and highway driving, the Trucks' actual UAF and NOx emissions in real-world operation are significantly higher than the values reported for the Trucks in Defendants' certification applications to the Regulators. *Id.* at PageID.21577. Therefore, Smithers concludes that the NOx values Defendants provided for certification are a gross misrepresentation of real NOx emissions during normal and expected vehicle operation. *Id.* at PageID.21622. Smithers further opines that consumers would not expect these fuel economy losses, making excess fuel consumption a hidden cost of operating the Trucks. *Id.* at PageID.21624.

Smithers explains that the Trucks' excessive active regeneration, and resulting excessive NOx emissions, is largely due to Cummins' choice to use a NOx adsorber catalyst ("NAC") as the NOx aftertreatment system for the Trucks. ECF No. 184-2, PageID.289001. This technology

28

was not required for the 2007-2009 model years in which it was used, but Cummins deployed it voluntarily in part to generate valuable NOx credits. *Id.* Smithers opines that Cummins cannot validly argue that it was limited by current technology because it attempted to go above and beyond what then-existing regulations required (though, according to Smithers, it ultimately failed by designing a system that produced excessive emissions). *Id.*

Smithers also details results from his testing to identify ambient temperature, higher power/load conditions, and start temperature as other EEDs. ECF No. 221-10, PageID.289001. As with excessive active regeneration, Smithers concludes that Cummins falls short in explaining why these EEDs are necessary. *Id.* In sum, Smithers opinions on EEDs plainly fit into Plaintiffs' allegations and the factual disputes and theories at issue. But as discussed below, Smithers' opinions on defeat devices are inadmissible, and cannot be considered to raise a genuine dispute of material fact for summary judgment purposes.

### b. Smithers' Inadmissible Opinions on Defeat Devices and Cummins' Alleged Fraud on the Regulators

In Smithers' December 16, 2021 Merits Report, Smithers opined that the active regeneration EED identified in his first report is a defeat device. Smithers' Merits Report (Dec. 16, 2021), ECF No. 221-10, PageID.28900. Federal regulations define a "defeat device" as "an auxiliary emission control device (AECD) that reduces the effectiveness

of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01. There are two relevant exceptions to this definition: (1) "the need for the AECD is justified in terms of protecting the vehicle against damage or accident" or (2) "such conditions are substantially included in the Federal emission test procedure." *Id.*; *see also* ECF No. 221-10, PageID.28901.

Smithers concluded that the UAFs (the values that account for the NOx-increasing effect of active regeneration) that Cummins presented to Regulators in its certification applications grossly underrepresent the Trucks' real-world emissions. ECF No. 221-10, PageID.28900–01. While Cummins provided the Regulators with UAF values for each of its emission tests, Smithers opined that it misapplied the UAF calculation methodology, thus underestimating the effect on NOx emissions. *Id.* at PageID.28903. Based upon his assumption that Cummins misled the Regulators in the UAF certification process, Smithers explained that Cummins' excessive regeneration feature cannot be considered "substantially covered" by the federal emissions test procedure. *Id.* at PageID.28916. Accordingly, Smithers determined that the Trucks' active regeneration represented by the UAF values was a defeat device producing NOx emissions far above the certified limit without falling under a federally recognized exemption. *Id.*

But as detailed in the Court's *Daubert* Order, Smithers failed to state a reliable basis for his opinion that the Regulators did not fully understand the UAF values that Cummins reported or the methodology used to generate those values. ECF No. 262, PageID.36967–72. Consequently, the Court excluded Smithers' opinions on Cummins' alleged fraud on the Regulators and the existence of a defeat device. As such, Plaintiffs may not rely on Smithers' defeat device and fraud opinions to create a genuine dispute of material fact on their fraud-related claims.

### 2. Stockton's Damages Opinions

In excluding Smithers' opinions on defeat devices, the Court also excluded Stockton's opinions "to the extent that Stockton's opinions are specifically based upon any of the [alleged EEDs theorized by Smithers] being defeat devices under the fraud-on-the-regulators theory." *Id.* at PageID.36986. But Stockton's damages opinions are otherwise admissible to raise genuine disputes of material fact.

Stockton presents two damages models. The Overpayment model measures overpayment at point of sale for the Truck's "clean diesel" system. Stockton Decl. (Aug. 16, 2021), ECF No. 175-3, PageID.19367. The Excess Fuel Consumption model calculates the additional fuel costs Plaintiffs incurred from the Trucks' decreased fuel economy. *Id.*

Stockton's Overpayment model provides an "estimate of economic harm from Overpayment from the EED," and "is predicated on finding that the EED offsets the incremental positive benefit of the premium

emissions feature." Stockton Merits Report (Dec. 16, 2021), ECF No. 217-2, PageID.26525. Moreover, Stockton recognizes that EEDs are "inferior and non-conforming . . . emissions features" that diminish the positive value of the Truck, and notes that "models that quantify overpayment harm attributable to the EED also measure negative impact on vehicle emissions." *Id.* at PageID.26509, PageID.26525.

The Excess Fuel Consumption model "tak[es] into account Excess Fuel Consumption attributable to the EED." *Id.* at PageID.26518. As summarized above, Smithers opines that the Trucks' excessive active regeneration, an EED, causes the Trucks to use more fuel than a reasonable consumer would anticipate. Stockton opines that regardless of consumers' specific expectations on fuel economy, putative class members have paid more for fuel "because of an undisclosed vehicle attribute." ECF No. 197-2, PageID.25042–43.

Plaintiffs have clearly alleged that they overpaid for both the Trucks and fuel based on their lack of awareness that Defendants' product generated higher emissions and, as a result, worse fuel economy. Stockton's damages models are germane to assessing the injury caused by these allegations and are admissible for that purpose.

### D.  General Principles of Article III Standing

Federal courts have limited jurisdiction and may only adjudicate "cases" and "controversies" as permitted by Article III of the Constitution. U.S. Const. art. III, § 2. A plaintiff's "standing implicates the United

States Constitution's Article III case-or-controversy requirement, which must be satisfied for a federal court to hear the case." *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 622 (6th Cir. 2000). Accordingly, courts must resolve questions of subject matter jurisdiction before ruling on the merits of a particular claim. *Gross v. Hougland*, 712 F.2d 1034, 1036 (6th Cir. 1983). Where a plaintiff lacks Article III standing, a court must dismiss the case. *TCG Detroit*, 206 F.3d at 622.

There are three fundamental elements to Article III standing. First, "[t]he plaintiff must have suffered an injury in fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal citations and quotation marks omitted). Second, the plaintiff's injury must be causally connected or "fairly traceable" to the defendant's conduct. *Id.* And third, the plaintiff's injury must be "likely" to be redressed by a favorable judicial decision. *Id.* at 561.

In putative class actions, "Plaintiffs are not absolved of their individual obligation to satisfy the injury element of Article III just because they allege class claims." *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 582 (6th Cir. 2016). "A potential class representative must demonstrate individual standing vis-as-vis [sic] the defendant; he cannot acquire such standing merely by virtue of bringing a class action" on behalf of absent putative class members who experienced cognizable

injuries. *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). Therefore, potential "[c]lass representatives without personal standing cannot predicate standing on injuries suffered by members of the class but which they themselves have not or will not suffer." *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 928 (6th Cir. 2002).

Here, Defendants argue that Plaintiffs claims must be dismissed because they cannot satisfy the injury-in-fact and causation elements of the standing inquiry. ECF No. 218, PageID.27385–93; ECF No. 221, PageID.28594–95. Defendants further argue that Plaintiffs lack standing to bring claims under the laws of the states where they do not reside, on behalf of putative class members in states where Plaintiffs did not purchase a vehicle, and on behalf of putative class members in states where Plaintiffs could not have been injured by Defendants' conduct. ECF No. 218, PageID.27418; ECF No. 221, PageID.28614.

## E. Plaintiffs Have Sufficiently Demonstrated Injury-in-Fact and Causation

Plaintiffs bear the burden of demonstrating each element to establish standing. *Rosen*, 288 F.3d at 930. The proof necessary to meet this burden increases as the case progresses. At summary judgment, Plaintiffs "cannot rely on allegations alone but must set forth evidence demonstrating [their] standing." *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019).

## 1. Plaintiffs' Alleged Overpayments Confer Standing Because They Are Injuries-in-Fact

As noted, an injury in fact must be both "concrete and particularized," and "actual or imminent not conjectural or hypothetical." *Lujan*, 504 U.S. at 560; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). An injury is not "concrete and particularized" unless it "affect[s] the plaintiff in a personal and individual way" and "must actually exist." *Spokeo*, 578 U.S. at 339 (internal citations omitted).

The admissible opinions of Plaintiffs' experts are sufficient to demonstrate that Plaintiffs have suffered injury in fact at the summary judgment stage. Smithers' technical opinions on the Trucks' EEDs, including excessive active regeneration, create a triable issue of whether the Trucks "lacked a feature for which Plaintiffs paid a premium." *Counts v. Gen. Motors, LLC*, No. 16-12541, 2022 WL 2079757, at *5 (E.D. Mich. June 9, 2022). And relatedly, Stockton's Overpayment model posits that Defendants overcharged Plaintiffs for a product that Plaintiffs did not actually receive—specifically, a "clean diesel" Truck without nonconforming, inferior EEDs. In addition, Stockton's Excess Fuel Consumption model estimates the amount of extra fuel costs Plaintiffs unanticipatedly incurred because of the Trucks' undisclosed EEDs.

Defendants make much of the fact that Plaintiffs cannot demonstrate injury based on the existence of a defeat device. ECF No. 218, PageID.27387–88; ECF No. 221, PageID.28956–98. In deciding

Defendants' *Daubert* motions, the Court agreed that Smithers' opinions on the existence of a defeat device were inadequately supported by the factual record. But Plaintiffs have raised a genuine dispute of material fact as to whether the Trucks emitted excessive NOx and consumed excess fuel because of the EEDs. Thus, even if the EEDs fall short of constituting a defeat device, Plaintiffs may still succeed by showing that Defendants "misrepresented the emissions output," and "injured Plaintiffs though a deceptive act or unfair practice." *Counts*, 2022 WL 2079757, at *5; *see also In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1061 (E.D. Mich. 2018) (explaining that "Plaintiffs will not be required to prove that the engine component which is the source of the harm meets the EPA's definition of an illegal defeat device" to succeed on fraudulent concealment and consumer protection claims).

Plaintiffs' alleged injury is also sufficiently particularized. In overpaying for their Trucks, Plaintiffs suffered an injury "particular" to them as individuals. *See Counts*, 2022 WL 2079757, at *5 ("In overpaying for their 2014 or 2015 diesel Cruzes, . . . Plaintiffs suffered an injury 'particular' to them."); *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 694 (E.D. Mich. 2020) ("[A] plaintiff who pays a premium for a product but does not receive the anticipated benefit demonstrates a cognizable injury in fact sufficient to establish Article III standing."); *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 886 (E.D. Mich. 2019) (same); *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1275 (E.D. Mich. 2021) (same).

Therefore, Plaintiffs have standing based on allegations of overpayment that are supported by admissible evidence to establish standing.

### 2. Plaintiffs Demonstrate Causation Because Their Alleged Injuries Are Fairly Traceable to Defendants' Conduct

To establish standing, Plaintiffs must also demonstrate that their alleged injuries were caused by Defendants, such that the injuries are "fairly traceable to [Defendants'] challenged conduct." *Spokeo*, 578 U.S. at 338. Although causation and redressability are often intertwined, *see Lujan*, 504 U.S. 555 at 562, Defendants here do not challenge Plaintiffs' ability to satisfy the redressability element of standing. And in fact, if Plaintiffs prevail, requiring Defendants to compensate them for the overpayments they incurred would remedy Plaintiffs' economic injury. *See Counts*, 2022 WL 2079757, at *6. Instead, Defendants argue that Plaintiffs cannot trace their alleged overpayment injuries to Defendants' conduct.

