UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JAMES BLEDSOE, et al.**, individually and on behalf of all others similarly situated,<br><br>        **Plaintiffs**,<br><br>   v.<br><br>**FCA US LLC,** a Delaware corporation, and **CUMMINS INC.**, an Indiana corporation,<br><br>        **Defendants**. | **4:16-CV-14024-TGB-RSW**<br><br>HON. TERRENCE G. BERG<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (ECF NO. 288); AND DENYING AS MOOT PLAINTIFFS' SECOND AMENDED MOTION FOR CLASS CERTIFICATION (ECF NOS. 274, 275)**, **DEFENDANTS' MOTION FOR LEAVE TO FILE SUR-REPLY (ECF NO. 285), AND DEFENDANTS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY (ECF NO. 292)** |

Before the Court are Defendants' Motion for Judgment on the Pleadings (ECF No. 288) and Plaintiffs' Second Amended Motion for Class Certification. ECF No. 275. The case is a putative class action brought by purchasers of Dodge Ram 2500 and 3500 pickup trucks ("Trucks" or "Pickups") manufactured by Defendant FCA US LLC ("FCA") and equipped with 6.7-liter Turbo-Diesel engines produced by Defendant Cummins Inc. ("Cummins"). Plaintiffs allege that between

2007 and 2012, Defendants marketed the Trucks as eco-friendly and fuel-efficient, with "clean diesel engines" as compared to other diesel trucks. In reality, they allege, the Pickups were emitting nitrogen oxides ("NOx") at levels exceeding federal and state emissions standards and at levels greater than a reasonable consumer would expect based on the alleged representations.

The Court has ruled on several pretrial matters here: motions to dismiss for judgment on the pleadings (ECF Nos. 97, 215), to exclude expert testimony under Daubert (ECF No. 262), and for summary judgment (ECF No. 272). Now, Defendants have asked for judgment on the pleadings based on recent developments in Sixth Circuit case law.

Last year, the Sixth Circuit issued an opinion considering facts similar to this case. *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.* 65 F.4th 851 (6th Cir. 2023) ("*Ford Motor*"). There, the Sixth Circuit upheld the district court's 12(b)(6) dismissal,[1] concluding that federal law—expressly, the Energy Policy and Conservation Act ("EPCA"), U.S.C. § 6201, and its corresponding regulatory scheme—preempted the plaintiffs' state-law claims. *Ford Motor*, 65 F.4th at 854.

Following *Ford Motor*, the Honorable Thomas L. Ludington of this Court dismissed two cases, also factually similar to this case, holding the

---

[1] *In re Ford Motor Co.*, No. 2:19-02901, 2022 WL 551221 (E.D. Mich. Feb. 23, 2022) (Cox, C.J.).

claims preempted by the Clean Air Act ("CAA"). 42 U.S.C. § 7401. *See Counts v. GM, LLC,* No. 16-12541, 2023 WL 4494336 (E.D. Mich. July 12, 2023) ("*Counts*"); *In re Duramax Diesel Litig.*, No. 17-11661, 2023 WL 4493595 (E.D. Mich. July 12, 2023) ("*Duramax*").

Defendants now rely on *Ford Motor, Counts, Duramax*, and the CAA to support their motion for judgment on the pleadings on Plaintiffs' remaining state-law claims. ECF No. 288. The parties fully briefed that motion (ECF Nos. 290, 291), and the Court is fully familiar with this long-standing case. A hearing is, therefore, unnecessary for the disposition of the motion. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). Having carefully considered these recent decisions and the briefing and argument on both sides, the Court concludes that the CAA impliedly preempts Plaintiffs' remaining state-law claims. Therefore, Defendants' motion for judgment on the pleadings (ECF No. 288) must be **GRANTED**. Consequently, Plaintiffs' Class Certification motion (ECF Nos. 274, 275), Defendants' Motion for Leave to File Sur-reply (ECF No. 285), and Defendants' Motion for Leave to File Supplemental Authority (ECF No. 292) will be **DENIED** as moot.

## I.    BACKGROUND

Plaintiffs first sought to bring a nationwide class action, with sub-classes in all 50 states and the District of Columbia. In Plaintiffs' operative Third Consolidated and Amended Class Action Complaint ("TCAC"), they allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Magnuson Moss Warranty Act

("MMWA"), and consumer protection, breach of contract, and fraudulent concealment laws of 50 states as well as the District of Columbia. ECF No. 255; Order, ECF No. 272, PageID.37714.

To prove their claims, Plaintiffs offer expert opinions and reports from Juston Smithers ("Smithers") and Edward Stockton ("Stockton"). Smithers' opinions address two primary issues: (1) whether the Pickups contain "defeat devices" or "excessive emissions devices" that cause NOx emissions beyond regulatory standards in common real-world driving conditions and (2) whether the Pickups' designs cause excessive fuel consumption. ECF No. 272, PageID.37715.

Smithers provides evidence advancing Plaintiffs' contentions that Defendants designed, manufactured, distributed, and sold thousands of Pickups in each of the states at issue, all of which—under real-world driving conditions—produce excessive emissions and suffer from decreased fuel economy as a result of undisclosed excessive emissions devices ("EEDs"). Expert Report of Juston Smithers ("Smithers Rep."), ECF No. 274-2, PageID.37904, 37916–20; ECF No. 174-3, PageID.18564–87.

Plaintiffs allege that Defendants marketed the Pickups with terms such as "clean diesel"; "ultra clean emissions"; "cleanest diesel engines"; "specifically developed to meet U.S. heavy-duty truck emission standards for 2010 in all 50 states"; "virtually eliminate particulate matter emissions"; "environmentally responsible"; and delivering "superior,"

4

"improved," "best," and "increased" fuel economy. ECF No. 274, PageID.37857; ECF No. 275, PageID.38865. Plaintiffs contend that Defendants failed to disclose, at point-of-sale communications or elsewhere, the following: (1) the fuel economy in the Pickups decreased from the fuel economy seen in prior models; (2) frequent de-sooting in the Pickups decreased fuel economy and increased emissions; (3) actual on-road emissions in the Pickups were much higher than the emissions standards; and (4) the Pickups entered active regeneration more often in real-world driving than under testing. *Id.* at PageID.38866.

Stockton's opinions address two damages models: (i) an "Overpayment" model, calculating the amount at the point of sale that putative class members overpaid for the Pickups that emit excessive NOx; (ii) and an "Excess Fuel Consumption" model, calculating the increased costs passed along to the consumer through the Pickups' excessive fuel consumption. These two damage models turn on Plaintiffs' ability to prove the existence of EEDs or defeat devices as described by Smithers. ECF No. 272, PageID.37715–16.

