# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

JAMES BLEDSOE, *et al.*, individually and on behalf of all others similarly situated,

|  |  |
|---|---|
| Plaintiffs, |  |

v.

FCA US LLC, a Delaware corporation, and CUMMINS INC., an Indiana corporation,

Defendants.

No. 4:16-cv-14024-TGB-RSW

Honorable Terrence G. Berg

Magistrate Judge R. Steven Whalen

## PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS FCA US LLC'S AND CUMMINS INC.'S <u>RENEWED MOTIONS FOR SUMMARY JUDGMENT</u>

## [REDACTED VERSION]

010649-11/3438118 V1

## TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED.................................................................iv

STATEMENT OF CONTROLLING  OR MOST APPROPRIATE
    AUTHORITY .........................................................................................v

I.    INTRODUCTION .................................................................................1

    A.    Responses to Cummins' Statement of Material Facts ..........................2

    B.    Responses to FCA's Statement of Material Facts................................6

    C.    Additional Facts Requiring Denial of the Motions.............................16

        1.    Juston Smithers' reports establish that the Trucks
            emit more NOx than comparable trucks or than a
            reasonable consumer would expect. .........................................16

        2.    The named Plaintiffs all testified that the Trucks'
            fuel economy and emissions were material to their
            purchase, that their expectations were not met, and
            that they would not have purchased had they been
            aware. ..............................................................................18

        3.    Cummins and FCA jointly marketed the Trucks as
            clean and fuel efficient using uniform advertising
            and representations..............................................................20

II.    ARGUMENT.......................................................................................20

    A.    Standard of Review .......................................................................20

    B.    Plaintiffs' claims are not preempted under *Fenner*, the
        controlling Sixth Circuit precedent. ......................................................21

        1.    *Fenner* involved claims and theories identical to
            the claims here, with similar evidence....................................25

010649-11/3438118 V1

2. *Fenner* applied the *Ford* factors to the evidence and found the state-law claims were not preempted.............................................................26

    a. Plaintiffs' claims do not impermissibly challenge EPA decisions. ...............................................28

    b. Plaintiffs' claims do not undermine EPA policy considerations. ......................................................30

    c. Plaintiffs' claims do not usurp the EPA's authority to police fraud. ................................................31

    d. Plaintiffs' claims do not risk skewing disclosures to the EPA.......................................................33

3. *Fenner* also analyzed the claims under *Buckman* and its progeny, and again held claims based on comparisons to comparator vehicles, consumer expectations, and marketing claims are not preempted...............................................................34

4. Defendants' arguments fail to show Plaintiffs' claims are preempted. ..............................................37

C. FCA's state-specific arguments must be rejected. .............................40

1. FCA has not advanced any timely argument meeting its burden of establishing that Plaintiffs' Illinois claims are preempted or supported by insufficient evidence. ..............................................41

2. FCA has not advanced any timely argument meeting its burden of establishing that Plaintiffs' New Mexico claims are preempted or supported by insufficient evidence. ..............................................43

3. FCA has not advanced any timely argument meeting its burden of establishing that Plaintiffs' California claims are preempted or supported by insufficient evidence. ..............................................46

III. CONCLUSION...............................................................................46

- ii -

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)...................................................................................21

*Bledsoe v. FCA US, LLC*,
 2025 WL 2268065 (6th Cir. Aug. 8, 2025) ...............................................*passim*

*Brown v. Earthboard Sports USA, Inc.*,
 481 F.3d 901 (6th Cir. 2007) .....................................................................21

*Buckman Co. v. Plaintiffs' Legal Comm.*,
 531 U.S. 341 (2001)......................................................................34, 35, 36

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)...................................................................................20

*Counts v. Gen. Motors, LLC*,
 139 F.4th 576 (6th Cir. 2025)......................................................................*passim*

*Fenner v. Gen. Motors, LLC*,
 113 F.4th 585 (6th Cir. 2024) .....................................................................*passim*

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. &*
 *Sales Pracs. Litig.*,
 65 F.4th 851 (6th Cir. 2023).....................................................................3, 4, 21

*Freed v. Thomas*,
 976 F.3d 729 (6th Cir. 2020) .....................................................................22

*Fulgenzi v. PLIVA, Inc.*,
 711 F.3d 578 (6th Cir. 2013).....................................................................34

*Loreto v. Procter & Gamble Co.*,
 515 F. App'x 576 (6th Cir. 2013)..............................................................35

*Scott v. Harris*,
 550 U.S. 372 (2007)...................................................................................21

010649-11/3438118 V1

## STATEMENT OF ISSUES PRESENTED

1.    Do Plaintiffs' state-law consumer fraud claims, supported by evidence allowing comparisons between the Trucks' fuel economy and emissions performance and comparator vehicles, consumer expectations, and Defendants' marketing messages, pass the *Fenner* preemption test?

Plaintiffs say: Yes.

2.    Should FCA's arguments bearing no relationship to preemption or to the Sixth Circuit's decision in *Bledsoe* and be rejected as untimely?

Plaintiffs say: Yes.

3.    Have Plaintiffs presented sufficient evidence of consumer expectations grounded in comparisons between the Trucks' fuel economy and emissions performance and comparator vehicles, consumer expectations, and Defendants' marketing messages to permit those claims to proceed under *Fenner*, which approved claims based on similar evidence?

Plaintiffs say: Yes.

010649-11/3438118 V1

## STATEMENT OF CONTROLLING
## OR MOST APPROPRIATE AUTHORITY

**Section II.B.   Plaintiffs' claims are not preempted under Fenner, the controlling Sixth Circuit precedent**

*Fenner v. General Motors, LLC*, 113 F.4th 585 (6th Cir. 2024)

*Bledsoe v. FCA US, LLC*, 2025 WL 2268065 (6th Cir. Aug. 8, 2025)

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001)

**Section II.C.    FCA's state-specific arguments must be rejected**

*Fenner v. General Motors, LLC*, 113 F.4th 585 (6th Cir. 2024)

*Bledsoe v. FCA US, LLC*, 2025 WL 2268065 (6th Cir. Aug. 8, 2025)

- v -

010649-11/3438118 V1

## I.    INTRODUCTION

The law is clear, the facts are compelling, and the precedent is decisive. Defendants' renewed motions for summary judgment are not just unsupported—they are fundamentally flawed. Every argument for preemption collapses under the weight of *Fenner*. Plaintiffs have offered evidence—real-world comparisons, consumer expectations, and marketing promises—that anchor their state law claims.

Defendants boldly, if misguidedly, claim that this Court's analysis is governed by commentary from the panel in *Counts* and echoed by the *Bledsoe* panel. But neither the *Counts* nor *Bledsoe* panels—both of which recognized that *Fenner* is binding Sixth Circuit precedent—applied the rule articulated in *Fenner* to the facts. The <u>only</u> case in the trilogy to have taken that step was *Fenner*. Thus, this Court should first look to *Fenner*, and the evidence deemed sufficient to sustain the claims there, to determine whether the evidence here is sufficiently similar to require upholding Plaintiffs' claims. The *Counts* and *Bledsoe* commentary was not necessary to the disposition of either case, since both remanded for the application of the facts to the law. It therefore does not change this Court's essential duty to apply *Fenner* in a manner consistent with its holding. Plaintiffs are confident that having done so, this Court will also find the evidence aligns with the evidence in *Fenner* and must be sustained.

010649-11/3438118 V1

Defendants cannot escape accountability by running away from *Fenner*. *Fenner* is controlling and Plaintiffs' claims should not be dismissed now as Defendants attempt to use this as an opportunity to re-litigate, or litigate for the first time, issues that bear no relation to the pre-emption issue. The Court should deny Defendants' motions. Precedent and the evidence point in one direction: forward.

**A.     Responses to Cummins' Statement of Material Facts**

1.     **Admitted**.

2.     **Admitted** that the Court's summary judgment ruling (ECF No. 272) addressed opinions proffered by Juston Smithers, otherwise **Disputed**. Although the summary judgment order recognized the exclusion of Mr. Smithers's opinions to the extent they concluded that excessive active regenerations constituted a "defeat device" or resulted from a fraud on the regulators (*see id.*, Page.ID.37739), Mr. Smithers' remaining opinions were ruled admissible and the Court considered those opinions in its summary judgment ruling. *See, e.g., id.*, Page.ID.37743 ("Smithers' technical opinions on the Trucks' EEDs, including excessive active regeneration, create a triable issue of whether the Trucks 'lacked a feature for which Plaintiffs paid a premium.'") (citation omitted). *See also* ECF No. 262 (*Daubert* Order) (excluding Smithers' opinions to the extent that they were based on allegations of a defeat device or fraud on the regulators, but finding his remaining opinions admissible).

