UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JAMES BLEDSOE, et al.,** individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>**FCA US LLC**, a Delaware corporation, and **CUMMINS INC.**, an Indiana corporation,<br><br>Defendants. | **4:16-CV-14024-TGB-RSW**<br><br>HON. TERRENCE G. BERG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' JOINT MOTION TO STRIKE PLAINTIFFS' SUMMARY JUDGMENT DECLARATIONS (ECF NO. 328);**<br><br>**GRANTING DEFENDANT FCA US LLC'S RENEWED MOTION FOR SUMMARY JUDGMENT (ECF NO. 315);**<br><br>**AND GRANTING DEFENDANT CUMMINS INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT (ECF NO. 316)** |

The case is a putative class action brought by purchasers of Dodge Ram 2500 and 3500 pickup trucks ("Trucks" or "Pickups") manufactured by Defendant FCA US LLC ("FCA") and equipped with 6.7-liter Turbo-Diesel engines produced by Defendant Cummins Inc. ("Cummins"). Plaintiffs allege that between 2007 and 2012, Defendants marketed the Trucks as eco-friendly and fuel-efficient, with "clean diesel engines" as compared to other diesel trucks. According to the Complaint, however,

the Trucks were emitting nitrogen oxides ("NOx") at levels exceeding federal and state emissions standards and at levels greater than a reasonable consumer would expect based on the alleged marketing representations.

Over the course of issuing several Orders on multiple pretrial dispositive motions, including motions to dismiss (ECF Nos. 60, 97), to exclude expert testimony under Daubert (ECF No. 262), for summary judgment (ECF No. 272), and for judgment on the pleadings (ECF Nos. 215, 293), the Court ultimately granted judgment in Defendants' favor and dismissed this case. ECF No. 294. Applying recent Sixth Circuit precedent in the *Ford Motor* case, *In re Ford Motor Company F-150 and Ranger Truck Fuel Economy Marketing and Sales Practices Litigation*, 65 F.4th 851 (6th Cir. 2023), this Court concluded that the state law claims would be preempted because the facts supporting those claims would have challenged or relied upon findings of the EPA. *See* ECF No. 293, PageID.41846–55, 41863–74. As to Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Court had previously granted summary judgment to Defendants on this claim in a prior order, holding that Plaintiffs lacked standing to bring their RICO claims as indirect purchasers. *See* ECF No. 272, PageID.37752.

Plaintiffs appealed the judgment on the pleadings entered against them on their state law claims and the grant of summary judgment as to the RICO claims, and the Sixth Circuit Court of Appeals, in an

unpublished opinion, affirmed in part, reversed in part, and remanded for further proceedings consistent with the opinion. *Bledsoe v. FCA US LLC*, No. 24-1094, 2025 WL 2268065 (6th Cir. Aug. 8, 2025). The court affirmed dismissal of Plaintiffs' RICO claims but reversed the dismissal of the state law claims on preemption grounds because, based on intervening Sixth Circuit precedent, it was plausible that "emissions-based" fraud claims could survive—independently of any reference to EPA findings—under three possible theories: "that FCA and Cummins misled and defrauded consumers because the trucks emitted NOx at a rate higher than (1) emitted by comparable gasoline trucks, (2) expected by a reasonable consumer, and (3) as advertised by defendants." *Id.* at *5. The court found that Plaintiffs' "fuel economy-based" claims are based on "only what FCA told consumers," and stated "[w]hether the claims can be proven without reliance on the alleged existence of a defeat device is a matter for the district court to determine on remand." *Id.* at *6–7. The Sixth Circuit then remanded this case for this Court to determine whether—after considering the full factual record on summary judgment—Plaintiffs' remaining claims were "preempted under the analysis described [in the opinion]." *Id.* at *7. To make this determination, the Court would need to consider, under the standards of summary judgment, whether the record raises a genuine issue of material fact as to those fraud theories, without being preempted by relying on any reference to EPA regulations or decision making.

Upon remand therefore, the Court set a briefing schedule for the parties to address the issues identified by the Court of Appeals. Now before the Court are FCA's and Cummins' separately-filed Renewed Motions for Summary Judgment. ECF Nos. 315, 316. The motions are fully briefed. ECF Nos. 319, 321 (sealed response), 329, 330. Also before the Court is the Defendants' Joint Motion to Strike Summary Judgment Declarations of certain Plaintiffs that Plaintiffs proffered in support of their Response to the summary judgment motions. ECF No. 328. That motion is also fully briefed. ECF Nos. 331, 332. The Court held a hearing on the three motions on August 11, 2026, at which counsel for the parties appeared and argued. For the reasons that follow, Defendants' Joint Motion to Strike Summary Judgment Declarations will be **GRANTED IN PART** and **DENIED IN PART**, Defendant FCA's Renewed Motion for Summary Judgment will be **GRANTED**, Defendant Cummins' Renewed Motion for Summary Judgment will be **GRANTED,** and Plaintiffs' remaining claims will be **DISMISSED WITH PREJUDICE**.

## I. BACKGROUND

### A. Procedural History

#### 1. Plaintiffs' claims

Plaintiffs initially sought to bring a nationwide class action against FCA and Cummins, with subclasses in all 50 states and the District of Columbia. ECF No. 1. They allege that Defendant FCA's 2007–2012 Dodge Ram 2500 and 3500 Trucks, equipped with 6.7- liter Turbo Diesel

engines manufactured by Defendant Cummins, emit NOx in real-world driving at levels that exceed federal and state emissions standards as well as the expectations of reasonable consumers. Plaintiffs allege that they purchased their Trucks based on Defendants' advertising the Trucks as more fuel efficient and environmentally friendly than other diesel trucks. Plaintiffs specifically claim that Defendants knew the Trucks discharged emissions in real-world driving at levels greater than what a reasonable consumer would expect but continued to market them as using "clean diesel" technology. In Plaintiffs' operative Third Consolidated and Amended Class Action Complaint ("TCAC"), they alleged violations of the RICO, the Magnuson Moss Warranty Act ("MMWA"), and consumer protection, breach of contract, and fraudulent concealment laws of 50 states as well as the District of Columbia. TCAC, ECF No. 255.

To summarize the current state of Plaintiffs' claims, the Court considers the entire factual record, including fact sheets filed by Plaintiffs, depositions of the Plaintiffs, admissible portions of Plaintiffs' expert reports, and, where permissible, the recently filed declarations of several Plaintiffs, as well as the claims in the TCAC. The factual record below is what the Court must carefully consider in assessing whether there is a genuine issue of material fact regarding the fraud theories identified by the Sixth Circuit as not preempted.

**a. James Bledsoe**

Plaintiff James Bledsoe purchased a new 2007 Ram 2500 Truck from an FCA-authorized dealership in California on September 7, 2007. Bledsoe Fact Sheet (July 2, 2021), ECF No. 183-44, PageID.21297. Bledsoe testified that he did not have any expectations regarding the Trucks' emissions at the time of purchase and did not know what type of emissions his Truck did produce. ECF No. 316, PageID.43021. He testified that he expected the emissions level of his Truck to comply with the law, and that he understood "clean diesel" to mean "meets the requirements or exceeds the requirements that were set at the time." *Id.* Bledsoe stated that he purchased the truck because of its towing capacity and because it had more torque and power than his current vehicle. *Id.* PageID.43022.

Bledsoe testified that he did not review any websites before he purchased the Truck, cannot recall seeing any advertisements regarding the Truck prior to its purchase, and admits that he did not rely on any representations by Cummins in purchasing the Truck and that he cannot identify any statements by Cummins regarding the Truck's fuel economy. ECF No. 316-2, PageID.43039, 43052–53, 43068, 43087, 43090–91. Instead, Bledsoe's expectations for fuel economy were formed by discussions "with friends who owned similar vehicles." *Id.*

Bledsoe's claims against FCA were previously dismissed, but his claims against Cummins remain for:

- Violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*,
- Violation of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*, and
- Fraudulent concealment based on California law.

ECF No. 315, PageID.44173–74. The Court notes that Plaintiffs do not cite to any testimony of Bledsoe in responding to the Defendants' motions for summary judgment.

**b. Marc Ganz**

Plaintiff Marc Ganz purchased a new 2012 Ram 3500 Truck from an FCA-authorized dealership in Illinois in July 2013 for his business and personal use. ECF No. 315, PageID.342389. Since purchasing his Truck in 2013, Ganz has driven it for over 140,000 miles and believes it to be in good condition. ECF No. 316-4, PageID.43363.

Ganz admits that he did not recall seeing any advertisements about "clean diesel" specific to the Trucks prior to purchase. ECF No. 315, PageID.42389. Similarly, the Monroney label on Ganz's Truck did not reference emissions or "clean diesel." *Id.* But Ganz claims that in researching the Trucks, "they were very adamant that what the product that they had was better than the competition because of the motor and transmission and the truck in itself because of the clean emissions and such," but he did not know what type of emissions his Truck produces. ECF No. 321, PageID.44176; ECF No. 316-4, PageID.43236. Ganz understood "cleaner" to mean that the new Truck was "cleaner than the

truck [he previously owned]," but admits that he never measured the emissions in his previous vehicle and has no reason to believe that his new Truck is not cleaner than his prior vehicle. ECF No. 315, PageID.42390; ECF No. 321, PageID.44177; ECF No. 316, PageID.43023 (Ganz testifying that he believed "clean emissions" meant only that the United States Environmental Protection Agency ("EPA") had determined the Truck did not produce too many emissions and he agreed that "if the EPA said that [the Truck] didn't produce too many emissions, then it would be okay.").

Ganz cannot identify any representations by FCA or Cummins about fuel economy but recalls that a salesperson at the FCA-authorized dealership made representations about the Truck's estimated fuel economy, based on that salesperson's "personal experience." ECF No. 315, PageID.42390; ECF No. 321, PageID.44177. Ganz testified that while he was expecting to get 17 MPG based on what the dealership salesman quoted for a combination of city and highway driving, Ganz's Truck averaged about 11 MPG. ECF No. 315, PageID.42390; ECF No. 321, PageID.44177–78. Ganz testified he does "very little" highway driving but instead does mostly "stop-and-go" driving, which he admits yields a lower mileage-per-gallon ("MPG") that highway driving. ECF No. 315, PageID.42390; ECF No. 321, PageID.44177–78. Ganz also used his Truck to tow or haul about 40% of the time, which again yields lower gas mileage. ECF No. 315, PageID.42390; ECF No. 321, PageID.42177–78.