Plaintiffs' claims under RICO, state law breach of contract, fraudulent concealment, and consumer protection claims rely on substantially similar allegations of Defendants' misconduct. For example, Plaintiffs' RICO claims are premised on demonstrating that Defendants "misrepresent[ed] or conceal[ed] the true nature of the Polluting Vehicles from the public." TCAC, ECF No. 255, PageID.35149, ¶ 310(g).

This alleged misrepresentation or concealment also serves as the challenged conduct for Plaintiffs' state law consumer protection,

deceptive trade practices, and fraudulent concealment claims. *See, e.g.*, *id.* at PageID.35199, ¶ 463 (alleging that Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act by "willfully fail[ing] to disclose and actively conceal[ing] that the NOx reduction system in the Polluting Vehicles . . . is limited during normal driving conditions . . . [and] represent[ed] that Polluting Vehicles have characteristics, uses, benefits, and qualities which they do not have"). The same challenged conduct underlies all of Plaintiffs' state law breach of contract claims. *See, e.g.*, *id.* at PageID.35203–04, ¶ 479 (alleging breach of contract under Illinois law due to Defendants' "misrepresentations and omissions" including Defendants' "failure to disclose the existence of the Adsorber Engine's defect and/or defective design of emissions controls").

Through their experts, Plaintiffs have provided admissible evidence to support their allegations of Defendants' misconduct. As detailed in the Court's *Daubert* Order, Smithers' opinions are admissible to show that the Trucks were equipped with undisclosed EEDs, Defendants' diesel aftertreatment system design increased NOx emissions, the Trucks' NOx emissions were significantly higher in real-world operating conditions than in testing conditions, and excessive active regeneration decreased the Trucks' fuel economy. ECF No. 262, PageID.36925–33, PageID.36961.

Stockton's damages models demonstrate that Plaintiffs paid a premium for an "ultra-clean diesel" ("UCD") system that did not perform as promised. Specifically, Stockton's Overpayment model illustrates the alleged overpayment injury Plaintiffs suffered by purchasing their preferred Truck "without knowing that the Trucks' EEDs cancel out [the Trucks'] purportedly 'clean' qualities." *Id.* at PageID.36976–77. And Stockton's Excess Fuel Consumption model concretizes the alleged economic harm of "purchasing incrementally more fuel for reasons attributable to the EEDs." *Id.* at PageID.36978. Therefore, to the extent that Defendants support their summary judgment motions by disputing the admissibility or weight of Plaintiffs' experts' opinions that have since been deemed admissible, those arguments are meritless.

But Cummins maintains that Plaintiffs' injuries relating to excess fuel costs are not traceable "to anything that Cummins said or did." ECF No. 218, PageID.27398. For example, Cummins contends that it "did not make any representations to anyone—not FCA, not the regulators, and not Plaintiffs—about the fuel economy performance of the Trucks." *Id.* Cummins further explains that the Regulators did not require "the Trucks to meet any fuel economy standard," nor did the Trucks' Monroney label "include any representation as to estimated fuel economy." *Id.* Cummins also points out that "Plaintiffs had different expectations for their Trucks' fuel economy." *Id.*

Meanwhile, FCA argues that Stockton's damages models cannot establish Plaintiffs' standing because "the models have nothing to do with misrepresentations or non-disclosures." ECF No. 221, PageID.28596. As the Court found in deciding Defendants' *Daubert* motions, these arguments misapprehend Plaintiffs' theory of liability. Plaintiffs argue that Defendants' intentional design choices resulted in EEDs that deliberately decreased fuel economy and increased NOx emissions. ECF No. 241, PageID.34170. In turn, Plaintiffs claim that they spent more on fuel than they anticipated, and did not receive the "clean diesel" Trucks for which they bargained. *Id.*

Defendants are correct that Stockton's damages models do "not depend on anything Truck owners heard, saw, or expected." *Id.* at PageID.34171. But Plaintiffs intend to show that "no rational person would want to incur additional, unnecessary fuel costs or overpay for a feature the Trucks did not have." *Id.* Indeed, Plaintiffs claim that Defendants "had a duty to disclose these hidden costs or overcharges based on their exclusive knowledge of the system." *Id.* at PageID.34131. Moreover, Plaintiffs have evidence of Defendants' statements on the Trucks' "clean" diesel engine and reduced emissions that a reasonable jury could find to be false or misleading. *See id.* at PageID.34195–96 n.29.

Therefore, before addressing the merits of their claims, the Court concludes that Plaintiffs have satisfied the elements of Article III standing.

### F. Plaintiffs Lack RICO Standing as Indirect Purchasers

Cummins argues that Plaintiffs lack standing to raise RICO claims because they are indirect purchasers. ECF No. 218, PageID.27396–97. Accordingly, before addressing the merits of Plaintiffs' RICO claims, the Court must assess whether Plaintiffs have standing as to Cummins and/or FCA for their RICO claims.

In *Trollinger v. Tyson Foods, Inc.*, the Sixth Circuit explained that just as under federal antitrust statutes and the rule set out by the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), "indirect purchasers lack standing under RICO . . . to sue for overcharges passed on to them by middlemen." 370 F.3d 602, 616 (6th Cir. 2004). And under identical circumstances in *Counts*, the court held that the plaintiffs were indirect purchasers, and thus lacked standing for RICO claims against car manufacturers. 2022 WL 2079757, at *12.

Just as in *Counts*, Defendants here did not sell the Trucks directly to Plaintiffs. By purchasing their vehicles from dealerships, Plaintiffs are indirect purchasers "who are two or more steps removed from the violator in a distribution chain." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019). As the *Counts* court noted, the rule that indirect purchasers lack standing to bring antitrust and RICO claims is a "bright-line rule." 2022 WL 2079757, at *12; *see also Pepper*, 139 S. Ct. at 1520.

Plaintiffs have failed to demonstrate why their RICO claims are not barred under this bright-line standing rule. Plaintiffs are correct that in

*Gamboa v. Ford Motor Co.*, the plaintiffs' RICO claim against a manufacturer survived a motion to dismiss, where the court relied on the "coconspirator exception" to the indirect purchaser rule. No. 18-10106, 2020 WL 7047612, at *8 (E.D. Mich. Nov. 30, 2020). But the *Gamboa* court noted that this exception has not been recognized by the Sixth Circuit, and the plaintiffs' RICO standing was entirely contingent upon their ability to prove that the manufacturer conspired with car dealerships. *Id.* at *8–9. Unlike the *Gamboa* plaintiffs, Plaintiffs here have no evidence that Defendants conspired with dealerships; *Gamboa* thus fails to support their RICO standing.

Moreover, Plaintiffs' arguments that they were directly injured by Defendants also miss the mark. ECF No. 241, PageID.34198–200. While the Supreme Court has held that proximate cause is a necessary element to establish statutory standing for a RICO claim, *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992), Plaintiffs are indisputably indirect purchasers. In cases like this one "where the plaintiffs had no relationship with the defendants except through intermediaries," Plaintiffs simply lack standing to bring RICO claims. *Trollinger*, 370 F.3d at 616; *see also Counts*, 2022 WL 2079757, at *13.

In their surreply, Plaintiffs argue that the indirect purchaser rule is limited to antitrust-related RICO claims. ECF No. 257, PageID.36313. Plaintiffs contend that rather than precluding their RICO standing, "*Trollinger* extended RICO claims to indirect targets of fraudulent

schemes," like Plaintiffs here. *Id.* at PageID.36310. But the Court is not persuaded by Plaintiffs' arguments on this point. Notably, *Trollinger*, *Holmes*, and *Illinois Brick* are based upon well-accepted principles of causation, and direct, indirect, and derivative injuries that are not cabined to antitrust claims only. Furthermore, federal courts commonly rely upon principles of antitrust standing in interpreting RICO, making the *Pepper* Court's foreclosure of indirect purchaser standing in the antitrust context equally applicable to RICO standing. *See Trollinger*, 370 F.3d at 612 ("Congress modeled [RICO's civil suit] provision on similar language in the antitrust laws."); *Holmes*, 503 U.S. at 268.

Plaintiffs' attempt to distinguish the policy considerations of *Illinois Brick* is also unavailing. In *County of Oakland v. City of Detroit*, the Sixth Circuit declined to adopt a "pass-on approach" that would allow consumers, the parties ultimately injured by the wrongdoer's overcharge, to bring antitrust claims. 866 F.2d 839, 849 (6th Cir. 1989). The *Oakland* court explained that under the pass-on approach, "the appropriate plaintiffs in this case are not a few dozen municipalities, but thousands of individual householders, businesses, and other consumers" that overpaid for sewerage services at inflated prices set by the City of Detroit. *Id.* In rebuking this approach as unmanageable, the court cited *Illinois Brick*'s rejection of "an attempt by indirect purchasers to make offensive use of the 'passing on' concept." *Id.* at 848. Even if Plaintiffs have identified reasons why *Illinois Brick* and *Oakland*'s manageability

43

concerns are less salient here, that does not bypass the Sixth Circuit's wholesale rejection of the pass-on approach for indirect purchasers.

In short, Plaintiffs have not articulated a principled distinction limiting application of the indirect purchaser rule only to RICO claims arising under antitrust law. Because Plaintiffs lack standing to bring their RICO claims as indirect purchasers, the Court grants Defendants' motions for summary judgment on Plaintiffs' RICO claims.

## G. Plaintiffs' Claims Are Not Preempted by the Clean Air Act

Defendants argue that the Clean Air Act ("CAA") preempts Plaintiffs' state law claims challenging the Trucks' emissions performance. Defendants contend that if Plaintiffs cannot show a "measurable expectation" of the Trucks' emissions performance, their claims are preempted by the CAA. ECF No. 218, PageID.27406–08; ECF No. 221, PageID.28603–04. For the same reasons that the Court has previously rejected Defendants' CAA preemption arguments, the Court again declines to find Plaintiffs' claims preempted by the CAA.

As relevant here, the CAA provides that: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." 42 U.S.C. § 7543(a). But as the Court emphasized at the motion to dismiss phase, "Plaintiffs' claims do not depend on proof of noncompliance with federal emissions standards," nor

do they seek to introduce stricter emissions criteria through state tort claims. *Bledsoe*, 378 F. Supp. 3d at 642.

Although Plaintiffs allege that the Trucks emit excessive NOx in real-world driving, Plaintiffs' state law claims are premised on Defendants' conduct in misrepresenting the Trucks' emissions performance to consumers. In essence, "[r]ather than imposing requirements regarding the type of emissions technology which [Defendants] must include in its vehicles, Plaintiffs' suit seeks compensation for [Defendants'] fraudulent concealment of the actual operation of the emissions technology in its diesel vehicles from consumers." *In re Duramax Diesel Litig.*, 298 F. Supp. 3d at 1059.

To prove their state law claims, Plaintiffs intend to show that Defendants knowingly advertised and sold the Trucks (or their components) as if they had a "clean diesel" system with low emissions. ECF No. 241, PageID.34180. Plaintiffs will also need to demonstrate that consumers paid a premium for the feature that did not work as advertised in real-world driving. *Id.*

Defendants argue that the CAA preempts these claims because the Trucks met the Regulators' emission requirements, as evidenced by the Cummins' receipt of certificates of conformity based on its complete disclosures. ECF No. 250, PageID.34893; ECF No. 251, PageID.34913. But Defendants read Plaintiffs' claims too narrowly and selectively. The mere fact that the Trucks passed the Regulators' scrutiny is not the end

of the story. Rather, "it is conceivably possible that Defendants could simultaneously comply with EPA regulations while still concealing material information from consumers." *In re Duramax Diesel Litig.*, 298 F. Supp. 3d at 1062.