Defendants previously filed five *Daubert* motions seeking to exclude Smithers' and Stockton's opinions. The Court mostly denied these motions, except for Smithers' and Stockton's opinions on defeat devices only. *Daubert* Order, ECF No. 262. The Court excluded Smithers' opinions on the presence of a defeat device in the Pickups because his fraud-on-the-regulators theory lacked a sufficient factual basis. *Id.* at

PageID.36971–72. Consequently, the Court also excluded Stockton's opinions as much as they relied on Smithers' defeat device opinions. *Id.* at PageID.36982–83.

Defendants also moved for summary judgment, which was denied in part and granted in part. ECF No. 272. Because of the Court's prior rulings, Plaintiffs' only remaining claims against Defendant FCA are for violating state consumer protection statutes and fraudulent concealment in California, Illinois, and New Mexico. Plaintiffs' only remaining claims against Defendant Cummins are for violating state consumer protection statutes and fraudulent concealment in California, Illinois, and New Mexico, as well as fraudulent concealment in South Carolina. *Id.* at PageID.37804–05.

Plaintiffs filed a second amended motion for class certification and appointment of class representatives and class counsel ("Class Certification motion") (ECF No. 275) which was fully briefed. ECF Nos. 277, 278, 283, 284, and 285-1. That motion is pending. But because the Court will grant Defendants' instant motion for judgment on the pleadings (ECF No. 288), the Class Certification motion will be denied as moot.

### A.   The *Ford Motor* Decision

The Sixth Circuit decided *Ford Motor* on April 21, 2023. In *Ford Motor,* the Sixth Circuit affirmed the dismissal of claims[2] similar to those brought here, as impliedly preempted by the Energy Policy and Conservation Act (EPCA), 42 U.S.C. § 6201, and its corresponding regulations for emissions testing. The full Sixth Circuit Court denied a petition for an en banc rehearing. *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.,* No. 22-1245, 2023 WL 4115991, at *1 (6th Cir. June 21, 2023).

The plaintiffs in *Ford Motor* had filed a 311-count putative class action complaint brought by the same counsel representing Plaintiffs

---

[2] "The *Ford Motor* plaintiffs tested the 2018 Ford F-150 and 2019 Ford Ranger to verify the fuel economy of those vehicles. [I]n short, plaintiffs' testing allegedly prove[d] that the EPA estimates for both those truck models are several mpg better than what they should be. This means that both trucks consume much more fuel than previously estimated, costing consumers thousands of dollars in added fuel cost. [The plaintiffs] "filed a host of putative class-action suits alleging that Ford cheated during its coastdown testing procedure to ensure that it received a more favorable fuel economy estimate from the EPA. [T]he ensuing complaint, at nearly 1,000 pages long, included claims of breach of contract, negligent misrepresentation, breach of express warranty, fraud, and unjust enrichment under the laws of every state. Plaintiffs requested several forms of relief, including: 1) certification of the proposed class; 2) 'Declaring, adjudging, and decreeing the conduct of the Defendant as alleged herein to be unlawful, unfair, and deceptive'; 3) 'Requiring that all Class members be notified about the lower fuel economy ratings and higher emissions at Ford's expense and providing correct fuel economy and emissions ratings'; and 4) awarding plaintiffs restitution and damages." *Ford Motor*, 65 F.4th at 858.

here. In dismissing that complaint, *Ford Motor* held that federal law preempted state consumer protection and fraudulent concealment claims. Those claims alleged that Ford deceived consumers regarding the on-road emissions and fuel economy performance of Ford F-150 trucks. *Ford Motor*, 65 F.4th at 866.

The plaintiffs alleged that Ford "misrepresented or miscalculated certain road-testing factors during internal vehicle testing processes to report that its vehicles were more fuel efficient than they actually were." *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, No. 2:19-MD-02901, 2022 WL 551221, at *3 (E.D. Mich. Feb. 23, 2022). Plaintiffs also alleged that Ford engaged in deceptive and false advertising regarding the performance of the F-150 trucks: Specifically, Ford "sold its [trucks] while omitting information that would be material to a reasonable consumer; namely, that Ford miscalculated factors during internal vehicle testing processes[] to report that its vehicles were more fuel efficient than they were and discounted common real-world driving conditions." *Id.*

Ford moved to dismiss the complaint, arguing that the EPCA and its related regulations impliedly and expressly preempted Plaintiffs' claims. 2:19-MD-02901, ECF No. 82, PageID.3209–3217. Plaintiffs' opposition to Ford's preemption argument cited this Court's March 27, 2019 Order on Defendants' Motions to Dismiss Plaintiffs' Second Amended Complaint, (ECF No. 97) ("MTD Order"), stating: "Ford's

preemption argument conveniently ignores the raft of cases involving emissions cheating including several in this District, where defendants (including Ford) have unsuccessfully posited a similar challenge." 2:19-MD-02901, ECF No. 85, PageID.3317. Plaintiffs cited this Court's MTD Order throughout their opposition, designating that ruling as "passim" in its Table of Authorities. *Id.* at PageID.3293.

Judge Cox heard argument on Ford's motion to dismiss. *See* ECF No. 288-2, PageID.41428. Plaintiffs continued to rely on this Court's MTD Order and rulings in other emissions cases in this District, arguing this case is "exactly the same" and "on all fours" with *Ford Motor*:

> [J]ust like *Counts*, just like *Volkswagen* and a total of six cases [including *Bledsoe*] that have just denied exactly these kinds of preemption arguments in the emissions scandal cases *which are intellectually exactly the same as ours*. The only difference is in the emissions cases, Your Honor, there were cheap devices used to understate emissions when tested. And it was the EPA there, too.
>
> In our case, the bad behavior was to manipulate the road load variable to reduce the weight on the cars to inflate the miles per gallon. Both were dishonest acts to cheat on these tests. And Ford in its reply brief says all six district courts got it wrong in the emissions cases, but *they're on all fours with our cases. It's the exact same analysis, the exact same arguments that were made to support preemption* and to support their motions to dismiss and six out of six of the complaints were sustained in most material respects.

*Id.* at 22:16–23:6 (emphases added). ECF No. 288-2, PageID.41450–51.