- 2 -

010649-11/3438118 V1

3.     **Admitted**.

4.     **Admitted** that the Court's summary judgment Order discussed Smithers' opinion that the Trucks engaged in excessive active regeneration, which caused reduced fuel economy and increased NOx emissions. ECF No. 272, PageID.37734-37, otherwise **Disputed**. Mr. Smithers' opinions are detailed in his reports (Ex. 1, Smithers Class Cert. Rep.; Ex. 2, Smithers Merits Rep.) and are analyzed in the Court's *Daubert* Order (ECF No. 262).

5.     **Admitted**.

6.     **Admitted**. *See also Daubert* Order (ECF No. 262) for a fuller discussion of the Court's reasoning.

7.     **Admitted**.

8.     **Admitted** that the Court's Summary Judgment Order (ECF No. 272) dismissed Plaintiffs' RICO claim and certain of their state-law claims, otherwise **Disputed**. Cummins' summary of the surviving claims accurately describes the claims pending against Cummins but omits certain remaining claims against FCA only: Count C.III: California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*; Count D.III: Illinois Fraudulent Concealment. The South Carolina fraudulent concealment claim remains pending against Cummins only.

9.     **Admitted** that the Sixth Circuit published its opinion in *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th

- 3 -

851 (6th Cir. 2023), and that the quoted language is contained in the referenced pleadings, otherwise **Disputed**. This paragraph contains legal argument, not facts.

10.   **Admitted** that *In re Ford* dismissed plaintiffs' claims in that case under implied preemption, otherwise **Disputed**. This paragraph contains legal argument, not facts.

11.   **Admitted** that *In re Ford* contains the quoted language, otherwise **Disputed**. This paragraph contains legal argument, not facts.

12.   **Admitted** that *In re Ford* contains the quoted language, otherwise **Disputed**. This paragraph contains legal argument, not facts.

13.   **Admitted** that *In re Ford* contains the quoted language, otherwise **Disputed**. This paragraph contains legal argument, not facts.

14.   **Admitted** that *In re Ford* contains the quoted language, otherwise **Disputed**. This paragraph contains legal argument, not facts.

15.   **Admitted**.

16.   **Admitted**.

17.   **Admitted**.

18.   **Admitted** that the Sixth Circuit issued its opinions in *Fenner v. General Motors, LLC*, 113 F.4th 585 (6th Cir. 2024), and *Counts v. General Motors, LLC*, 139 F.4th 576 (6th Cir. 2025), while Plaintiffs' appeal in this case was pending, otherwise **Disputed**. This paragraph contains legal argument, not facts—because it

- 4 -

simply recognized *Fenner* as binding precedent and remanded for further proceedings without applying the rule in *Fenner* to the facts of that case, Plaintiffs disagree that any *dicta* in *Counts* provides "additional guidance regarding federal preemption of claims brought under state law relating to vehicle emissions."

19.     **Admitted** that *Fenner* contains the quoted language, otherwise **Disputed**. This paragraph contains legal argument, not facts.

20.     **Admitted** that *Fenner* contains the quoted language, otherwise **Disputed**. This paragraph contains legal argument, not facts.

21.     **Admitted** that *Counts* contains the quoted language, otherwise **Disputed**. This paragraph contains legal argument, not facts.

22.     **Admitted** that the Sixth Circuit issued its opinions in *Bledsoe v. FCA US, LLC*, 2025 WL 2268065 (6th Cir. Aug. 8, 2025), approximately two months after its decision in *Counts*, otherwise **Disputed**. This paragraph contains legal argument, not facts. The *Bledsoe* opinion did not "reaffirm the preemption test as distilled in *Counts*." *Counts* merely recognized *Fenner* as binding precedent and remanded for further proceedings; it did not "distill" or create a test different from that stated in *Fenner*.

23.     **Admitted** that *Bledsoe* contains the quoted language, otherwise **Disputed**. This paragraph contains legal argument, not facts.

24.     **Admitted**.

**B.     Responses to FCA's Statement of Material Facts**

1.      **Admitted**.

2.      **Disputed in part, Admitted in part**. Plaintiff Ganz admits that he could not identify any reference to emissions or "clean diesel" on the Monroney label for his Truck, and that he could not identify specific advertisements related to "clean diesel." However, he testified that when he performed research, the advertisements "were very adamant that what the product that they had was better than the competition because of . . . the clean emissions and such." Ex. 3, Ganz Dep. at 21:10-17; *see also id.* at 86:15-89:25, 210:10-19.

3.      **Disputed in part, Admitted in part**. Plaintiff Ganz contests the allegation that at the time of purchase, he did not research emissions, because Plaintiff Ganz testified that when he conducted research, the advertisements "were very adamant that what the product that they had was better than the competition because of . . . the clean emissions and such." *Id.* at 21:10-17, 86:15-89:25. Plaintiff Ganz admits that at the time of his deposition, he did not know "what type of emissions" his Truck produces.

4.      **Disputed in part, Admitted in part**. Plaintiff Ganz admits that at the time of his deposition, he stated his understanding that the lawsuit related to the "mileage and the performance and the, you know, environmental impact on the emissions." *Id.* at 16:2-6. He disputes the description of his understanding of "clean

- 6 -

diesel" and states that his understanding was based on several factors, including Defendants' advertisements. *Id.* at 21:10-17, 86:15-89:25, 89:15-21, 98:14-22.

5. **Disputed in part, Admitted in part**. Plaintiff Ganz admits that he expected his Truck to have cleaner emissions than his earlier model year diesel truck, that he never measured the emissions in his previous vehicle, and that he lacks specific information whether his earlier truck had higher emissions than his Class Truck. However, Plaintiff Ganz testified that "I knew that the whole clean diesel was a hot topic; you know, that there was a big push for all these diesels, that they were, you know, trying to meet these standards to put a better product on the street and I knew that any product that was out there on any lot at that time in 2013 was going to be better than the 2003 that I had, so my assumptions were that they were cleaner." *Id.* at 200:14-21.

6. **Disputed**. Plaintiff Ganz testified that he conducted research into the fuel economy of the Truck, and that the estimated fuel economy was represented to him, including by the FCA-authorized dealership salesman. *Id.* at 126:22-127:3, 139:10-18; *see also id.* at 27:9-14, 66:7-10.

7. **Disputed in part, Admitted in part**. Plaintiff Ganz testified that about 60% of his driving is "city driving" on flat roads, and there is traffic "at times." *Id.* at 148:8-19. He admits that he estimates that he uses the Truck for towing a little

- 7 -

less than half the time, and that city driving and towing yield lower fuel economy than unloaded highway driving in his experience.

8.      **Disputed in part, Admitted in part**. Plaintiff Ganz admits he testified that a salesperson at an FCA-authorized dealership advised him he could expect 17 MPG based on a combination of city and highway driving, and that when asked in his deposition he testified the estimate was based on the salesperson's personal experience. Plaintiff Ganz was not asked in deposition and does not know whether the salesperson's estimate took towing into account, but he intended to purchase the Truck in part for towing and knew from FCA brochures and advertisements that "Dodge, you know, advertised that they had the largest towing capacity" and he discussed towing with the salesperson, who told him that "Dodge was better than Ford and Chevy because of towing and horsepower and torque." *Id.* at 202:4-203:17, 204:8-18, 209:5-210:1 (describing advertisements for the Truck Mr. Ganz saw focused on towing).

9.      **Admitted**.

10.      **Disputed in part, Admitted in part**. Plaintiff Roberts admits that one factor for choosing her Truck was because it was "pretty," but also states that she chose it because of its towing and hauling capabilities, as well as the size of its backseat. *See* Ex. 4, Roberts Dep. at 72:8-13, 74:4-13.

010649-11/3438118 V1

11.     **Disputed in part, Admitted in part**. Plaintiff Roberts admits that she testified she does not recall looking at any advertisements regarding her Truck before purchasing it, but cannot state with certainty that she did not. Plaintiff Roberts admits that she did not do any research before purchasing her Truck, but states that she relied in part on her husband, who was with her at the time of purchase, to learn about the Truck's attributes: "I would not have asked those questions. My husband would have. . . . [N]ot my department. That's my husband's. To me, it's pretty." *Id.* at 77:7-25.

12.     **Disputed in part, Admitted in part**. Plaintiff Roberts admits that she had no specific expectations about emissions levels and did not purchase her Truck based on it having a "clean diesel system" (*id.*), but states that she has been economically harmed and has overpaid for the vehicle due to the vehicle emitting excess emissions. *Id.* at 29:21-30:1, 30:10-31:5, 32:4-11, 102:17-20, 134:6-135:9.