Ganz's remaining claims are:

- Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("IFCA"), 815 Ill. Comp. Stat. 505/1 *et seq*. and 720 Ill. Comp. Stat. 295/1A, against FCA and Cummins, and
- Fraudulent concealment under Illinois law against FCA only.

ECF No. 315, PageID.42389; ECF No. 316, PageID.43009.

**c. Dawn Roberts**

Plaintiff Dawn Roberts purchased a new 2012 Ram 2500 Truck from a dealership in Illinois. ECF No. 315, PageID.42391; ECF No. 321, PageID.44178. Roberts chose the Truck because it was "pretty," and because of its towing and hauling capacities, as well as the size of its backseat. ECF No. 315, PageID.42391; ECF No. 321, PageID.44178. Roberts did no research and saw no advertisements before purchasing the Truck. She admitted that "emissions" was not "one of the key factors" in her purchase decision, and neither was mileage. ECF No. 315, PageID.42391; ECF No. 321, PageID.44179. She had no expectations about emissions when she purchased her truck and did not buy it based on it having a "clean diesel system." ECF No. 315, PageID.42391; ECF No. 321, PageID.44179. Roberts in fact had never heard the term "clean diesel" before reviewing the Complaint in this case. ECF No.315, PageID.42391; ECF No. 316, PageID.43022; ECF No. 321, PageID.44179.

When she bought the Truck, Roberts did not know what type of emissions the Truck produced and was not familiar with NOx emissions.

ECF No. 315, PageID.42391; ECF No. 316, PageID.43022; ECF No. 321, PageID.44179. Her understanding of this case is that there was something in the Trucks that was causing them to put out more emissions than should legally be allowed, as stated by the EPA. ECF No. 315, PageID.42391; ECF No. 321, PageID.44179–80; ECF No. 316, PageID.42022–23 (testifying that the "wrong she wants righted" through this lawsuit was "cheating on emissions").

Roberts testified that neither FCA nor dealership personnel made any representations or promises to her about fuel economy for her Truck. ECF No. 315, PageID.42391; ECF No. 321, PageID.44180. She did testify however that she did not get the gas mileage she expected to from her Truck. ECF No. 321, PageID.44180.

Roberts' remaining claims are:

- Violation of the IFCA against FCA and Cummins, and
- Fraudulent concealment under Illinois law against FCA only.

ECF No. 315, PageID.42389; ECF No. 316, PageID.43009.

**d. Marty Ward**

Plaintiff Marty Ward purchased a new 2012 Ram 3500 Truck from an FCA-authorized dealership in New Mexico on March 31, 2012. ECF No. 315, PageID.42391; ECF No. 321, PageID.44180. Before buying the Truck, Ward reviewed the Dodge website and brochures but did not recall seeing any representations about the Truck's emissions or fuel mileage there. ECF No. 315, PageID.42392; ECF No. 321, PageID.44180–81. At

that time, Ward testified he wanted things such as "diesel fuel economy," "good power," "clean diesel," and a "compression brake." ECF No. 321, PageID.44180–81.

Ward did speak with a dealership salesperson about the Truck's fuel economy and emissions. *Id.* Specifically, the salesperson informed Ward that the Truck was a "clean emissions truck," which Ward interpreted to mean that the Truck "met the EPA guidelines that was required without using DEF [diesel exhaust fluid]." *Id.*; ECF No. 315, PageID.42392; ECF No. 316, PageID.42026. Ward further testified that he viewed internet and television advertisements related to the Truck and they said, "it was one of the most fuel efficient diesels out there," and that brochures on the website stated that the vehicle met the new green emissions standards earlier than any other manufacturer. ECF No. 321, PageID.44181; ECF No. 316-6, PageID.43649.

Ward testified that the premium he paid for his Truck was for "cleaner emissions," but he believes his Truck does not "have green emissions or a clean exhaust system" because it was "not in compliance with the EPA's guidelines" and that he was "sold a defective vehicle" "designed to pass emission tests illegally." ECF No. 315, PageID.42392; ECF No. 321, PageID.44181. Ward stated that he "do[es] not believe the exhaust system and the emissions system on [his] [T]ruck are working according to the way they were advertised to work and [it's] emitting [a] substantial amount of pollutants into the air." ECF No. 321,

PageID.44181. While Ward expected his Truck "me[t] the emissions standard required by federal law on its date and time of manufacture," he had no understanding of what those particular levels were. ECF No. 315, PageID.42392. However, Ward expected at the time he purchased his Truck that NOx emissions from diesel vehicles, like his Truck, would exceed that of a comparable gasoline vehicle. ECF No. 315, PageID.42392.

Ward does not recall seeing any FCA representations about his Truck's fuel economy, or any materials on the internet regarding his Truck's fuel mileage. ECF No. 315, PageID.42392; ECF No. 321, PageID.44181–82. He did testify that a dealership salesperson told him that he would get "comparable fuel mileage to the truck [he] was trading in." ECF No. 321, PageID.44181–82. At the time of his deposition, Ward testified that his Truck got 19.5 MPG without towing a trailer, but he expected it would get 22.5 MPG based on his past experience and the dealership salesperson's representation that he would receive "comparable performance;" although the dealership salesperson never promised Ward a specific fuel economy. ECF No. 315, PageID.42392–93; ECF No. 321, PageID.44182. Ward complains that he "overpaid for his vehicle based on the existence of the undisclosed defeat device." ECF No. 315, PageID.42393; ECF No. 321, PageID.44182.

Ward's remaining claims against both FCA and Cummins are:

- Violation of the New Mexico Unfair Trade Practices Act ("NMUTPA"), N.M. Stat. Ann. § 57-12-1 *et seq.*, and
- Fraudulent concealment under New Mexico law.

ECF No. 315, PageID.42389; ECF No. 316, PageID.43009.

**e. James Forshaw**

Plaintiff James Forshaw is a resident of South Carolina. Forshaw Fact Sheet (July 2, 2021), ECF No. 175-44, PageID.19668. He purchased a new 2007 Ram 3500 Truck from an FCA-authorized dealership based in North Carolina on September 24, 2007. *Id.* PageID.19669. Forshaw testified that he officially purchased the Truck from a dealership salesperson in South Carolina after test driving the Truck. ECF No. 316-5, PageID.43509. The salesperson told Forshaw that the Truck would be "perfect" for towing his boat, and Forshaw noted that he was "impressed" by the fact that the Truck did not have a "diesel exhaust smell" when he test drove it. *Id.* PageID.43508–09.

Forshaw testified that he understood that "this case is about the emissions control device—defeat device that was put in place to basically state by FCA that they were already in compliance with the 2010 emissions requirements when, in fact, they were—they falsely misrepresented themselves and, in fact, were not in compliance[.]" ECF No. 316-5, PageID.43490. Forshaw further agreed that his case is about, in part, the Trucks "emit[ting] higher amounts of NOx than the Clean Air Act permits and higher than what Cummins and FCA told the

regulators and consumers that it would emit." *Id.* PageID.43497. Forshaw defined "excessive" emissions as "exceeding the federal standards for the Clean Air Act," and "exceeding the claims made by FCA and Cummins as to what this engine was generating in terms of emissions." *Id.* PageID.43494.

Forshaw alleges that Cummins falsely claims that the "2007 Cummins engine met the 2010 federal guidelines for clean emissions for diesel engines." *Id.* However, Forshaw admits that he did not rely on any representations by Cummins in purchasing the Truck and cannot identify any statements by Cummins about the Truck's fuel economy. *Id.* PageID.43535. As with Bledsoe, Plaintiffs do not raise any of Forshaw's statements in responding to Defendants' motions for summary judgment.

Forshaw's claims against FCA were previously dismissed, but his fraudulent concealment claim under South Carolina law against Cummins remains. ECF No. 316, PageID.43009.

**f. Donovan Kerber**

Plaintiff Donovan Kerber was added to this case on July 20, 2022 when Plaintiffs filed their TCAC. The Court granted Plaintiffs' request for leave to file their TCAC to add new named plaintiffs with claims against FCA only under the laws of California, Idaho, South Carolina, Michigan, and Texas. Case Management Order, ECF No. 249, PageID.34862–63. While the Court permitted Plaintiffs to add multiple new plaintiffs through the TCAC, Plaintiffs added only Kerber as a

potential class representative for putative class members in California. ECF No. 255.

Over three years after this lawsuit was initially filed, on June 12, 2020, Kerber purchased a then eight-year-old, used 2012 Ram 2500 Truck from a dealership in California. ECF No. 315, PageID.42393; ECF No. 321, PageID.44182. Kerber's Truck had approximately 111,000 miles on it when purchased, and it was not covered by any FCA warranty. ECF No. 315, PageID.42393–94; ECF No. 321, PageID.44182. The Truck's user guide was in the vehicle's glove box when Kerber purchased it, but he did not review it. ECF No. 315, PageID.42393; ECF No. 321, PageID.44182.

Kerber never communicated with FCA regarding the Truck prior to or after purchasing it. ECF No. 315, PageID.42393; ECF No. 321, PageID.44182. He admits that he has not seen any contract between FCA and the dealership where he purchased his Truck, and he is not aware of whether any such contract exists. ECF No. 315, PageID.42395; ECF No. 321, PageID.44185. He testified that his only basis for the existence of an agency relationship between FCA and the dealership where he purchased his Truck is that the dealership was "[a] Chrysler/Ram/Dodge-branded dealership" and "[t]hey have Ram and Chrysler over everything in the dealership." ECF No. 315, PageID.42395–96; ECF No. 321, PageID.44185.