Even if the Trucks did not emit NOx beyond federal and state emission standards—which is a material fact in dispute—Plaintiffs have admissible evidence to demonstrate that Defendants touted the Trucks as having environmentally friendly "clean diesel" engines, were aware that the "clean diesel" engines did not function as advertised, and charged Plaintiffs a premium for a nonexistent feature. As the *In re Duramax* court noted, "the significant market for environmentally friendly vehicles—which are designed to emit pollution far below the regulatory maximums" supports Plaintiffs' claims that consumers care about more than just "compliance with emissions standards." *Id.* Therefore, as this Court has emphasized, Plaintiffs are seeking ascertainable loss from the design of the emissions system, not attempting to enforce federal or state emissions regulations. *See Bledsoe*, 378 F. Supp. 3d at 640. Plaintiffs' state law consumer protection and fraudulent concealment claims here are not preempted by the CAA.

## H. State Law Consumer Protection, Fraudulent Concealment, and Breach of Contract Claims

Plaintiffs seek to bring state law consumer protection, fraudulent concealment, and breach of contract claims on behalf of themselves and

putative class members in the states of California, Illinois, Michigan, Idaho, New Mexico, North Carolina, South Carolina, Tennessee, and Texas. While Plaintiffs concede that they will not seek class certification on behalf of a nationwide class for their consumer protection and fraudulent concealment claims brought against both Defendants, Plaintiffs intend to pursue breach of contract claims against FCA only on a nationwide basis. Therefore, with respect to the state law claims for which Defendants have moved for summary judgment, the Court must determine whether Plaintiffs have demonstrated genuine disputes of material fact.

### 1. Fraud-Related Claims Generally

While each state has developed nuanced rules for fraudulent concealment and fraud-based consumer protection law claims, the essential elements for fraud-based claims are:

(1) an intentional misrepresentation

(2) of fact

(3) that proximately causes harm and

(4) is material,

(5) intended to induce and

(5) does induce reliance by the plaintiff,

(6) which is reasonable or "justifiable."

Dan B. Dobbs, et al., *The Law of Torts* § 664 (2d ed.) (footnotes omitted).

Plaintiffs' fraud-related claims are premised on two general theories. First, under a traditional fraudulent misrepresentation theory that

47

underlies their consumer protection law claims, Plaintiffs argue that Defendants made material statements about the Trucks' emissions and fuel economy, which induced them to buy the Trucks. And because Defendants had exclusive knowledge of the existence of EEDs and the Trucks' propensity to consume excess fuel, their failure to disclose these alleged defects made the initial representations misleading. *See* ECF No. 241, PageID.34183.

Second, under a fraudulent concealment or "silent fraud" theory, Plaintiffs suggest that even if they did not see or hear Defendants' material statements about the Trucks' emissions and fuel economy, Defendants still had an affirmative duty to disclose the existence of the alleged defects based on their exclusive knowledge alone. *See* ECF No. 241, PageID.34189; *see also Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 599 (E.D. Mich. 2017) (summarizing that even without demonstrating that the defendants made material statements about the vehicles, the plaintiffs had stated a claim for fraudulent concealment under certain states' fraudulent concealment statutes).

In moving for summary judgment on Plaintiffs' fraud-related claims, Defendants argue that they did not conceal any material facts with intent to deceive, did not have a duty to disclose, and further claim that Plaintiffs cannot demonstrate their reliance on any representation about the Trucks' NOx emissions or fuel economy to show actionable fraud. *See, e.g.*, ECF No. 218, PageID.27413; ECF No. 221, PageID.28605–06. Relatedly,

Defendants also contend that all of their public statements and advertising are either irrelevant or mere "puffery." ECF No. 250, PageID.34888.

The Court has previously addressed the materiality of Defendants' affirmative statements about the Trucks at the motion to dismiss phase. There, the Court recognized that Defendants "simply touting the 'cleanliness' of their vehicles" or claiming to be "the cleanest or best in the world" constituted mere puffery. *Bledsoe*, 378 F. Supp. 3d at 649. But other statements claiming that the Trucks satisfied an "ascertainable and quantifiable standard for fuel efficiency and emissions set in place by a third-party regulator (implying independent corroboration) rise above nonactionable puffery." *Id.* And Defendants' statements about fuel efficiency and lower emissions taken together, reflected their "understanding that emissions and fuel efficiency were important considerations for consumers." *Id.* Accordingly, if Defendants concealed the existence of EEDs that "rendered the trucks more environmentally-harmful and less fuel-efficient than the advertisements they propagated," Defendants' statements "which induced reasonable consumers to purchase the trucks" were materially misleading. *Id.* at 643.

But Defendants argue that even if they made actionable material statements regarding the Trucks, Plaintiffs did not rely on Defendants' statements about NOx emissions or fuel economy in purchasing the Trucks. While reliance is an essential element of fraudulent misrepresentation, Plaintiffs' fraudulent concealment theory is not

49

premised on Defendants' affirmative representations of the Trucks' emissions or fuel economy. Instead, Plaintiffs argue that Defendants had a duty to disclose material facts about the Trucks' emissions systems that were within Defendants' exclusive knowledge. ECF No. 241, PageID.34192. Accordingly, without such disclosures, Plaintiffs were misled to believe that the Trucks did not have EEDs. *See Counts*, 2022 WL 2079757, at * 14.

Plaintiffs have affirmatively conceded that they fail to make out claims under the Michigan Consumer Protection Act and South Carolina Unfair Trade Practices Act. ECF No. 241, PageID.34190 n.26. As such, Defendants' motions for summary judgment with respect to those claims are granted, and the claims are dismissed with prejudice. But Defendants have also raised specific arguments against Plaintiffs' fraud-related claims arising under Michigan, Illinois, California, Idaho, New Mexico, North Carolina, and Texas law. The Court thus proceeds to addresses the merits of Defendants' arguments under the laws of each respective state.

### 2. Breach of Contract Claims

Plaintiffs also raise state-specific breach of contract claims against FCA only. Plaintiffs further intend to move for certification of breach of contract claims on a nationwide basis. ECF No. 241, PageID.34208. FCA has moved for summary judgment on Plaintiffs' state-specific breach of contract claims and argues that Plaintiffs lack standing to pursue such

claims on behalf of a nationwide class. *See* ECF No. 221, PageID.28593–94, PageID.28606.

Because Plaintiffs do not have a direct contractual relationship with FCA, Plaintiffs argue that they are third-party beneficiaries to contracts between FCA and the dealerships where they purchased their Trucks. *See* ECF No. 241, PageID.34184. FCA contends that Plaintiffs fail to show how any contracts between FCA and the dealerships were undertaken for Plaintiffs' direct benefit, rather than providing incidental benefits. *See* ECF No. 251, PageID.34917–18.

## I. State-by-State Discussion of Plaintiffs' Individual State Law Claims

### 1. Michigan State Law Claims

Through Plaintiff Martin Witberg, Plaintiffs seek to bring consumer protection and fraudulent concealment claims on behalf of the putative Michigan subclass against Defendant Cummins.[3] As noted, Plaintiffs

---

[3] The Court has previously dismissed Plaintiffs' Michigan law claims as to Defendant FCA. ECF No. 221, PageID.28614 n.27. From Plaintiffs' TCAC, Plaintiff Witberg is also purported to serve as a potential class representative for putative subclass members in Tennessee. Defendant Cummins cites one Tennessee state court case in its summary judgment brief, but provides no factual or substantive legal context. And from the Court's review, this case does not demonstrate that Plaintiffs' fraud-based claims under Tennessee law must fail. To the extent Cummins intended to move for summary judgment on Tennessee law claims brought by Witberg, it has failed to meet its burden. *See Celotex*, 477 U.S. at 328 (White, J., concurring) ("It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory

explicitly concede their Michigan Consumer Protection Act claim. Therefore, summary judgment is granted in favor of Cummins as to that claim.

But as for Plaintiffs' remaining Michigan fraudulent concealment claim, Cummins cites only two Michigan state court cases in discussing its lack of duty to disclose as an element of fraudulent concealment. Moreover, Cummins fails to provide any factual or substantive legal context for the cases upon which it relies. Only in its response to Plaintiffs' notice of supplemental authority does Cummins begin to clearly articulate its arguments against Plaintiffs' Michigan fraudulent concealment claim. ECF No. 248. Such disjointed briefing is unhelpful to the Court in considering the question of summary judgment. Indeed, "[c]ourts in this Circuit have denied summary judgment motions where the movant fails to support its motion with developed legal argument or citation to the record." *Gard v. Grand River Rubber & Plastics Co.*, No. 20-125, 2021 WL 6000039, at *26 (N.D. Ohio Dec. 20, 2021).

Nonetheless, Plaintiffs were clearly on notice of the *Counts* summary judgment ruling, which squarely addresses fraudulent concealment under Michigan law. Therefore, the Court will address the merits of the parties'

---

assertion that the plaintiff has no evidence to prove his case."). Therefore, the Court denies summary judgment on Plaintiffs' Tennessee law claims as to Cummins.

arguments as to whether Cummins is entitled to summary judgment on Plaintiffs' Michigan fraudulent concealment claim.

### a. Michigan Fraudulent Concealment Claim

Under Michigan law, fraudulent concealment (also referred to as "silent fraud") requires showing that "the purchaser expresses some particularized concern or makes a direct inquiry relative to or touching on the condition at issue and the parties engage in a general discussion on the topic." *Elliott v. Therrien*, No. 288235, 2010 WL 293071, at *5 (Mich. Ct. App. Jan. 26, 2010); *see also Hord v. Env't Rsch. Inst. of Mich.*, 617 N.W.2d 543, 550 (Mich. 2000) (summarizing the requirement that a buyer make "an inquiry" to which the defendant provides a misleading response); *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 38 (Mich. Ct. App. 1998) ("[T]he touchstone of liability for misdirection or 'silent fraud' is that some form of representation has been made and that it was or proved to be false."); *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 794 (E.D. Mich. 2019) (concluding that a "fraudulent concealment claim under Michigan law is not viable" where the plaintiffs did not allege that the defendant "made incomplete or misleading statements in response to a specific purchaser inquiry").

In *Counts*, the court explained that "Plaintiffs had to inquire with Defendants about their emissions-control systems to bring a claim for fraudulent concealment (i.e., silent fraud)." 2022 WL 2079757, at *21. And in finding that the plaintiffs "had no contact with Defendants regarding

53

their diesel Cruzes and have not demonstrated that they made any inquiry with Defendants" regarding the emissions systems, the *Counts* court granted summary judgment to the defendants on the plaintiffs' Michigan fraudulent concealment claim. *Id.* at *22.

Here, Plaintiffs concede that they did not rely on any of Cummins' statements in purchasing their Trucks. ECF No. 218, PageID.27381; ECF No. 241, PageID.34142. Nor have Plaintiffs presented any evidence that they made direct inquiries of Cummins regarding their Trucks' diesel engines. Accordingly, Plaintiffs' Michigan fraudulent concealment claim fails as a matter of law. Therefore, summary judgment is granted in favor of Cummins on this claim, and it is dismissed with prejudice.

### 2. Illinois State Law Claims

Through Plaintiffs Dawn Roberts and Marc Ganz, Plaintiffs seek to bring consumer protection, fraudulent concealment, and breach of contract claims on behalf of the putative Illinois subclass.

### a. Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") Claim

Defendants argue that the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") permits only "consumers"—those who purchase merchandise for household use—to raise claims under the statute. The statutory definition of "consumer" explicitly excludes business purchasers who buy products "for resale in the ordinary course of [their] trade or business." 815 Ill. Comp. Stat 505/1(e). Here, Defendants

point out that Plaintiff Ganz admits to purchasing the Truck in a representative capacity for his business, Ganz Services, Inc. ECF No. 221-18, PageID.29084–85; ECF No. 241, PageID.34144. Defendants contend that Ganz did not purchase the Truck for his use or that of a member of his household, as required for him to be classified as a consumer under ICFA.