Plaintiffs in *Ford Motor* compared this case (and five other emissions cases) to the claims and theories asserted in *Ford Motor*, arguing *Ford Motor* is "exactly" the same as this case:

> Our case is that Ford was dishonest, which causes two problems for Ford. One is that they might have trouble with the EPA, but that's not our case. Our case is that they defrauded consumers.
>
> And there's a case right on point, Your Honor, the *Counts* case from Judge Ludington at 237 F. Supp. 3d, 572. This is one of the emissions cheating cases involving General Motors. And Judge Ludington holds, 'Plaintiff's claims are not, as GM contends, contingent on proving that GM is in noncompliance with the EPA emissions regulations. There can be no doubt that proving noncompliance would bolster plaintiff's claims, but plaintiffs need not make that showing to prevail. Accordingly, plaintiff's claims are not preempted by the CAA.'
>
> So, they're confusing what is happening as between them and the EPA not the wrongs they've committed against consumers by deceiving consumers.
>
> *And Judge Ludington goes on to hold and I think it's just right on point* and he's quoting with approval the state court *Volkswagen* case. And Judge Ludington says 'Plaintiff's fraud in Virginia Consumer Protection Act claims do not rely on emissions violations or enforcement to make out their claims. Instead, plaintiff's claims rely upon allegedly false promises of compliance, efficiency and new technology or concealment of the fact that compliance testing was being circumvented.'
>
> *That is exactly our case.* That Ford omitted to consumers that the miles per gallon estimates were fraudulent, because they rigged the test.

Ex. A at 19:14–20:15 (emphases added). ECF No. 288-2, PageID.41448–49.

Despite being fully aware of the prior cases, Chief Judge Cox rejected the plaintiffs' arguments, entering an opinion and order that granted Ford's motion, concluding federal law impliedly and expressly preempted plaintiffs' claims. *Ford Motor*, 2022 WL 551221.

The Sixth Circuit affirmed the district court in *Ford Motor,* concluding similarly that federal law impliedly preempted plaintiffs' complaint, 65 F.4th at 864, and cited four main reasons in support of its conclusion.

First, by challenging the accuracy and appropriateness of Ford's testing submissions, the plaintiffs' claims "inescapably and impermissibly puts a jury into the EPA's regulatory shoes." *Id.* at 863. As a result, the plaintiffs' complaint encroached upon the EPA's regulatory authority because "even though the EPA exercised its statutory duty and found Ford's testing to be acceptable [as is the case here in *Bledsoe*], a jury would still make its own determination, thus conflicting with the EPA's authority to set its own fuel-economy figures." *Id.*

Second, the Sixth Circuit observed that "allowing juries to second-guess the EPA's fuel economy figures would permit them to rebalance the EPA's objectives." *Id.* The court noted the EPA "accounts for several factors, including costs, accuracy of data, and redundancy of testing" when choosing whether to accept a manufacturer's fuel mileage

estimates and reasoned "[i]t is for the EPA, not a jury, to balance its own objectives in determining whether fuel economy data is reasonable." *Id.*

Third, the appellate court explained that the "EPA has several statutory and regulatory ways to police suspected fraud and monitor compliance with its testing procedures." *Id.* (citing 49 U.S.C. § 32910; 40 C.F.R. § 600.312-08; 40 C.F.R. § 600.008; and 40 C.F.R. § 1066.2). Thus, because "determining whether a manufacturer has committed fraud against the agency *and* policing said fraud is, consequently, the responsibility of the EPA," the plaintiffs' allegations that Ford defrauded the EPA invited a jury "to usurp the EPA's fraud-policing powers." 65 F.4th at 863–64.

Finally, the panel in *Ford Motor* explained that allowing the plaintiffs' complaint to move forward "would skew the disclosures that manufacturers need to make to the EPA." *Id.* at 864. The panel noted that the EPA enacted regulations specifying precisely what information needed to be provided to the agency to gain its approval and found that "the EPA has the responsibility to determine whether this documentation is sufficient." *Id.* (citing 40 C.F.R. § 600.008(e)(1)). The court further reasoned, "[I]f a state-law claim were to proceed, a jury may find [an applicant's] documentation inadequate even if the EPA had previously determined otherwise." *Id.*

As applied here, *Ford Motor* forecloses Plaintiffs' consumer protection and fraudulent concealment claims relating to the Pickups'

excessive emissions and fuel economy. The Sixth Circuit held that preemption applied to the *Ford Motor* plaintiffs' argument that Ford's advertising campaign provided an independent basis on which the plaintiffs could base their claims. The court concluded these advertisements were inextricably tied to the plaintiffs' allegations that Ford defrauded the EPA. The court explained that Ford "relied solely on the EPA [fuel economy] estimates to proclaim that the Ranger was the 'most fuel-efficient gas-powered midsize pickup in America' and that the F-150 had a 'best-in-class EPA-estimated highway fuel efficiency rating of 30 mpg.'" 65 F.4th at 866.

The advertisements Plaintiffs cite here likewise rely solely on EPA's certification of the Pickups as meeting 2010 standards. *See* TCAC, ECF No. 255, PageID.34993, ¶ 17 (citing advertisements referring to "the strongest, cleanest, quietest diesel engine in its class," and stating, "both versions of the 6.7-liter Cummins Turbo Diesel in Ram Heavy Duty pickups meet all 50-state emissions standards with no need for a [diesel exhaust fluid] system"). *See also* TCAC, ECF No. 255, PageID.35061, ¶ 126 ("Every Dodge Ram pickup will comply with the 2010 NOx and PM emissions standards"); *Id.* at PageID.35062, ¶ 130 ("Cummins engineers determined that certifying the Dodge Ram pickup truck to the 0.2 g/mi 2010 NOx emission standard early would provide Cummins with significant commercial and technical advantages"); *Id.* at PageID.35063, ¶ 134 ("The 6.7L diesel engine…is the first to meet the 2010 EPA

emissions regulations in all 50 states"); *Id*. at PageID.35065, ¶ 137 ("Dodge and Cummins produced the cleanest heavy-duty diesel pickup in the market by meeting U.S. Environmental Protection Agency (EPA) 2010 emissions levels a full three years in advance"); *Id*. at PageID.35066, ¶ 140 ("The new Dodge Ram 2500 and 3500 are the first vehicles to achieve the stringent NOx 'phase-in' emission standard in all 50 states, and to do so three years early"); *Id*. at PageID.35068, ¶ 143 ("Reduced emissions are so important, the 6.7-liter is already able to meet the stringent truck emissions standards based on future requirements— for the 2010 model year"); *Id*. at PageID.35069, ¶ 145 ("Emissions are so low, they currently meet 2010 emissions regulations"); *Id*. at PageID.35070, ¶ 148 ("The Cummins 6.7-liter Turbo Diesel in Ram Heavy Duty is the only one in its class to meet all 50-state emissions standards").