13.     **Admitted**.

14.     **Disputed in part, Admitted in part**. Plaintiff Roberts admits that her understanding of the case at the time of her deposition was that "there's something that was causing the vehicles to put out more emissions than should legally be allowed." *Id.* at 37:15-20. Plaintiff Roberts also testified that she did not know "who sets th[e] standards or the limits for NOx emissions for vehicles in the U.S.," but that

- 9 -

010649-11/3438118 V1

her "assumption is the EPA," and she also assumed that Illinois has its own NOx standards. *Id.* at 51:7-19.

15. **Disputed in part, Admitted in part**. Plaintiff Roberts admits that at the time of her deposition, she did not recall any specific representations or promises by FCA US about the fuel economy in her Truck, but she testified that "I sure didn't get the gas mil[e]age that I expected to get out of my truck" and "I wasn't getting the gas mil[e]age that I hoped to get." *Id.* at 32:9-11, 102:19-104:21. Plaintiff Roberts further testified that "I would have had expected to get at least up to 20 miles per gallon. As I recall, like I said, I recalled like averaging around 12, seems to be the number. And that was -- that was pretty poor." *Id.* at 131:16-20.

16. **Disputed in part, Admitted in part**. Plaintiff Roberts admits that at the time of her deposition, she did not recall any specific representations or promises about fuel economy by dealership personnel, but she cannot definitively state that no such representations were made to her or to her husband, who accompanied her.

17. **Admitted**.

18. **Disputed in part, Admitted in part**. Plaintiff Ward admits that he reviewed the Dodge website and brochures and does not recall whether they discussed fuel economy and emissions, but states that he was reviewing those sources "looking for information . . . to see what I thought would best fit my needs" and that his "needs at the time I wanted diesel fuel economy. I wanted good power.

- 10 -

I wanted a clean diesel. I wanted a compression brake, these were the things I was looking at." Ex. 5, Ward Dep. at 172:14-173:17. But he recalled discussing fuel economy with the salesperson at the FCA dealership. *Id.* at 164:18-165:2, 166:4-167:12, 173:20-23. He also viewed internet and television advertisements related to the vehicle and recalls "the advertisements on TV and the internet said it was one of the most fuel efficient diesels out there." *Id.* at 174:12-16; *see also id.* at 174:21-176:20.

19. **Disputed in part, Admitted in part**. Plaintiff Ward admits he testified as quoted, but further clarified that he understood that the Truck was represented as having emissions that were cleaner than applicable EPA standards and provided "green emissions." *Id.* at 165:15-21, 174:23-175:13. He also testified that "I do not believe the exhaust system and the emissions system on my truck are working according to the way they were advertised to work and I'm emitting [a] substantial amount of pollutants into the air." *Id.* at 130:13-19. Mr. Ward admits that he paid a premium for a diesel Truck with clean emissions, and that the emissions system does not provide the clean emissions he was promised and expected.

21. **Admitted**.

22. **Disputed in part, Admitted in part**. Plaintiff Ward admits that at the time of his deposition he could not recall any statements in the FCA brochures or website regarding fuel economy, but testified that the salesperson at the FCA-

authorized dealership "said I would get comparable fuel mileage to the truck I was trading in." *Id.* at 50:12-19, 51:11-14.

23. **Admitted**.

24. **Disputed in part, Admitted in part**. Plaintiff Ward admits that he stated his understanding of his damages in his fact sheet and depositions. However, Mr. Ward also testified that he was relying on his attorneys and their experts to determine his damages, and that his damages would "necessarily be informed by fact discovery and expert opinions." *Id.* at 244:8-246:16.

25. **Admitted**.

26. **Admitted**.

27. **Disputed in part, Admitted in part**. Plaintiff Kerber admits he testified that he did not have any telephone, email, or letter communications with FCA before or after he purchased it. However, Mr. Kerber states that prior to his purchase, he spoke to the salesperson at the FCA-authorized dealership where he purchased his Truck about the Truck's fuel economy, among other things. Ex. 6, Kerber Dep. at 43:12-19, 46:7-22, 93:6-11, 90:14-15 ("[T]hey have Ram and Chrysler over everything in the dealership.").

28. **Admitted**.

29. **Admitted**.

- 12 -

30. **Disputed in part, Admitted in part**. Plaintiff Kerber admits that he testified he could not recall whether he saw a sticker or document referring to an "ultra clean diesel system," but further testified that "it could be some in those -- in the -- in the documents I got from the dealer but I don't --." *Id.* at 134:19-135:1. But Plaintiff Kerber also testified that he spoke with the salesperson at the FCA-authorized dealership where he purchased the Truck about emissions. *Id.* at 54:7-55:14. Plaintiff Kerber otherwise was not asked and did not testify about seeing statements about "clean diesel."

31. **Disputed in part, Admitted in part**. Plaintiff Kerber admits he testified that he did not "read anything about emissions from the manufacturer of the subject truck before [he] bought the subject truck." *Id.* at 56:5-8. Mr. Kerber testified that he did not "look specifically for the kinds of issues that you're now complaining about" before he purchased the Truck because "I wasn't aware of the issues prior, because when I did my research, I was like, you know, Dodge Ram, 2012, gas mileage, you know. . . . I didn't Google, like, the bad things for some reasons. I just seen like, oh, it was having smog issues. I don't -- I didn't even think about, I guess, doing that, but having the truck and owning it and driving it and then realizing the issues it has, that's, you know, why I started looking for it . . . . Because it's supposed to have all the appropriate smog equipment on the truck, not necessarily cause issues with the truck." *Id.* at 75:19-76:12.

- 13 -

32. **Disputed**. Plaintiff Kerber was not asked and did not testify that he was not concerned about emissions. Mr. Kerber testified that "I'm all about the environment, but not about paying out of my pocket to maintain this stuff and have it, you know, work and not work kind of thing. . . . No, I said I care about the environment, so like, I understand why we have to have this stuff. But, like I said, if it's not working or it's causing more grief for the consumer, for myself, having to pay extra and maintain all these components that, I mean, to me I think it just -- it puts it out in the atmosphere anyways." *Id.* at 54:7-55:14.

33. **Disputed in part, Admitted in part**. Plaintiff Kerber testified that he would remove his truck's diesel particulate filter ("DPF") if California law permitted it, but he went on to explain that he would do so because he did not believe it was performing its intended function and providing clean emissions. *Id.* at 54:7-55:22.

34. **Disputed** for the reasons stated in response to No. 33, above.

35. **Admitted**.

36. **Admitted** that Plaintiff Kerber testified that he recalled discussing California smog testing, that the Truck's emissions system did not employ DEF, and the "ultra clean diesel system" with the salesperson at the FCA-authorized dealership where he purchased his Truck.

37. **Disputed in part, Admitted in part**. Plaintiff Kerber testified he recalled discussing his Truck's expected mileage with the salesperson at the FCA-

- 14 -

010649-11/3438118 V1

authorized dealership where he purchased his Truck. *Id.* at 43:12-24. Mr. Kerber admits that he could not recall any other specific fuel economy information published by FCA. *Id.* at 44:3-5.

38. **Disputed in part, Admitted in part**. Plaintiff Kerber admits that he was told by the salesperson he could expect 16 or 17 MPG. But he further testified that, "So long as I'm continuously driving . . . , I usually get about maybe 13 to 14. [] And then if it's around the city, then it's about 10 to 12. [] Yeah. Sometimes worse. . . . If it's hot out, it seems to guzzle more fuel for some weird reason." *Id.* at 51:11-21. He also testified that "the gas mileage, too, it says it's supposed to be around 17 or 18, but, you know, I get like 9." *Id.* at 42:17-21.

39. **Admitted**.

40. **Admitted in part, Disputed in part**. Plaintiff Kerber also testified that "[t]hey have Ram and Chrysler over everything in the dealership." *Id.* at 90:14-15.

41. **Admitted**.

42. **Admitted in part, Disputed in part**. Plaintiff Kerber testified that as of his deposition, he drove his Truck about half the time: "every other week I switch off between my 4Runner and my truck. I'm not driving very far, because, like I said, I'm three and a half miles from home from my office. . . . So five days a week, two weeks out of the month, so ten days, unless I'm using it to tow our trailer, but --."

010649-11/3438118 V1

*Id.* at 59:17-60:3. Mr. Kerber admits that as of his deposition, he planned to continue using the truck. *Id.* at 65:18-23.

43. **Admitted**.