Kerber concedes that he did not see or rely upon any advertisement, brochure, or Monroney label from FCA when purchasing his Truck. ECF No. 315, PageID.42394; ECF No. 321, PageID.44182. In addition, Kerber does not recall encountering or relying on any statements about the Trucks' "clean diesel" or emissions when purchasing his Truck, although he testified he spoke with the dealership salesperson about emissions. ECF No. 315, PageID.42394; ECF No. 321, PageID.44182. He testified that the "emissions-type" representations he received from the dealership were that (1) the Truck would have to go through California smog testing bi-annually, and (2) that the Truck did not have a DEF system. ECF No. 315, PageID.42395; ECF No. 321, PageID.44184. He states that they may have also discussed the Truck's "ultra clean diesel system." ECF No. 315, PageID.42395; ECF No. 321, PageID.44184. However, he did not research or investigate emissions prior to his Truck purchase. ECF No. 315, PageID.42394; ECF No. 321, PageID.44183. At the time of his deposition, Kerber did not know what type of emissions his Truck does or does not produce. ECF No. 315, PageID.42394–95; ECF No. 321, PageID.44184.

Kerber admits that FCA did not make any representations directly to him about the Truck's fuel economy. ECF No. 315, PageID.42395; ECF No. 44184–85. Instead, Kerber contends that he read about the Truck's fuel economy on third-party websites before purchasing and he briefly discussed the Truck's fuel economy with a dealership salesperson. ECF

No. 315, PageID.42395; ECF No. 321, PageID.44185. Specifically, Kerber recalled that the salesperson told him the Truck would run at 16 or 17 MPG on the freeway. ECF No. 315, PageID.42395; ECF No. 321, PageID.44185. Kerber testified that his Truck gets only 13 to 14 MPG while driving on the freeway. ECF No. 315, PageID.42395; ECF No. 321, PageID.44185.

Since purchasing his Truck, Kerber has driven it over 23,000 miles, and he admits that the Truck and its engine are "still in good condition," and he continues to drive it five days a week. ECF No. 315, PageID.42396; ECF No. 321, PageID.44185–86. Kerber has complained that the Truck requires additional fuel to complete "regeneration cycles to clean the diesel particulate filter," but admits that the Truck's owner's manual described this regeneration process. ECF No. 315, PageID.42396; ECF No. 321, PageID.44186.

Kerber's remaining claims against FCA only are:

- Violation of the California UCL;
- Violation of the California CLRA;
- Violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*, and
- Fraudulent concealment under California law.

ECF No. 315, PageID.42389.

In addition to this evidence regarding the individual Plaintiffs, the Court also considered the Declarations of Plaintiffs Ganz, Roberts, Ward,

and Kerber that Plaintiffs attached to their Response to Defendants' Renewed Motions for Summary Judgment, ECF Nos. 319-8 to 319-11, the admissible portions of Plaintiffs' expert, Juston Smithers', Class Certification and Merits Reports, ECF Nos. 321-2 and 321-3, and the evidence in the record. This evidence will be discussed in greater detail below.

### 2. The federal regulatory process governing the Dodge Ram trucks with the Cummins engine

The Clean Air Act ("CAA"), 42 U.S.C. §§ 7401–7671, subjects all vehicles in the United State market, including the Dodge Ram Trucks at issue here, to extensive government regulation and testing prior to sale. In the Act, Congress authorized the EPA to develop, police, and enforce motor vehicle emissions standards, including prescribing standards for the emission of dangerous pollutants from new motor vehicles or engines. *Id.* §§ 7521(a)(1), 7525.

Under this regulatory framework, the responsibility of rigorous testing falls on vehicle and engine manufacturers, *id.* § 7525(a)–(d), (h), and manufacturers must submit data specified by the EPA for review. 40 C.F.R. §§ 86.1843-01, 86.1844-01. Motor vehicles generally cannot be sold in the United States without a "certificate of conformity," which is the EPA's certification that a vehicle complies with all federal emissions standards. 42 U.S.C. § 7521(a); 40 C.F.R. § 86.1848-01(e). As part of this process, manufacturers must disclose whether the vehicle has any

"auxiliary emission control devices" ("AECDs"), which for various reasons can increase vehicle emissions under certain operating conditions. 40 C.F.R. § 86.1844-01(d)(11). When a vehicle is equipped with AECDs, the manufacturer must provide the EPA with "a justification for each AECD, the parameters they sense and control, a detailed justification for each AECD that results in a reduction in effectiveness of the emission control system, and rationale for why it is not a defeat device." *Id.* Not all AECDs are permissible. A "defeat device" is an AECD that unjustifiably "reduces the effectiveness of the emissions control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use[.]" 40 C.F.R. § 86.004-2. Thus, a defeat device defeats the proper functioning of an emission control system, and the EPA may not issue a certificate of conformity as to any vehicle equipped with one. 40 C.F.R. §§ 86.1809-12(a) 86.1844-01(g)(5).

Cummins is the component part supplier to FCA that designed and manufactured the 6.7-liter adsorber and Turbo Diesel engine installed in the 2007–2012 model year Trucks at issue in this litigation. ECF No. 218, PageID.27365; ECF No. 241, PageID.34132. The engine included two emission control features: a diesel particulate filter ("DPF"), which traps and removes particulate (soot) emissions, and an NOx adsorber catalyst system, which facilitates the capture and reduction of NOx into less harmful substances, such as nitrogen and oxygen. ECF No. 218, PageID.27367. The engine primarily removes the soot through a process

called "active regeneration," during which the temperature of the exhaust is elevated to 550°C or higher to burn off the accumulated soot. *Id.* In general, active regeneration requires additional fuel consumption and causes higher NOx emissions. *Id.* PageID.27370. Therefore, the more frequently that the Trucks undergo active regeneration, the more fuel they will consume and the more NOx they will emit. Cummins calibrated the engines to control when and how often the process called active regeneration would occur. ECF No. 218, PageID.27370–71. Cummins did not share its actual calibrations on active regeneration with FCA because they were Cummins' intellectual property. ECF No. 221, PageID.28589; ECF No. 241, PageID.34147.

Cummins, in conjunction with FCA, commenced the regulatory process for Dodge Ram trucks' engines in 2006. ECF No. 218, PageID.27366–67; ECF No. 241, PageID.34133. The Regulators, including the EPA and the California Air Resources Board ("CARB"), had to ensure that the Trucks met the pertinent emissions standards by conducting emissions testing and reviewing Cummins' methodology for calculating emissions rates. *Id.* Both the EPA and the CARB granted certification for the Cummins engine. ECF. No. 281, PageID.27372.

### 3. Motion practice

Prior rulings on a raft of Defendants' earlier dispositive motions had narrowed the claims against Defendant FCA to those of Plaintiffs Ganz, Roberts, Ward, and Kerber for violating state consumer protection

statutes and/or fraudulent concealment in Illinois, New Mexico, and California, while those against Defendant Cummins had been limited to Plaintiffs Bledsoe, Roberts, Ganz, Ward, and Forshaw pertaining to alleged violations of state consumer protection statutes and/or fraudulent concealment in California, Illinois, and New Mexico, as well as fraudulent concealment in South Carolina. ECF No. 272; ECF No. 293. Defendants then raised a motion for judgment on the pleadings directed at the remaining claims, and on January 26, 2024, the Court ruled that Plaintiffs' remaining claims arising under state law were preempted. ECF No. 293.

Plaintiffs filed an appeal to the Sixth Circuit Court of Appeals, challenging both the judgment on the pleadings entered against them on their state law claims, as well as the Court's earlier order that had granted of summary judgment as to Plaintiffs' RICO claims. On August 8, 2025, in an unpublished opinion, the Sixth Circuit affirmed the Court's award of summary judgment to Defendants on Plaintiffs' RICO claims, but remanded the dismissal of Plaintiffs' state-law claims on preemption grounds to this Court so that it could consider the application of intervening decisions by the Sixth Circuit that had clarified how preemption applied to the kinds of state law claims at issue in auto-defect cases such as this. *See Bledsoe v. FCA US LLC*, No. 24-1094, 2025 WL 2268065 (6th Cir. Aug. 8, 2025) (applying and discussing in detail the intervening cases of *Fenner v. General Motors, LLC*, 113 F.4th 585 (6th

Cir. 2024) and *Counts v. General Motors, LLC*, 139 F.4th 576 (6th Cir. 2025)).

In *Bledsoe*, the Sixth Circuit held, "at this pleading stage," that Plaintiffs' existing allegations were sufficient to survive a Rule 12 motion and that Plaintiffs "have at least alleged baselines that are plausibly independent from EPA regulations—consumer expectations, gasoline vehicles, and manufacturer advertisements"—to survive a motion to dismiss. *Id.* at *5. Thus the Sixth Circuit found that while three of Plaintiffs' theories of liability were not preempted based solely on the pleadings, whether those claims could survive summary judgment would depend on whether the Plaintiffs presented evidence capable of supporting those theories. The court cautioned that while the *Fenner* plaintiffs survived summary judgment "because they presented concrete, competent evidence of consumer expectations that 'exist[ed] independently of EPA standards,' … [t]he same may not be true in every case." *Id.* at *5–6. The Sixth Circuit stated therefore that "[i]t is incumbent upon [this Court], as these claims proceed beyond the pleadings, to determine whether plaintiffs 'can prevail without showing that the subject vehicles violate EPA regulations,'" *id.* at *6 (citing *Fenner*, 113 F.4th at 598), and to apply the test for preemption set forth in *Counts*. *Id.*

The Sixth Circuit further held, with respect to Plaintiffs' fuel economy-based claims, that "[w]hether the claims can be proven without

reliance on the alleged existence of a defeat device is a [factual] matter for [this Court] to determine on remand." *Id.* at *7.

On November 18, 2025, Defendants FCA and Cummins filed separate Renewed Motions for Summary Judgment. ECF Nos. 315, 316. Defendants advanced the argument that under the current Sixth Circuit standard set forth in *Fenner* and *Counts*, Plaintiffs' remaining state law claims are preempted; and, to the extent any such claims are not preempted, they should be dismissed on the merits. *Id.* Plaintiffs filed a consolidated response in opposition to Defendants' motions, ECF Nos. 319, 321 (under seal), and Defendants filed separate reply briefs in support of their motions. ECF Nos. 329, 330.

Plaintiffs' consolidated response brief was supported in part by Declarations of four of the six remaining Plaintiffs: Marc Ganz, Dawn Roberts, Marty Ward, and Donovan Kerber. ECF Nos. 319-3 to 319-7. On February 10, 2026, Defendants FCA and Cummins filed a Joint Motion to Strike those Declarations. ECF No. 328. Plaintiffs filed a response in opposition to the motion to strike, ECF No. 331, and Defendants filed a joint reply. ECF No. 332.