But the Illinois Supreme Court has made clear that ICFA is "intended to protect consumers, borrowers, and **business persons** against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002) (emphasis added). Therefore, businesses that are "a consumer of [another] business's product" may still bring ICFA claims, even if the product is used for business purposes, so long as the product is not intended for resale. *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1368 (N.D. Ill. 1996). There is no evidence that Ganz intends to resell his Truck in the ordinary course of his business, a snowplowing company. ECF No. 241, PageID.34190–91. Furthermore, Ganz has also testified that he frequently uses the Truck for personal reasons. *Id.* Drawing all inferences in Ganz's favor, a reasonable jury could find that he is not prohibited from bringing an ICFA claim.

Defendants further argue that Plaintiffs cannot show actual reliance on a representation or omission, as required for a successful ICFA claim. ECF No. 221, PageID.28605. Relatedly, Defendants claim that Plaintiffs

cannot demonstrate causation to prove their ICFA claim. *Id.* These arguments are also meritless.

The Illinois Supreme Court has unequivocally held that ICFA "does not require actual reliance," *Siegel v. Levy Org. Dev. Co.*, 607 N.E.2d 194, 198 (Ill. 1992), but does require showing that the consumer fraud proximately caused the plaintiff's injury. *Wheeler v. Sunbelt Tool Co.*, 537 N.E.2d 1332, 1346 (Ill. 1989). So long as Plaintiffs establish "(1) a deceptive act or practice, (2) intent on the defendants' part that plaintiff rely on the deception, and (3) that the deception occurred in the course of conduct involving trade or commerce," they can succeed on an ICFA claim. *Siegel*, 607 N.E.2d at 198. Therefore, while Plaintiffs concede that they did not "consider *any* statement by Cummins in making their purchasing decision," ECF No. 218, PageID.27381; ECF No. 241, PageID.34142, Cummins may still be held liable under ICFA.

To the extent FCA argues that lack of "reliance" on alleged the misrepresentations is fatal to Plaintiffs' ability to demonstrate proximate cause, the Court disagrees. Plaintiffs have demonstrated a genuine dispute of material fact as to whether Plaintiffs Ganz and Roberts relied on FCA's alleged misrepresentations in purchasing their Trucks. For example, Plaintiff Ganz testified that he "heard the term 'clean diesel' being advertised" and, at the time of purchasing his Truck, believed that "all the technology had advanced to the point where they were cleaner." ECF No. 241, PageID.34183. Similarly, Plaintiff Roberts testified that

"she anticipated the [T]ruck was 'clean burning' as was advertised to her when she purchased the [T]ruck." *Id*. Although FCA has compelling evidence that Plaintiffs did not specifically rely on these alleged statements in purchasing the Trucks and did not have clear expectations about the Trucks' emissions or fuel economy, these are factual disputes as to proximate cause that a jury must resolve.

Ultimately, ICFA permit claims based on the premise that "[a]n omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud," even absent a common law duty to disclose. *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996). Where Defendants had knowledge of the alleged defects that were material to Plaintiffs' purchase and failed to disclose those defects, Plaintiffs can make out an ICFA claim. *Id*. Therefore, summary judgment is inappropriate on Plaintiffs' ICFA claims.

### b. Illinois Fraudulent Concealment Claim

Unlike under ICFA, a common law fraudulent concealment claim requires proving additional elements. In particular here, Plaintiffs must demonstrate that Defendants had a duty to disclose and Plaintiffs relied on Defendants' silence. *Bauer v. Giannis*, 834 N.E.2d 952 (Ill. Ct. App. 2005).

Defendants argue that Plaintiffs' Illinois fraudulent concealment claim fails because Defendants did not have a duty to disclose. Specifically, Defendants claim that Plaintiffs did not have a fiduciary or confidential

relationship with Defendants, the requisite type of special relationship triggering a duty to disclose. ECF No. 218, PageID.27416–17; ECF No. 221, PageID.28605–06.

Plaintiffs respond that a fiduciary or confidential relationship is not required because Illinois courts have recognized that a defendant may "owe a duty to speak under the 'trust and confidence' standard while not being in a fiduciary relationship with the plaintiff." *Benson v. Stafford*, 941 N.E. 2d 386, 402 (Ill. App. Ct. 2010). While very similar to a fiduciary relationship, Illinois courts have clarified that a "relationship of confidence and trust" requires showing that the plaintiffs trusted the defendant, and the defendant had "a position of influence over them." *Id.* at 403.

Moreover, where plaintiffs can demonstrate that defendants told "half-truths" about a product, Illinois courts have found that defendants have a duty to disclose even absent a fiduciary-type relationship. "A half-truth is a disclosure that is misleading because it omits important information." *BCBSM, Inc. v. Walgreen Co.*, 512 F. Supp. 3d 837, 855 (N.D. Ill. 2021). Under such circumstances, there is a duty to disclose additional information to ensure that a partial disclosure is not misleading. *See Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 40 N.E.3d 264, 276 (Ill. Ct. App. 2015); *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 737 (7th Cir. 2017).

Here, Plaintiffs Ganz and Roberts have testified that they relied on FCA's statements about the "cleanliness" of the Trucks' engines in

58

purchasing their Trucks. Although such statements are arguably mere puffery, *see Counts*, 237 F. Supp. 3d at 597, Illinois courts have recognized that "statements that ascribe specific virtues to a product that it does not possess are not considered puffing." *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 908 (N.D. Ill. 2013). And "[w]hether a statement is puffery or actionable is generally a factual question." *Bietsch v. Sergeant's Pet Care Prod., Inc.*, No. 15-5432, 2016 WL 1011512, at *3 (N.D. Ill. Mar. 15, 2016).

But on the other hand, if Plaintiffs cannot demonstrate that Defendants told half-truths, Defendants' silence alone is not enough to establish fraudulent concealment without showing a special relationship. *Cosentino v. Kunkle*, 2019 IL App (2d) 181001-U, ¶¶31–33; *see also Roe v. Ford Motor Co.*, No. 18-12528, 2021 WL 2529825, at *9 (E.D. Mich. June 21, 2021) (holding that absent evidence of half-truths or a special relationship between the parties, a manufacturer is not liable for silence on an alleged defect). Plaintiffs admit that they never considered Cummins' statements in purchasing their Trucks. ECF No. 218, PageID.27381; ECF No. 241, PageID.34142. And without being able to rely on Cummins' telling of "half-truths," Plaintiffs must demonstrate that Cummins had an independent duty to disclose. But contrary to Plaintiffs' position, the mere fact that a manufacturer or seller is more sophisticated or knowledgeable than the consumer is insufficient to trigger a special relationship. *Rodriguez v. Ford Motor Co.*, No. 21-2553, 2022 WL 972306, at *5 (N.D. Ill. Mar. 31, 2022) (explaining that a manufacturer's superior

knowledge "as to the functionality of its vehicles and their parts" does not constitute "an overwhelming influence" requiring disclosure of latent defects).

As to FCA, a factfinder must determine whether FCA's "half-truths" are actionable and whether Plaintiffs reasonably relied upon FCA's statements. Therefore, FCA is not entitled to summary judgment on Plaintiffs' Illinois fraudulent concealment claim. But because Plaintiffs cannot demonstrate that Cummins similarly told "half-truths" nor that Cummins had an independent duty to disclose, summary judgment must be granted in favor of Cummins on this claim.

### c. Illinois Breach of Contract Claim

The existence of a valid contract is a fundamental element of a breach of contract claim. *See Ivey v. Transunion Rental Screening Sols., Inc.*, 2022 IL 127903, ¶ 28. FCA argues that because Plaintiffs Ganz and Roberts purchased their Trucks from third-party dealerships, they did not have a contract with either Defendant. ECF No. 221, PageID.28606. In fact, Plaintiffs seem to concede that no contract existed between Plaintiffs and FCA. Instead, Plaintiffs argue that they are third-party beneficiaries of the contracts between FCA and the dealerships from which Plaintiffs purchased their Trucks. ECF No. 241, PageID.34184.

To determine whether a person can be considered a third-party beneficiary, the court "must look to the contracts to determine the intent of the parties." *Fed. Ins. Co. v. Turner Const. Co.*, 660 N.E.2d 127, 132 (Ill.

Ct. App. 1995). In particular, the third-party beneficiary must be the "direct" beneficiary of the contract, not just a recipient of an incidental benefit arising from the contract. *Id.* Moreover, for a contract to be "undertaken for the plaintiff's direct benefit[,] . . . the contract itself must affirmatively make this intention clear." *Waterford Condo. Ass'n v. Dunbar Corp.*, 432 N.E.2d 1009, 1011 (Ill. Ct. App. 1982).

Plaintiffs have failed to proffer any evidence that they were the direct intended beneficiaries of contracts between FCA, Cummins, and/or the car dealerships that ultimately sold them the Trucks. Plaintiffs claim that FCA had knowledge of Plaintiffs' requirements and expectations for the Trucks, making them third-party beneficiaries of FCA's contracts with the Truck dealerships. ECF No. 241, PageID.34185. But in general, the mere fact that a "remote seller knows that a dealer will resell the seller's product will not support a third party beneficiary claim." *Chi. Heights Venture v. Dynamit Nobel of Am., Inc.*, 575 F. Supp. 214, 219 (N.D. Ill. 1983), *aff'd*, 782 F.2d 723 (7th Cir. 1986).

Plaintiffs have also failed to meaningfully distinguish *O'Connor v. Ford Motor Co.*, where the Northern District of Illinois court rejected the plaintiffs' third-party beneficiary arguments under similar circumstances. Plaintiffs claim that *O'Connor* is inapt because the plaintiffs there "had simply failed to allege requirements specific to them." ECF No. 241, PageID.34185. While this is partially accurate, Plaintiffs overlook the *O'Connor* court's emphasis on how the plaintiffs' allegations as to their

61

expectations for vehicle safety "relate to consumers generally, not any particular Illinois customer." 567 F. Supp. 3d 915, 945 (N.D. Ill. 2021).

Plaintiffs point to testimony from Ganz and Roberts on their expectations on vehicle emissions. But fatally, Plaintiffs have no evidence that Defendants knew Plaintiffs' identities or their specific requirements, or that Defendants intended to manufacture the Truck tailored to their expectations. *Id.*; *Allstate Ins. Co. v. Toyota Motor Mfg. N. Am., Inc.*, No. 09-1517, 2009 WL 3147315, at *2 (N.D. Ill. Sept. 28, 2009) (rejecting the plaintiff's third-party beneficiary argument absent evidence that he "had Toyota manufacture the minivan specifically to meet his requirements"). Therefore, Plaintiffs' third-party beneficiary argument is meritless.

Lastly, whenever a provision of the Uniform Commercial Code ("UCC") applies to the parties' claims, the UCC displaces common law breach of contract claims. *See Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, 829 F. Supp. 2d 636, 645 (N.D. Ill. 2011). Plaintiffs concede that their breach of contract claims under Illinois law are governed by the UCC. ECF No. 241, PageID.34184 n.25. As such, Plaintiffs' third-party beneficiary contract claim is displaced by the UCC, and it must be dismissed. *Fullerton v. Corelle Brands, LLC*, No. 18-4152, 2019 WL 4750039, at *8 (N.D. Ill. 2019). Summary judgment is entered in favor of FCA on Plaintiffs' Illinois breach of contract claim, and it is dismissed with prejudice.

### 3. Idaho State Law Claims

Through Plaintiff Michael Erben, Plaintiffs seek to bring consumer protection and fraudulent concealment claims on behalf of the putative Idaho subclass against Defendant Cummins.[4] Cummins now moves for summary judgment on Plaintiffs' Idaho consumer protection and fraudulent concealment claims.