As in *Ford Motor*, were the Court to hear complaints related to Defendants' EPA certification use, it would be "tantamount to permitting Plaintiffs to challenge the EPA [certification] itself, which plaintiffs cannot do." *Ford Motor*, 65 F.4th at 866 (quotation omitted).

The *Ford Motor* plaintiffs asked the Sixth Circuit to reconsider and rehear their appeal en banc. *See* Rehearing Pet. ECF No. 288-3. They asserted that the opinion created "a newfound preemption rule—no claim under state law if emissions testing is implicated[.]" They argued the Sixth Circuit should not have dismissed their claims because they "rest

on Ford's marketing of untruthful EPA estimates to consumers in violation of state law" and were thus not preempted. *Id.* at PageID.41480, 41483. The Sixth Circuit denied the petition for rehearing en banc. *Ford Motor*, 2023 WL 4115991.

In this case, the Court has already held, after much analysis, that due to lack of evidence and speculation, Plaintiffs could not support their fraud-on-the-regulators (EPA) theory that Defendants used a defeat device. ECF No. 262. That claim had been a significant part of Plaintiffs' case. Still, the underlying evidence for that theory and Defendants' underlying interactions with the EPA would be part of Plaintiffs' case on the few surviving state law consumer protection and fraudulent concealment claims involving EEDs and fuel economy. Like Plaintiffs here, the *Ford Motor* plaintiffs alleged:

1. Ford defrauded the EPA by submitting false and misleading information to secure regulatory approval;[3]

2. The *Ford Motor* plaintiffs conducted testing that purported to show the trucks at issue did not conform to the test results reported to the EPA when used in real-world driving;[4] and

---

[3] *Compare Id.* at 857–58 *with* TCAC, ECF No. 255, PageID.34991–995, 34999–35000, 35144–153, ¶¶ 15–19, 31–32, 300–16;

[4] *Compare Id.* at 858, *with* TCAC, ECF No. 255, PageID.35090–91, ¶¶ 189–191

3. Ford defrauded consumers in its advertising regarding Pickup performance in real-world use.[5]

In argument, Counsel for Plaintiffs told the trial court in *Ford Motor* that the instant case, *Bledsoe v. FCA*, is "*intellectually exactly the same*" as *Ford Motor*. ECF No. 288-2, PageID.41450, at 22:11–22. Counsel's statement is understandable because there is no principled distinction between this case and *Ford Motor*. The reasons that led the Sixth Circuit to hold that federal law preempted the *Ford Motor* plaintiffs' state-law claims require the same result here.

This Court already undertook, and a jury would still have to consider, detailed analyses on what, when, and how Defendants made disclosures to the EPA; the effect of those disclosures and later certifications by the EPA; and the Pickups' real-world driving experience compared to those disclosures and EPA certifications. The *Ford Motor* decision—which is binding Sixth Circuit precedent—had not existed when this Court made earlier rulings on motions involving preemption under the CAA and on the allegations against Defendants that they had defrauded the EPA and consumers. This Court must now follow the binding precedent of *Ford Motor*, which is directly on point.

---

[5] *Compare Id.* at 866, *with* TCAC, ECF No. 255, PageID.34993–94, ¶¶ 17–18.

**B.**   *Counts* **and** *Duramax*

Following *Ford Motor*, Judge Ludington dismissed two cases, also filed by Plaintiffs' counsel in this District, that are substantially similar to this one, on the grounds of implied preemption under the CAA. In those cases, the district court concluded that the claims before it, as in *Ford Motor,* were impliedly preempted by the CAA. *Counts*, 2023 WL 4494336, at *5; *In re Duramax Diesel Litig.*, 2023 WL 4493595, at *5. *Counts* and *Duramax* provide a comprehensive analysis that applies here. Given their essential substantive similarity, the Court discerns no legitimate reason to diverge from the study in those cases. Because *Counts* and *Duramax* correctly apply *Ford Motor*, much of the analysis below tracks and parallels their reasoning.

## II.   LEGAL STANDARD

A motion for judgment on the pleadings such as this one "is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties and judgment on the merits can be achieved by focusing on the content of the competing pleadings, attached exhibits, matters incorporated into the pleadings, and any facts of which the court may take judicial notice." *Strehle v. CitiMortgage, Inc.*, No. 17-11764, 2018 WL 2327027, at *3 (E.D. Mich. Apr. 30, 2018).

The same standard governing a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6) applies to a Fed. R. Civ. P. 12(c) motion. *Warriors*

*Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 284–85 (6th Cir. 2010). Thus, while the Court construes the complaint in the light most favorable to the plaintiffs, it "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. State of Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). Once the conclusory allegations and labels are stripped away, a complaint states a plausible claim for relief only if the remaining well-pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Sixth Circuit affirmed dismissal of the complaint in *Ford Motor* under Fed. R. Civ. P. 12(b)(6). *Ford Motor,* 65 F.4th at 867. It is appropriate for this Court to dispose of Plaintiffs' remaining state-law claims on the pleadings under Fed. R. Civ. P. 12(c).

## III.  DISCUSSION

### A.    Implied and Express Preemption

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States…shall be the supreme Law of the Land, "despite any 'Thing in the Constitution or Laws of any State to the Contrary.'" U.S. CONST. art. VI, cl. 2. *See also Ford Motor*, 65 F.4th 859; *Counts*, 2023 WL 4494336, at *2; *In re Duramax Diesel Litig*., 2023 WL 4493595, at *2. "The phrase 'Laws of the United States' encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization." *City of New York v.*

18

*FCC*, 486 U.S. 57, 63 (1988). Thus, "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." *Wis. Pub. Intervenor v. Mortier,* 501 U.S. 597, 604 (1991) (quoting *Gibbons v. Ogden,* 22 U.S. 1 (1824)). This inquiry is largely one of congressional intent: whether the statute demonstrates an "intent to supplant state authority in a particular field." *Id.* at 604–05. In line with the standards governing motions for dismissal, a defendant bears the burden of proof in establishing preemption as grounds for dismissal. *Brown v. Earthboard Sports USA, Inc.,* 481 F.3d 901, 912 (6th Cir. 2007); *See, E.g., Ford Motor*, 65 F.4th 859; *Counts*, 2023 WL 4494336, at *2; *In re Duramax Diesel Litig*., 2023 WL 4493595, at *2.