44. **Admitted** that one of Plaintiff Kerber's complaints is that the frequent regeneration requires him to drive longer in order to complete the cycle, consuming more fuel.

45. **Disputed**. The Truck's owner's manual and user's guide describe the regeneration process but do not disclose its frequency or the significant impact it has on fuel economy. *See* FCA Ex. I (Owner's Manual), ECF No. 315-10, PageID.42717-19; FCA Ex. J (User's Guide), ECF No. 315-11, PageID.42873-75.

46. **Admitted**.

47. **Admitted** that the owner's manual and user's guide discuss the regeneration process.

**C.    Additional Facts Requiring Denial of the Motions**

**1.    Juston Smithers' reports establish that the Trucks emit more NOx than comparable trucks or than a reasonable consumer would expect.**

1. Smithers' opinions are described in his Class Certification Report and his Merits Report, which, taken together, represent his opinions in this case and the bases for those opinions. *See* Ex. 2, Smithers Merits Rep. at 2.

2. In his Class Certification Report, Smithers identified mechanisms in the trucks that lead to increased NOx emissions, which he referred to as Excessive

- 16 -

010649-11/3438118 V1

Emissions Devices ("EEDs"). Ex. 1, Smithers Class Cert. Rep. at 3-4. Specifically, Smithers identified EEDs associated with ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Smithers also described the battery of emissions tests he conducted on the Trucks and analyzed their results. *Id.* at 20-39.

3.      Smithers conducted extensive PEMS testing over thousands of miles on five diesel Ram Trucks from model years 2007 to 2012, including four Ram 2500s, one Ram 3500, and one gasoline Ram 2500 for comparison. *Id.* at 20. He also collected data from Plaintiffs' vehicles and conducted dynamometer testing on each of the test vehicles to confirm that the vehicles were "representative of the current in-use population of Vehicles." *Id.* at 24-25.

4.      Although Smithers' report refers frequently to EPA emissions standards and regulations, his analysis is not limited to comparisons between the diesel test Trucks and those regulatory standards. Smithers' data and analysis also compare the Trucks' emissions performance to that of a gasoline version of a similarly sized Ram truck and to the Trucks' performance in non-regulatory dynamometer testing. *See id.* at 25-28 (dynamometer test results for gas and diesel test trucks), 28-37 (PEMS test results for gas and diesel test trucks), 41-44 (active regeneration emissions data analysis comparing gas and diesel test trucks), 58-65

- 17 -

(gas and diesel test truck results in high and low ambient temperatures), 65-69 (gas and diesel road grade test results), 80-83 (gas and diesel cold and hot start test results).

5.      Smithers' class certification report also analyzed the fuel economy impact of the excessive regeneration EED on fuel economy; that data does not include any comparisons to EPA standards, because none apply to these trucks. *Id.* at 48-51. Instead, the report analyzes the fuel economy impact of the test trucks during regeneration cycles. *Id.*

> **2.      The named Plaintiffs all testified that the Trucks' fuel economy and emissions were material to their purchase, that their expectations were not met, and that they would not have purchased had they been aware.**

6.      Plaintiffs all state that fuel economy was a factor in their decision to purchase their vehicles. Ex. 3, Ganz Dep. at 137:20-138:4; Ex. 4, Roberts Dep. at 32:4-11, 102:17-20, 131:3-5; Ex. 5, Ward Dep. at 49:8-52:19, 166:15-167:8, 168:9-169:7, 172:22-173:17; Ex. 6, Kerber Dep. at 39:9-24, 41:3-13, 42:7-10.

7.      Plaintiffs all had worse fuel economy than they expected or what was represented to them. Ex. 3, Ganz Dep. at 18:3-9, 34:1-20, 137:24-138:4; Ex. 4, Roberts Dep. at 30:10-31:5, 32:4-11, 102:17-20; Ex. 5, Ward Dep. at 17:3-10, 34:15-35:6, 49:8-11; Ex. 6, Kerber Dep. at 29:6-17, 39:9-24, 42:17-21, 43:1-24, 46:7-22, 47:5-8, 50:11-52:18, 75:21-24, 90:3-9 (comparing his Truck's mileage to similar vehicles'), 100:13-101:3, 110:22-111:15, 111:20-112:18, 147:3-21, 151:4-23.

- 18 -

8.      Plaintiffs all knew that their Trucks contained technology that was supposed to provide clean emissions and expected that their Trucks would provide clean emissions compared to older models and other similar trucks, even if they were not aware of any specific NOx standards. *See* Ex. 7 (Ganz Declaration); Ex. 8 (Roberts Declaration); Ex. 9 (Ward Declaration); Ex. 10 (Kerber Declaration).

9.      Plaintiff Ganz testified that his understanding and expectation that his Truck was "clean diesel" was based on several factors, including advertisements that were "very adamant" that the Truck was "better than the competition" in part because of the "clean emissions and such." Ex. 3, Ganz Dep. at 21:10-17. He also testified that he saw advertisements touting the Truck's "clean emissions, clean diesel," which he believes he saw on television. *Id.* at 86:15-89:25. And he testified that "[t]hey told me it had less emissions. Well, when I heard clean diesel, I would assume that meant less emission." *Id.* at 89:15-21. In addition, Mr. Ganz testified that "it was an assumption that it was environmentally friendly based on the clean diesel advertisements that went along. . . . I believe it was probably on -- on the media. It was in their -- in their brochures." *Id.* at 98:14-22.

10.      Plaintiff Ward testified that "[i]t was my understanding and what the salesman told me they exceeded the 2010 standards and that they met those standards early without having to use DEF." Ex. 5, Ward Dep. at 165:15-21. And Mr. Ward stated that he reviewed "brochures that showed the full package of the truck and the

- 19 -

website itself stated that it met the new green emissions standards earlier than any other manufacturer without using DEF." *Id.* at 174:23-175:13.

> **3.      Cummins and FCA jointly marketed the Trucks as clean and fuel efficient using uniform advertising and representations.**

11.      Defendants marketed the Trucks as "clean diesel," "ultra clean emissions," and the "cleanest diesel engines" that would "virtually eliminate particulate matter emissions" and be "environmentally responsible." Ex. 11 at -539; Ex. 12 at -424; Ex. 13 at -663; Ex. 14; Ex. 15; Ex. 16 at -614.

12.       Customers had to pay for these purported benefits, through two premiums applied to all Class Vehicles. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

## II.      ARGUMENT

### A.      Standard of Review

Under Rule 56, the party seeking summary judgment must first point to evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, then the burden shifts to the opposing party, who must present specific facts showing "a

010649-11/3438118 V1

genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). Courts "are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted).

Federal preemption is an even higher bar and the burden rests squarely on the Defendants. "'[F]ederal preemption is an affirmative defense upon which the defendants bear the burden of proof,'" which arises when federal regulations conflict with state law claims. *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007) (quoting *Fifth Third Bank v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005)). Defendants' preemption arguments rely solely on a theory of conflict preemption—when federal law and state claims truly collide, making it impossible to comply with both, or when state law stands as a roadblock to federal objectives. *See In re Ford*, 65 F.4th at 860.

## B.     Plaintiffs' claims are not preempted under *Fenner*, the controlling Sixth Circuit precedent.

*Fenner* not only created the rule this Court has been instructed to apply, but it also engaged in the exercise this Court is now tasked with: examining the factual record to determine whether the evidence is sufficient to support Plaintiffs' claims without running afoul of preemption. As a result, *Fenner* is not only the controlling authority, it is the guiding light for this Court. The other two Sixth Circuit cases addressing CAA preemption, *Counts* and *Bledsoe*, reaffirm *Fenner*. *Bledsoe*, and its

- 21 -

holding that Plaintiffs' claims based on excessive emissions and fuel consumption as alleged are not preempted applies and contains the Sixth Circuit's instructions to this Court. At the same time, neither *Bledsoe* nor *Counts* made new law regarding CAA preemption; those decisions applied the *Fenner* rule and remanded with instructions to examine the factual record in light of that rule.

Plaintiffs recognize this Court has a duty to follow holdings[1] from the Sixth Circuit, particularly precedent in this case. Yet Cummins wrongly urges this Court to focus on *Counts*, and oddly, to a lesser degree *Bledsoe*, but neither case rewrites or changed the *Fenner* holding. Commentary in *Counts*, echoed in *Bledsoe*, is *dicta* and thus does not bind this Court's application of *Fenner* to the facts here. That is not to say the Court should ignore that commentary, but rather that it should recognize its nature and not transmute it into a binding "test" as FCA urges.