**B. Relevant Sixth Circuit Opinions**

The Sixth Circuit has issued three published opinions that provide guidance regarding federal preemption of claims brought under state law relating to vehicle emissions and fuel economy.

**1. *In re Ford Motor Company***

The first of these decisions was relied upon heavily by the Court in reaching its decision to grant Defendants' motion for judgment on the pleadings. *See In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851 (6th Cir. 2023). In *Ford Motor*, the plaintiffs brought state law fraud claims against Ford Motor Company, alleging that the gas mileage of F-150 and Ranger pickup trucks was worse than advertised. *Id.* at 858. Ford advertised the trucks by citing the EPA mileage estimates—estimates that the EPA approved based on testing data Ford submitted to the agency. *Id.* at 857. In *Ford Motor*, the court considered the preemptive effect of the Energy Policy and Conservation Act ("EPCA"), and the implementing regulations enacted by the EPA under it. *Id.* at 854.

The Sixth Circuit held that the plaintiffs' claims, which were based on a fraud-on-the-agency theory, were preempted because they "inescapably and impermissibly put[ ] a jury into the EPA's regulatory shoes," as the plaintiffs' claims "essentially challenge[d] the EPA's [gas-mileage] figures" for the vehicles. *Id.* at 863. The Court reasoned that, "because the EPA accepted Ford's testing information and published its estimate based on that information," the plaintiffs' state-law claims acted as a "challenge [of] the EPA's figures," noting "a jury would have to decide whether Ford's testing figures are correct or fraudulent," which "inescapably and impermissibly puts [it] into the EPA's regulatory

shoes." *Id*. The court stated that "allowing juries to second-guess the EPA's fuel economy figures would permit them to rebalance the EPA's objectives," thereby "disrupt[ing] the expert balancing underlying the federal scheme." *Id*. (quotation omitted). The court reasoned that because the EPA is itself empowered to monitor, police, punish, and deter fraud against the agency, allowing private plaintiffs to bring lawsuits to accomplish these ends would effectively usurp EPA power. *Id*. at 863–64. Finally, the court found that allowing state-law fraud-on-the-agency claims would "skew the disclosures that manufacturers need to make to the EPA," encouraging overproduction and thus "burden[ing] the agency's approval process and obstruct[ing] its goals." *Id*. at 864. The court concluded that the plaintiffs' claims were "conflict-preempted" by the EPCA. *Id.*[1]

---

[1] The Sixth Circuit explained the different kinds of preemption in *Ford Motor*:

> State-law claims can be preempted expressly in a federal statute or regulation, or impliedly, where congressional intent to preempt state law is inferred. Through an express preemption clause, Congress may make clear that it is displacing or prohibiting the enactment of state legislation in a particular area. By contrast, implied preemption applies in one of two forms: field or conflict. Field preemption occurs where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Conflict preemption may instead be present when Congress has not entirely displaced state regulation over the matter in question. In that circumstance,

### 2. *Fenner v. General Motors*

In 2024, after this Court had issued its Order relying on *Ford Motor*, the Sixth Circuit issued its opinion in *Fenner v. General Motors, LLC*, 113 F.4th 585 (6th Cir. 2024). *Fenner*, like this case and *Ford Motor*, involved state law consumer protection claims, this time against General Motors and one of its engine suppliers, Robert Bosch GMbH ("Bosch"), alleging that GM trucks equipped with Duramax diesel engines (supplied by Bosch) contained a "defeat device" that made the trucks emit more NOx than consumers expected. *Id.* at 591. The theories in *Fenner* are similar to those in this case: that the trucks emitted levels of NOx many times higher than "(i) their gasoline counterparts, (ii) what a reasonable consumer would expect, (iii) what GM had advertised, (iv) the [EPA]'s maximum standards, and (v) the levels set for the vehicles to obtain a certificate of compliance," as required under the federal Clean Air Act ("CAA"). *Id.* at 596 (citation modified).

A divided panel held that the CAA did not displace the first three of those theories. *Id.* at 596–97. The court distinguished *Ford Motor* on

---

> state law may be preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Ford Motor*, 65 F.4th at 859–60 (citation modified).

the grounds that the *Fenner* plaintiffs' claims relied solely on GM's advertisements to consumers which, unlike the advertisements in *Ford Motor*, were "unconnected" to the regulatory approval of GM's certification application, and thus they did "not depend" on either the existence of a defeat device or "any fraud in the emissions-testing process." *Id.* at 596, 598–99 (citation modified). Rather, the court found that the plaintiffs' evidence rooted those theories in statements GM had made to market to consumers, not what it told the EPA during the certification process. *Id.* at 599; *see id.* at 601 ("If the EPA did not exist or if there were no federal emissions regulations, Plaintiffs' claims that GM fraudulently omitted facts about its emissions systems in advertisements and communications to consumers would live on.").

By contrast, the remaining two theories—those premised on whether the emissions exceeded the EPA's maximum standards or the levels set for the vehicles to obtain a certificate of compliance—were categorically preempted. *Id.* at 596. Those claims, the majority opinion explained, because they were tied to the EPA's "maximum standards" and the levels set for the vehicles to obtain a certificate of conformity, "would require a showing that, contrary to the EPA's decision, the Duramax Trucks failed to meet EPA standards" in violation of the CAA. *Id.* In other words, the claims depended on a showing of fraud on the agency, which *Ford Motor* held was preempted by federal law. *Id.*

The Sixth Circuit subsequently denied a petition for rehearing en banc, again in a divided opinion with Judges Richard Allen Griffin and Raymond M. Kethledge delivering separate dissenting opinions, in which Judge John K. Bush concurred. *Fenner v. Gen. Motors, LLC*, 121 F.4th 1117 (6th Cir. 2024).

### 3. *Counts v. General Motors*

In June 2025, the Sixth Circuit issued its unanimous opinion in *Counts v. General Motors, LLC*, 139 F.4th 576 (6th Cir. 2025). *Counts*, like *Ford Motor*, *Fenner*, and this case, involved claims of fraud under various state laws, and under RICO, against General Motors and the supplier of the vehicles' engine, Bosch, for alleged fraudulent concealment that the subject vehicles contained "defeat devices" designed to undermine the effectiveness of the emissions control systems. Like the other cases, the plaintiffs' fraud claims were based on five theories: namely, that the vehicles "emit levels of NOx many times higher than (i) their gasoline counterparts, (ii) what a reasonable consumer would expect, (iii) what GM had advertised, (iv) the [EPA]'s maximum standards, and (v) the levels set for the vehicles to obtain a Certificate of Conformity that allows them to be sold in the United States." *Id.* at 579–80. The district court ultimately dismissed the last two theories as preempted by the CAA, and dismissed the first theory—that a reasonable consumer would expect that the diesel vehicles would have lower emissions than their gasoline counterparts—as "too implausible to

proceed." *Id.* at 580 (citing *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 678, 693 (E.D. Mich. 2022) (Ludington, J.)). Then, after *Ford Motor* was decided, the district court held that the remaining two theories—that the vehicles' NOx emissions were higher than "(ii) what a reasonable consumer would expect" and "(iii) what GM had advertised"—were preempted by the CAA, and thus dismissed those remaining claims and entered judgment in favor of the defendants. *Id.* at 581 (citing *Counts v. Gen. Motors, LLC*, 681 F. Supp. 3d 778, 785–86 (E.D. Mich. 2023)).

On appeal, the Sixth Circuit reconciled its previous holdings in *Ford Motor* and *Fenner* and, citing to *Fenner*, set forth the following test that plaintiffs bringing claims challenging their vehicles' emissions performance must satisfy to avoid preemption:

> [F]or a claim based on a particular theory to avoid preemption, no part of its syllogism can "implicate or challenge" a determination of the EPA. Moreover, the evidence in support of the claim must "exist[ ] independently of EPA standards." Only if both of those things are true are the claims not preempted. For the text of the Clean Air Act empowers the EPA's Administrator, and not a lay jury, to determine compliance with the EPA's regulations under the Act. *See* 42 U.S.C. § 7525(a)(3), *id*. at 7521(a)(4).

*Id.* at 582–83 (citation modified). The court then remanded the case for the district court to apply this preemption test.

Following remand, the defendants filed post-remand summary judgment motions, and the district court (Honorable David M. Lawson)

held a hearing on those motions on June 24, 2026. That court has not yet rendered a decision on the defendants' motions.

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure provide that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). That is, the non-moving party must provide specific facts to rebut or cast doubt on the moving party's proffered facts. *Matsushita Elec. Indus.*, 475 U.S. at 586.

Summary judgment must be entered against a party who fails to establish the existence of an element essential to that party's case on

"which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23.

## III. DISCUSSION

### A. Defendants' Joint Motion to Strike Declarations (ECF No. 328)

In support of their Response brief, Plaintiffs proffer Declarations of Plaintiffs Marc Ganz, Dawn Roberts, Marty Ward, and Donovan Kerber. ECF No. 319-8 to 319-11. Defendants have filed a Joint Motion to Strike those Declarations, contending that the Declarations attempt to change, and in some instances plainly contradict, those four Plaintiffs' prior sworn deposition testimony, and thus should be stricken under the "sham declaration" rule. ECF No. 328.

#### 1. Standard

Under the "sham declaration" rule, a party cannot proffer a declaration that is contradictory to, or "in tension" with, prior testimony to create a factual issue at the summary judgment stage. *Cox v. Ruckel*, No. 23-5698, 2025 WL 2603787, at *8–9 (6th Cir. Sept. 9, 2025). When presented with such a declaration, courts examine: "(1) whether the affiant was cross-examined during his prior sworn testimony, (2) whether the affidavit is based on newly discovered evidence or information that

the affiant had access to at the time of his prior testimony, and (3) whether the affidavit merely represents an attempt to clarify a point of confusion in the prior testimony." *Id.* st *9 (quoting *Johnson v. Ford Motor Co.*, 13 F.4th 493, 501 n.6 (6th Cir. 2021)). In performing the analysis, the "key question is whether, by filing this declaration, [the party] attempted to create a sham fact issue and frustrate the summary judgment motion." *Id.* The Sixth Circuit cautions, however, that "contradictions in this context are construed 'narrowly,'" because "[a]fter all, deponents are not required to 'volunteer information' or answer questions they've never been asked." *Id.* (citations omitted).