### d. Idaho Consumer Protection Act ("ICPA") Claim

Cummins argues that the Idaho Consumer Protection Act ("ICPA") requires a privity of contract between the parties, which does not exist between Plaintiffs and Cummins. ECF No. 218, PageID.27412. As the *In re Duramax* court summarized, "[w]ith one exception, federal courts applying Idaho law have interpreted the Idaho Supreme Court's analysis as predicating ICPA standing on direct privity." No. 17-11661, 2018 WL 3647047, *8 (E.D. Mich. Aug. 1, 2018); *see also Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010) (explaining that under ICPA, "the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively").

Plaintiffs are correct that a Northern District of California court has concluded that ICPA does not require "direct" privity, meaning that a contract between Plaintiffs and the Truck dealership can suffice. ECF No. 241, PageID.34191. But having reviewed the weight of authority, the

---

[4] The Court has previously dismissed Plaintiffs' Idaho law claims as to Defendant FCA. ECF No. 221, PageID.28614 n.27.

Court agrees with the *In re Duramax* court's assessment that waiving the privity requirement runs afoul of the Idaho Supreme Court's clear interpretation of ICPA. 2018 WL 3647047, at *9; *see also Moto Tech, LLC v. KTM N. Am., Inc.*, No. 13-00165, 2013 WL 6446239, at *4 (D. Idaho Dec. 9, 2013) ("[T]he Idaho Supreme Court has unequivocally stated that a contractual relationship must exist between the aggrieved party and the alleged aggrieving party."). Because there is no privity of contract between Plaintiffs and Cummins, the Court must enter summary judgment in favor of Cummins on Plaintiffs' ICPA claim. The claim is dismissed with prejudice.

### e. Idaho Fraudulent Concealment Claims

Under Idaho's fraudulent concealment law, Plaintiffs must demonstrate that Defendants owed them a duty to disclose even without a direct privity relationship. The Supreme Court of Idaho has recognized that "a duty to disclose may arise in the context of third party beneficiaries." *Printcraft Press, Inc. v. Sunnyside Park Utils., Inc.*, 283 P.3d 757, 771 (Idaho 2012). Relatedly, aside from a formal fiduciary relationship, Idaho law permits showing other types of "similar relation of trust and confidence between the two parties" that triggers a duty to disclose. *Sowards v. Rathbun*, 8 P.3d 1245, 1250 (Idaho 2000). A party may also have a duty to disclose "to prevent a partial statement of the facts from being misleading." *Humphries v. Becker*, 366 P.3d 1088, 1096 (Idaho 2016).

Plaintiffs fail to cite a single case to rebut Cummins' argument that it lacked a duty to disclose under Idaho law. For example, Cummins points to *Sowards v. Rathbun*, where the Idaho Supreme Court held that real estate sellers did not have a duty to disclose irrigation issues to the buyers because the parties lacked a trust and confidence relationship. 8 P.3d at 1250. Here, Plaintiffs are even further removed from Cummins than the buyers in *Sowards*. As the Trucks' engine manufacturer, Cummins did not have a trust and confidence relationship with Plaintiffs, who purchased their Trucks from dealerships. Furthermore, Plaintiffs concede that they did not rely on statements by Cummins in purchasing the Trucks, thus subverting any duty to disclose based on a partial statement of fact. ECF No. 218, PageID.27381; ECF No. 241, PageID.34142. Therefore, summary judgment is granted in favor of Cummins on Plaintiffs' Idaho fraudulent concealment claims. Those claims are dismissed with prejudice.

### 4. California State Law Claims

Through Plaintiffs James Bledsoe and Donovan Kerber, Plaintiffs seek to bring consumer protection, fraudulent concealment, and breach of contract claims on behalf of the putative California subclass. As previously noted, Plaintiffs' TCAC added Kerber to represent the putative California subclass raising claims against Defendant FCA. FCA has moved for summary judgment as to Kerber in a separate motion for summary judgment. ECF No. 263.

### a. California Unfair Competition Law ("UCL"), Consumer Legal Remedies Act ("CLRA"), False Advertising Law ("FAL"), and Fraudulent Concealment Claims

Defendants argue that Plaintiffs' California Unfair Competition Law ("UCL"), Consumer Legal Remedies Act ("CLRA"), False Advertising Law ("FAL"), and fraudulent concealment claims fail because Plaintiffs cannot demonstrate that Defendants made misrepresentations or non-disclosures upon which Plaintiffs relied and caused Plaintiffs' injury. ECF No. 218, PageID.27413–16; ECF No. 263, PageID.37030–32. Additionally, Defendants contend that California courts have rejected imposing a duty to disclose product defects under similar circumstances. ECF No. 218, PageID.27416–18; ECF No. 263, PageID.37033–34.

At the outset, the Court recognizes that "[w]hile the CLRA, UCL, and FAL proscribe much of the same conduct, the statutes sometimes have distinct requirements." *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1100 (N.D. Cal. 2021). For example, at least one California federal court has concluded that the CLRA and UCL do not require showing that the defendants had a duty to disclose. *Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005) (finding no requirement that "a duty must be alleged in order to state a claim under either the CLRA or the [UCL]," such that "pure omissions are actionable" under the statutes). Meanwhile, the Ninth Circuit has accepted that the CLRA, UCL, and FAL all require the plaintiff to establish a duty to disclose. *See Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861–67 (9th Cir. 2018).

Despite the complicated statutory regimes, none of the parties clearly articulate the proper elements or standards related to these California claims. And Plaintiffs seem to accept the requirement of demonstrating that Defendants had a duty to disclose to succeed on their CLRA, UCL, and FAL claims. ECF No. 264, PageID.37633. Accordingly, the Court follows the *In re Toyota RAV4* court's approach in focusing on the most heavily briefed issue—"namely, whether [Defendants] had a duty to disclose . . ., as Plaintiffs' omission-based claims require." 534 F. Supp. 3d at 1100.

Under California law, a manufacturer has a duty to disclose a design defect under four circumstances: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997). Here, because Plaintiffs lack a fiduciary relationship with Defendants, they must rely on one of the other three *Judkins* factors to demonstrate fraudulent misrepresentation through omission or affirmative misrepresentation. *See Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007).

For an omission-based theory in the latent defect context, a fact is only considered "material" where the alleged defect relates to safety

concerns or the product's central functionality. *See People v. Johnson & Johnson*, 292 Cal. Rptr. 3d 424, 448 (Cal. Ct. App. 2022) (noting that "omissions-based claims can be pure-omissions claims or partial-misrepresentation claims," but the omissions must be "material"); *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1142 (9th Cir. 2012); *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1096 (S.D. Cal. 2010); *Hodsdon*, 891 F.3d at 863.

Meanwhile, to base a CLRA, UCL, or FAL claim on affirmative misrepresentations, Plaintiffs must show that Defendants' statements were "about 'specific or absolute characteristics of a product,'" rather than "non-actionable puffery." *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1136 (N.D. Cal. 2010) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997)). Moreover, if a plaintiff alleges that the defendant made affirmative misrepresentations, they must show that they actually relied upon the allegedly deceptive statements. *See Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 888 (Cal. 2011) (summarizing that actual reliance is an element of UCL and FAL claims based on affirmative misrepresentations); *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1170 (C.D. Cal. 2011) (identifying "actual causation and reliance" as "requirements for purposes of the CLRA"). Importantly, however, an FAL claim must be based on affirmative misrepresentations. "The plain language of the statute—which prohibits making, disseminating, or

causing the dissemination of false or misleading statements—does not encompass omissions." *McCoy v. Nestle USA, Inc*, 173 F. Supp. 3d 954, 969 (N.D. Cal. 2016), *aff'd*, 730 F. App'x 462 (9th Cir. 2018).

But for an omissions-based misrepresentation under the CLRA, UCL, and common law fraudulent concealment, a plaintiff can satisfy reliance and causation by showing that they relied on the defendant's material representations about the product, but the plaintiff "would have made a different purchasing decision had it been disclosed that" the product was defective. *In re Toyota*, 790 F. Supp. 2d at 1169. In other words, the failure to disclose a fact "material to a reasonable person" satisfies "actual causation and reliance" under the CLRA, UCL, and fraudulent concealment laws. *Id.* at 1169–70.

### i. Bledsoe's UCL, CLRA, FAL, and Fraudulent Concealment Claims Against Cummins

Plaintiff Bledsoe testified that prior to purchasing his Truck, he was told that the Truck would "meet the 2010 more stringent [regulatory] requirements] and would also get "great fuel mileage." ECF No. 241, PageID.34180 n.24. Because Plaintiffs cannot attribute these statements to Cummins, they proffer an omissions-based theory where "Cummins ha[d] a duty to disclose based on its exclusive knowledge (vis-à-vis the truck owners) about the emissions system." *Id.* at PageID.34192.

To demonstrate that Cummins "ha[d] a duty to disclose a defect based on exclusive knowledge," Plaintiffs must show that Cummins "knew

of this defect while plaintiffs did not, and, given the nature of the defect, it was difficult to discover." *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 752 (E.D. Mich. 2017) (quoting *Herron v. Best Buy Co., Inc.*, 924 F. Supp. 2d 1161, 1176 (E.D. Cal. 2013)). As Plaintiffs point out, "Cummins never suggests that it did *not* have exclusive knowledge about the emissions." ECF No. 241, PageID.34192. And based on Plaintiffs' admissible expert evidence on Cummins' engine design process, a reasonable jury could conclude that "a plausible inference of knowledge" exists. *Beck*, 273 F. Supp. 3d at 753; *see also In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1012 (N.D. Cal. 2018) (permitting inference of exclusive knowledge based on allegations that the "defendants involved in the design and manufacturing process" manipulated the engine so that it would "pass the emissions tests but [lacked] proper emissions control under normal driving conditions").

Nonetheless, Plaintiffs must also demonstrate that Cummins failed to disclose a *material* fact. In the manufacturing defect context, omissions are considered material only where the alleged latent defect is related to safety or the product's central functionality. Plaintiffs do not appear to argue that the EEDs and fuel economy defects at issue are safety concerns. Nor do Plaintiffs explicitly claim that the defects are part of a product's central functionality. But Cummins has not met its burden to show that the defects alleged cannot be considered safety-related, central to functionality, or otherwise immaterial as a matter of law. And in *In re*

*Chrysler*, the court reasoned that if the defendants promoted the vehicles "as environmentally friendly[,] . . . they believed that such information was material to the consuming public." 295 F. Supp. at 1014. Therefore, the materiality of the omitted facts remains a disputed issue that a jury must resolve. As such, summary judgment on Bledsoe's CLRA, UCL, and fraudulent concealment claims against Cummins is improper.

On the other hand, FAL claims under California law require showing the existence of an affirmative misrepresentation. Bledsoe has conceded that he did not rely on any statements by Cummins in purchasing the Truck. ECF No. 218, PageID.27381; ECF No. 241, PageID.34142. Therefore, without evidence of an affirmative misrepresentation by Cummins, summary judgment must be granted in favor of Cummins as to Bledsoe's FAL claim.

### ii. Kerber's UCL, CLRA, FAL, and Fraudulent Concealment Claims Against FCA

Plaintiff Kerber's fraud-related claims against FCA present additional complications. As Defendant FCA emphasizes, Plaintiff Kerber purchased his Truck over three years after this lawsuit was filed. ECF No. 263, PageID.37016. FCA thus argues that Kerber's fraud-based claims must fail because he is "presumed" to have knowledge of the alleged defect. *Id.* at PageID.37030–31. FCA also contends that the affirmative misrepresentations upon which Kerber relies cannot be imputed to FCA because they were made by a dealership salesperson. ECF No. 266,

71

PageID.37692. And if Kerber cannot rely on affirmative misrepresentations to prove his fraud-related claims, FCA argues that the claims are barred by the economic loss rule. ECF No. 263, PageID.37035.