Ordinary preemption provides an affirmative defense to support the dismissal of a claim. *Hudak v. Elmcroft of Sagamore Hills,* 58 F.4th 845, 852 (6th Cir. 2023). "State-law claims can be preempted expressly in a federal statute or regulation, or impliedly, where congressional intent to preempt state law is inferred." *McDaniel v. Upsher-Smith Lab'ys, Inc.*, 893 F.3d 941, 944 (6th Cir. 2018) (citation omitted). Through an express preemption clause, Congress may make clear "that it is displacing or prohibiting the enactment of state legislation in a particular area." *Matthews v. Centrus Energy Corp.,* 15 F.4th 714, 720 (6th Cir. 2021). *Ford Motor*, 65 F.4th 859–60; *Counts*, 2023 WL 4494336, at *2; *In re Duramax Diesel Litig*., 2023 WL 4493595, at *2.

19

By contrast, implied preemption applies in one of two forms: field or conflict. *Matthews*, 15 F.4th at 720. "Field preemption occurs 'where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 98 (1992)). In this kind of preemption, the scope or breadth of federal law is such that it may be inferred to occupy the entire field. Conflict preemption may instead be present when "Congress has not entirely displaced state regulation over the matter in question." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984). In that circumstance, state law may be preempted "to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* (internal citations omitted). *Ford Motor*, 65 F.4th 859–60; *Counts*, 2023 WL 4494336, at *2; *In re Duramax Diesel Litig.*, 2023 WL 4493595, at *3.

Plaintiffs correctly point out that this Court had refused to dismiss this case on the grounds of preemption under the CAA. Even so, as noted above, that was before *Ford Motor, Counts*, and *Duramax* were decided. This Court must now follow *Ford Motor*, and it finds the application of that decision in *Counts* and *Duramax* to be persuasive because the facts in those cases are virtually indistinguishable from those of this case. Plaintiffs argue that there is a presumption against preemption

concerning state-law consumer protection and fraudulent concealment claims. Yet those were the same kinds of claims found preempted by *Ford Motor*. Plaintiffs also invoke the text of the EPCA's preemption provision. ECF No. 290, PageID.41707–08. But consistent with *Ford Motor*, implied preemption applies here, not express preemption. Therefore, neither the EPCA's preemption language nor the CAA's saving clause is at issue.

## B.   The ECPA and CAA

When reviewing preemption, Congressional intention is the keystone. *Ford Motor,* 65 F.4th at 860; *Cipollone v. Liggett Grp.*, 505 U.S. 504, 516 (1992). The EPCA and the CAA grant the EPA wide-ranging authority to manage and supervise motor vehicle performance. The EPCA, enacted in 1975, aimed to establish a thorough regulation plan for fuel-economy testing, emphasizing improving motor-vehicle energy efficiency and assuring reliable energy data. *Ford Motor*, 65 F.4th at 854 (quoting 42 U.S.C. § 6201(5), (7)). Similarly, the CAA aims to safeguard and improve national air quality via a detailed regulation plan— ultimately benefiting public health, welfare, and productive capacity. 42 U.S.C. § 7401(b)(1). The CAA directs the EPA to set standards for air-pollutant emissions from new motor vehicles and their engines. *Id.* § 7521(a)(1). *Counts*, 2023 WL 4494336, at *3; *Duramax*, 2023 WL 4493595, at *3.

Under both these regulatory frameworks, the responsibility of rigorous testing falls on vehicle manufacturers. *Ford Motor,* 65 F.4th at

854–55; 42 U.S.C. § 7525(a)–(d), (h). The EPA requires such manufacturers to use a chassis dynamometer to conduct testing cycles for fuel economy under the EPCA and emissions under the CAA. *Ford Motor,* 65 F.4th at 854–55; *see also* 40 C.F.R. § 86.115-78. Congress clarified that fuel-economy tests should coincide with emission tests when possible (49 U.S.C. § 32904) highlighting that regulating vehicle fuel economy (EPCA) and emissions (CAA) are complementary and manageable by the same testing procedures. *Counts*, 2023 WL 4494336, at *3; *Duramax*, 2023 WL 4493595, at *3.

Both laws have provisions for "in-use testing," requiring manufacturers to conduct and report emissions tests for vehicles already in use. *See* 42 U.S.C. § 7541; 40 C.F.R. § 86.1847-01. If the EPA suspects the presence of a "defeat device," it can test or demand additional testing on any vehicle at a specified location, using its defined driving cycles and test conditions. 40 C.F.R. § 86.1809-01(b); *cf. Ford Motor,* 65 F.4th at 865. In both frameworks, manufacturers must submit data specified by the EPA for review. *See* 40 C.F.R. §§ 86.1843-01, 86.1844-01; *Ford Motor,* 65 F.4th at 856. Under the CAA, manufacturers must also deliver a meticulous account of the vehicle's auxiliary emission control devices ("AECDs"), enabling the EPA to investigate if any "defeat device" is present. 40 C.F.R. § 86.004-2 (providing the EPA's definition of "defeat device"); 40 C.F.R. § 86.1844-01(d)(11) (requiring manufacturers to

describe any AECDs); *see also Counts*, 2023 WL 4494336, at *3–4; *Duramax*, 2023 WL 4493595, at *4.

The EPA controls data evaluation under both regimes. Manufacturers must convince the EPA that their vehicle design does not unnecessarily reduce the effectiveness of emissions control under regular operation and use. 40 C.F.R. § 86.1809-01(d)(1), (2)(ii). If the initial round of fuel-economy testing shows unsatisfactory results, manufacturers must conduct more tests. *Counts*, 2023 WL 4494336, at *3; *Duramax*, 2023 WL 4493595, at *4 (quoting *Ford Motor*, 65 F.4th at 865).

Under the EPCA and the CAA, the EPA is tasked with making an affirmative statement about the vehicle's performance based on its review of manufacturer data. This results in either a fuel-economy estimate under the EPCA, 49 U.S.C. § 32904(c), or a Certificate of Conformity ("COC") based on emissions testing under the CAA, 42 U.S.C. § 7525(a)(1). If a vehicle complies with the regulations, the EPA issues a COC—the EPA's favorable decision on the vehicle's emissions performance. *Counts*, 2023 WL 4494336, at *4; *Duramax*, 2023 WL 4493595, at *4.