The *Counts* holding was limited by the procedural posture of that case and its disposition. *Counts* involved nearly identical claims and theories to those in *Fenner*. *Counts*, 139 F.4th at 581. But unlike *Fenner*, and like this case, the district court in *Counts* had already ruled against preemption on summary judgment and dismissed the claims on the pleadings following a show-cause order directing briefing on *Ford*.

---

[1] "A holding is [a] court's determination of a matter of law pivotal to its decision. And dictum is anything not necessary to the determination of the issue on appeal." *Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020) (citations and internal quotation marks omitted).

*See Counts*, No. 1:16-cv-12541, ECF No. 493, PageID.42989. Moreover, the *Counts* court did not examine the full factual record (which was not before it) to assess the evidence in light of *Fenner*, but instead remanded the case to the district court to conduct that exercise. *Counts*, 139 F.4th at 582. Indeed, the only holding in *Counts* was that "[t]he holding of *Fenner* applies here" and that some of the theories advanced matched those approved in *Fenner*. *Id.* The application of that holding to the evidence was left to the district court.

In remanding the case, *Counts* opined that "for a claim based on a particular theory to avoid preemption, no part of its syllogism can 'implicate or challenge' a determination of the EPA" and "the evidence in support of the claim must 'exist[] independently of the EPA standards.'" *Id.* (quoting *Fenner*, 113 F.4th at 596-97). This commentary (not necessary to its determination of the issue, and therefore not a holding) on *Fenner*'s language provides little guidance beyond what is contained in *Fenner* itself—it certainly does not create a "test."[2] The *Counts* court did not have occasion to apply the facts of that case to the *Fenner* rule, so its decision reveals nothing about when a "syllogism" implicates or challenges an EPA determination, and it does not help in understanding when evidence exists "independently of EPA

---

[2] *See* Cummins Br., ECF No. 316, PageID.43012 ("the *Counts* panel set forth the test that plaintiffs bringing claims challenging their vehicles' emissions performance must satisfy to avoid preemption . . . .").

- 23 -

standards." To answer those questions, one must look to *Fenner*, which considered and identified claims and evidence that were found to pass muster.

*Bledsoe* stands on the same footing: that decision too followed a dismissal on the pleadings, and it also remanded for consideration of the evidence in light of the *Fenner* standard. *Bledsoe*, 2025 WL 2268065, at *3, 7. Thus, it is equally unilluminating regarding what types of evidence are sufficient. *Fenner* remains the sole source for examples of claims and evidence that avoid CAA preemption.

*Bledsoe*'s primary holding, like *Counts*, was that "*Fenner* remains binding on this panel" and that the surviving claims involve the "exact theories in *Fenner* that we eventually determined did not depend on plaintiffs proving non-compliance with federal regulation." *Id.* at *5. But unlike both *Counts* and *Fenner*, this case involves not only emissions claims but also claims based on excessive fuel consumption. *Bledsoe* examined the fuel economy claims and found that they were not preempted: "FCA was not legally required to inform consumers of its vehicles' fuel economy figures; in fact, it was explicitly exempt. Therefore, any representations made regarding the truck's fuel economy concern only what FCA told consumers—not any EPA-issued or -tested figures." *Id.* at *6. Citing *Fenner*, the *Bledsoe* court held that "[b]ecause plaintiffs' theory here is premised on what FCA marketed to consumers and not on disclosures it made to the EPA, it is not preempted." *Id.* Thus, *Bledsoe* extended *Fenner*'s holding under the CAA to claims implicating the EPCA.

- 24 -

In analyzing the claims and evidence here, the Court is bound and should be primarily guided by *Fenner*. The Court can and should consider the commentary in *Counts* and echoed in *Bledsoe*, but in assessing that commentary, it should look to *Fenner*, which provides the *only* example of the application of the rule to evidence.

### 1.     *Fenner* involved claims and theories identical to the claims here, with similar evidence.

*Fenner* dealt with claims nearly identical to those here—heavy-duty diesel trucks marketed as "clean diesel," "low emissions," and "advanced technology," yet containing an undisclosed emissions defect that results in emitting higher levels of NOx in real-world use than expected. *Fenner*, 113 F.4th at 589-90. Also like this case, the original allegations in *Fenner* asserted five bases of liability, asserting excessive emissions in the subject trucks compared to "(i) their counterparts, (ii) what a reasonable consumer would expect, (iii) what [Defendants] advertised, (iv) the Environmental Protection Agency's emissions standards, and (v) the levels set for the vehicles to obtain a certificate of compliance . . . ." *Id. Bledsoe* recognized the overlapping theories approved in *Fenner* and confirmed their validity. *Bledsoe,* 2025 WL 2268065, at *5.

The liability theories in *Fenner* also involved a mixture of affirmative representations giving rise to a duty to disclose and fraudulent omissions. The evidence of affirmative misrepresentations included "advertisements [which] stated that the Duramax Trucks 'turn heavy diesel fuel into a fine mist, burning cleaner and

- 25 -

faster with lower emissions and greater power than the previous model.'" *Fenner*, 113 F.4th at 591. Other marketing messages included statements that the trucks contained the "latest emission control technology" that reduced emissions "compared to previous models" and made them "one of the cleanest diesels in the segment." *Id.* (internal quotation marks and record citations omitted). Despite these representations, the *Fenner* defendants "did not tell consumers that the emission control systems that it advertised would, under some conditions, shut off." *Id.* Similarly, Plaintiffs here have provided evidence of Cummins' and FCA's joint marketing touting the trucks as having "clean diesel," "ultra clean emissions," the "cleanest diesel engines" that "virtually eliminate particulate matter emissions," and as "environmentally responsible." Plaintiffs' Add'l Facts, ¶¶ 9-11. And both cases include claims that the Defendants fraudulently omitted that their emissions systems were ineffective in commonly experienced conditions. *See Fenner*, 113 F.4th at 591; *Bledsoe*, 2025 WL 2268065, at *2.

### 2. *Fenner* applied the *Ford* factors to the evidence and found the state-law claims were not preempted.

*Fenner* applied the *Ford* factors and found that state-law consumer fraud claims are not preempted by the Clean Air Act, 42 U.S.C. § 7401 *et seq.* ("CAA"). *Fenner*, 113 F.4th at 594.[3] The court emphasized that "[t]here is a 'high threshold'

---

[3] In *Fenner*, as here, the defendants did not argue either express or field preemption, nor did they argue impossibility. *Id.*

for such an argument" and applied the presumption against preemption, which "operates with special force" in these cases because "[s]tates have traditionally occupied the field[s] of consumer protection" and "environmental regulation." *Id.* at 594-95. The presumption is just as powerful here.

Despite differences between the claims and statutes at issue,[4] *Fenner* examined the preemption arguments through the lens of *Ford* and applied its analytical framework. Specifically, *Fenner* examined *Ford*'s four-part framework asking whether the state law claims would (1) pose an impermissible challenge to EPA decisions, (2) undermine EPA policy considerations, (3) usurp the EPA's authority to police fraud, or (4) skew disclosures to the EPA. *Id.* at 596-600. In each case, the *Fenner* court concluded that at least some of the claims met the test and thus were not preempted. Applying *Fenner* to the facts at issue here, this Court should reach the same conclusion.

---

[4] *In re Ford* did not apply the presumption because the claims there were premised solely upon "fraud against a federal agency," not an area of traditional state regulation. *Fenner*, 113 F.4th at 595. *See also id.* at 595-96 ("The instant case . . . meaningfully differs from *Ford* . . . . In *Ford*, there was no presumption against preemption, whereas here the presumption against preemption is particularly strong[.]") (citations omitted). *Ford* also involved preemption under the Energy Policy and Conservation Act, 42 U.S.C. § 6201 *et seq.* ("EPCA") rather than the CAA.

- 27 -

### a. Plaintiffs' claims do not impermissibly challenge EPA decisions.

Examining whether the state-law claims would pose an impermissible challenge to EPA decisions, *Fenner* found that three of the five liability theories[5]—those based on claims of excessive emissions compared to comparator trucks, reasonable consumer expectations, and marketing statements—"do not implicate or challenge the EPA's determinations." *Fenner*, 113 F.4th. at 596. The court explained that "Plaintiffs claim that GM fraudulently omitted emissions information in its advertisements and communication *to the public*. These theories of liability rest on traditional state tort law and exist independently of EPA decisions." *Id.* The court also found that the plaintiffs' evidence adequately supported those claims:

> When Duramax truck consumers heard 'clean diesel,' they expected their [] Truck to have lower emissions than previous diesel models. Based on GM advertisements and communications to consumers, consumers likewise expected that the Duramax Trucks would have lower emissions than other vehicles on the market. Some consumers measured 'clean diesel' visually, expecting their vehicles not to 'blow the black smoke,' that diesel engines can be known for, whereas others understood GM's communications to mean that the Duramax Trucks would have lower emissions, 'be cleaner[,] and run a lot

---

[5] The *Fenner* court found claims based upon the EPA's standards and the levels set for the vehicles to obtain a COC would constitute an impermissible challenge and were preempted. Plaintiffs recognize that to the extent their claims are based solely on EPA standards and COC qualification levels, they are preempted. However, as discussed further below, that does not mean that any mention of or relation to federal standards necessarily leads to preemption.