**2. Discussion**

Defendants argue that the Ganz, Roberts, Ward, and Kerber Declarations (1) were provided after each Plaintiff had been cross-examined at deposition, (2) are not based on new evidence, and (3) are not an attempt to clarify a previous point of confusion. ECF No. 328, PageID.44831. Defendants continue that what is "most telling" about the Declarations is that, despite the four Plaintiffs purchasing different vehicles at different times, and in different states, and previously providing different deposition testimony at different times, all four Declarations contain nearly identical language in the second paragraph, with only minor differences between them. *Id.* PageID.44831–32.

Plaintiffs respond that the Declarations at issue are not "in tension" with the Plaintiffs' prior deposition testimony, much less directly

contradictory to it, but instead supplement the prior testimony or set forth information not specifically elicited during the depositions. ECF No. 331. Plaintiffs further point out that Defendants do not challenge the statements in the *third* paragraphs of the four Declarations, and only challenge a single assertion in the second paragraph of each of those Declarations—that Plaintiffs expected their Trucks to have "clean diesel technology" meaning "the truck's emissions would be clean as compared to other trucks with that technology, including older models … with similar capabilities." *Id.* PageID.44392. Plaintiffs argue that the unchallenged assertions in paragraphs 2 and 3 of each Declaration therefore should not be stricken. *Id.* The Court agrees and will limit its review to the specifically-challenged assertions in the second paragraph of each of the four Declarations.

**a. Roberts**

First, as to Roberts, Defendants challenge her assertion in her Declaration that she "expected that the truck's emissions would be clean as compared to other trucks without that technology, including older models and gasoline trucks with similar capabilities." ECF No. 328, PageID.44832–33 (citing ECF No. 319-9). Defendants point out, and they are correct, that Roberts unequivocally testified in her deposition that: (1) she had no expectations as to the amount of NOx that a diesel truck would emit, (2) she never heard the term "clean diesel" before reviewing the Complaint in this case, (3) she didn't purchase the Truck based on a

clean diesel engine, (4) emissions performance was not a priority when she purchased the Truck, (5) she doesn't recall any advertisements or representations regarding the clean diesel system, and (6) she was not comparing the diesel Truck to another gas truck as a potential purchase. ECF No. 315-5, PageID.42484–88.

The Court has carefully reviewed Roberts' deposition, focusing on the context of answers given to questions, the questions, and the opportunity for cross-examination, and finds that the challenged statement in Roberts' Declaration is at odds with and contradicted by her deposition testimony. For this reason it will be **STRICKEN.** However, the remainder of her Declaration is unchallenged and stands.

**b. Ganz**

Defendants next challenge Ganz's statement in his Declaration that he "expected that the truck's emissions would be clean as compared to other trucks without that technology, including older models and other trucks with similar capabilities." ECF No. 328, PageID.44833–34. Defendants assert that Ganz previously testified in his deposition that he believed all competitor trucks were "clean diesel" and that he now is trying to change that to say he expected his Truck's emissions to be cleaner than emissions of competitor trucks. *Id.* Reviewing Ganz's deposition testimony, he testified that he understood from TV ads that the Trucks were said to have less emissions than older model trucks, that advertisements "were very adamant that what the product that they had

was better than the competition because of the motor and transmission and the truck in itself because of the clean emissions and such," and that he was not even considering vehicles with gas engines because they "didn't have the horsepower, the torque or the mileage that diesels did." ECF No. 315-3, PageID.42434–36; ECF No. 319-4, PageID.48306. He further testified that he was comparing the Dodge diesel Truck to Ford and Chevy diesel trucks, that he considered all of them to be "clean diesel," and he admitted that he has not compared the emissions from his 2003 truck to his 2012 Truck, and so does not know if the 2012 Truck is cleaner. *Id.* PageID.42454–56.

Having carefully reviewed Ganz's deposition testimony and compared it to the statements in his Declaration, the Court finds that the new statements are not so contradictory that they should be stricken. *See Head v. Detroit Stoker Co.*, No. 21-cv-12634, 2023 WL 2267155, at *1, n.4 (E.D. Mich. Feb. 28, 2023) (Cleland, J.) ("While they expand upon the deposition testimony, the declarations are not so broad as to imply that the depositions themselves contain significant omissions nor are they contradictory.") (citing *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906–08 (6th Cir. 2006)). The Court therefore declines to strike the challenged statement in Ganz's Declaration.

**c. Ward**

Next, Defendants seek to strike Ward's statement in his Declaration that he "expected that the truck's emissions would be clean

as compared to other trucks without that technology, including older models and other trucks with similar capabilities[.]" ECF No. 328, PageID.44384–35 (citing ECF No. 319-10). Defendants assert that Ward testified that he purchased the Truck "because of the increased towing capacity, the increased torque, about the same comparable fuel mileage according to the salesman as the Dodge I was turning in, it had the compression brake on it and it was a clean emissions truck, I didn't have to use DEF." ECF No. 315-6, PageID.42510–11. He clarified that "clean emissions truck" meant that it "met the EPA guidelines." *Id.*

Plaintiffs fail to point to any deposition testimony where Ward specifically asserted an expectation that the Truck's emissions would be cleaner than other vehicles or where he testified that "cleaner" meant anything other than meeting EPA standards. *See* ECF No. 331, PageID.44936–37. Nevertheless, construing "contradiction" narrowly, *Cox*, 2025 WL 2603787, at *8–9, Ward's cited deposition testimony is not so directly contradictory to the statement in his Declaration that it should be stricken. *See Aerel, S.R.L.*, 448 F.3d at 907 (recognizing that this rule is not intended to "prevent[ ] a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit," which serves to "fill[ ] a gap left open by the moving party" and "provide[ ] the district court with more information, rather than less, at the crucial summary judgment stage.").

Accordingly, the Court will not strike Ward's statement in paragraph 2 of his Declaration. *See Head*, 2023 WL 2267155, at *1, n.4.

**d. Kerber**

Finally, as to Kerber, Defendants seek to strike his statement that he "expected that the truck's emissions would be clean as compared to other trucks without that technology, including older models and gasoline trucks with similar capabilities." ECF No. 328, PageID.44836–37 (citing ECF No. 319-11). Defendants state however that Kerber testified in his deposition that before purchasing his used Truck, he did not read anything about emissions from FCA, he did not research NOx, and that he had no expectations about NOx. ECF No. 315-8, PageID.42549, 42578. Having carefully reviewed Kerber's deposition, the Court finds that Kerber's admission that he did not read anything from FCA regarding emissions and had no expectations regarding the only type of pollutant at issue in this case belies his newly-filed statement in his Declaration that he expected his Truck's emissions to be clean as compared to other vehicles. This does amount to a direct contradiction that should not be permitted. Accordingly, his statement in his Declaration will be **STRICKEN**.

**3. Conclusion**

Accordingly, for the reasons stated above, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' Joint Motion to Strike Declarations. ECF No. 328.

Specifically, the Court will **STRIKE** Roberts' statement in ECF No. 319-9 that "As a result, I expected that the truck's emissions would be clean as compared to other trucks without that technology, including older models and gasoline trucks with similar capabilities" and will **STRIKE** Kerber's statement in ECF No. 319-11 that "I expected that the truck's emissions would be clean as compared to other trucks without that technology, including older models and gasoline trucks with similar capabilities."

The Court will otherwise **DENY** Defendants' motion, and the Declarations of Plaintiffs Ward and Ganz may be considered in full as part of the record.

**B. Preemption**

Plaintiffs' remaining theories of liability—that Defendants misrepresented the Trucks' fuel economy and defrauded consumers because the Trucks emitted NOx at a rate higher than (1) emitted by comparable gasoline trucks, (2) expected by a reasonable consumer, or (3) as advertised by defendants—require factual proof to survive summary judgment at this stage of the litigation. Defendants argue that Plaintiffs' remaining theories fail the Sixth Circuit's preemption test set forth in *Counts* and because the theories all depend on Plaintiffs' putative expert, Juston Smithers', "excessive emissions devices" ("EED") theory, which challenges the EPA's decision to certify the Trucks' engines for sale. Defendants contend that Plaintiffs fail to proffer admissible

evidence that they had unmet expectations—unrelated to EPA standards—that were formed based on some fraudulent action, communication, or material omission by FCA and/or Cummins.

Plaintiffs argue in response that their claims are not precluded under *Fenner*, which they assert is the "controlling Sixth Circuit precedent," and that they have offered evidence of real-world comparisons, consumer expectations, and marketing promises anchoring their state law claims so that they "align with the evidence in *Fenner*" that the court found to be sufficient.

**1. Preemption doctrine**

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States … shall be the supreme Law of the Land," despite any 'Thing in the Constitution or Laws of any State to the Contrary.'" U.S. CONST. art. VI, cl. 2. *See also Fenner*, 113 F.4th at 593; *Ford Motor*, 65 F.4th at 859. "The phrase 'Laws of the United States' encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization." *City of New York v. FCC*, 486 U.S. 57, 63 (1988). "[S]tate laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons v. Ogden*, 22 U.S. 1 (1824)). "In honor of this command, [the courts] will not enforce a state law that either expressly or implicitly conflicts with federal law." *Bledsoe*, 2025

WL 2268065, at *4 (citing *McDaniel v. Upsher-Smith Lab'ys, Inc.*, 893 F.3d 941, 944 (6th Cir. 2018)).

In this case, as the Sixth Circuit made clear in *Bledsoe*, the type of preemption at issue is "conflict preemption"—where state law may be preempted to the extent that it would be "impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.'" *Ford Motor*, 65 F.4th at 859–60 (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)); *see Bledsoe*, 2025 WL 2268065, at *4. "Whether a state-law claim presents such an 'obstacle' depends on the federal statute's text, not on a judge's sense of what the statute's purposes might be." *Counts*, 139 F.4th at 581. A defendant bears the burden of proving preemption. *Id*. (citing *Ford Motor*, 65 F.4th at 859). "[W]hen considering a preemption argument, [the court] appl[ies] a presumption against preemption" and "the existence of federal regulations does not undermine [this] presumption[.]" *Fenner*, 113 F.4th at 594–95.