First, FCA's substantive support for its "presumed" knowledge theory falls short. Almost every case FCA cites relates to the inquiry notice defense for enforcing the statute of limitations in fraud-based claims. And none of FCA's cases address whether inquiry notice serves as a defense to the substantive elements of a timely CLRA, UCL, FAL, or fraudulent concealment claim under the present circumstances.

Even FCA's most on-point case, *Stathakos v. Columbia Sportswear Co.*, is readily distinguishable. There, the court granted summary judgment in favor of the defendant where the plaintiffs continued purchasing clothes from the defendant's stores after they personally filed suit alleging that the defendant's price tags were deceptive. No. 15-04543, 2017 WL 1957063, at *9 (N.D. Cal. May 11, 2017). With respect to those plaintiffs, the *Stathakos* court concluded that "they could not have actually relied on the reference prices on the price tags on any of the garments at defendants' outlet stores," having already sued the defendant for allegedly misrepresenting the prices. *Id.* Here, Kerber was not an original plaintiff who initiated the lawsuit against FCA, and he claims that he had no knowledge of the lawsuit before purchasing his vehicle.

Moreover, in the omissions-based fraud context, California courts have recognized that "even the presence of information online does not

automatically defeat exclusive knowledge." *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014). For example, in *Terstate Restoration v. Seaman*, the defendant, a receiver charged with liquidating and disbursing assets of a defunct company called MedCap, argued that he did not have exclusive knowledge of the allegedly concealed information because "all of the documents that would have disclosed the concealed facts were posted to the receivership website, and were filed on the public docket of the MedCap court case." No. 13-00706, 2014 WL 12569347, at *8 (C.D. Cal. July 9, 2014). In rejecting the defendant's argument that the plaintiff could have discovered the information through court filings, the *Terstate Restoration* court summarized that "California law appears unwilling, even in the case of more sophisticated parties, to find public dissemination alone enough to defeat a claim of fraudulent concealment." *Id.*

Similarly, the public availability of allegedly concealed information does not defeat justifiable reliance even among sophisticated parties. In *Vega v. Jones, Day, Reavis & Pogue*, the defendant law firm argued that "with reasonable diligence," the plaintiff shareholder would have discovered the allegedly concealed information through a public document filed two weeks before the merger that "contain[ed] all the financing terms." 17 Cal. Rptr. 3d 26, 35 (Cal. Ct. App. 2004). The *Vega* court denied the defendant's motion to dismiss because whether the financing terms were "reasonably accessible" to the plaintiff was a question of fact. *Id.*

In the consumer context, California courts have repeatedly emphasized that "[n]egligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent." *All. Mortg. Co. v. Rothwell*, 900 P.2d 601, 614 (Cal. 1995) (quoting *Seeger v. Odell*, 115 P.2d 977, 980 (Cal. 1941)). "Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man" in determining whether their reliance was reasonable. *Id.* Instead, California law treats reasonable reliance as a highly fact specific question of whether the plaintiff's conduct "is manifestly unreasonable in light of his own intelligence or information." *Hartong v. Partake, Inc.*, 72 Cal. Rptr. 722, 737 (Cal. Ct. App. 1968). Therefore, FCA is not entitled to summary judgment based on Kerber's purported ability to discover information about the alleged defects.

Second, FCA argues that the allegedly misleading statements made by a salesperson at an FCA-authorized dealership cannot be attributed to FCA for lack of agency. FCA points out that "an authorized dealership of a vehicle manufacturer is not an agent per se of the manufacturer." *Murphy v. Toyota Motor Sales*, No. 20-05892, 2021 WL 2801452, at *6 (C.D. Cal. July 1, 2021). Indeed, at the motion to dismiss phase, California courts appear to closely scrutinize whether plaintiffs have adequately alleged an agency relationship between dealerships and manufacturers. *See Banh v. Am. Honda Motor Co., Inc.*, No. 19-05984, 2019 WL 8683361,

at *5 (C.D. Cal. Dec. 17, 2019) (collecting cases). But in general, "unless only one conclusion may be drawn, existence of an agency [relationship] and the extent of an agent's authority is a question of fact and should not be decided on summary judgment." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).

In the "ostensible" or "apparent" authority context, a plaintiff must show that "there is information that might lead one to believe that [the purported agent] spoke on behalf of [the purported principal] even if, as a matter of *actual* or *classical* agency, he did not." *Gil v. Sea Shepherd Conservation Soc'y*, No. 14-7049, 2015 WL 11387765, at *3 (C.D. Cal. Jan. 22, 2015). However, "the ostensible authority of an agent cannot be based solely upon the agent's conduct." *C.A.R.*, 213 F.3d at 480. But even so, "it is not true that the principal must make explicit representations regarding the agent's authority to the third party before ostensible authority can be found." *Id.* For example, "a franchisee's authorized use of the franchisor's name and logo was sufficient to show that the franchisee was the ostensible [agent] of the franchisor." *Holt v. Kormann*, No. 11-1047, 2012 WL 2150070, at *5 (C.D. Cal. June 12, 2012) (citing *Kaplan v. Coldwell Banker Residential Affiliates, Inc.*, 69 Cal. Rptr. 2d 640, 643 (Cal. Ct. App. 1997)).

Here, Kerber has evidence that he purchased his Truck from an FCA-authorized dealership that is listed on Chrysler's website. ECF No. 264, PageID.37629. A review of the dealership's website reveals that it

uses Ram, Chrysler, Dodge, and Jeep logos in its primary logo, and includes images of the car brand logos on its "Showroom" page.[5] A reasonable jury could conclude that in discussing the Truck with the dealership salesperson, Kerber reasonably believed that the salesperson served as FCA's agent or representative. While FCA may be able to present compelling evidence that the dealership salesperson should not be considered its apparent agent, there are factual disputes that preclude summary judgment on this agency issue.

Lastly, under California law, "the economic loss rule does not bar . . . fraud and intentional misrepresentation claims." *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 274 (Cal. 2004). Because Kerber has raised genuine disputes of material fact as to affirmative misrepresentations attributable to FCA through an apparent agency theory, the Court cannot grant summary judgment based on the economic loss doctrine. Therefore, FCA is not entitled to summary judgment on Kerber's CLRA, UCL, FAL, or California fraudulent concealment claims.

### b. Kerber's MMWA Claim

Plaintiffs concede that they have not pled "an underlying state law warranty claim," to sustain an MMWA claim brought by Plaintiff Kerber. ECF No. 264, PageID.37636 n.11. Summary judgment is entered in favor

---

[5] *Showroom San Bernardino*, Moss Bros. San Bernadino, https://www.mossbroscjdrsanbernardino.com/showroom/index.htm (last visited March 23, 2023).

of Defendant FCA on Plaintiffs' MMWA claim, and it is dismissed with prejudice.

### c. Kerber's California Breach of Contract Claim Against FCA

FCA argues that Plaintiff Kerber's breach of contract claim fails because he has not met his burden of demonstrating the requisite privity of contract between himself and FCA. ECF No. 263, PageID.37036–37. Plaintiffs failed to respond to FCA's argument in their opposition brief, and have not presented any evidence that Kerber can establish privity on a third-party beneficiary theory. And indeed, Kerber's admission that he was not aware of whether a contract between FCA and his dealership exists and what terms that purported contract contains are fatal to his ability to demonstrate privity. *Id.* at PageID.37020; ECF No. 264, PageID.37616. Therefore, summary judgment on Kerber's breach of contract claim against FCA is warranted. Plaintiff Kerber's California breach of contract claim is dismissed with prejudice.

### 5. South Carolina Law Claims

Through Plaintiff James Forshaw, Plaintiffs seek to bring consumer protection and fraudulent concealment claims against Defendant Cummins on behalf of a putative South Carolina subclass.[6] Plaintiffs explicitly concede their South Carolina Unfair Trade Practices Act ("SCUTPA") claims. ECF No. 241, PageID.34190 n.26. But Plaintiffs also

---

[6] The Court has previously dismissed Plaintiffs' South Carolina law claims as to Defendant FCA. ECF No. 221, PageID.28614 n.27.

failed to respond to Cummins' argument that their claim under South Carolina's Regulation of Manufacturers, Distributors, and Dealers Act ("SCRMDD") does not apply to Cummins as a manufacturer. In neglecting to rebut Cummins' contention that Plaintiffs cannot raise a SCRMDD claim, the Court must grant summary judgment on this claim. Therefore, summary judgment is entered in favor of Cummins on Plaintiffs' SCUTPA claim, and it is dismissed with prejudice. Summary judgment is also entered in favor of Cummins on Plaintiffs' SCRMDD claim, and it is dismissed with prejudice.

As for Plaintiffs' South Carolina fraudulent concealment claims, Cummins cites one South Carolina state court case in its summary judgment brief, but provides no meaningful legal context. While the Court understands Cummins' general contention that it did not have a duty to disclose, Cummins fails to explain how *Pitts v. Jackson National Life Insurance Co.* (which involved the sale of insurance and a clearcut answer that "there is no relationship of trust and confidence between an applicant and an insurance agent") applies to the present circumstances. 574 S.E.2d 502, 510 (S.C. Ct. App. 2002). Because this is insufficient to meet its summary judgment burden, the Court denies summary judgment on Plaintiffs' South Carolina fraudulent concealment claims.

### 6. New Mexico Law Claims

Through Plaintiff Marty Ward, Plaintiffs seek to bring New Mexico Unfair Trade Practices Act ("NMUTPA"), fraudulent concealment, and

78

breach of contract claims on behalf of the putative New Mexico subclass. Defendant FCA[7] argues that Ward's NMUTPA and fraudulent concealment claims are time-barred. FCA further claims that Ward's fraudulent concealment claim is barred by the economic loss rule. *Id.* at PageID.28609. In addition, FCA contends that Ward's breach of contract claim fails for lack of privity and is preempted by the UCC. *Id.* at PageID.28609–10.

### a. Whether Plaintiff Ward's New Mexico Unfair Trade Practices Act ("NMUTPA") Claim is Time-Barred

FCA argues that Plaintiff Ward's New Mexico Unfair Trade Practices Act ("NMUTPA") and fraudulent concealment claims are barred by the applicable four-year limitations period. ECF No. 221, PageID.28608. FCA points out that Ward purchased his Truck on March 31, 2012, but did not file suit until more than four years later on November 14, 2016. *Id.* And because Ward started having "regen issues on [his] truck" and decreased fuel mileage in June 2012, two-and-a-half months after he bought it, FCA contends that Ward cannot invoke the "discovery rule." *Id.*

---

[7] Defendant Cummins cites one New Mexico state court case in its summary judgment brief, but provides no factual or substantive legal context. And from the Court's review, this case does not demonstrate that Plaintiffs' fraud-based claims under New Mexico law must fail. This is plainly insufficient to meet its summary judgment burden, such that the Court denies summary judgment on Plaintiffs' New Mexico claims as to Cummins.

"When a defendant makes a prima facie showing that a claim is time barred, a plaintiff attempting to invoke the discovery rule has the burden of 'demonstrat[ing] that if [he or] she had diligently investigated the problem [he or] she would have been unable to discover' the facts underlying the claim." *Butler v. Deutsche Morgan Grenfell, Inc.*, 140 P.3d 532, 539 (N.M. Ct. App. 2006) (alterations in original) (quoting *Martinez v. Showa Denko, K.K.*, 964 P.2d 176, 181 (N.M. Ct. App. 1998)). Here, FCA has made a prima facie showing that Ward's NMUTPA claim is time-barred. In response, Plaintiffs argue that Ward's awareness of "regen issues" or decreased fuel mileage were not enough to show that he had sufficient knowledge of the issue to bring suit earlier. ECF No. 241, PageID.34186.