The EPA also holds substantial power to investigate and penalize manufacturers that do not comply. As with the EPCA, *see Ford Motor,* 65 F.4th at 857 (including statutory and regulatory citations), under the CAA, the EPA may impose fines, *see, e.g.*, 42 U.S.C. §§ 7524(b), 7524(c), call back vehicles, *id.* § 7541(c)(1), and revoke a vehicle's COC, 40 C.F.R.

23

§§ 86.1850-01(d), 86.1851-10(d)(1). *Counts*, 2023 WL 4494336, at *4; *Duramax*, 2023 WL 4493595, at *4.

Both legislative frameworks provide information for consumers, guiding them with publicly disclosed test results. *See* Data on Cars used for Testing Fuel Economy, EPA (last updated June 14, 2023), https://www.epa.gov/compliance-and-fuel-economy-data/data-cars-used-testing-fuel-economy (releasing results of fuel-economy testing publicly); 42 U.S.C. § 7525(e) (requiring the EPA to do the same under the CAA).

In the CAA context, the EPA also requires manufacturers to put specific language inside the engine compartment stating that the vehicle complies with the EPA's applicable emissions standards. 40 C.F.R. § 86.1807-01(a), (c)(ii). This transparency allows prospective buyers to make informed decisions and manufacturers to communicate clear compliance to their customers, ensuring consistent and comparable emissions information. *See Ford Motor,* 65 F.4th at 857; *Counts*, 2023 WL 4494336, at *4; *Duramax*, 2023 WL 4493595, at *4. Congressional intent demonstrates that the CAA impliedly preempts state-law claims of the type remaining here: those reliant on emissions figures provided by vehicle manufacturers and approved by the EPA. *Id*.

## C.   Applying *Ford Motor* and Progeny

The *Ford Motor* court concluded that the EPCA impliedly preempted state-law claims because the latter intertwined with alleged

violations of the former. *Ford Motor,* 65 F.4th at 866. Those conclusions apply equally to the CAA implied preemption at issue. *Counts*, 2023 WL 4494336, at *4; *Duramax*, 2023 WL 4493595, at *5.

Like those in *Ford Motor*, Plaintiffs' claims here are inextricably intertwined with alleged violations of the CAA. As explained earlier, Plaintiffs' state-law claims arise from alleged misconduct by Defendants involving violations of the CAA vis-à-vis EPA regulations for defeat devices,[6] EEDs, testing procedures, and emissions output in real-world driving. Without the CAA and its regulations, Plaintiffs would have no basis for their claims. As a result, they exist "solely because of" a federal statute and are thus impliedly preempted by it. *Ford Motor,* 65 F.4th at 866; *see also Loreto v. Procter & Gamble Co.,* 515 F. App'x 576, 579 (6th Cir. 2013). As stated in *Ford Motor*, "any fraud committed by [defendants] on consumers is a byproduct of alleged fraud committed on the EPA" such that allowing plaintiffs' challenge "is 'tantamount to permitting [p]laintiffs to challenge the EPA…, which plaintiffs cannot do." *Ford Motor*, 65 F.4th at 866 (quoting *In re Ford Motor Fusion and C-MAX Fuel Econ. Litig.,* No. 7:13-MD-02450, 2017 WL 3142078, at *10 (S.D.N.Y. July 24, 2017)). Because Plaintiffs' state-law claims would "inevitably conflict with the [EPA]'s responsibility to police fraud consistently with the Administration's judgment and objectives," the

---

[6] The Court previously found Plaintiffs' evidence of defeat devices lacking.

CAA impliedly preempts them. See *Ford Motor,* 65 F.4th at 861 (reiterating *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001)). *Counts*, 2023 WL 4494336, at *4–5; *Duramax*, 2023 WL 4493595, at *5.

First, *Ford Motor* provided clear insight: when the EPA approves and accepts a manufacturer's test data, legal challenges of the data are essentially proxy battles over the EPA. *Ford Motor*, 65 F.4th at 862–63. The same principle applies here. For their state-law fraud and consumer protection claims, whether based on EEDs or defeat devices, Plaintiffs must demonstrate in some measure that Defendants "failed to follow the EPA-pr[e]scribed testing procedures or [their] obligation to report truthful information to the EPA." *Id.* at 865. *Counts*, 2023 WL 4494336, at *5; *Duramax,* 2023 WL 4493595, at *5.

Despite EPA approval of Defendants' emissions tests and AECD reports, a jury would have to make its own independent judgment, potentially encroaching on the EPA's mandate by determining whether Defendants' test results were deceptive—as Plaintiffs and their experts claim—or truthful, according to the EPA's assessment. *Ford Motor,* 65 F.4th at 863. Plaintiffs claim that Defendants deceived the EPA to secure EPA-issued COCs, resulting in Pickups that emit more in real-world conditions than is allowable under federal standards. *Counts*, 2023 WL 4494336, at *5; *Duramax*, 2023 WL 4493595, at *5.

26

The 'defeat device' claims of Plaintiffs have been found to lack sufficient evidence. Plaintiffs' proofs for their close cousin EEDs, as described by their expert Smithers, will involve much the same evidence and analyses for Plaintiffs' excessive emissions, fuel efficiency, and fraud-on-consumers theories and claims. *See* ECF No. 262.

Plaintiffs have not identified an emissions benchmark—except the EPA's standards—that a reasonable consumer would be aware of, care about, or expect. Plaintiffs' allegations about EEDs concealing excess emissions from consumers (and the EPA) hinge solely on the violation of EPA regulations. *See Counts*, 2023 WL 4494336, at *5; *Duramax*, 2023 WL 4493595, at *5. The exceeding of the allowed EPA emissions standards in real-world driving conditions—what the EPA standards are supposed to approximate—is the crux of Plaintiffs' remaining state-law fraud claims.

The core of the remaining part of this case is Plaintiffs' primary allegation that Defendants should have disclosed EEDs, accurate real-world driving NOx emissions, and their impact on fuel economy to consumers (and the EPA), based on definitions and expectations all arising from EPA regulations. Because the EPA accepted Defendants' testing information and approved the Pickups, Plaintiffs' claims essentially challenge the EPA's actions. *See Ford Motor,* 65 F.4th at 683 (citing *Farina v. Nokia Inc.*, 625 F.3d 97, 122 (3d Cir. 2010)). Plaintiffs' claims are thoroughly entwined with federal emissions standards and the

27

EPA and are impliedly preempted by the CAA. *Ford Motor*, 65 F.4th at 863. *Counts*, 2023 WL 4494336, at \*6; *Duramax*, 2023 WL 4493595, at \*6.