010649-11/3438118 V1

better" than the older pickup trucks that they previously owned.

*Id.* at 596-97 (internal citations to factual record omitted).

Rejecting the defendants' argument that the plaintiffs "have not identified an alternative emissions benchmark," the court concluded that the cited evidence of comparator vehicles, consumer expectations, and marketing claims created a "plausible alternative emissions benchmark [that] do not depend on federal emissions standards." *Id.* at 598. Tellingly, the court did not require a *numerical* benchmark or evidence that the plaintiffs had specific knowledge about NOx emissions levels before purchase: evidence that emissions were higher than reasonably expected based on the statements and omissions shown was enough.

The evidence in this case is equally, if not more, compelling than in *Fenner*. While Plaintiffs may not have had specific expectations about NOx levels, each of them knew that their Trucks were supposed to contain technology that provided clean emissions compared to older models and other similar trucks. Plaintiffs' Add'l Facts, ¶ 8. At least two Plaintiffs also expected, based on Defendants' marketing statements and information provided by FCA-authorized dealers, that the Trucks were represented as having clean emissions technology. *Id.*, ¶¶ 9, 10. And Defendants' marketing statements bear those expectations out, touting the Trucks' "ultra clean emissions" and "cleanest diesel engines," among other things. *Id.*, ¶ 11. Moreover, Plaintiffs' expert Juston Smithers provided in-depth analysis showing the

- 29 -

Trucks' performance as compared to a similar gasoline Ram truck. *Id.*, ¶¶ 1-5. This evidence exists independently of any EPA determination.

### b. Plaintiffs' claims do not undermine EPA policy considerations.

The court next considered whether the claims would allow "juries to second guess EPA decisions [and] undermine[] EPA balancing and policy considerations." *Fenner*, 113 F4th at 598. As with the first factor, the court found that the plaintiffs weren't asking the jury to second-guess the EPA, they were demanding accountability for what was promised to them as consumers and therefore their claims were not preempted.

The court explained that "[t]he 'gravamen' of Plaintiffs' state-law claims is that they purchased a vehicle which polluted at levels far greater than a reasonable consumer would expect. In other words, the vehicle operated differently than they expected." *Id*. at 598 (citation and internal quotation marks omitted).[6] These claims were "entirely premised on fraudulent omissions *to consumers*" and "do not require proof of noncompliance with EPA regulations. In fact, it is conceivably possible that Defendants could simultaneously comply with EPA regulations while still concealing material information from consumers." *Id.* at 598-99, 601 (citation and internal quotation marks omitted). Thus, a jury would not need to "look at any EPA-

---

[6] The court cited to the previously discussed evidence of consumer expectations.

- 30 -

approved figures or determine whether the EPA was correct," but rather "would need to look at GM advertisements and the expectations of a reasonable consumer alone." *Id.* at 599.

The same evidence cited above sustains Plaintiffs' claims under the second prong. The evidence does not require a jury to examine any EPA figures, but depends on the Defendants' statements and reasonable consumer expectations.

### c. Plaintiffs' claims do not usurp the EPA's authority to police fraud.

Plaintiffs' case is simple: consumers bought trucks expecting advanced diesel technology that results in lower emissions and better fuel economy based on what Defendants advertised. These claims do not require proof of regulatory non-compliance. Those same theories would not usurp the EPA's authority, because "policing fraud on consumers is not within the EPA's scope of authority." *Fenner*, 113 F4th at 599. In so holding, *Fenner* also made it clear that references to EPA regulations and standards do not automatically bring such claims within the ambit of EPA authority—so long as the claims are based upon fraud on *consumers* (which is outside the EPA's authority) and not fraud in the regulatory process, they do not infringe the EPA's dominion.

*Fenner* decisively rejects the argument, also asserted here, that the claims necessarily infringed on the EPA's authority because the excessive emissions were caused by a mechanism that can be characterized as an AECD or defeat device under

EPA regulations, and the EPA has the authority to approve or reject such devices.

*Id*. That characterization mis-cast the issue: "Plaintiffs' claims . . . are based on fraudulent omissions *to consumers* about how the Duramax Trucks' emissions systems run." *Id.* The court explained that even though the evidence included references to defeat devices and regulatory standards, that did not render them dependent on those regulations:

> Though Plaintiffs discuss defeat devices, their remaining theories of liability do not depend on the use (or misuse) of a "defeat device," nor on any fraud "in the emissions-testing process." [] ("It may be that GM also installed defeat devices in the vehicles to aid in their deception. It may be that these defeat devices also enabled Defendants to commit fraud on the EPA. But GM's fraud on consumers is not based on any fraud on the EPA or based on repeating any finding made by the EPA, and Plaintiffs can prove their allegations without proving that GM defrauded the EPA."). Discussion of defeat devices does not necessitate that Plaintiffs' theories of liability depend on the CAA. *See Loreto*, 515 F. App'x at 580 (holding that even though "the complaint does include extensive reference" to an agency determination, the "claim does not depend upon this determination and would logically exist even in its absence"). Instead, Plaintiffs' claim is that GM omitted information about the truck's emissions during regular use in its representations to consumers, regardless of whether the AECD's use was approved. Stated otherwise, even if an AECD is approved, GM cannot mislead consumers by omitting information about how the (permissible) AECD works.

*Id.* at 599-600.

- 32 -

As above, Plaintiffs' evidence is sufficient. Although some Plaintiffs referenced compliance with EPA standards, that is not the only basis for their expectations—indeed, none of them knew or understood the EPA NOx thresholds (as few non-expert consumers would). But each of them has stated that they at least expected their "clean diesel" Trucks to have more advanced technology that resulted in lower emissions than similar trucks lacking that technology, and the Smithers report provides a basis for comparing the diesel Trucks' performance to a comparable gasoline truck. The fact that his report references EPA standards does not render all his conclusions inadmissible.

### d. Plaintiffs' claims do not risk skewing disclosures to the EPA.

Finally, *Fenner* considered whether the remaining claims would skew manufacturer disclosures to the EPA. It concluded they would not. "Plaintiffs' remaining theories of liability do not depend on any fraud on the EPA. The documentation that GM provided to the EPA thus has no bearing on whether GM provided sufficient information to consumers. Because the information provided to the EPA would not serve as a defense to these state-law consumer fraud or fraudulent concealment claims, manufacturers would have no incentive to over-disclose information to the EPA." *Fenner*, 113 F4th at 600. Defendants here do not claim that this prong justifies dismissal.

- 33 -

010649-11/3438118 V1

### 3. *Fenner* also analyzed the claims under *Buckman* and its progeny, and again held claims based on comparisons to comparator vehicles, consumer expectations, and marketing claims are not preempted.

Having examined the *Ford* factors and finding that none applied to the remaining consumer fraud claims, the *Fenner* court concluded that *Ford* "does not control whether the CAA preempts the state-law claims in this case." *Fenner*, 113 F4th at 600. As a result, the court went on to analyze the claims under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), "the central case in this area." *Fenner*, 113 F.4th, at 600. *Buckman*, the court noted, involved injuries from an FDA-approved medical device where "plaintiffs claimed that the defendant company had defrauded the FDA in order to get approval of the device." *Id.* Examining *Buckman*'s reasoning, *Fenner* again concluded that the surviving emissions claims were not "fraud on the agency claims" subject to implied preemption.