**2. Plaintiffs' emission-based claims are preempted**

Defendants here bear the burden of proving that Plaintiffs' state law claims are preempted. *See Counts*, 139 F.4th at 581. Defendants argue that all of Plaintiffs' remaining state law claims are preempted because they all expressly depend on an EED theory that cannot pass the Sixth Circuit's preemption test as set forth in *Counts* and reiterated in *Bledsoe*. ECF No. 316, PageID.43015–18. This test states that for a state-

law claim challenging a vehicle's emissions or fuel performance to avoid preemption, "no part of its syllogism can 'implicate or challenge' a determination of the EPA," *and* "the evidence in support of the claim must 'exist[] independently of EPA standards.'" *Counts*, 139 F.4th at 582 (citing *Fenner*, 113 F.4th at 596–97). The *Counts* court made it clear that "[o]nly if *both* of those things are true are the claims not preempted." *Id.* (emphasis added).

**a. The Court must follow *Counts* and *Bledsoe***

Plaintiffs first argue that their claims are not preempted under *Fenner*, which they assert is the "controlling Sixth Circuit precedent" and the "guiding light for this Court." ECF No. 321, PageID.44191–95. Plaintiffs contend that the Sixth Circuit's subsequent published opinion in *Counts* and its unpublished opinion in *Bledsoe* remanding this case applied *Fenner* but did not change its holding and that those opinions, including the preemption test articulated in *Counts*, are merely "commentary" or "dicta" not binding on this Court. *Id.* Plaintiffs specifically refer to the Sixth Circuit's statements in *Counts* that "for a claim based on a particular theory to avoid preemption, no part of its syllogism can 'implicate or challenge' a determination of the EPA" and "the evidence in support of the claim must 'exist[] independently of the EPA standards'" as "commentary … provid[ing] little guidance beyond what is contained in *Fenner* itself." *Id.* PageID.44193 (citing *Counts* 139 F.4th at 582). Plaintiffs contend that the Sixth Circuit's opinion in

*Bledsoe* "stands on the same footing" and is "equally unilluminating." *Id.* PageID.44194–95.

The Court rejects the approach urged by Plaintiffs. First, *Counts* is a published opinion, and under Sixth Circuit rules, published opinions are precedentially binding. 6 Cir. R. 32.1(b) ("Published panel opinions are binding on later panels. A published opinion is overruled only by the court en banc."); *Priorities USA v Nessel*, 860 F. App'x 419, 420–21 (6th Cir. 2021) ("[W]e are bound by our earlier, published order.") (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001) (interpreting 6 Cir. R. 32.1(b)'s forerunner to mean that "published panel opinions are binding on all subsequent panels")). The Sixth Circuit in *Counts* discussed its prior opinion in *Fenner*, recognized that the *Fenner* court concluded on the record before it that "the plaintiffs there could 'prevail without showing that the subject vehicles violate EPA regulations'" and thus their claims were not preempted, but then queried "whether the same things are true [based on the record] in *this* case." *Counts*, 139 F.4th at 581–82 (emphasis added). The Sixth Circuit in *Counts* thus "remand[ed] the case for the district court to decide whether, *on this record*, the plaintiffs' remaining claims can proceed without relying in any way on a disagreement with the EPA's determinations." *Id.* (emphasis added). The *Counts* court affirmatively stated that "for a claim based on a particular theory to avoid preemption, no part of its syllogism can 'implicate or challenge' a determination of the EPA" and

"the evidence in support of the claim must 'exist[] independently of EPA standards.'" *Id.* at 582. The court further affirmatively stated that "[o]nly if *both* of these things are true are the claims not preempted." *Id.* (emphasis added). This Court must follow the Sixth Circuit's published decision in *Counts*.

And similarly, as to the Sixth Circuit's opinion in *Bledsoe* remanding this case and directing this Court to evaluate Plaintiffs' claims by applying *Counts*, that direction is similarly controlling. The mandate rule "requires lower courts to adhere to the commands of a superior court." *United States v. Mendez*, 498 F.3d 423, 426 (6th Cir. 2007) (quoting *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994)). Therefore, "[u]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must 'proceed in accordance with the mandate and the law of the case as established on appeal.' The trial court must 'implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.'" *Moored*, 38 F.3d at 1421 (quoting *United States v. Kikumura*, 947 F.2d 72, 76 (3d Cir. 1991)). Thus, a "lower court 'is bound by the decree [of a higher court] as the law of the case, and must carry it into execution according to the mandate.'" *Medical Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 733 (6th Cir. 2019) (Sutton, J., concurring) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)); *see also United States v. Haynes*, 468 F.3d 422, 426

(6th Cir. 2006) ("Determinations by a Court of Appeals become the law of the case and are binding on both the district court on remand and the Court of Appeals upon subsequent appeal.").

Thus, the Sixth Circuit's order in *Bledsoe* "'remand[ing] the case for [this Court] to decide whether … the plaintiffs' remaining claims can proceed without relying in any way on a disagreement with the EPA's determinations' and standards," applying the preemption test set forth in *Counts*, *see Bledsoe*, 2025 WL 2268065, at *7–8, must and will be followed.

**b. Defendants' arguments**

Defendants argue that Plaintiffs' emissions-based claims challenge the EPA's decision to certify the Trucks' engines for sale and Plaintiffs' state law claims therefore are preempted. ECF No. 316, PageID.43015.

Defendants explain that Cummins developed a 6.7-liter diesel engine that paired with a NOx adsorber catalyst ("NAC") that is used in the Trucks' aftertreatment system. The aftertreatment system also contained a diesel particulate filter ("DPF"). During the course of the Trucks' operation, soot is trapped in the DPF and must be removed. The Trucks primarily remove the soot through a process called "active regeneration," during which the temperature of the exhaust is elevated to 550°C or higher to burn off the accumulated soot. ECF No. 218, PageID.27367; Smither's Class Report, ECF No. 321-2, PageID.44247.

Defendants state active regeneration events occur infrequently and when they do, emit higher amounts of NOx. ECF No. 316, PageID.43015. They assert that because active regeneration events occur infrequently, their emissions impact may not be fully captured during the standard EPA test cycle. *Id.* PageID.43016. As a result, Defendants explain, EPA regulators "require calculating the impact of active regeneration on overall NOx emissions" by adding Upward Adjustment Factors ("UAFs") to account for the increase of NOx emissions during active regeneration events. *Id.* (citing ECF No. 272 at PageID.37735). Cummins shared its UAF calculations with the EPA, who approved Cummins' UAF methodology and its calculations in issuing the certificate of conformity. *Id.* (citing in part Smithers' Merits Report, ECF No. 321-3, PageID.44428).

Plaintiffs' expert, Smithers, opines that the Trucks were equipped with an excessive active regeneration "excessive emissions device" ("EED") which caused the Trucks to undergo active regeneration events more frequently than disclosed to the EPA such that the Trucks' "NOx emissions in real-world operations are significantly higher than the values reported for the Trucks in Defendants' certification applications to the Regulators." ECF No. 316, PageID.43007 (citing Smithers' Report). Smithers also opined that the "excessive active regeneration consumes additional fuel," resulting in decreased fuel economy during regeneration events. *Id*. PageID.43007–08 (citing Smithers Report). Smithers further

opines that Cummins' UAF calculations and the "NOx values Defendants provided for certification are a gross misrepresentation [to EPA regulators] of real NOx emissions during normal and expected vehicle operation." *Id.* (citing ECF No. 272, PageID.37736).

Defendants argue that Plaintiffs' EED theory, on which their excessive emissions claims and fuel economy claims are based, therefore challenges the EPA's decision to certify the Trucks' engine for sale and that Plaintiffs fail to present evidence in support of their claims that stands independently of the EPA standards. *Id.* Defendants assert that this Court previously recognized Plaintiffs' EED theory was preempted "[b]ecause the EPA accepted Defendants' testing information and approved the Pickups" and so "Plaintiffs' claims essentially challenge the EPA's action." *Id.* (citing ECF No. 293, PageID.41866–87).

Defendants also argue that Plaintiffs' claims are preempted because they present no evidence in support of their claims that exist independently of EPA standards. ECF No. 316, PageID.43017–18. Defendants contend that this Court previously found, on this same record, that "Plaintiffs have not identified an emissions benchmark—except the EPA's standards—that a reasonable consumer would be aware of, care about, or expect." ECF No. 316, PageID.43018 (citing ECF No. 293, PageID.41866). Defendants further argue that Plaintiffs' dependence on the existence of EPA standards is evident in the name of their "excessive emissions device" theory itself because Smithers used

EED as shorthand for software controls that cause "excessive" NOx emissions—excessive in the sense that they "exceed" regulatory test limits. *Id.* (citing ECF No. 272, PageID.37734).

**c. Plaintiffs' response**

Plaintiffs contend in response that the claims and evidence they present in this case are identical to the evidence, claims, and theories found not to be preempted in the *Fenner* case. Because these facts are so similar, this Court should find, as in *Fenner*, that Plaintiffs' claims are not preempted. ECF No. 321, PageID.44197. Plaintiffs argue, relying on their post-deposition declarations, that while they "may not have had specific expectations about NOx levels, each of them knew that their Trucks were supposed to contain technology that provided clean emissions compared to older models and other similar trucks." *Id.* PageID.44199. Plaintiffs further argue that they expected, based on Defendants' marketing statements and information provided by FCA-authorized dealers, that the Trucks were represented as having clean emissions technology. *Id.* (citing Ganz and Ward deposition testimony). In addition, Plaintiffs assert their expert, Smithers, evaluated the Trucks' performance as compared to a similar gasoline Ram truck. *Id.* PageID.44199–200.

Plaintiffs argue that their evidence does not require a jury to examine any EPA figures, but instead depends on the Defendants' statements and reasonable consumer expectations. *Id.* PageID.44201.

Plaintiffs contend that, under *Fenner*, mere references to EPA regulations and standards or defeat devices do not automatically bring such claims within the ambit of EPA authority. *Id.* PageID.44201–02. They assert that compliance with EPA standards "is not the only basis for their expectations," and the fact that Smithers' report references EPA standards does not render all of his conclusions inadmissible. *Id.* PageID.44203.