But Plaintiffs' rebuttal does not fully demonstrate why Ward "could not have discovered his claims through the exercise of reasonable diligence within the limitations period." *Butler*, 140 P.3d at 540. As the Court understands it, however, Plaintiffs' expert testimony can be used to demonstrate that "most reasonable people who had been subjected to the misconduct alleged in this case would not have been able to appreciate the causal connection between the misconduct and the . . . injury." *Martinez-Sandoval v. Kirsch*, 884 P.2d 507, 512 (N.M. Ct. App. 1994). A reasonable jury could conclude that Ward, an average consumer, would not attribute "regen issues" or decreased fuel mileage to FCA's alleged misconduct, such that these concerns would not even trigger a diligent investigation.

Therefore, whether the discovery rule extends the limitations period for Ward is itself a materially disputed fact issue that the jury must decide. The statute of limitations is not grounds for summary judgment on Ward's NMUTPA claim.

### b. Duty to Disclose Under the NMUTPA

FCA argues that Ward was not exposed to any statements by FCA about emissions or fuel mileage, meaning he cannot demonstrate the existence of a predicate statement requiring subsequent disclosure. ECF No. 221, PageID.28608. In response, Plaintiffs claim that Ward read several statements from FCA regarding his Truck, "including Dodge's website which stated that FCA's vehicles 'met the new green emissions standards.'" ECF No. 241, PageID.34186. Even so, FCA contends that Ward's inability to recall specific statements on fuel economy or emissions is fatal to his NMUTPA claim. ECF No. 251, PageID.34920–21.

To bring a claim under the NMUTPA, a plaintiff must demonstrate that:

> (1) the defendant made an oral or written statement that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale of goods or services; (3) the conduct complained of occurred in the regular course of defendant's business; and (4) the representation may, tends to, or does deceive or mislead any person.

*Belanger v. Allstate Fire & Cas. Ins. Co.*, 588 F. Supp. 3d 1249, 1262 (D.N.M. 2022). Accordingly, the NMUTPA "imposes a duty to disclose material facts 'reasonably necessary to prevent any statements from being

81

misleading.'" *Id.* (quoting *Smoot v. Physicians Life Ins. Co.*, 87 P.3d 545, 549 (N.M. Ct. App. 2004)). Moreover, unlike other state consumer protection statutes, New Mexico courts have interpreted that the NMUTPA does not require demonstrating "reliance upon a defendant's deceptive conduct." *Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091, 1098 (N.M. Ct. App. 2007).

Plaintiffs have created a genuine dispute of material fact as to whether FCA made affirmative misrepresentations upon which Ward relied in purchasing his Truck. While FCA's arguments that Ward could not recall specific statements about the Trucks' emissions or fuel economy are evidence of lack of reliance, NMUTPA does not require actual reliance. Therefore, drawing all reasonable inferences in Plaintiffs' favor, the Court must deny summary judgment on Plaintiffs' NMUTPA claim.

### c. New Mexico Economic Loss Rule

FCA argues that Ward's fraudulent concealment claim is barred by the New Mexico economic loss rule. ECF No. 221, PageID.28609. But as Plaintiffs point out, the economic loss doctrine does not "bar a tort claim where an independent duty exists." *Bull v. BGK Holdings, LLC*, 859 F. Supp. 2d 1238, 1243 (D.N.M. 2012). As explained above, NMUTPA imposed a duty on FCA to disclose material facts based on the alleged misrepresentations it made about the Trucks. Accordingly, the economic loss doctrine does not bar Plaintiffs' claims based on an alleged breach of duty. *See id.* (holding that the economic loss rule does not bar negligent

and intentional misrepresentation claims because they "arise from an independent and recognized duty of care"); *Farmers All. Mut. Ins. Co. v. Naylor*, 452 F. Supp. 2d 1167, 1174 (D.N.M. 2006) (holding that the economic loss rule does not bar professional negligence claims that arise from an independent duty of care).

### d. New Mexico Breach of Contract Claim

FCA argues that Ward's breach of contract claim fails because of lack of privity and UCC preemption. First, it is undisputed that Ward purchased his Truck from a third-party dealership, and Ward has no evidence of a contract between himself and either Defendant. ECF No. 241, PageID.34187–88. Even so, Ward argues that he is a third-party beneficiary of a contract between FCA and the dealership from which Ward purchased his Truck. *Id.* at PageID.34187.

Ward "has the burden of showing that the parties to that contract intended to benefit [him], individually or as a member of a class of beneficiaries." *Casias v. Cont'l Cas. Co.*, 960 P.2d 839 (N.M. Ct. App. 1998). This intent must "appear either from the contract itself or from some evidence that the person claiming to be a third party beneficiary is an intended beneficiary." *Valdez v. Cillessen & Son, Inc.*, 734 P.2d 1258, 1264 (N.M. 1987).

Without evidence of a contract between Defendants and/or third-party dealerships, Ward argues that FCA's awareness that Ward "required" a Truck that met emissions standards demonstrates his

intended beneficiary status. ECF No. 241, PageID.34187–88. Ward also claims that he relied on FCA's representations, "made both directly on its website and through a salesperson at FCA's third-party dealership." *Id.* at PageID.34188. But no reasonable jury could find this evidence sufficient to demonstrate that FCA intended to give Ward "a right to enforce a contract to which he is not a party." *Thompson v. Potter*, 268 P.3d 57, 61 (N.M. Ct. App. 2011). Therefore, as a mere incidental beneficiary, Ward cannot bring a breach of contract claim against FCA. *Fleet Mortg. Corp. v. Schuster*, 811 P.2d 81, 83 (N.M. 1991).

In addition, Ward's breach of contract claim is preempted by the UCC. Ward does not dispute that his Truck purchase was a contract for the sale of goods governed by the UCC, which limits his remedies to those available under the UCC. *See Badilla v. Wal-Mart Stores E., Inc.*, 389 P.3d 1050, 1052 (N.M. Ct. App. 2016). Accordingly, summary judgment is entered in favor of FCA on Plaintiffs' New Mexico breach of contract claim, and it is dismissed with prejudice.

### 7. North Carolina State Law Claims

Through Plaintiff Jeremy Perdue, Plaintiffs seek to bring consumer protection, fraudulent concealment, and breach of contract claims on behalf of the putative North Carolina subclass.

### a. North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") and Fraudulent Concealment Claims

Defendants argue that Plaintiffs cannot demonstrate actual reliance or causation based on a misrepresentation or non-disclosure to succeed on their North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") claim. ECF No. 218, PageID.27413, PageID.27415–16; ECF No. 221, PageID.28611. To raise a NCUDTPA claim "based upon deception and 'fraudulent statements,' plaintiffs must allege 'actual reliance' on a misrepresentation and that such reliance was the proximate cause of the injury." *Cross v. Ciox Health, LLC*, 438 F. Supp. 3d 572, 584 (E.D.N.C. 2020) (quoting *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 781 S.E.2d 1, 9–10 (N.C. 2015)). Furthermore, as with fraudulent concealment claims, if an NCUDTPA claim is premised on "failure to disclose a material fact, there must have been a duty to speak or the party accused of fraud must have taken steps to actively conceal facts." *Withers v. BMW of N. Am., LLC*, 560 F. Supp. 3d 1010, 1020 (W.D.N.C. 2021); *see also Lawrence v. UMLIC-Five Corp.*, No. 06-20643, 2007 WL 2570256, at *3 (N.C. Super. Ct. June 18, 2007). North Carolina law also specifically recognizes that "once a party speaks[,] it has a duty to reveal other pertinent information," to avoid making the "original statement" misleading. *Jones v. Am. Tobacco Co.*, No. 89-1477, 1990 WL 101455, at *5 (4th Cir. July 6, 1990).

Although Plaintiffs contend that North Carolina courts "apply a duty to disclose under circumstances similar to those present in this case," ECF

No. 241, PageID.34194, their support for this contention is sparse. Plaintiffs cite *Packrite, LLC v. Graphic Packaging International, LLC*, which enumerates instances where a duty to disclose arises in arm's length transactions even absent a fiduciary relationship. For example, where "one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence," the party with knowledge has a duty to disclose. No. 17-1019, 2020 WL 7060395, at *3 (M.D.N.C. Dec. 2, 2020) (quoting *Hardin v. KCS Int'l, Inc.*, 682 S.E.2d 726, 733 (N.C. Ct. App. 2009)). But *Packrite* involved an undisputed existence of "arm's-length negotiations" as part of the parties' contractual relationship and allegations that the defendant made partial disclosures upon which the plaintiff relied. *Id.*

In the most on-point cases the Court could identify, vehicle manufacturers were found to have a duty to disclose latent defects because the plaintiffs purchased their cars at authorized dealerships that were presumed to be agents of the manufacturer. *Wheeler v. BMW of North America LLC*, 534 F. Supp. 3d 527, 534, 535 n.2 (W.D.N.C. 2021); *Jones v. BMW of North America, LLC*, No. 20-00057, 2020 WL 5752808, at *1 n.1, *10 (M.D.N.C. Sept. 25, 2020); *Withers*, 560 F. Supp. 3d at 1019, 1019 n.3. And in *Wheeler*, *Jones*, and *Withers*, the plaintiffs all proffered evidence that dealership employees gave misleading information about the alleged defect. Specifically, when the plaintiffs raised complaints about the

alleged defect to the authorized dealers, they were told that the car was "normal." *Wheeler*, 534 F. Supp. 3d at 532; *Jones*, 2020 WL 5752808, at \*1; *Withers*, 560 F. Supp. 3d at 1018.

But here, Plaintiffs never engaged in similar arms-length negotiations with Defendants or their purported agents. Furthermore, Plaintiffs admit that Perdue did not rely on any partial disclosures that would trigger Defendants' duty to disclose. In fact, Plaintiffs concede that Perdue "relied on no advertisements" by FCA before purchasing his Truck and did not rely on any of Cummins' statements. ECF No. 218, PageID.27381; ECF No. 221, PageID.28586; ECF No. 241, PageID.34142, PageID.34145.

Unlike in *Wheeler*, *Jones*, and *Withers*, Perdue purchased his Truck "***used*** from a third-party Chevrolet dealership that is unaffiliated with FCA US." ECF No. 221, PageID.28612. Plaintiffs do not rebut FCA's contention that the Chevrolet dealership is unaffiliated with FCA and cannot be considered an FCA agent. Nor do they articulate a theory to justify a "contractual or other similar relationship" with Cummins. In the absence of such a relationship and because they cannot demonstrate Perdue's reliance on Defendants' partial disclosures, Plaintiffs cannot succeed on their NCUDTPA claim or fraudulent concealment claim under North Carolina law.

Relatedly, the North Carolina economic loss doctrine bars NCUDTPA claims "where the only damage alleged is damage to the

product itself and the allegations of unfair trade practices are intertwined with the breach of contract or warranty claims." *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 627 (M.D.N.C. 2006). Without demonstrating a breach of "a duty, independent of a contractual duty," NCUDTPA claims are foreclosed by the economic loss doctrine. *Withers*, 560 F. Supp. 3d at 1021. Therefore, summary judgment is granted in favor of Defendants on Plaintiffs' NCUDTPA and fraudulent concealment claims. Those claims are dismissed with prejudice.

### b. North Carolina Breach of Contract Claim

FCA argues that Plaintiffs' breach of contract claim fails because North Carolina courts have declined to recognize privity between manufacturers and consumers. ECF No. 221, PageID.28613. Plaintiffs respond by claiming that Perdue was a third-party beneficiary of the contract between FCA and the dealership from which he purchased his Truck. ECF No. 241, PageID.34190. But Plaintiffs have not proffered any evidence of a contract between Defendants and/or the dealership where Perdue purchased his Truck. In fact, Plaintiffs lack any evidence demonstrating that Perdue was an intended beneficiary of such contracts, assuming they exist. Therefore, Plaintiffs simply cannot maintain a breach of contract claim or a third-party beneficiary claim under North Carolina law. *See Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 407 S.E.2d 178, 182 (N.C. 1991); *Pearson v. Gardere Wynne Sewell LLP*, 814 F. Supp. 2d 592, 601 (M.D.N.C. 2011). Summary judgment is entered

in favor of FCA on Plaintiffs' North Carolina breach of contract claim, and it is dismissed with prejudice.