Plaintiffs argue that their claims do not depend on noncompliance with the CAA; they are based on Defendants' alleged failure to disclose to consumers that the Pickups "emit[] pollutants and consume[] fuel at rates far exceeding what a reasonable consumer would expect." ECF No. 290, PageID.41690. But as noted above and in *Counts* and *Duramax,* it is only the EPA's standards that "a reasonable consumer would be aware of, care about, or expect." *Counts*, 2023 WL 4494336, at \*5; *Duramax*, 2023 WL 4493595, at \*5.

Moreover, the advertisements that Plaintiffs challenge relied on the EPA's certification that the Pickups' engines met emissions standards. *See* TCAC, ECF No. 255, PageID.35066–71, ¶¶ 142–150. Plaintiffs' argument that these statements were deceptive requires proof that the Pickups fail emissions standards. *Ford Motor* rejected this same line of argument, explaining plaintiffs cannot avoid preemption by challenging advertising based on EPA approval since "complaining about how Ford uses [EPA] estimates is tantamount to permitting Plaintiffs to challenge the EPA estimates themselves, which plaintiffs cannot do." *Ford Motor,* 65 F.4th at 866.

Second, in this case, a jury must assess that the EPA accepted and approved the emissions testing data received from Defendants as the

proxy for allowed emissions in real-world driving conditions, even if emissions exceed those levels in real-world driving. The EPA's allowance of proxy test data is how the EPA balances many objectives. A jury could easily overstep their bounds and meddle with the EPA's balanced objectives, including cost, data accuracy, and test-redundancy considerations. *Id.* at 863. After manufacturers conduct EPA-prescribed testing and submit their required data, the EPA—and no one else—must evaluate the results based on various important factors and objectives. *Id.* at 854, 856. *Counts*, 2023 WL 4494336, at *6; *Duramax*, 2023 WL 4493595, at *6.

The same principle applies to the Pickups here, which are put through a stringent testing process before their results are submitted to the EPA for review. *See* 40 C.F.R. § 1066; *see also* 42 U.S.C. § 7525(a)(1); 40 C.F.R. § 86.1844-01(d)(11) (requiring manufacturers to disclose the function and justification of any AECDs that reduce the effectiveness of emissions system under certain conditions); 40 C.F.R. § 86.1844-01(g)(3) (requiring "[d]etailed technical descriptions of emission-related components and AECDs"); 40 C.F.R. § 86.1844-01(g)(4) (requiring "[d]etailed calibration specifications for all emission-related components and AECDs"); 40 C.F.R. § 86.1844-01(g)(5) (requiring "[a]ny information necessary to demonstrate that no defeat devices are present on any vehicles covered by a certificate"). The EPA is well-equipped to assess these test results and disclosures holistically while striking a balanced

decision about regulatory compliance. *See* 42 U.S.C. § 7521(a)(1), (b)(2)(A) (permitting the EPA to revoke COCs). Allowing Plaintiffs to ask a jury to override these judgments could give rise to a shadow regulatory system— one led by private lawyers and experts unaccountable to the public rather than by elected officials in Congress and federal agencies like the EPA, charged with executing the law. *Ford Motor,* 65 F.4th at 863. *Counts*, 2023 WL 4494336, at *6; *Duramax*, 2023 WL 4493595, at *6.

The Sixth Circuit recognized that "[a]llowing juries to perform their own risk-utility analysis and second-guess the EPA's conclusion would disrupt the expert balancing underlying the federal scheme." *Ford Motor*, 65 F.4th at 863. For example, Plaintiffs allege the use of a NOx adsorber caused the Pickup to have more active regeneration events and exceed federal emissions standards. TCAC, ECF No. 255, PageID.34999, 35053, 35096, ¶¶ 30, 109, 203, ("Defendants failed to disclose…that the [Pickups]…emit dangerous levels of NOx at many times higher…than EPA and state maximum standards"). But the Court has already found that Cummins fully disclosed the effect of active regenerations on emissions to the EPA, which still certified the engines. ECF No. 262.

While *Ford Motor* concerned fuel economy figures and this case is about emissions-output statistics and fuel economy, that difference is not meaningful. As in *Counts* and *Duramax*, *Ford Motor*'s reasoning applies with greater force to the circumstances presented in this case than it did to the facts of *Ford Motor*. In *Ford Motor*, the debate revolved around

fuel-economy information calculated from the emissions figures approved by the EPA. *Ford Motor*, 65 F.4th at 854–57 ("This case centers on allegations that Ford cheated on its fuel economy *and emissions testing*…") (emphasis added). In this case, though, Plaintiffs are not just complaining about a product of the emissions data; as in *Counts* and *Duramax*, Plaintiffs are directly challenging compliance by Defendants with emissions data that the EPA itself approved after being provided the data by Defendants. *See Counts*, 2023 WL 4494336, at *7; *Duramax*, 2023 WL 4493595, at *7, citing 42 U.S.C. § 7525(a)(1). In other words, Plaintiffs' challenge here is one degree closer to the core issue than the challengers were in *Ford Motor*. As in *Counts* and *Duramax*, this fact only strengthens the controlling force that *Ford Motor* has here.

Under both the EPCA and CAA regulatory schemes, the EPA reviews an applicant's test data and disclosures and, if accepted, confers its imprimatur to the manufacturer's consumers. Under the EPCA, the EPA makes a fuel economy estimate based on its review of the manufacturer's fuel economy testing after confirming the applicant's testing met the EPCA's criteria: communicating to consumers that the manufacturer's testing was sufficient and its miles per gallon estimate reliable. 49 U.S.C. § 32904(c). ECF No. 288, PageID.41422.