The court identified two "critical distinctions between preempted fraud-on-the-agency claims and not-preempted traditional state tort law claims [:] (1) whether the source of the allegedly violated duty stems from federal law or regulation, as opposed to preexisting state tort law, and (2) whether 'proof of fraud against the [agency] is *alone sufficient* to impose liability.'" *Id.* (quoting *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 94-95 (2d Cir. 2006)).[7]

---

[7] The court also cited to *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 586 (6th Cir. 2013) (quoting in turn *Buckman*, 531 U.S. at 353), which noted that if claims "'exist

- 34 -

010649-11/3438118 V1

Applying this law, Fenner found that "[u]nlike in Buckman, the source of the duty in this case is state consumer-protection law; it is not federal regulation. If the EPA did not exist or if there were no federal emissions regulations, Plaintiffs' claims that GM fraudulently omitted facts about its emissions systems in advertisements and communications to consumers would live on." *Fenner*, 113 F.4th at 601. Moreover, the "state-law claims in this case do not require proof of fraud against the EPA to demonstrate liability," but instead are "entirely premised on fraudulent omissions *to consumers*." *Id.*

The court analogized the surviving claims to those approved in *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576 (6th Cir. 2013). In *Loreto*, the Sixth Circuit examined consumer protection claims based on allegations that the maker falsely marketed an FDA-approved drug. The court found a claim based on the failure to disclose that the drug was "illegal" was preempted, but a claim based on statements that the drug could blunt the effects of a cold was not, because it "relies solely on traditional state tort law predating the [federal law], and would exist in the absence of the Act." *Id.* at 579-80. *Fenner* found the remaining theories "analogous to the *Loreto* plaintiffs' non-preempted, second theory of liability." *Fenner*, 113 F.4th at 602. "These theories assert that, based on GM's omissions to consumers, consumers

---

solely by virtue of' the regulatory scheme they are preempted," but if a claim is based on an "independent, pre-existing state law cause[] of action that parallel[s] federal safety requirements, the suit is not preempted."

reasonably expected their Duramax Trucks to have lower emissions than previous diesel models, other vehicles on the market, and their own older trucks. [] These theories assert that the Duramax trucks ultimately failed to meet these expectations, and that GM fraudulently omitted information to induce these consumer beliefs and consequent purchase. . . . Without the CAA, Plaintiffs could nonetheless bring a claim that GM fraudulently omitted relevant information about its emission system in its communications to consumers. These theories of liability benchmark against other vehicles; these claims exist independently of federal regulation." *Id.* at 602.

The court concluded that "[t]he instant case is controlled by *Buckman* and informed by *Loreto*.[8] Unlike the claims in Ford, these state-law claims exist independently of federal law and any EPA findings, and do not depend on proving fraud on the EPA or a violation of federal law. These state-law claims are, accordingly, not preempted by the CAA." *Id.* The same holds true here. Plaintiffs' claims, and the evidence supporting them, depend upon consumer expectations, Defendants' marketing statements, and comparisons with similar vehicles. They do not require proving fraud on the EPA or violation of federal law and are not preempted.

---

[8] Neither Cummins nor FCA cited or discussed *Buckman* or *Loreto* in their opening briefs.

- 36 -

**4.** **Defendants' arguments fail to show Plaintiffs' claims are preempted.**

Defendants' attempts to invoke preemption simply do not hold up. Their logic is circular, their evidence is, at best, thin, and their reading of the law misses the mark.

First, Defendants claim that Plaintiffs' "EED theory"[9] somehow challenges the EPA's decision to certify the trucks for sale and lacks evidence that exists independently of EPA standards. Cummins Br., ECF No. 316, PageID.43015-18. This theory, they claim, would require proof that the EPA should not have approved the engine design. *Id.* But Defendants' argument misses the point: under *Fenner*, Plaintiffs are entitled to and have shown that the Trucks' emissions exceed those of comparable vehicles, what was represented, and reasonable consumer expectations. They are not required to, and will not provide, evidence that the emissions exceeded EPA standards, though that evidence exists.[10] The relevant benchmark is what

---

[9] Plaintiffs do not have an "EED theory." Rather, Plaintiffs have alleged that the Trucks' software contains several features that lead to high NOx emissions under common driving conditions. *See* Ex. 1, Smithers Class Cert. Rep. at 11-80. These include ███████████████████████████████████████████ ████████████████████████████████████████████████. *Id.* Defendants' argument only discusses frequent regenerations; they have waived any argument that proof of the other causes of high emissions fails the *Fenner* test.

[10] For example, Plaintiffs do not rely on evidence pertaining to Cummins' UAF calculations, as that evidence relates solely to the dismissed theories premised on regulatory violations. That is not to say that the record must be devoid of *all* mentions of regulatory standards—*Fenner* clearly indicated that discussion of

consumers expected—not what regulators approved. Evidence that a particular function of the Trucks led to higher-than-expected emissions does not mean or even imply that the EPA's decision to certify the Trucks was wrong, because the relevant expectation is the *consumers*', not the EPA's, expectation.

Next, Defendants claim that fuel economy claims are preempted and must be dismissed. Cummins Br., ECF No. 316, PageID.43018-20. Cummins' justification for this conclusion—which directly contradicts the Sixth Circuit's holding in *Bledsoe* that the fuel economy claims are *not* preempted—is that the *reason* for the decreased fuel economy is the Trucks' frequent regenerations, which it in turn claims implies that the EPA erred in granting a COC to Cummins for that design. This is a leap with no legal basis. *Bledsoe* squarely held that fuel economy claims are not preempted. *Bledsoe*, 2025 WL 2268065, at *6. The EPA does not regulate the Trucks' fuel economy; they are explicitly exempt. *Id.* So there is no reason to conclude that because a particular feature of the Truck caused it to have lower-than-expected fuel economy (from a consumer's perspective), the EPA's approval of the trucks was in error. Defendants' argument collapses under the weight of Sixth Circuit precedent.

---

regulatory concepts does "not necessitate that Plaintiffs' theories of liability depend on the CAA." *Fenner*, 113 F.4th at 599.

Finally, Defendants insist that Plaintiffs lack an "emissions benchmark" other than federal emissions standards. Cummins Br., ECF No. 316, PageID.43018, 43015-22. This argument ignores *Fenner*'s mandate.

Plaintiffs are not emissions experts, nor do they need to be. The law does not require them to articulate specific NOx levels. It is not surprising that they did not have specific expectations about NOx emissions levels before purchasing their vehicles. What matters is that Plaintiffs expected—and have provided evidence showing—that they expected the Trucks would be cleaner than comparable trucks. Plaintiffs' Add'l Facts, ¶¶ 8-9.[11] Plaintiffs also offered evidence that Defendants uniformly marketed the trucks as "clean diesel" and that they charged a premium for those features. *Id.*, ¶¶ 9-11. Along with Smithers' evidence comparing the Trucks' emissions and fuel economy performance (*id.*, ¶¶ 1-5), a jury could conclude that a "reasonable consumer" would expect the Trucks to provide lower NOx emissions and higher fuel economy than the amounts revealed by Smithers' testing. Moreover, *Fenner* found that the *same* types of evidence, grounded in consumer expectations, comparator vehicles, and representations about the vehicles, is sufficient to establish a "plausible [] emissions benchmarks [that] do not depend on federal emissions standards." *Fenner*, 113 F.4th at 598. Plaintiffs' evidence is similarly compelling

---

[11] *See also* Plaintiffs' Resp. to FCA's Facts, ¶¶ 1-47.

- 39 -

and establishes plausible benchmarks of any federal standard. *Fenner* found this sufficient and so should this Court.

## C.    FCA's state-specific arguments must be rejected.

FCA's preemption arguments are smoke and mirrors. Its brief purports to focus on its argument that "Plaintiffs cannot create the genuine issues of material fact necessary to survive summary judgment." FCA Br., ECF No. 315, PageID.42387. Plaintiffs' claims under Illinois, New Mexico, and California law are grounded in consumer expectations, Defendants' promises, and real-world comparisons—not federal regulations. *Fenner* is decisive: these claims survive because the evidence here aligns with that found sufficient to sustain the *Fenner* claims, and FCA's arguments fail. Several of FCA's arguments are improper attempts to re-litigate issues that it already had a chance to address, and that have no relationship to the preemption issue decided on appeal.[12] FCA's remaining arguments ignore the substantial evidence bearing on consumer expectations,

---

[12] As the Court is aware, the parties extensively briefed and this Court has already decided Defendants' summary judgment motions, in addition to various motions to dismiss and motions for judgment on the pleadings. At the latest status conference, this Court reminded the parties that it did not view this briefing as an opportunity to raise issues that have been (or could have been) decided in the prior summary judgment briefing and that have no relationship to preemption. That admonition was consistent with the admonition in *Counts* that "we do not remand [] for the parties to litigate anew. Rather, we remand the case for the limited purpose of determining whether the plaintiffs' remaining claims (as we have defined that term here) are preempted under the analysis described above." *Counts*, 139 F.4th at 583.

- 40 -

comparable vehicles, and Defendants' marketing of the Trucks that *Fenner* found sufficient to sustain identical claims.