Finally, Plaintiffs contend that their theories of liability do not depend on any fraud on the EPA, and that "[t]he documentation GM [FCA] provided to the EPA thus has no bearing on whether GM [FCA] provided sufficient information to consumers." *Id.* PageID.44203. Plaintiffs argue that their claims, and the evidence supporting them, depend only upon consumer expectations, Defendants' marketing statements, and comparisons with similar vehicles. *Id.* PageID.44206.

**d. Discussion**

For Plaintiffs' claims against FCA and Cummins to avoid preemption under the CAA, (1) no part of the claims' syllogism can "implicate or challenge" a determination of the EPA; *and* (2) the evidence in support of the claims must "exist[] independently of EPA standards." *See Counts*, 139 F.4th at 582. Plaintiffs concede in their Response that "to the extent their claims are based solely on EPA standards and [certificate of conformity] qualification levels, they are preempted." ECF No. 321, PageID.44198 fn.5.

Following remand from the Sixth Circuit, Plaintiffs' remaining claims or theories of liability before this Court are that FCA and Cummins misled and defrauded consumers because the Trucks emitted NOx at a rate higher than (1) emitted by comparable gasoline trucks, (2) expected by a reasonable consumer, or (3) as advertised by Defendants. *See Bledsoe*, 2025 WL 2268065, at *5. The Court must determine whether Plaintiffs have proffered any evidence of these "baselines" or "benchmarks" independent of EPA standards and whether, having identified such benchmarks, they further offer proof that Defendants committed some act that misled or defrauded consumers with reference to those baselines concerning expected NOx emissions.

**i. Comparable gasoline trucks**

Defendants argue that no Plaintiff can present any summary judgment evidence that they were duped by Defendants misrepresenting that the Trucks had lower NOx emissions than a comparable gasoline truck. First, Plaintiffs Ganz and Ward affirmatively testified that they do not allege any misrepresentations related to gasoline trucks. ECF No. 315-3, PageID.42435; ECF No. 325-6, PageID.42508. And while Plaintiffs Roberts and Kerber proffered statements in their Declarations that they believed their Trucks' emissions would be clean compared to gasoline models, as stated above, those statements have been stricken as contradictory to their depositions. Plaintiffs otherwise fail to identify any

statement by FCA or Cummins that could have led Roberts or Kerber to develop such a belief.

And as Defendants argued at the hearing, while Plaintiffs' expert, Smithers, did refer to a single gasoline 2012 Ram 2500 in his Report, he did not contend in his Report that the emissions from a gasoline vehicle are comparable to those of a diesel vehicle. Instead he tested a 2500 Class gasoline Ram truck "[f]or comparison to mature emissions technology"—to show that "a vehicle with a mature emissions aftertreatment system is capable of meeting emissions standards in the real-world." ECF No. 321-2, PageID.44250, 44266, 44332–34; ECF No. 321-3, PageID.44419. Accordingly, Smithers' Reports fails to support Plaintiffs' claims that Defendants misrepresented that Plaintiffs' Trucks had lower NOx emissions than a comparable gasoline truck.

Finally, Defendants assert that, in any event, a gasoline vehicle is an "apples-to-oranges" comparison to diesel Trucks and therefore fails to establish a genuine issue of material fact. ECF No. 329, PageID.44900. This is because it is uncontested that diesel trucks emit higher amounts of NOx and use more fuel than their gasoline counterparts and thus a gasoline truck is not a valid comparable in this case. As the district court explained in *Counts*:

> [T]he comparison between gasoline and diesel vehicles is inapt. Gasoline and diesel engines operate differently and, therefore, produce different emissions. As explained by the EPA, "In comparison to gasoline, diesel: Is denser and harder

> to ignite[;] Contains more energy per gallon of fuel than gasoline (generally resulting in higher fuel economy)[;] [and] Contains more carbon per gallon (generally resulting in more CO2 emissions per gallon)." Therefore, traditional diesel engines inherently output more emissions than gasoline engines.

*Counts v. Gen. Motors, LLC*, No. 1:16-cv-12541, 2021 WL 8014317, at *15 (E.D. Mich. Sept. 1, 2021) (Ludington, J.) (citation modified); *see also Counts*, 139 F.4th at 580 (acknowledging that "[t]he district court held that claims based on their first theory—that a reasonable consumer would expect that the diesel Cruzes would have lower emissions than their gasoline counterparts—were too implausible to proceed," and that the plaintiffs have not challenged that determination).

Accordingly, the Court finds that Plaintiffs fail to present evidence sufficient to create an issue of material fact as to their claims against Defendants based on fraudulent statements or omissions that that the Trucks had lower NOx emissions than a comparable gasoline truck. Defendants are entitled to summary judgment on that claim; it will therefore be **DISMISSED**.

**ii. Reasonable consumer expectations**

Plaintiffs contend that they have presented sufficient evidence to raise a question of fact that the Trucks' emissions exceed those of comparable vehicles—with the "relevant benchmark" being "what consumers expected." ECF No. 321, PageID.44207–08. Plaintiffs assert that the law does not require them to be emissions experts and does not

require them to articulate specific NOx levels. *Id.* PageID.44209. Plaintiffs state that in *Fenner*, the court concluded that "the cited evidence of comparator vehicles, consumer expectations, and marketing claims created a 'plausible alternative emissions benchmark [that] do not depend on federal emissions standards." *Id.* PageID.44199 (citing *Fenner*, 113 F.4th at 598). Plaintiffs contend that "[t]he evidence in this case is equally, if not more, compelling than in *Fenner*." *Id.*

Defendants assert that Plaintiffs have produced no evidence of comparable vehicles, relying instead solely on Smithers' analysis in his report of a single gasoline 2012 Ram 2500 as a comparator. Defendants point out that Smithers did not test any non-Ram truck, so he cannot compare the Ram Trucks' emissions to those of any competitors' trucks. ECF No. 330, PageID.44915–16 (citing ECF No. 321, PageID.44199–200); ECF No. 321-2, PageID.44250. Defendants further contend, as they did at oral argument, that Plaintiffs themselves have adduced no record evidence in support of their "reasonable consumer" claim. Defendants point out that even in the Declarations proffered by Plaintiffs Roberts, Ward, Ganz, and Kerber, their statements only broadly refer to "other trucks," without identifying what trucks they are talking about, without producing any evidence concerning such unidentified "other trucks," or offering proof as to whether the emissions of those "other trucks" were in fact higher or lower compared to the emissions of the Ram Trucks. Defendants argue that Plaintiffs' statements are conclusory, lack

specificity, and are unsupported by any evidence. Defendants maintain that, unlike in *Fenner*, here Plaintiffs have failed to offer "concrete, competent evidence of consumer expectation," such as any consumer survey, market research, expert testimony, or other evidence establishing what a "reasonable" consumer expected from the emissions or fuel economy performance of their Trucks. ECF No. 316, PageID.42020.

The Court finds, on this record, that Plaintiffs have failed to proffer "concrete, competence evidence of consumer expectations" about the performance of the Trucks' emissions systems that existed independently of EPA standards. *See Bledsoe*, 2025 WL 2268065, at *5. As the Ninth Circuit has explained, the reasonable consumer expectation standard requires "more than a mere possibility that the label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023) (citation modified).

Plaintiffs have not produced, for example, any kind of consumer survey or market research or expert testimony establishing what a "reasonable" consumer expected from the emissions or fuel economy of their Trucks. Plaintiffs instead point only to their deposition testimony

and declarations in support of this claim. However, those depositions and Declarations, even taken collectively, fail to create a triable issue of fact as to a "reasonable consumer's expectation" as a matter of law. *See Bustamante v. KIND, LLC*, 100 F.4th 419, 433–34 (2d Cir. 2024) (finding that the plaintiffs' deposition testimony "even taken collectively, does not establish an objective definition of" a reasonable consumer's expectations, but instead "establishe[d] how divergent consumers' expectations can be"); *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 936–37 (7th Cir. 2021) (plaintiff failed to offer "consumer surveys or market research" of consumer expectations and his reliance on his own deposition testimony to prove how a "reasonable consumer" would interpret a food label was insufficient); *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1181 (4th Cir. 1997) ("[Plaintiff's] subjective expectations are insufficient to establish what degree of protection or deterrence society expects from a safe."); *see also Newell Rubbermaid, Inc. v. The Raymond Corp.*, 676 F.3d 521, 533 (6th Cir. 2012) (stating in a design-defect case that "[a]n affidavit from the injured worker alone would not be sufficient to establish" the expectations of reasonable consumers about a product) (citing *Jordan v. Paccar, Inc.*, 37 F.3d 1181, 1184 (6th Cir. 1994) "for the principle that plaintiffs cannot support their consumer-expectations claim with only the victim's or the jury's personal expectations").

Moreover, Plaintiffs testified repeatedly in their depositions that they understood the term "clean diesel," to the extent that they even heard that term before purchasing their Trucks or had any expectations about it, to mean that the Trucks would comply with federal or EPA emission standards, had less emissions, or met standards without DEF. *See* Bledsoe Dep., ECF No. 316-2, PageID.43067–38, 43082; Roberts Dep., ECF No. 316-3, PageID.43149–50, 43151–52; Ganz Dep., ECF No. 316-4, PageID.43230–31, 43282–83; Forshaw Dep., ECF No. 316-5, PageID.43490, 43494; Ward Dep. ECF No. 316-6, PageID.43628, 43646, 43664; Kerber Dep., ECF No. 315-8, PageID.42577–78. As in *Bustamante*, this deposition testimony "establishes how divergent consumers' expectations can be." *Bustamante*, 100 F.4th at 433. In addition, such claims expressly based on EPA standards are preempted.

The question here is not whether Plaintiffs' allegations are plausible—the Sixth Circuit has found that they are—but instead whether Plaintiffs have provided sufficient evidence from which a jury could find that a reasonable consumer would be materially misled by Defendants' alleged representations or omissions regarding "clean diesel." "Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (citation modified). Here, Plaintiffs have failed to offer evidence that would allow a jury to

determine what reasonable consumer expectations were in connection with NOx emissions of diesel trucks.