### 8. Texas State Law Claims

Through Plaintiff Paul Chouffet[8], Plaintiffs seek to bring consumer protection and fraudulent concealment on behalf of the putative Texas subclass. Defendant Cummins[9] has moved for summary judgment on Plaintiffs' consumer protection and fraudulent concealment claims under Texas law.

### a. Texas Deceptive Trade Practices Act ("DTPA") and Fraudulent Concealment Claims

Just as with its arguments against Plaintiffs' Michigan fraudulent concealment claims, Cummins cites several federal and state Texas court cases in its opening summary judgment brief, but does not contextualize much of its legal support. Instead, Cummins most clearly outlines its arguments against Plaintiffs' Texas law claims in response to Plaintiffs' notice of supplemental authority. ECF No. 248. As noted above, the Court disfavors this disorganized method of summary judgment briefing. Even

---

[8] Although Plaintiff Natalie Beight is still listed as a Texas plaintiff in the TCAC (ECF No. 255, PageID.35026–30), Beight has been dismissed from this case. ECF No. 153. Similarly, Plaintiff Martin Rivas is listed as a Texas Plaintiff, but Plaintiffs' counsel has been permitted to withdraw as his attorney, and Rivas has not indicated his intent to continue as a pro se party to this case. ECF No. 154.

[9] The Court has previously dismissed Plaintiffs' Texas law claims as to Defendant FCA. ECF No. 221, PageID.28614 n.27.

so, Plaintiffs were indisputably on notice of the DTPA and Texas fraudulent concealment issues addressed by the *Counts* court under factually and procedurally similar circumstances. As such, the Court will address the merits of the parties' arguments.

In general, Cummins argues that Plaintiffs' Texas consumer protection and fraudulent concealment claims fail because Plaintiffs cannot demonstrate actual reliance nor that Cummins had a duty to disclose. As the Texas Supreme Court has recognized, "downstream purchasers" generally cannot "bring DTPA claims against remote manufacturers and suppliers." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 88 (Tex. 2004). Specifically, where the "deceptive acts alleged were not committed against or communicated to [downstream purchasers] in connection with their own purchases," upstream manufacturers are not liable under the DTPA. *Id.*; *see also Bailey v. Smith*, No. 05-085, 2006 WL 1360846, at *11 (Tex. Ct. App. May 18, 2006) (summarizing that Texas courts have dismissed "DTPA claims against upstream manufacturers where none of their representations reached the consumer").

In *Amstadt v. U.S. Brass Corp.*, the Texas Supreme Court found that even where a manufacturer "exercised significant control over the design and installation" of the defective component product, it ultimately "had no role in the sale [of the finished product] to the plaintiffs." 919 S.W.2d 644, 652 (Tex. 1996). Moreover, the manufacturer's "marketing efforts were not

intended to, nor were they, incorporated into the marketing of the [finished product] to the plaintiffs." *Id.* Even more significantly, the manufacturer's "products were subject to independent evaluation" by state regulators and other professionals. *Id.* As such, the court held that the manufacturer's "actions were not connected with the plaintiffs' transactions . . . in a way that justifies liability under the DTPA." *Id.*

Cummins is entitled to summary judgment on Plaintiffs' DTPA claim. While the *Counts* court denied summary judgment on the DTPA claim, the *Counts* plaintiffs presented evidence that they "viewed and relied on Defendants' advertisements regarding the diesel Cruze's emissions." 2022 WL 2079757, at *23. But here, Plaintiffs concede that Chouffet "did not consider *any* statement by Cummins in making [his] purchasing decision." ECF No. 218, PageID.27381; ECF No. 241, PageID.34142.

Indeed, Cummins is very similarly positioned to the manufacturer in *Amstadt*. Even though Cummins designed the diesel engine that was incorporated into the Trucks, it never communicated directly to consumers. Nor did Plaintiffs rely on any of Cummins' statements in purchasing the Trucks. Lastly, independent Regulators evaluated Cummins' engines, further removing Cummins from a direct relationship with consumers. Without a connection to Plaintiffs' transactions or evidence that consumers were exposed to any of Cummins' alleged misrepresentations, Plaintiffs cannot succeed on a DTPA claim. *See James*

*V. Mazuca & Assocs. v. Schumann*, 82 S.W.3d 90, 95–96 (Tex. Ct. App. 2002) (explaining that in the absence of actionable misrepresentations, the defendant's "silence amounts to nothing more than potentially negligent omissions, but falls short of the affirmative deception required by the DTPA").

For similar reasons, Plaintiffs' fraudulent concealment claim under Texas law must be dismissed. "Under Texas law, a duty to disclose in the context of fraudulent concealment arises only in limited circumstances where there is a fiduciary or confidential relationship." *Adams v. Nissan N. Am., Inc.*, 395 F. Supp. 3d 838, 849 (S.D. Tex. 2018). A party can also assume a duty to disclose if it "voluntarily elects to make a partial disclosure . . . even though the speaker was under no duty to make the partial disclosure in the first place." *Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 584 (5th Cir. 2001); *see also Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019). But in general, "[s]ilence is a false representation only when the circumstances impose a duty on the party to speak and he deliberately remains silent." *Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, 662 F. Supp. 2d 623, 648 (S.D. Tex. 2009). Furthermore, fraudulent concealment requires showing actual reliance. *Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 623 (Tex. Ct. App. 2000).

Plaintiffs cannot demonstrate that Cummins made partial disclosures that it had a duty to supplement or that Cummins had an

independent duty to disclose based on a special relationship. Plaintiffs admit that they were not exposed to any of Cummins' alleged misrepresentations, making it impossible for them to have relied on any partial disclosures. Moreover, absent any special relationship with Plaintiffs, Cummins did not have an independent duty to disclose. *See Adams*, 395 F. Supp. 3d at 850 ("No duty [to disclose] arises in an arms-length transaction between a manufacturer and consumer, particularly where Plaintiffs did not purchase or lease their vehicles directly from the manufacturer."). Therefore, Cummins is entitled to summary judgment on Plaintiffs' Texas fraudulent concealment claims. Those claims are dismissed with prejudice.

## J. Standing Issues Related to State Law Claims Lacking a Corresponding Potential Class Representative

Defendants further argue that Plaintiffs lack standing to bring claims arising under the laws of any states for which there is no putative class representative identified as a party. ECF No. 218, PageID.27418; ECF No. 221, PageID.28614–15. Plaintiffs effectively concede this point, clarifying that they are seeking class certification only for "state-specific classes corresponding to the claims of the remaining [potential] class representatives." ECF No. 241, PageID.34208. Plaintiffs further concede that "they are not seeking to certify any remaining claims." *Id.* As such, Plaintiffs need not justify their standing for state law claims they no longer intend to pursue, and those abandoned claims are dismissed with

93

prejudice. At the same time, the Court notes that Plaintiffs *are* seeking to raise RICO and state breach of contract claims on behalf of a "nationwide class." *Id.*

Defendants are correct that Plaintiffs must demonstrate standing for every claim they raise. This Court has previously indicated that "the certification issues in the instant case are logically antecedent to the Article III standing concerns, and the determination of standing will be postponed until a class certification ruling." *Bledsoe*, 378 F. Supp. 3d at 642. As discussed above, however, "where the putative plaintiffs' injury is in doubt, Article III standing issues should be resolved in the first instance." *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011).

Here, the Court has concluded that Plaintiffs lack standing to bring RICO claims against Defendants. Accordingly, Plaintiffs may not raise RICO claims on behalf of a nationwide class. *See Fallick*, 162 F.3d at 422–23. Furthermore, the Court has granted summary judgment in favor of FCA on all of Plaintiffs' state-specific breach of contract claims. If named Plaintiffs themselves have not suffered redressable injury on a certain claim, they are "not eligible to represent a class of persons who did allegedly suffer injury." *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403–04 (1977). Therefore, Plaintiffs cannot bring breach of contract claims on a nationwide basis because they have not

demonstrated the elements of injury for their own respective breach of contract claims.[10]

## IV.   CONCLUSION

For the foregoing reasons, the motions for summary judgment of Defendant Cummins Inc. (ECF No. 218) and Defendant FCA US LLC (ECF Nos. 221, 263) are **DENIED IN PART and GRANTED IN PART**. Given the complexity of the TCAC and the fact that some of Plaintiffs' claims have been previously dismissed in prior Orders of the Court, the table below summarizes all claims that have been dismissed as a result of this Order, as well as the Court's previous Orders.

---

[10] At the motion to dismiss phase, courts in this circuit have consistently concluded that where the named plaintiffs did not allege that they suffered injuries in states other than the ones related to their individual injuries, they lack standing to raise claims on behalf of a nationwide class. *See, e.g.*, *McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 755 (E.D. Mich. 2019); *Withrow v. FCA US LLC*, No. 19-13214, 2021 WL 2529847, at *10 (E.D. Mich. June 21, 2021), *amended*, No. 19-13214, 2021 WL 9629458 (E.D. Mich. July 21, 2021); *Wozniak v. Ford Motor Co.*, No. 17-12794, 2019 WL 108845, at *1 (E.D. Mich. Jan. 4, 2019); *Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 291 (N.D. Ohio 2020). Now at summary judgment, the Court has not only concluded that Plaintiffs' individual breach of contract claims fail on the merits, but also that Plaintiffs cannot demonstrate how FCA's alleged violations of other states' breach of contract laws have caused them injury in any other states. Plaintiffs thus lack standing to raise nationwide breach of contract claims for this related reason.

The following counts of the TCAC are **DISMISSED with prejudice**:

| *Count* | *Claim* | *Dismissed as to:* |
|---|---|---|
| Count A.I | Racketeer Influenced & Corrupt Organizations Act ("RICO") | Cummins and FCA |
| Count A.II | Magnuson-Moss Warranty Act ("MMWA") | FCA (Plaintiff Kerber) [previously dismissed against Cummins and FCA (ECF No. 97)] |
| Counts B.I–II | Michigan CPA, Fraudulent Concealment | Cummins [previously dismissed against FCA (ECF No. 215)] |
| Count C.III | California FAL | Cummins (Plaintiff Bledsoe) [previously dismissed against FCA (Plaintiff Bledsoe) (ECF No. 215)] (California FAL remains as to FCA through Plaintiff Kerber) |
| Count C.IV | California Breach of Contract | FCA (Plaintiff Kerber) [previously dismissed against FCA (Plaintiff Bledsoe) (ECF No. 215)] |
| Count D.II | Illinois Breach of Contract | FCA (No breach of contract claims brought against Cummins) |
| Count D.III | Illinois Fraudulent Concealment | Cummins (Illinois fraudulent concealment claim remains as to FCA) |
| Count G.III | New Mexico Breach of Contract | FCA (No breach of contract claims brought against Cummins) |
| Counts H.I–II | South Carolina UTPA, RMDD | Cummins [previously dismissed against FCA (ECF No. 215)] |
| Counts J.I, J.III | Texas DTPA, Fraudulent Concealment | Cummins [previously dismissed against FCA (ECF No. 215)] |

| Counts W.I, W.III | Idaho CPA, Fraudulent Concealment | Cummins [previously dismissed against FCA (ECF No. 215)] |
|---|---|---|
| Counts MM.I–II | North Carolina UDTPA, Fraudulent Concealment | Cummins and FCA |
| Count MM.III | North Carolina Breach of Contract | FCA (No breach of contract claims brought against Cummins) |

Any other state law claims abandoned by Plaintiffs are also **DISMISSED with prejudice.** All other counts of the TCAC not dismissed by this Order remain.

**IT IS SO ORDERED.**

Dated: March 23, 2023          s/Terrence G. Berg
                               TERRENCE G. BERG
                               UNITED STATES DISTRICT