Under the CAA, the EPA issues a COC based on its review of the manufacturer's emissions testing and AECDs after confirming the applicant's testing conformed to the CAA's criteria and that the AECD

justifications were sufficient. The COC conveys to consumers that the manufacturer's testing was sufficient and its emissions data reliable. 42 U.S.C. § 7525(a)(1). That the EPA does not publish the manufacturer's emissions test results is irrelevant to the preemption analysis. What is material is that, as in *Ford Motor*, Plaintiffs seek to second-guess the EPA's determination. ECF No. 288, PageID.41422–23. The EPA has determined that once the manufacturer meets the agency's regulatory standards, based on proxy tests and data for how the Pickups may perform in real-world conditions, the EPA is satisfied with allowing the Pickups to operate in the real world. Plaintiffs also argue that *Ford Motor* does not apply because it involved representations about anticipated fuel economy. Indeed, Defendants here did not make any representations about fuel economy on the Pickups' Monroney stickers. ECF No. 290, PageID.41707–08. For preemption purposes, the fact that the Pickups' Monroney stickers did not make any representations about anticipated fuel economy is unimportant. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (federal law impliedly preempted tort claims seeking to impose liability on automaker for failure to equip vehicle with airbags when governing regulations did not require them for the class of vehicle at issue); *see also Ford Motor*, 65 F.4th at 863 (citing *Geier*). Plaintiffs' claims impermissibly invite the jury to second-guess the EPA's decision not to require the manufacturer to provide (or the Monroney stickers to contain) fuel-economy estimates, and they would require Defendants to

submit additional disclosures and documentation that the EPA has decided it need not require. *Id.*

Third, Plaintiffs' claims would overstep the EPA's powers to penalize and prevent fraud. The EPA holds significant authority to enforce the EPCA and to deter fraudulent activities. *Id.* at 857. The same can be said of EPA's power to enforce the CAA. Plaintiffs argue that *Ford Motor* is distinguishable because it "examined enforcement authority under the EPCA, which is a distinct and materially different regulatory structure than the one at issue here." ECF No. 290, PageID.41704, n.11. Any difference between the EPCA and CAA is not meaningful here. Moreover, *Ford Motor* did not rest on any particular aspect of the EPCA's regulatory structure. The EPA has the same powers under the CAA that *Ford Motor* found determinative in finding preemption under the EPCA. 65 F.4th at 863–64.

The EPA's enforcement power is intended to be wielded by the federal government in the interest of protecting the public, not by individuals or classes of litigants seeking verdicts from juries that could contradict or usurp the EPA's role. *Id.* at 865 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001)). The EPA can investigate violations, issue civil penalties, request voluntary recalls, and even revoke COCs. *Ford Motor*, 65 F.4th at 865.

And the EPA has used these powers against manufacturers. *See, e.g.*, Garret Ellison, Michigan Companies Fined $10M for Selling Diesel

"Defeat Devices," MLive (Sept. 15, 2022), https://www.mlive.com/public-interest/2022/09/michigan-companies-fined-10m-for-sellingdiesel-defeat-devices.html [https://perma.cc/K88N-C8TL] ("The EPA says it resolved 40 diesel tampering cases in 2021."); Press Release, U.S. Dep't of Just., Volkswagen AG Agrees to Plead Guilty and Pay $4.3 Billion in Criminal and Civil Penalties; Six Volkswagen Executives and Employees are Indicted in Connection with Conspiracy to Cheat U.S. Emissions Tests (Jan. 11, 2017), https://www.justice.gov/opa/pr/volkswagen-ag-agrees-plead-guilty-and-pay-43-billioncriminal-and-civil-penalties-six [https://perma.cc/48YH-37UE] (extracting a $1.45 billion settlement payment from Volkswagen in 2017 for its violations of the CAA). *Counts*, 2023 WL 4494336, at *7; *Duramax*, 2023 WL 4493595, at *7. The presence of enforcement powers and the record of their execution reveal a comprehensive regulatory framework under the EPA's authority, further supporting implied preemption under the CAA. *See Ford Motor,* 65 F.4th at 863.

Fourth, Plaintiffs' claims would distort the EPA-required disclosures. Under the CAA, manufacturers must adhere to EPA regulations to obtain a COC by providing details about their emissions tests and any AECDs they use. *See, e.g.*, 40 C.F.R. §§ 86.1843-01, 86.1844-01. Here, Plaintiffs are effectively challenging the adequacy of Defendants' disclosures, first to the EPA and then to consumers, echoing the fraud claims seen in *Ford Motor*. 65 F.4th at 865. If allowed to

proceed, these claims would compel manufacturers to over-document their submissions despite the EPA's satisfaction, resulting in an unnecessary burden on manufacturers and the EPA's evaluation process. *See Buckman*, 531 U.S. at 351 ("Applicants would then have an incentive to submit a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application."); *Ford Motor,* 65 F.4th at 864 ("[I]f a state-law claim were to proceed, a jury may find this documentation inadequate even if the EPA had previously determined otherwise."). Plaintiffs are implying that the EPA either accepted false or insufficient data or made an incorrect judgment—and both such claims are preempted by federal law. *See Ford Motor,* 65 F.4th at 863 ("Finally, state-law claims would skew the disclosures that manufacturers need to make to the EPA.").

### D.    Preemption of Plaintiffs' California state-law claims

Plaintiffs argue that their California state-law claims are not preempted under *Ford Motor* because the CAA allowed California to enact its own emissions standards. But courts have not exempted California claims from the CAA's preemption provision. *See, in re Caterpillar, Inc.*, No. 14-3722, 2015 WL 4591236, at *13 (D.N.J. July 29, 2015) (CAA preempts claims brought by California consumers, among other states, alleging defendant breached warranty that vehicle complied with EPA emissions standards); *Counts*, 2023 WL 4494336, at *8

(dismissing claims brought by California subclass over argument that California plaintiffs are exempted from preemption); *Duramax*, 2023 WL 4493595, at *8 (same); *see also Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246 (2004) (CAA preempted fleet rules enacted by Los Angeles political subdivision that proscribed vehicles that fleet operators must buy or lease when adding or replacing fleet vehicles). The CAA also requires that every new vehicle and new engine sold or imported into any state of the United States, including California, must be covered by a COC demonstrating that the vehicle conforms to all applicable emissions standards. *See* 42 U.S.C. § 7522(a)(1). Defendants first need to obtain the EPA's approval to sell the Pickups, regardless of the state where the Pickup was sold. Plaintiffs' California state-law claims are preempted.

## IV.  CONCLUSION

Federal law preempts Plaintiffs' remaining state-law claims. Accordingly, Defendants' motion for judgment on the pleadings (ECF No. 288) is **GRANTED**. All remaining claims in Plaintiffs' Second Consolidated and Amended Class Action Complaint are **DISMISSED WITH PREJUDICE** under Fed. R. Civ. P. 12(c). Further, Plaintiffs' Second Amended Motion for Class Certification (ECF Nos. 274, 275), Defendants' Motion for Leave to File Sur-reply (ECF No. 285), and Defendants' Motion for Leave to File Supplemental Authority (ECF No.

292) are **DENIED AS MOOT**. Judgment will be entered in favor of Defendants.

    **IT IS SO ORDERED.**

Dated: January 26, 2024       s/Terrence G. Berg
                                   TERRENCE G. BERG
                                   UNITED STATES DISTRICT JUDGE