**1.** **FCA has not advanced any timely argument meeting its burden of establishing that Plaintiffs' Illinois claims are preempted or supported by insufficient evidence.**

FCA argues that Plaintiffs' Illinois emissions-based claims must be dismissed because they cannot establish proximate cause or reliance. But FCA's own description of its position reveals that this argument is an improper attempt at a "second bite at the apple."

As FCA writes, "[t]he Court denied FCA US summary judgment" on the Illinois emission-based claims because Mr. Ganz "testified that he 'heard the term clean diesel being advertised' and, at the time of purchasing his Truck, believed that 'all the technology had advanced to the point where they were cleaner,'" and because Ms. Roberts "testified that 'she anticipated the truck was clean burning as was advertised to her when she purchased the truck.'" FCA Br., ECF No. 315, PageID.42398 (quoting SJ Order, ECF No. 272, PageID.37763-66). FCA goes on to urge that despite these conclusions (which do not implicate emissions standards), "a close look at their deposition testimony reveals that any belief the two had about their trucks being 'clean' was based solely upon the notion that they *would comply with emissions standards*." FCA Br., ECF No. 315, PageID.42398.

- 41 -

In other words, FCA invites this Court to re-examine evidence it already considered when they made the same argument in their original summary judgment motion, when it concluded that each of the Plaintiffs showed justifiable reliance based on factors *other than regulatory compliance*, and see if it has changed its mind. That is not an issue properly before the Court at this time—FCA already had a chance to litigate that issue. And nothing in *Fenner* or *Bledsoe* requires the Court to revisit its earlier conclusions based on a thorough review of the evidence. Moreover, on the merits, FCA's argument fails: both Mr. Ganz and Ms. Roberts have offered evidence of their expectations, neither of which depends upon EPA compliance. *See* Plaintiffs' Add'l Facts, ¶¶ 8, 9; *see also* Plaintiffs' Resp. to FCA's Facts, ¶¶ 1-16.

FCA next argues that Plaintiffs' Illinois fuel economy claims are preempted because Plaintiffs' *complaint* refers to defeat devices as being the cause of the increased fuel consumption. FCA Br., ECF No. 315, PageID.42399. This argument ignores the clear holding by the Sixth Circuit in *Bledsoe* that those claims "based on the pleadings" are not preempted, and is easily dispatched on that ground. *Bledsoe*, 2025 WL 2268065, at *6.

FCA's remaining arguments are all untimely, having no nexus with the preemption issue decided on appeal. FCA's claims the Illinois fuel economy claims should be dismissed on the ground that Plaintiffs evidence is insufficient to establish

- 42 -

that any fuel economy claims were made by FCA or were false or misleading.[13] FCA Br., ECF No. 315, PageID.42399-400. It goes on to argue that Plaintiffs failed to show a common law duty to disclose under the ICFA, and that the Court should re-examine its earlier summary judgment decision that Plaintiffs established actionable "half-truths" upon which they reasonably relied. *Id.* at PageID.42400. Again, those arguments have nothing to do with preemption or the *Fenner* test, and could have been raised and decided in the first summary judgment motion. They are now untimely and should be rejected as such.

**2. FCA has not advanced any timely argument meeting its burden of establishing that Plaintiffs' New Mexico claims are preempted or supported by insufficient evidence.**

FCA argues that Plaintiffs have not established proximate cause for the New Mexico NMUPTA and fraudulent concealment claims. FCA Br., ECF No. 315, PageID.42401-02. Its primary arguments in support of this notion, however, are that the evidence does not establish an agency relationship between dealership representatives and FCA. This argument again has nothing to do with preemption or with the *Fenner* test, and is untimely. It should be rejected accordingly.

---

[13] FCA seems to be implying that *Bledsoe* changed the analysis when it stated that "any representations made regarding the truck's fuel economy concern only what FCA told consumers—not any EPA-issued or -tested figures." *Bledsoe*, 2025 WL 2268065, at *6. But that clearly is not what was meant—*Bledsoe* merely pointed out that because the Trucks were exempt from EPA fuel economy regulations, any statements it did make clearly were not to the regulators.

- 43 -

FCA briefly argues that even if Mr. Ward could establish an agency relationship, "his testimony also shows that any belief he had about his truck being a 'clean emissions truck' was based **solely** on his understanding that it 'met the EPA guidelines . . . .'" *Id.* But Mr. Ward has offered evidence of his expectations of clean emissions independent of EPA regulations. *See* Plaintiffs Add'l Facts, ¶¶ 8, 10; Plaintiffs' Resp. to FCA Facts, ¶¶ 18-24.

FCA further argues that Mr. Ward failed to establish a duty to disclose, barring his NMUTPA and fraudulent concealment claims. FCA Br., ECF No. 315, PageID.42402-03. FCA's argument is based on this Court's earlier determination that statements on FCA's website that the Trucks would "meet the new green emissions standards" showed a misleading partial representation that triggered a duty to disclose. *Id.* This statement, it claims, triggers preemption under *Fenner*. But FCA's summary does not reveal the true nature of what Mr. Ward was told. In fact, Mr. Ward was told by an FCA-authorized salesperson that the Trucks "exceeded the 2010 standards," and he read on the FCA website and brochures that the Trucks "met the new green emissions standards earlier than any other manufacturer without using DEF." Plaintiffs' Add'l Facts, ¶ 10. In other words, FCA's representations were that the Trucks *exceeded* applicable emissions standards, and that the technology employed in the Trucks allowed it to meet those standards early without the additional expense and hassle of DEF. Those representations go beyond

- 44 -

representations of mere regulatory compliance and thus do not infringe on the EPA's regulatory authority.

Finally, FCA argues that Mr. Ward's claims are time-barred because it would require expert testimony explaining why Mr. Ward could not have discovered his claims through the exercise of reasonable diligence, which FCA claims would necessarily entail an explanation that the Trucks fail to meet regulatory standards. FCA Br., ECF No. 315, PageID.42403-04. But there is no rational reason why Mr. Smithers' testimony would need to refer to the regulatory standard. Mr. Smithers' report sets out in great detail the highly technical underpinnings of the mechanisms in the truck that cause higher than expected emissions. Those explanations are not inextricably entwined with the fact that because of those mechanisms, the Trucks not only exceed reasonable consumer expectations, but also regulatory standards. A jury could reasonably infer, based on the technical nature of the software and hardware at issue as described by Mr. Smithers, that Mr. Ward could not have reasonably discovered the excessive emissions earlier on his own. FCA's argument begs common sense.

Finally, FCA claims that the economic loss rule bars Mr. Ward's fraudulent concealment claim. FCA Br., ECF No. 315, PageID.42404. This claim depends on the success of FCA's duty to disclose argument and therefore fails for the above reasons.

010649-11/3438118 V1

**3.** **FCA has not advanced any timely argument meeting its burden of establishing that Plaintiffs' California claims are preempted or supported by insufficient evidence.**

FCA advances similar arguments in support of its claim that Mr. Kerber's California claims should be dismissed. Those arguments fare no better.

FCA first claims that Mr. Kerber's claims should be dismissed because he cannot show that he relied on any statement by FCA and cannot show that the salesperson at the FCA-authorized dealership where he purchased his car was an agent of FCA. FCA Br., ECF No. 315, PageID.42405-06. This argument, like many advanced by FCA in its motion, is untimely and has nothing to do with preemption. It should be rejected on those grounds.

FCA's materiality arguments (FCA Br., ECF No. 315, PageID.42407-08) and duty to disclose arguments (FCA Br., ECF No. 315, PageID.42409-11) fail for the same reason. FCA has identified no nexus between the preemption ruling that gave rise to its opportunity to submit a renewed summary judgment motion and either of these arguments. The arguments are untimely and an improper attempt to shoehorn unrelated issues into this limited review. Plaintiffs respectfully request that the Court reject these arguments along with FCA's other arguments as untimely and improper.

### III. CONCLUSION

For the foregoing reasons, Defendants' renewed motions for summary judgment should be denied.

- 46 -

010649-11/3438118 V1

DATED: January 20, 2026

Respectfully submitted,

*/s/ Steve W. Berman*

Steve W. Berman
Garth Wojtanowicz
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com
Email: garthw@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Email: epm@millerlawpc.com
Email: ssa@millerlawpc.com
Email: dal@millerlawpc.com

James E. Cecchi
**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Email: jcecchi@carellabyrne.com

Christopher A. Seeger
Shauna Itri
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: (212) 584-0700
Email: cseeger@seegerweiss.com

- 47 -

- 48 -

Paul J. Geller
**ROBBINS GELLER RUDMAN & DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Email: pgeller@rgrdlaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 20, 2026, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Steve W. Berman*
STEVE W. BERMAN

- 49 -

010649-11/3438118 V1