### iii. Marketing

Plaintiffs contend that they have "provided evidence of Cummins' and FCA's joint marketing touting the trucks as having "clean diesel," "ultra clean emissions," the "cleanest diesel engines" that "virtually eliminate particulate matter emissions," and as "environmentally responsible." ECF No. 321, PageID.44196, 44199 (citing *id.* PageID.44190 (citing Exs. 11–16 to Plaintiffs' Response)). However, as Cummins states in its reply brief, Plaintiffs present no evidence of "joint marketing" by FCA and Cummins and instead rely in their Response *only* on "confidential" "[i]nternal [draft] FCA document[s]" and alleged FCA advertisements and statements by dealership personnel. In addition, the Plaintiffs failed to identify any advertisements or other marketing by Cummins that they saw or relied on in purchasing the Trucks. *See* Bledsoe Dep., ECF No. 316-2, PageID.43067–68; Roberts Dep., ECF No. 316-3, PageID.43160, 43174; Ganz Dep., ECF No. 316-4, PageID.43317; Ward Dep. ECF No. 316-6, PageID.43649; Forshaw Dep., ECF No. 316-5, PageID.43528. The Court agrees that the record does not contain, and Plaintiffs have failed to identify, any such representations by Cummins.

Plaintiffs similarly fail to present summary judgment evidence that Trucks emitted levels of NOx many times higher than what FCA advertised. As the Court found previously, and as counsel for FCA argued

at the hearing, all fraud-based claims against FCA are barred and must be dismissed that arise out of vehicles manufactured and sold prior to June 10, 2009, when FCA came into existence. ECF No. 215, PageID.25575. Plaintiffs rely on Exhibits 11–16 attached to their Response in support of their claim of "advertising and representations." ECF No. 321, PageID.44190, 44199. However, as FCA demonstrates in its reply brief, four of those exhibits—11, 12, 14, and 15—predate FCA's existence and thus cannot support a claim against FCA. ECF No. 329, PageID.44898. And there is no evidence that the information in Exhibits 13 and 16 was available to the consumer as opposed to internal FCA documents, and they thus cannot support Plaintiffs' claim.

Looking at the Plaintiffs' deposition testimony, neither Roberts nor Kerber could identify any statements or advertisements from FCA. ECF No. 315, PageID.42391, 42394; ECF No. 321, PageID.44179, 44182. Ganz testified he did not recall seeing any advertisements about "clean diesel" specific to the Trucks prior to purchase, ECF No. 315, PageID.42389, and while he saw advertisements highlighting "clean emissions," he believed that meant only that the EPA had determined the Truck did not produce too many emissions. ECF No. 315, PageID.42390; ECF No. 321, PageID.44177; ECF No. 316, PageID.43023. Finally, Ward saw advertisements touting the Truck as meeting the "new green emission standards" or representations that the Truck "exceeded" the EPA standards. ECF No. 42392; ECF No. 321, PageID.44181. Thus, Plaintiffs'

deposition testimony does not support their claim. And as the Court previously found, the advertisements Plaintiffs refer to in their TCAC, but not in their Response here, "rely solely on EPA's certification of the Pickups as meeting 2010 standards." ECF No. 293, PageID.41852–53 (quoting excerpts of the advertisements).

Plaintiffs otherwise have failed to show that FCA's advertisements established any non-EPA standard that Plaintiffs have shown to be unmet. Accordingly, this claim fails. Because Plaintiffs have failed to produce evidence of a benchmark for comparison of their Trucks independent of the EPA, their emissions-based claims will be **DISMISSED**.

### 3. Plaintiffs' fuel economy claims are preempted

#### a. Defendants' arguments

Defendants argue that Plaintiffs' fuel economy-based theories are preempted for the same reasons their "EED theory" is. ECF No. 316, PageID.43018. This is because Plaintiffs assert that the same "active regeneration EED" that allegedly causes their Trucks to emit more NOx than expected also caused their Trucks to use fuel less efficiently. *Id.* PageID.43018–19 (citing Smithers' report and Plaintiffs' deposition testimony). Defendants argue therefore that Plaintiffs' fuel economy claims depend on their argument that the EPA erred in certifying the Trucks' engines (based on the allegedly "grossly misrepresented" UAF

values) and that the EPA's certification was procured through fraud. *Id.* PageID.42020.

**b. Plaintiffs' arguments**

Plaintiffs argue that the Sixth Circuit in *Bledsoe* held that Plaintiffs' fuel economy-based claims are not preempted. ECF No. 321, PageID.44208 (citing *Bledsoe*, 2025 WL 2268065, at *6). Plaintiffs argue that because the EPA does not regulate the Trucks' fuel economy, such fuel economy-based claims are explicitly exempt, and that "there is no reason to conclude that because a particular feature of the Truck [the alleged "defeat device"] caused it to have lower-than-expected fuel economy (from a consumer's perspective), the EPA's approval of the truck was in error." *Id.*

**c. Discussion**

The Sixth Circuit in *Bledsoe* did find, "at least based on the pleadings," that "[b]ecause plaintiffs' theory here is premised on what FCA marketed to consumers and not on disclosures it made to the EPA, [the fuel economy claim] is not preempted." *Bledsoe*, 2025 WL 2268065. However, the court went on to recognize, whether preemption of Plaintiffs' fuel economy-based claims is warranted "as a factual matter" at summary judgment depends on whether "the claims can be proven without reliance on the alleged existence of a defeat device" which "is a matter for [this Court] to determine on remand." *Id.* at *7. The Sixth Circuit in *Bledsoe* therefore deferred to this Court to make the

determination, based on record evidence at the summary judgment stage, as to whether Plaintiffs' fuel economy-based claims are preempted.

The problem with Plaintiffs' fuel-economy evidence is that it is intertwined with the EPA disclosures for the Trucks. It therefore implicates the EPA's oversight process and Plaintiff's fuel-economy claims are therefore preempted. Plaintiffs admit that Smithers opines that "excessive active regeneration consumes additional fuel," which results "in decreased fuel economy during regeneration events." ECF 321, PageID.44173. While it is true that the EPA does not regulate the Trucks' fuel economy, Plaintiffs do contend that "a particular feature of the Truck [the excessive active regeneration theory] caused it to have lower-than-expected fuel economy (from a consumer's perspective)." *See* ECF No. 321, PageID.44208. Smithers states in his Report that "[i]n both City and Highway driving conditions, there is considerable loss in fuel economy due to excessive active regeneration frequency" and "[t]his fuel economy impact is not implied by the certification UAF values [supplied by Defendants to the EPA, and accepted by the EPA] and is not incorporated into any fuel economy testing." *Id.* PageID.44280. He concludes therefore that "these [fuel economy] losses would not be expected by the consumer and serve to increase the amount of fuel necessary to operate the Vehicles." *Id.* This conclusion is premised on an alleged defeat device not implied during certification and thus preempted.

Further, Plaintiffs testified that they understand that their Trucks' fuel economy is low because of the "alleged defeat device" in their Trucks. *See* ECF No. 316, PageID.43019 (citing Bledsoe Dep. 72:7-18 (explaining his "understanding is" that he is "not getting the fuel mileage [he] wanted" because of the "alleged defeat device" in his Truck); Roberts Dep. 30:17-31:5 ("it appears that emissions was cheated on and, therefore, us consumers that owned those vehicles within those years were cheated out of the gas milage [sic] that I was expected to have when we purchased the vehicle, clean air"); Ganz Dep. 70:20-71:5 ("if you're getting more miles [per gallon], you're getting less emissions"); Forshaw Dep. 223:3-12, 223:24-224:12 (testifying the alleged defeat device "increased fuel consumption" by "burning additional diesel fuel that's not used for locomotion"); Ward 113:17-114:5 (testifying that the alleged defeat code had "definitely" affected his Truck's fuel economy, because the engine system was "dumping extra fuel in there" so that "it could come close to meeting clean emissions standards")).

Defendants assert that this is "a repackaged attack on Cummins' disclosures to the EPA regarding the Trucks' active regeneration frequency and UAF calculations and turns on a finding that Cummins defrauded the EPA," which claim is preempted. ECF No. 330, PageID.44919. Indeed, as Defendants point out, Plaintiffs fail to offer any explanation for the Trucks' fuel economy performance other than the alleged active regeneration EED.

Plaintiffs therefore fail to offer any "concrete, competent evidence of consumer expectations [regarding the Trucks' fuel economy] that existed independently of EPA standards." *See Bledsoe*, 2025 WL 2268065, at *5. These claims therefore are preempted and will be **DISMISSED**.

**C. Defendants' State-Specific Arguments**

The Sixth Circuit remanded this case for this Court "to decide … whether the plaintiffs' remaining claims can proceed without relying in any way on a disagreement with the EPA's determinations' and standards." *Bledsoe*, 2025 WL 2268065, at *7. "Said differently, 'are [plaintiffs' remaining claims] preempted under the analysis described above[?]'" *Id.* Consistent with that directive from the Sixth Circuit, this Court reminded the parties at an October 14, 2025 status conference that motions for summary judgment have already been decided and would not be relitigated, and that the remaining issue was limited to whether the Plaintiffs' claims were preempted under the analysis set forth in *Fenner* and *Counts*. This is consistent with the Sixth Circuit's remand in *Counts* where it stated that it "do[es] not remand [the case] for the parties to litigate anew," but instead "remand[ed] the case for the limited purpose of determining whether the plaintiffs' remaining claims … are preempted under the analysis described above." *Counts*, 139 F.4th at 583.

Consequently, the Court will not consider Defendants' state-specific merits-based arguments raised in their motions (many of which were already raised in Defendants' first motions for summary judgment) that

have no relation to the preemption issue decided on appeal. *See* ECF No. 315, PageID.42398–411; ECF No. 316, PageID.43020–27.

## IV. CONCLUSION

For the reasons stated above, Defendants' Joint Motion to Strike Summary Judgment Declarations, ECF No. 328, is **GRANTED IN PART** and **DENIED IN PART**, Defendant FCA's Renewed Motion for Summary Judgment, ECF No. 315, is **GRANTED**, Defendant Cummins' Renewed Motion for Summary Judgment, ECF No. 316, is **GRANTED,** and Plaintiffs' remaining claims are **DISMISSED WITH PREJUDICE**

This is a final order that closes the case.

**IT IS SO ORDERED.**

Dated: September 9, 2026 /s/Terrence G. Berg
HON. TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE